Exhibit 9

Declaration of Richard Carlson

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| GLBT YOUTH IN IOWA SCHOOLS TASK FORCE d/b/a/ IOWA SAFE SCHOOLS; P.B.-P., by his parent and next friend, BELINDA SCARROTT; P.C. and A.C., by their parents and next friends, RICHARD and ULRIKE CARLSON; T.S., by her parent and next friend, ERIC SAYLOR; B.F.S., by their parents and next friends, BRIGIT and JOSEPH STEVENS; ROBERT SMITH, by his parents and next friends JANE and JOHN SMITH; B.F., by their parent and next friend, LARA NEWSOM; JAMES DOE, by his parent and next friend, JOHN DOE, *Plaintiffs,* v. KIM REYNOLDS, in her official capacity as Governor of the State of Iowa; MCKENZIE SNOW, in her official capacity as Director of the Department of Education; IOWA DEPARTMENT OF EDUCATION; IOWA STATE BOARD OF EDUCATION; IOWA CITY COMMUNITY SCHOOL DISTRICT; MATT DEGNER, in his official capacity as Iowa City Community School District Superintendent; MOLLY ABRAHAM, J.P. CLAUSSEN, CHARLIE EASTHAM, JAYNE FINCH, RUTHINA MALONE, MAKA PILCHER HAYEK, and LISA WILLIAMS, in their official capacities as board members of the Iowa City Community School District; SIOUX CITY COMMUNITY SCHOOL DISTRICT; ROD EARLEYWINE, in his official capacity as Sioux City Community School District Superintendent; DAN GREENWELL, JAN GEORGE, TAYLOR GOODVIN, BOB MICHAELSON, MONIQUE E. SCARLETT, PHILIP HAMMAN, and BERNIE SCOLARO, in their official capacities as board members of the Sioux City Community School District; URBANDALE COMMUNITY SCHOOL DISTRICT; ROSALIE DACA, in her official capacity as Urbandale Community School District Superintendent; KATHERINE HOWSARE, BRIANNA SAYRE GEISER, ASHLEY ANDERSON, DANIEL GUTMANN, RACHEL KENT, JENNY MEADE, JASON MENKE, JULIE MITCHELL, and STEVE RICHMAN, in their official capacities as board | Case No.   4:23-cv-474<br><br>**DECLARATION OF RICHARD CARLSON** |

1

| | |
|---|---|
| members of the Urbandale Community School District; WATERLOO COMMUNITY SCHOOL DISTRICT; JARED SMITH, in his official capacity as Waterloo Community School District Superintendent; SUE FLYNN, JESSE KNIGHT, ASTOR WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, PAM ARNDORFER, and JEFF SOMMERFELDT, in their official capacities as board members of the Waterloo Community School District; WEST DES MOINES COMMUNITY SCHOOLS; MATT ADAMS, in his official capacity as West Des Moines Community Schools Superintendent; JEFF HICKS, LILA P. MONTOYA STARR, LIZ COX, LONNIE DAFNEY, FANNETTE ELLIOTT, JILL CATON JOHNSON, and ANADELIA MORGAN, in their official capacities as board members of the West Des Moines Community Schools District, <br><br> *Defendants.* | |

COMES NOW, Richard Carlson and pursuant to 28 U.S.C §1746, declares under penalty of perjury that the following is true and correct:

1. My name is Richard Carlson. I am over 18 years old. I have personal knowledge of the facts as stated herein.

2. My wife, Ulrike Carlson, and I are the legal parents and next friends of our minor children, A.C. and P.C., ages 9 and 17, respectively, who are plaintiffs in this action.

3. I am a resident of Iowa City in Johnson County, Iowa, along with my wife and our children. I have lived in Iowa for 26 years, and my wife has lived here for 21 years. Both of our children were born here.

4. A.C. is a girl in the 4th grade at Twain Elementary School in Iowa City. P.C. is a non-binary student in the 12th grade at Iowa City High School.

5. A.C. is transgender. She is binary rather than non-binary, identifying as a girl. A.C. was assigned male at birth, but she has been identifying as a girl since she was old enough to

articulate how she felt, around the time of her third birthday. She had been interested in colors coded as female—pink and purple—for her wardrobe long before she turned three, and two months before her third birthday she chose a Minnie Mouse costume as the one she wanted to wear that year for Halloween. But it was only around the time of A.C.'s third birthday that Ulrike and I began questioning her directly about her gender identity. The exchange I remember most clearly from that time, because it was initially mystifying to Ulrike and myself, is A.C.'s expressing herself adamantly (in German, one of her two native languages) after we'd attempted to dress her in traditionally boys' clothes: "Ich will aber ein Kind sein!" ("But I want to be a child!"). Our reassurances that she was a child did not make her any less agitated. After we questioned her further, it became clear that she thought that "Kind" ("child") was the opposite of "Junge" ("boy"), and that she was trying to convey that she wanted to be—and to be dressed as—a girl. She soon came to identify explicitly and exclusively as a girl.

6.     By the time she was four, A.C. wanted people (other than her parents) to address her exclusively with she/her pronouns. She was more lenient with her parents, allowing us to continue to refer to her with he/him pronouns, although by this time she would reject pretty much any item of boy's clothing we bought for her. It was also around this time, perhaps around the age of four, that she began insisting on using the women's rest room rather than the men's rest room in public places. Ulrike and I continued to question her over the next year or so, thinking her identification as female may have been just a phase. Indeed, we sometimes hoped that it was just a phase, since we knew how difficult our society can make it for trans people. But A.C. was consistent. To her family, her friends, and her preschool day care, she presented herself as a girl. Eventually we stopped buying her boys' clothing completely, and began using she/her pronouns exclusively.

7. By the time A.C. entered kindergarten at age five, she had been identifying as a girl consistently for at least a year, probably closer to two. She wore skirts and dresses, she used girls' or women's rest rooms, and she wanted to be known as a girl and to be called by she/her pronouns. A.C. does well in school and is well liked by her peers. She enjoys video games, manga, and anime, and is fascinated by large numbers, like Graham's Number and Tree(3). A.C. is confident in who she is and we support her completely in being true to her identity.

8. P.C. is transgender. They are non-binary rather than binary, identifying as neither male nor female. P.C. was assigned female at birth. P.C. uses all pronouns (he/she/they). For the sake of consistency, P.C. will be referred to here by they/them pronouns. P.C. had a less linear path to their gender identity than A.C. did. In their elementary school years, they tended to dress in traditionally female clothing, although they also liked to dress up in suits and ties. In P.C.'s early teen years, they seemed to adopt a new sexual orientation or gender identity every few months. As confusing, and sometimes frustrating, as this was for their parents, in retrospect it is clear that P.C. was trying to understand what they were feeling: what it means to be non-binary and transgender, and what labels most closely approximated what they understood their gender identity to be. During this period of searching, P.C. asked me questions that I found hard to answer, like "Why do you identify as a man? How do you know you're a man?" Around eighth grade, P.C. stopped using their birth name, which they associated with a younger version of themselves that they no longer felt accurately represented who they were, and adopted the name P.C., named after a character in Shakespeare's *A Midsummer Night's Dream*. Eventually P.C. came to better understand their own gender identity and they have identified consistently as non-binary for two or three years now.

9. P.C. enjoys reading, creating art (digital and otherwise), listening to and playing music, and most of their school subjects, especially literature, science, math, and art. P.C. is outstanding academically, is well liked by their peers, and is a warm, caring, and empathetic person. P.C. is confident in who they are and we support them completely in being true to their identity.

10. After passage of SF 496, A.C.'s school removed all LGBTQ+ flags, posters, and similar items from classrooms and other spaces. Even the use of rainbows as decorations is now discouraged, whether or not the rainbow design is associated directly with a LGBTQ+ message. No LGBTQ+ flags, signs, or other messages of support can be seen now in the classrooms, library, hallways, or other locations in the school. This sends the message to the school's LGBTQ+ students—and to its faculty and staff, for that matter—that they are invisible at best, and unwelcome at worst. This most obviously harms LGBTQ+ children, who are made to feel as though they don't exist, or shouldn't exist, but it also harms other children, who are kept in ignorance that LGBTQ+ kids exist. If one of the goals of school is to prepare children to live in a pluralistic society, then SF 496 works directly against that goal.

11. Before the passage of SF 496, A.C.'s school had a GSA (Genders & Sexualities Alliance), the aim of which was to build community among the LGBTQ+ students at the school. Community-building is important for members of marginalized groups, including LGBTQ+ children, who may feel—or be made to feel—isolated, and who are often targets of bullying. A.C., then a third grader, attended meetings of her school's GSA last year. This year, A.C.'s school district prohibited GSAs at the K-6 level. A.C. and other LGBTQ+ students at her school have therefore not been able to attend a meeting of the GSA this year.

12.     SF 496 is vaguely worded, so it's not clear what constitutes prohibited instruction related to sexual orientation and gender identity. Because of the vague wording and lack of guidance from the state in how to interpret the law, the teachers and administrators at A.C.'s school are struggling to balance following the law with meeting the needs of their LGBTQ+ students, including their basic human need of having their existence acknowledged. Because the school district interprets the law as prohibiting LGBTQ+ messages—or even just rainbows—in K-6 schools, it is clear that the school district administrators believe they cannot acknowledge or support A.C.'s gender identity as a fourth-grade transgender girl in any meaningful way without running afoul of the law. I'm fearful that without official or unofficial classroom instruction about gender identity at the K-6 level, or even acknowledgement that gender identity and transgender students exist, A.C.'s gender identity will not be understood as normal and acceptable by her teachers and peers, and may lead to bullying in the future. A.C. has already heard the occasional anti-trans comment from a classmate, although most of her classmates accept who she is without question. Will the law embolden other children to bully A.C. for expressing who she is? Will her teachers face retaliation from the school district or the state if those teachers support A.C. in her gender identity? I'm very worried that SF 496, both as written and as it's being interpreted in my school district, will harm my child in multiple ways.

13.     In addition to my concern that A.C. will not be able to safely express her gender identity or have it acknowledged in the classroom, I'm concerned that books that speak directly to A.C.'s identity have been or will be removed from her school library. I want A.C. to be able to read books about trans kids—about people like her—books that seem certain to be removed from K-6 school libraries as a result of SF 496. One important age-appropriate example is *Melissa* by Alex Gino, a novel for young people centered on a transgender fourth grader. This book had a

great impact on P.C. while they were trying to understand their gender identity. Access to age-appropriate books and other materials focused on LGBTQ+ characters is critical—life-changing, and possibly even life-saving—for LGBTQ+ young people, including those in grades K-6. The law doesn't only ban works of fiction from school libraries. A.C. tells me that a non-fiction book about adolescence, including a chapter discussing changes to the body during puberty, has already been removed from her school library, presumably because it contains content about sexuality. This deprives A.C. and others in her school of factual information about puberty that they may not encounter in the school curriculum until years after they experience the onset of puberty. I am deeply concerned that, as a result of SF 496 and the school district's implementation of this law, age-appropriate books dealing with sexual orientation and gender identity, including books that allow A.C. to see her own experiences and identity reflected, will not be available for her in the school library.

14.     SF 496 sends a clear message to A.C. that something is wrong with her. It tells her that she needs to hide her gender identity, to accept that her school and her teachers cannot acknowledge or support her gender identity, and to accept that she cannot read or learn about transgender kids like herself in school. If she simply expresses who she is, the consequences for herself, her teachers, and her school could be substantial. Although the law as written prohibits instruction in sexual orientation and gender identity at the K-6 level, without singling out instruction in LGBTQ+ issues specifically, A.C.'s school district is not interpreting the law to force other children to accept the same constraints on their gender identity and self-expression that are imposed on LGBTQ+ children. Non-LGBTQ+ children are still allowed to read books in school about people who share their gender identities, and to see posters at the school that validate their gender identities. I do not want A.C. to internalize the negative message that this law sends, that

7

she is not only different from her classmates, but inferior to them, and subject to constraints on her self-expression that do not apply to her classmates.

15. A.C.'s experience at school this year is different from previous years as a result of SF 496 and other recently enacted laws targeting transgender youth. A.C. can't understand why laws that target her and other children like her were passed. She feels that she has less freedom to express who she is at school, and she fears that being honest and open about her identity will get her, or any teachers or staff who might show support for her, into trouble. The environment at school now makes her feel singled out, anxious, and upset. She doesn't know which adults she can trust at school; many teachers and staff might be supportive of her gender identity in private, but they feel the law forces them to offer A.C. little or no support at school, where it's needed. Since the anti-trans bills were passed, A.C. has complained repeatedly about school, and done a lot of foot-dragging in the morning to keep herself away from school for as long as possible. The anti-trans laws make A.C. feel less safe and less supported in school.

16. In a way, P.C. has been affected less than A.C. by SF 496 since fewer prohibitions apply to grades 7-12 than to grades K-6. Nonetheless, the school district has removed many books from high school and junior high school libraries based on sexual content, so P.C. no longer has access at their high school library to a long list of books, including classic works of literature and LGBTQ+ books that contain characters that P.C. might relate to. Having access to these books was critical in P.C.'s journey to understand their own gender identity. These books describe a world where people like P.C. exist and their gender identity is validated. P.C. is very worried that their little sister, A.C., will be denied access to those same books and their important and affirming messages. More broadly, P.C. shares our concern that SF 496 and Iowa's other recent anti-trans

laws are creating a hostile school environment for A.C. that will continue to cause her anxiety and mental anguish as long as they continue to be enforced.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated this <u>24th</u> day of November, 2023, at Iowa City, Iowa.

                                      Respectfully Submitted,

                                      */s/ Richard Carlson*

                                      Richard Carlson