UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, *et al.*,<br><br>     Defendants. | Case No. 4:23-cv-474-SHL-SBJ<br><br><br>**MOTION FOR LEAVE TO FILE OVERLENGTH BRIEF (UNRESISTED)** |

Defendants Kim Reynolds, in her official capacity as Governor of the State of Iowa, McKenzie Snow, in her official capacity as Director of the Department of Education, Iowa Department of Education and the Iowa State Board of Education ("State Defendants"), pursuant to Local Rule 7(h), hereby request leave to allow the State Defendants to file an overlength Brief Resisting Plaintiffs Motion for a Preliminary Injunction. In support thereof, State Defendants state as follows:

1.     The State Defendants seek leave to file its Brief Resisting Plaintiffs Motion for a Preliminary Injunction of 21 pages.

2.     The issues addressed by the State Defendants' Brief Resisting Plaintiffs Motion for a Preliminary Injunction are of substantial public importance and require thorough analysis.

3.     The State Defendants' request for 1 additional page is a minor deviation from the local rules.

4.     A copy of the Brief Resisting Plaintiffs Motion for a Preliminary Injunction is attached to this motion.

5.     Counsel for State Defendants contacted counsel for Plaintiffs, and they do not resist the filing of an overlength brief by the State Defendants.

6.     For these reasons, good cause exists for the proposed overlength Brief Resisting Plaintiffs Motion for a Preliminary Injunction.

WHEREFORE, State Defendants pray this Court grant their motion for leave to file an overlength brief resisting Plaintiffs Motion for a Preliminary Injunction up to and including 21 pages.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Eric Wessan*
Eric Wessan
Solicitor General

/s/ *Daniel Johnston*
Daniel Johnston
Assistant Attorney General

/s/ *Alexa Den Herder*
Alexa Den Herder
Assistant Solicitor General

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
daniel.johnston@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on December 19, 2023:

☐ U.S. Mail              ☐ FAX
☐ Hand Delivery          ☐ Overnight Courier
☐ Federal Express        ☐ Other
☒ CM/ECF

Signature: _/s/_ ___Daniel Johnston___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, *et al.*,<br>    Plaintiffs, | Case No. 4:23-cv-474-SHL-SBJ |
| v. | |
| KIM REYNOLDS, in her official<br>capacity as Governor of the State of<br>Iowa, *et al.*,<br>    Defendants. | RESISTANCE TO PLAINTIFFS'<br>MOTION FOR PRELIMINARY<br>INJUNCTION |

## TABLE OF CONTENTS

Introduction ....................................................................................................6

Background......................................................................................................6

  I.  SF496 and its contents. .........................................................................6

  II. SF496's effective date and this belated suit. ...........................................8

Legal Standard ................................................................................................9

Argument .......................................................................................................10

  I.  Plaintiffs' claims are not likely to succeed............................................10

    A.  Plaintiffs' First Amendment claims fail. ............................................10

    B.  Plaintiffs' equal protection claim fails...............................................20

    C.  Plaintiff's equal access claim fails. ....................................................22

  II. The other factors do not support a preliminary injunction. .................23

    A.  Plaintiffs face no irreparable harm. ..................................................23

    B.  The equities balance against an injunction, which would not be in the public interest..........................................................................................24

Conclusion.....................................................................................................26

## TABLE OF AUTHORITIES

Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009)........................................................................18
*Ark. Educ. Television Commn. v. Forbes*,
  523 U.S. 666 (1998).............................................................................14, 17
*Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trs.*,
  37 F.4th 1386 (8th Cir. 2022) ........................................................................24
*Bailiff v. Adams Cnty. Conf. Bd.*,
  54 F. Supp. 2d 923 (S.D. Iowa 1999) ............................................................21
*Bannon v. Sch. Dist. of Palm Beach Cnty*,
  387 F.3d 1208 (11th Cir. 2004).......................................................................15
*Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982)..............................................................................17, 18
*Board of Regents of Univ. of Wis. System v. Southworth*,
  529 U.S. 217 (2000)......................................................................................14
*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)......................................................................................19
*Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*,
  459 U.S. 87 (1982)........................................................................................19
*CAMP Legal Def. Fund, Inc. v. City of Atlanta*,
  451 F.3d 1257 (11th Cir. 2006).......................................................................10
*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005)...........................................................................17
*Clapper*,
  568 U.S. ......................................................................................................12
*Craig v. Boren*,
  429 U.S. 190 (1976)......................................................................................20
*Dean v. Warren*,
  12 F.4th 1248 (11th Cir. 2021) .....................................................................16
*Dept. of Educ. v. Brown*,
  143 S. Ct. 2343 (2023)..................................................................................10
*Doe ex rel. Doe v. Governor of N.J.*,
  783 F.3d 150 (3d Cir. 2015) .........................................................................16
*Does v. Gillespie*,
  867 F.3d 1034 (8th Cir. 2017)........................................................................10
*Downs v. Los Angeles Unified Sch. Dist.*,
  228 F.3d 1003 (9th Cir. 2000).................................................................15, 19
*Furlow v. Belmar*,
  52 F.4th 393 (8th Cir. 2022) ........................................................................25

*Gundy v. City of Jacksonville Fla.,*
  50 F.4th 60 (11th Cir. 2022) .......................................................................17

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988) ...............................................................15, 16, 18, 21

*Healy v. James,*
  408 U.S. 169 (1972) ....................................................................................19

*Hershey v. Jasinski,*
  86 F. 1224 (8th Cir. 2023) ..........................................................................10

*Iowa Right to Life Comm., Inc. v. Tooker,*
  795 F. Supp. 2d 852 (S.D. Iowa) ................................................................11

*Johnson v. City of Minneapolis,*
  152 F.3d 859 (8th Cir. 1998) .......................................................................21

*Keeton v. Anderson Wiley,*
  644 F.3d 865 (11th Cir. 2011) .....................................................................17

*Leake v. Drinkard,*
  14 F.4th 1242 (11th Cir. 2021) ....................................................................14

*Marshall v. Bd. Of Educ. Of Tipp City Exempted Vill. Sch. Dist.,*
  624 F.3d 332 (6th Cir. 2010) .......................................................................16

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.,*
  474 F.3d 477 (7th Cir. 2007) .......................................................................16

*Mech v. Sch. Bd. of Palm Beach Cnty., Fla.,*
  806 F.3d 1070 (11th Cir. 2015) ...................................................................19

*Mediacom Comms. Corp. v. Sinclair Broad. Group, Inc.,*
  460 F. Supp. 2d 1012 (S.D. Iowa 2006) ......................................................9

*Missouri v. Biden,*
  52 F.4th 362 (8th Cir. 2022) .......................................................................11

*Moore v. Bryant,*
  853 F.3d 245 (5th Cir. 2017) .......................................................................21

*Murphy v. Arkansas,*
  852 F.2d 1039 (8th Cir. 1988) ......................................................................6

*Natl. Endowment for Arts v. Finley,*
  524 U.S. 569 (1998) ....................................................................................14

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ...................................................................................24

*Ng v. Bd. of Regents of Univ. of Minn.,*
  64 F.4th 992 (8th Cir. 2023) .......................................................................24

*Ouachita Watch League v. United States Forest Serv.,*
  858 F.3d 539 (8th Cir. 2017) .......................................................................13

*Persons for Free Speech at SAC v. U.S. Air Force,*
  675 F.2d 1010 (8th Cir. 1982) .....................................................................14

*PETA, Inc. v. Gittens,*
  414 F.3d 23 (D.C. Cir. 2005) ...............................................................18, 19

*Phelps-Roper v. City of Manchester,*
  697 F.3d 678 (8th Cir. 2012) .......................................................................25

*Planned Parenthood Minn., N.D., S.D. v. Rounds,*
    530 F.3d 724 (8th Cir. 2008) (en banc............................................9, 10, 23, 24
*Pleasant Grove City, Utah v. Summum,*
    555 U.S. 460 (2009).........................................................................13, 14, 15, 16
*Pope v. E. Brunswick Bd. of Educ.,*
    12 F.3d 1244 (3d Cir. 1993) .........................................................................19
*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022).........................................................................13
*Republican Party of Minn. v. Klobuchar,*
    381 F.3d 785 (8th Cir. 2004).....................................................................11, 12
*Rosenberger v. Rector and Visitors of Univ. of Va.,*
    515 U.S. 819 (1995)...............................................................................14, 15, 19
*Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.,*
    997 F.2d 484 (8th Cir. 1993)...........................................................................9
*Sch. of the Ozarks, Inc. v. Biden,*
    41 F.4th 992 (8th Cir. 2022) .....................................................................12, 22
*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)...............................................................................10, 11, 13
*Straights & Gays for Equal. v. Osseo Area Sch.-Dist. No. 279,*
    540 F.3d 911 (8th Cir. 2008)........................................................................22
*Taylor v. Roswell Indep. Sch. Dist.,*
    713 F.3d 25 (10th Cir. 2013).........................................................................15
*Tumey v. Mycroft AI, Inc.,*
    27 F.4th 657 (8th Cir. 2022) .......................................................................23
*United State,*
    *s v. Am. Libr. Assn., Inc.,* 539 U.S.......................................................18, 19
*United States v. Virginia,*
    518 U.S. 515 (1996).......................................................................................20
*Walker v. Hartford Life and Accidents Ins.,*
    831 F.3d 968 (8th Cir. 2016)........................................................................20
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015).......................................................................................18
*Ward v. Polite,*
    667 F.3d 727 (8th Cir. 2012).........................................................................15
*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)...........................................................................................9
*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016).....................................................................24
*Zanders v. Swanson,*
    573 F.3d 591 (8th Cir. 2009).........................................................................11

## Statutes

20 U.S.C. § 4071 ............................................................................................22, 23
Iowa Code § 256.1(19) .......................................................................................7

Iowa Code § 256.11 ................................................................. 6, 7, 8, 9, 12, 21, 23
Iowa Code § 256F.4(2) .......................................................................................... 21
Iowa Code § 279.50 ............................................................................................ 7, 8
Iowa Code § 279.78 ............................................................................ 7, 9, 12, 20, 21
Iowa Code § 279.80 .................................................................................................. 7
Iowa Code § 279.87(3) ............................................................................................. 7
Iowa Code § 37(1) .................................................................................................... 8
Iowa Code § 601.1(2) .............................................................................................. 6

## Introduction

State and federal law set educational standards in Iowa schools. Senate File 496 fits into those standards. And SF496 is constitutionally valid. The law does not regulate private speech, discriminate because of any suspect classification, or violate federal law.

Plaintiffs here—nine current Iowa students and an organization—challenge SF496. Though they ask the Court to enjoin enforcement of the entire law, Plaintiffs attack only three parts: the State's decision about what books remain on school library shelves ("Library Program"); imposing on schools a duty to inform parents if a student seeks significant social or medical attention ("Parental Notice Section"); and a curriculum standard that reserves school instruction on "gender identity" and "sexual orientation" until after sixth grade ("Instruction Section"). Plaintiffs also bring an equal protection and statutory challenge. But they lack standing and their claims fail on the merits.

## Background

### I.   SF496 and its contents.

During a national conversation about schools and parental rights, the Legislature passed SF496, which affirmed the longstanding American and Iowa traditions of strong parental rights alongside the State's unique role in forming its citizenry. *See Murphy v. Arkansas*, 852 F.2d 1039, 1041 (8th Cir. 1988). SF496 confirmed that "a parent [] bears the ultimate responsibility, and has the fundamental, constitutionally protected right, to make decisions affecting the parent's [] minor child." SF496, § 24 (Iowa Code § 601.1(2)).

The law established standards for school districts to use to determine whether certain books are appropriate for a school curriculum. *See* SF496 §§ 2, 4 (Iowa Code § 256.11). The three sections that Plaintiffs target ensure that

parents retain control over when and how to discuss sex and sexuality with their children:

- The **Instruction Section** prohibits school districts from using "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." *Id.* § 16 (Iowa Code § 279.80).

- The **Library Program** requires schools to adopt a library program that "contains only age-appropriate materials and supports the student achievement goals of the total school curriculum." *Id.* § 3 (Iowa Code § 256.11(9)(a)(1)).

- The **Parental Notice** section forbids school districts from "knowingly giv[ing] false or misleading information" to parents about their child's "gender identity or intention to transition to a gender that is different than" their sex. *Id.* § 14 (Iowa Code § 279.78(2)). Licensed school personnel must also report to a school administrator a student's request for "an accommodation that is intended to affirm the student's gender identity" *Id.* (Iowa Code § 279.87(3)). Covered accommodations include requests to "address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." *Id.*

SF496 requires school curricula and educational programs to provide "age appropriate and research-based information." SF496, §§ 1–3 (Iowa Code § 256.11). "'Age-appropriate' means topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." *Id.* § 4 (Iowa Code § 256.1(19)); *see also id.* § 9 (Iowa Code § 279.50). But the term does not include "descriptions or visual depictions of a sex act," *id.*, which is in turn defined in detail: it includes "penetration of the penis into the vagina or anus;" "[c]ontact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person;" "[c]ontact between the finger, hand, or other body part

of one person and the genitalia or anus of another person, except in the course of examination or treatment by" specified licensed professionals; "[e]jaculation onto the person of another;" the "use of artificial sexual organs or substitutes therefore in contact with the genitalia or anus;" and "[t]he touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person." *Id.* (Iowa Code § 256.11(19)(a)). The definition does not include health-related materials like those relating to Iowa's "human growth and development curriculum." *Id.*

SF496 sets curricular standards and imposes duties upon school districts and their employees. School administrators and school board members do not struggle to understand these standards and duties. *See* Exhibits D, E, F, J, K. No part of SF496 governs private speech or imposes the possibility of discipline on anyone but school districts and their personnel. And SF496 addresses a very real problem—books with graphic descriptions and visual depictions of sex acts are circulating in Iowa schools. *See* Exhibits A, B, C, D, G, H, I, L.

## II. SF496's effective date and this belated suit.

The Iowa Senate introduced SF496 on March 2, 2023. SF496 passed both chambers in late April. Governor Reynolds signed SF496 into law on May 26. *See* Bill History for SF496, https://perma.cc/WU74-P3A9 (accessed Dec. 11, 2023). Anti-bullying sections not challenged here went into immediate effect, followed by the Parental Notice Section, Library Program, and Instruction Section on July 1. *See* SF496 § 22; Iowa Code § 37(1). When Plaintiffs sued on November 28, the anti-bullying sections of the bill had been in effect for six months and the remainder, nearly five. Their suit raises a facial challenge to the entire law but identifies challenges only to the Instruction Section, Library Program, and Parental Notice Section along with the law's exemption of "sex

acts" from the definition of "age appropriate." *See* Dkt. 1-1. They assert a pressing need for relief based on SF496's taking effect on January 1, 2024, but that is merely the first date on which the Department of Education can bring enforcement proceedings against school districts or employees who violate the Library Program. *See* SF496 § 2 (Iowa Code § 256.11(9)(a)(2)). Indeed, like the rest of SF496, the language allowing enforcement against districts and employees that violate the Parental Notice and Instruction Sections of the law have been in effect since June 1. *Id.* § 14 (Iowa Code § 279.78).

### Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This "awesome power" cannot be exercised unless a careful analysis shows a plaintiff likely "will be irreparably harmed absent the issuance of the requested relief." *Mediacom Comms. Corp. v. Sinclair Broad. Group, Inc.*, 460 F. Supp. 2d 1012, 1017 (S.D. Iowa 2006).

Plaintiffs can satisfy none of the four factors—probability of success on the merits, threat of irreparable harm to the movant, balance between that harm and the injury the injunction will inflict on others and whether an injunction is in the public interest—courts weigh when deciding whether to grant a preliminary injunction. *See Sanborn Mfg. Co., v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir. 1993). The Court's work is lessened here, however, as without "a threshold finding that [Plaintiffs are] likely to prevail on the merits," which they are not, the Court does not even proceed to the other three factors. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). That ordering creates a "more rigorous standard" that "ensure[s] that preliminary injunctions that thwart a state's

presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id.* at 733.

**Argument**

## I.  Plaintiffs' claims are not likely to succeed.

Plaintiffs' claims are both procedurally and substantively infirm. They therefore cannot show likely success on the merits, which at a bare minimum requires a complaint that properly states a claim—a hurdle they do not clear. *See Does v. Gillespie*, 867 F.3d 1034, 1039 (8th Cir. 2017) (no likelihood of success on the merits when the plaintiffs lacked an enforceable federal right).

### A.  Plaintiffs' First Amendment claims fail.

Plaintiffs lack standing to pursue their free-speech claims. But even with standing, Plaintiffs' claims are foreclosed by the government speech doctrine. Plaintiffs also fail to plead an actionable a First Amendment expressive association claim.

#### 1.  Plaintiffs lack standing.

Before reaching the merits, federal courts must ensure litigants have Article III standing. *Dept. of Educ. v. Brown*, 143 S. Ct. 2343, 2350–51 (2023). Standing requires having "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs must prove standing as to each challenged section— "[s]tanding is not dispensed in gross." *Hershey v. Jasinski*, 86 F. 1224, 1230 (8th Cir. 2023) (quotation omitted). They fail; they do not allege, much less introduce, facts showing they have standing. *Id.* (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006)).

### a. Plaintiffs have suffered no injury in fact.

First, Plaintiffs plead no injury in fac—no "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022), *cert. denied*, No. 22-1248 (U.S. Oct. 10, 2023) (quoting *Spokeo*, 578 U.S. at 339) (quotations omitted). Subjective belief does not create standing. *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009). Even when life or liberty is at stake, a plaintiff "must face a credible threat of present or future prosecution under the statute for a claimed chilling effect to confer standing." *Id.* at 593. "[G]eneral allegations of *possible* or *potential* injury do not" create an injury in fact, especially when a defendant cannot enforce a challenged statute. *Id.* at 594.

Rather than allege an injury in fact, Plaintiffs' allegations challenge SF496's symbolism. In their view, the law "is designed to erase LGBTQ+ students from Iowa Schools," "condemns any acknowledgement that LGBTQ+ people exist," "stigmatizes those students who wish to read" materials removed from Iowa curricula, and prohibits "anything that might acknowledge the existence of an LGBTQ+ student or make an LGBTQ+ student feel welcome." Dkt.2-1 at 12, 16, 18, 20, 12. These are catchy sound bites, not concrete, particularized injuries cognizable under the First Amendment. An injunction cannot redress Plaintiffs' disagreement with the Legislature.

Alleged "chill" pervades Plaintiffs First Amendment claims. But standing based on chill requires showing "objectively reasonable" self-censorship. *Iowa Right to Life Comm., Inc. v. Tooker*, 795 F. Supp. 2d 852, 871 (S.D. Iowa) (quoting *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004)). They must also show they face "a credible threat" of discipline following

protected speech they would otherwise make. *Republican Party of Minn.*, 381 F.3d at 792.

They can show neither because SF496 does not regulate their conduct. Nothing in that law prohibits students from "taking pride" in who they are, "being honest and open about" their identities, "wearing clothing that could identify" them as homosexual, or sharing their gender identity or sexual orientation with others, including teachers or staff. Dkt. 2-1 at 9. Their allegedly chilled speech "is not proscribed" by SF496. *Republican Party of Minn.*, 381 F.3d at 793. For example, Plaintiff A.C. alleges that she "conceals herself instead of taking pride in who she is" at school, for fear "that being honest and open about her identity will get her, or any teachers or staff who might show support for her, into trouble." Dkt. 2-1 at 16. But SF496 prohibits none of that. And nothing A.C. says will lead to her or any school employee's discipline. Her decision to self-censor is not "objectively reasonable." *See Republican Party of Minn.*, 381 F.3d at 792.

Further, Plaintiffs face no "credible threat of prosecution." *Id.* SF496 governs and is enforced against only school districts or employees, not students. *See* SF496 §§ 2 (Iowa Code § 256.11(9)(a)(1)), 14 (Iowa Code § 279.78(4)). Plaintiffs recognize that and so contend that their injury is their unwillingness to speak with teachers for fear of the teacher facing discipline. But, again, that is not objectively reasonable—the law does not prohibit students from speaking to teachers and, even if it did, the teacher would comply with the law by reporting conversations about sexuality or gender identity to the parents.

Speculative injuries that rely on "highly attenuated chain[s] of possibilities" do not establish standing. *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 2638 (2023) (quoting *Clapper*, 568 U.S. at 410). Here, Plaintiffs' alleged fear is not based on a threat of prosecution

against them for violating the law, but on the possibility that a future conversation might cause a teacher to choose to violate the law rather than comply with it. Even if it were possible for a student's comments to a teacher to violate the law, the claim in that case would belong to the injured party—the non-complying teacher against whom disciplinary proceedings were brought—not the student.

Finally, none of the minor Plaintiffs has standing to sue over the Parental Notice Section. Each Plaintiff's parents already know about the child's sexuality and announced gender—indeed, are comfortable enough with it that they are acting as next friends in this high-profile litigation over it—so there is no chance of the "forced outing" that Plaintiffs claim to fear.

Plaintiffs' subjective fears are not traceable to the text of SF496 or its proper enforcement. *See Spokeo*, 578 U.S. at 338. They cannot show a causal connection between SF496's requirements and the subjective injuries complained of. *Id.*

And Plaintiffs nowhere show how Iowa Safe Schools has standing. Iowa Safe Schools makes no allegations that it suffered an injury in fact. *See Ouachita Watch League v. United States Forest Serv.*, 858 F.3d 539, 542 (8th Cir. 2017). Without its own injury, Iowa Safe Schools may be attempting to assert associational standing. For Iowa Safe Schools to have associational standing they must "identify members who have suffered the requisite harm." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022) (quotation omitted). Iowa Safe Schools fails to meet its burden. *See id.*

### 2. The State's discretion over curriculum and library inventory is constitutionally protected government speech.

Under the government speech doctrine, "[a] government entity has the right to 'speak for itself.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467

(2009) (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). When it does so, "it is entitled to say what it wishes." *Id.* (citing *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Indeed "it is the very business of government to favor and disfavor points of view." *Natl. Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J. concurring in judgment). "When the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 833. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove*, 555 U.S. at 467.

Public schools in Iowa are creations of the State and many of their expressive decisions, including what books to make available in the library, are government speech. SF496 does not regulate private speech. It sets school curricula and library inventory, which is government speech that does not trigger the Free Speech Clause of the First Amendment. *See Rosenberger*, 515 U.S. at 833 ("When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed."); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (government speech does not violate First Amendment); *PETA, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (government speaks through its exclusion of books in libraries). The Eighth Circuit recognizes that principle, too; if the United States can choose who speaks on its bases, States can choose who speaks at their schools. *Persons for Free Speech at SAC v. U.S. Air Force*, 675 F.2d 1010, 1022 (8th Cir. 1982).

Government speech includes content discretion over speech the government presents to the public. *See, e.g.*, *Leake v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021) (parade); *Ark. Educ. Television Commn. v. Forbes*, 523 U.S. 666, 674 (1998) (broadcasted debate and university commencement); *Finley*, 524 U.S. at

586 (art gallery). Government speech goes beyond content-based decisions to include viewpoint-based choices, too. For example, a city's decision as to what type of statue to erect was government speech that did not require even viewpoint neutrality. *Pleasant Grove*, 555 U.S. at 470–73.

In public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech, and the school "is free to make subject-matter-based choices." *Bannon v. Sch. Dist. of Palm Beach Cnty*, 387 F.3d 1208, 1213 (11th Cir. 2004); *see Rosenberger*, 515 U.S. at 833; *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 36 (10th Cir. 2013) ("Schools 'do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities.'") (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013 (9th Cir. 2000) ("[W]hen a public high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individual's choice of how to convey oneself.").

As governmental bodies, schools "have considerable authority to control their own speech," and "[f]oremost among a school's speech is its selection and implementation of a curriculum," which "public schools have broad discretion in making." *Ward v. Polite*, 667 F.3d 727, 732 (8th Cir. 2012). So "and which they may use to ensure students "are not exposed to material that may be inappropriate for their level of maturity." *Kuhlmeier*, 484 U.S. at 271.

A school may "disassociate itself" from speech that is "vulgar" or "unsuitable for immature audiences." *Id.* Indeed, it "must be able to take into account the emotional maturity" of students, especially regarding "sensitive topics, which might range from the existence of Santa Claus in an elementary school to the

particulars of teenage sexual activity in a high school setting." *Id.* at 272. And a school must have the authority over its speech to maintain a position of "neutrality on matters of political controversy." *Id.*

When student speech amounts to school-sponsored expressive activity, like participation in a curriculum, the school may restrict it if doing so "reasonably relate[s] to legitimate pedagogical concerns." *Id.* at 273 (cleaned up). That standard reflects appreciation for "the education of the Nation's youth" being "primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Id.* at 273.

SF496's age-appropriateness standard is a curricular choice firmly protected by the government speech doctrine. Those portions of the law do not regulate private speech. The State may eliminate "sex acts" from age-appropriate school curricula and may choose to reserve teaching on "sexual orientation" and "gender identity" until after sixth grade. It may, that is, create government-speech guidelines that reflect student maturity. Courts have long upheld that type of maturity-based decision-making, *see id.* at 272. The Court should do so here. *See also Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (First Amendment does not entitle teachers to advocate viewpoints that depart from curriculum); *Marshall v. Bd. Of Educ. Of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010).

Plaintiffs' retreat to a "right to receive information" cannot help them. A "listener's right to receive information is reciprocal to the speaker's right to speak," *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015)—and the State has plenary authority over its own message. *Pleasant Grove*, 555 U.S. 460 at 467. Plaintiffs cannot compel the State to speak. *See Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021) (the "Free Speech Clause does not restrict government speech," including a planned protest by a cheerleader in

State university uniform); *see also Keeton v. Anderson Wiley*, 644 F.3d 865, 877 (11th Cir. 2011).

Indeed, Plaintiffs have no constitutional power to control school library inventories; a government's compilation of third-parties' expressive content is government speech. *Forbes*, 523 U.S. at 674. "The First Amendment works as a shield to protect *private* persons from encroachments by the government on their right to speak freely, not as a sword to compel the government to speak for them." *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 790 (2023). And "when the [State] is selecting textbooks for use in the classroom, students have no constitutional right to compel the [State] to select materials of their choosing." *Chiras v. Miller*, 432 F.3d 606, 620 (5th Cir. 2005).

### 3.  Precedent protects the State's discretion to control its curriculum.

#### a.  SF 496 does not function in a "narrowly partisan or political manner."

Nor can Plaintiffs find solace in *Pico*'s narrow and fractured judgment. *See* Dkt. 2-1 at 10 (citing *Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality op.). *Pico*'s plurality explained that school library materials may not be removed "in a narrowly partisan or political manner." 457 U.S. at 870. But there is nothing partisan about removing depictions and descriptions of sex acts from school libraries. The example *Pico* feared was a "Democratic school board, motivated by party affiliation, order[ing] the removal of all books by or in favor of Republicans." *Id.* at 871.

That is unlike the content choices here, which ensure school libraries contain age-appropriate books. SF496 is neutral—it takes no partisan or viewpoint stance on anything. It does not "prescribe what shall be orthodox in

politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. And the Legislature's role in setting those standards is "consistent with" the responsibility of the proper decision-makers for children: "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kuhlmeier*, 484 U.S. at 273. Even if SF496 triggered the first amendment under *Pico*, the result is the same.

### b. Recent cases that commanded a majority, not an earlier case decided by a plurality, establish the standard.

Not only does *Pico* not govern, it lacks "precedential value as to the application of the First Amendment to these issues" and "establishes no standard." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1200 (11th Cir. 2009) (quotation omitted). That "badly fractured decision" is "a non-decision so far as precedent is concerned." *Id.* at 1199–1200. Post-*Pico* developments show that *Pico*'s plurality should, at minimum, be narrowly construed.

Since *Pico*, courts have recognized that public libraries are not public forums for private speech and that "the government speaks through its selection of what books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 28; *see United States v. Am. Libr. Assn., Inc.*, 539 U.S. at 207. The First Amendment does not override a State's discretion to select materials based on content and viewpoint, *see Gittens*, 414 F.3d at 29, and that analysis does not change based on the forum, *Walker*, 576 U.S. at 215 ("When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). *A fortiori*, States may regulate their public-school libraries, particularly those with a young student body, so they "support[] the student achievement goals of the total school curriculum." SF496, § 2.

*Pico*'s narrow view of the right to remove books from libraries predates the Supreme Court's explanation of the government-speech doctrine, which took

on fuller shape after *Rosenberger*, 515 U.S. at 819. Indeed, courts have since concluded that forum analyses do not apply to public libraries due to the discretionary nature of their mission. 539 U.S. at 204, 213 n.7. Courts have since reiterated that government speech includes the freedom "not to speak" and to "'speak through the removal' of speech that the government disapproves." *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting *Downs*, 228 F.3d at 1012). In short, "[w]ith respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude." *Gittens*, 414 F.3d at 28–29.

### 4. Plaintiffs' expressive-association claim fails—both on the merits and for lack of standing.

Plaintiffs' right to expressive association or associational freedom are unaffected by SF496. SF496 does not regulate noncurricular groups. SF496 creates no "forced inclusion" that restricts the right to associate. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000). It does not require disclosure of membership lists for persons wanting anonymity. *Cf. Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 101–102 (1982). Nor does it impose penalties or withhold benefits based on membership in disfavored groups. *Healy v. James*, 408 U.S. 169, 180–184 (1972). It creates no restrictions, and imposes no requirements, on whom Plaintiffs may associate with.

Plaintiffs instead allege that club membership has "dwindled" in one school district and that another district cannot find a faculty sponsor for a proposed club. But SF496 does not forbid students from joining or school-district employees from sponsoring clubs of any sort. *Cf. Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244, 1256 n.17 (3d Cir. 1993) (finding no right to a faculty advisor). Neither inadequate sponsorship nor declining student participation are First Amendment violations. And a student's membership in a club does

19

not trigger the Parental Notice requirement. Indeed, joining a GSA or any student club is not a request for gender affirming accommodation. *See* SF496, § 14 (Iowa Code § 279.78(3)). But even if that were the case, as described above, these Plaintiffs, whose parents already know their sexual orientation and transgender status, cannot be chilled.

Plaintiffs allege that an Iowa City elementary school discontinued a club because of SF496, Dkt. 2-1 at 18, but they introduce no evidence that this was the case and no argument that SF496, reasonably construed, requires that result.

### B. Plaintiffs' equal protection claim fails.

#### 1. Rational-basis scrutiny applies.

SF496 is constitutional "so long as it bears a rational relation to some legitimate end." *Walker v. Hartford Life and Accidents Ins.,* 831 F.3d 968, 976 (8th Cir. 2016). For a heightened level of scrutiny to apply, the law would have to classify people based on sex or impose differential treatment based on sex. *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. Virginia*, 518 U.S. 515, 532–33 (1996). SB496 does neither—certainly, Plaintiffs identify no language in the law that does so.

Rather than identify a classification in SF496's text, Plaintiffs rely on their subjective reaction to the law—on how it makes them feel. Dkt. 2-1 at 17. A plaintiff's feelings do not show "differential treatment." *Virginia*, 518 U.S. at 532–33.

Plaintiffs also confuse their equal-protection and free-speech claims. They allege "the purpose and effect of SF496 is to suppress speech, expression, information, and ideas about" certain people but not others and contend it precludes their access to certain literature. Dkt. 2-1 at 17. But no one else can

access that literature in a school library. The law treats Plaintiffs the same as it treats similarly situated students, and "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017); *see also Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998) (lack of differential treatment precludes equal-protection claim); *Bailiff v. Adams Cnty. Conf. Bd.*, 54 F. Supp. 2d 923, 934 (S.D. Iowa 1999) (same).

### 2. There is a rational basis for the law.

SF496 rationally advances the goal of ensuring "age-appropriate and research based" lessons. SF496, § 2 (Iowa Code § 256.11(2)). It keeps inappropriate material away from children in school before they reach an age at which discussions become appropriate. SF496 also allows parents to decide when and whether they teach their children about "gender identity" and "sexual orientation." SF496, § 6 (Iowa Code § 256F.4(2)). It keeps parents informed about their child's important health, medical, and psychological information. SF496, § 15 (Iowa Code § 279.79(1)).

SF496 neutrally allows classes regarding human sexuality to begin around the common point of puberty. *See* SF496 § 16. It also neutrally proscribes instruction on "sexual orientation," whether gay, straight, or otherwise. *See id.* (defining "sexual orientation" as "actual or perceived heterosexuality, homosexuality, or bisexuality"). So age appropriate sexuality teaching remains the same regardless of the sex, sexual orientation, or gender identity of the students.

SF496's ends are "consistent with" *Kuhlmeier*'s holding that "the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." 484 U.S. at 273.

### C. Plaintiff's equal access claim fails.

The plain language of SF496 establishes that it does not regulate school clubs. It therefore cannot violate the Equal Access Act, 20 U.S.C. § 4071, which prohibits secondary schools from denying equal access to, or discriminating against, "students who wish to conduct a meeting within" a limited open forum because of "the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). A secondary school creates a "limited open forum" when it "grants an offering to or opportunity for one or more non-curricular student groups to meet on school premises during noninstructional time." *Id.* § 4071(b). To establish a violation of that act, Plaintiffs must show one of two things: that their schools prohibited their clubs from meeting while allowing other student groups to do so, or that their schools gave space to other student groups and but not their clubs. *Straights & Gays for Equal. v. Osseo Area Sch.-Dist. No. 279*, 540 F.3d 911, 914 (8th Cir. 2008). Either way, Plaintiffs' statutory claims fail.

First, SF496 does not deny equal access to school premises. It says nothing about student groups or access to school facilities. Plaintiffs contend that SF496 obstructs their clubs' ability "to meet on the same terms as other non-curricular clubs." *See* Dkt. 2–1 at 19. But they do not cite a section of the law that has that effect—because there is not one. Fears about a law that are unconnected from its proper enforcement do not confer standing or justify a preliminary injunction. *See Sch. of the Ozarks*, 41 F.4th at 1000.

Second, Plaintiffs' equal-access allegations do not state a claim. The shutdown of an elementary-school club could not state a claim because the Equal Access Act doesn't apply to elementary schools. *See* 20 U.S.C. § 4071. Even if it did, Plaintiffs do not allege the club was treated differently than other clubs—or even that the elementary school has other clubs. Nor can the

allegations state a claim against the State Defendants, who are not a "public secondary school" subject to the Equal Access Act. 20 U.S.C. § 4071(a).

Finally, the equal-access claim fails for the same reasons Plaintiffs' expressive-association claim fails above. *See* Argument § I.C.

## II. The other factors do not support a preliminary injunction.

Plaintiffs' failure to show likelihood of success is fatal. *See Rounds*, 530 F.3d at 732. This Court need not "proceed to weigh the other [preliminary-injunction] factors." *Id*. at 732. But the other factors also weigh against an injunction.

### A. Plaintiffs face no irreparable harm.

Plaintiffs do not face irreparable harm. Indeed, as described above, they face no harm at all—they are not covered by the law and it cannot be enforced against them. More, should Plaintiffs wish to access books that are removed from their school libraries, they have ample ability to do so from other libraries or booksellers—and the costs of doing so are quantifiable and compensable. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667 (8th Cir. 2022).

Further, whatever harm Plaintiffs might suffer is not imminent. The enforcement section that goes into effect on January 1 does not allow instantaneous punishment. *See* SF496, § 2 (Iowa Code § 256.11(9)). The Department of Education must first investigate an alleged violation of the Library Plan. If it finds a violation, it issues a written warning. *Id*. Disciplinary action can come only for a second or subsequent "knowing violation," and only after a hearing conducted by the board of educational examiners. *Id*. And the lack of imminence is reinforced because Plaintiffs can identify no enforcement actions brought against districts or personnel under the enforcement authority that has been operative for half a year. *See* Background § II.

This underscores the dichotomy between Plaintiffs' cry for immediate relief and their delay in seeking a preliminary injunction. SF496 was introduced in the Iowa Senate in March. After a lengthy and highly publicized committee, amendment, and debate process, it passed on April 20, and Governor Reynolds signed it into law on May 26. But Plaintiffs did not sue until nearly five months later. "A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) ("[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction.") (internal quotation omitted).

## B. The equities balance against an injunction, which would not be in the public interest.

As to the balance of harms, a preliminary injunction will create uncertainty and cause greater harm to the State, its students, and parents whose rights SF496 protects. An injunction is also not in in the public interest. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by represent-atives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Rounds*, 530 F.3d at 732–33 (stressing the "more rigorous stand-ard for" for showing likelihood of success when movants seek to "thwart a state's presumptively reasonable democratic processes"). Statutes are "pre-sumed constitutional and all doubts are resolved in favor of constitutionality." *Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trs.*, 37 F.4th 1386, 1393 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 774 (2023).

SF496 included three sections that were considered of immediate importance, so they went into immediate effect. SF496 § 21. All three sections addressed school bullying and harassment. Plaintiffs here seek a facial injunction against the entire law with no regard for preserving many clearly constitutional provisions, even those that protect children from bullying and harassment and require schools to notify parents when that behavior occurs. *See Phelps-Roper v. City of Manchester*, 697 F.3d 678, 685 (8th Cir. 2012) (en banc) ("Facial challenges are disfavored."). To succeed on a facial challenge, there must be no "circumstance" that exists in which the statute can be constitutionally applied. *Furlow v. Belmar*, 52 F.4th 393, 400 (8th Cir. 2022). Plaintiffs did the Court no favors in declining to specify enforcement of which sections of Iowa Code they believe warrants an injunction. Instead, they ask the Court to enjoin it all.

Further, enjoining enforcement of SF496—particularly if the law is ultimately upheld and the injunction dissolved—would perpetuate the harms the law seeks to avoid. *See* Exhibits A, B, C, D, G, H, I, L. Just as toothpaste cannot be forced back into the tube, children cannot unsee materials they were not mature enough to understand; all that remains is attempting to clean up the mess after. *Id.* Enjoining the operation of SF496 will prevent schools from acting to remove inappropriate material from their shelves, prevent parents from reviewing their local school's curriculum for inappropriate material, and withhold children's vital mental and physical health information from their parents. School administrators and school board members do not struggle to understand and apply SF496. *See* Exhibits D, E, F, J, K. There is little way to calculate how many children will be exposed to materials inappropriate for their age and maturity or how many children will face a delay in obtaining care because teachers thought they knew better than the parents what was best for

25

the child. Compare the potential harm to Plaintiffs if an injunction is wrong-
fully granted: They will have to wait for a few months to have access to a book
in their school libraries or, should their patience wane, go to a different library,
a bookstore, or Amazon.

### Conclusion

State Defendants ask the Court to deny Plaintiffs' request for a preliminary
injunction and grant such further relief the court deems equitable and just.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Eric Wessan*
Eric Wessan
Solicitor General
/s/ *Daniel Johnston*
Daniel Johnston
Assistant Attorney General
/s/ *Alexa Den Herder*
Alexa Den Herder
Assistant Solicitor General
Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
daniel.johnston@ag.iowa.gov
alexa.denherder@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served on counsel for all parties of record by delivery in the following manner on December 19, 2023:

☐ U.S. Mail ☐ FAX
☐ Hand Delivery ☐ Overnight Courier
☐ Federal Express ☐ Other
☒ CM/ECF

Signature: _/s/ Daniel Johnston_

Exhibit A

Affidavit of Jackie Abram

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., <br><br> Defendants. | Case No. 4:23-cv-474-SHL-SBJ <br><br><br> **DECLARATION OF JACKIE ABRAM** |

COMES NOW, Jackie Abram, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Jackie Abram. I am a former resident of Urbandale, Iowa and previously lived within the Waukee Community School District. All three of my children have attended Waukee schools or currently do.

2. When my two older children were in 6th grade, they were each required to fill out a survey in class that asked what name they would like the teacher to use to refer to them, whether to use that name, but not in front of or to their family, and what pronouns they would like their teacher to use.

3. I can remember my oldest child sharing with me about this survey and that it made him feel uncomfortable. I remember telling my son that if he was uncomfortable filling out any of the questions in the survey, that he should submit the survey without answering specific questions. He told me that

these surveys sometimes will not let him submit them without answering each question. A screenshot of a survey that is substantially similar to the one my two oldest children filled out can be seen below.



4. I believe that requiring a child, especially a 6th grader, to answer these questions, especially without notification or consent from the parents, is inappropriate.

5. Two years later, when my oldest son was in 8th grade, he referred to a female student with female pronouns. Upon learning of this interaction, his teacher removed him from the classroom and admonished him because the other student believed herself to be male and wanted to use male pronouns. This made my son feel uncomfortable and I believe it was inappropriate.

6.  In March of 2021, my youngest child, B.A., was a 5th grader at Shuler

Elementary. One day in March, my son came home to me crying. I remember

the conversation we had occurred similar to the exchange described below.

> **B.A.:** I'm really confused about why you guys decided to make me a
> boy.

> **Mother:** What do you mean?

> **B.A.:** Our teacher read us a book in class and told us that our parents
> might have made a mistake on our birth certificates.

7.  The book my son was referring to was *Call Me Max*. It's the story of a female,

similar in age to my son, who believes she is a male and it was read aloud by

his teacher, Michael Noble, to the entire class of 5th graders. An excerpt from

the book is below.

> "Transgender" is a long word but it means something simple. Trans
> means going across. Like how transportation means going from here to
> there. Gender means being a boy or a girl. Or a little of both. Or not
> feeling like a boy or a girl. When a baby is born, a grown-up says, "It's
> a boy!" or "It's a girl!" If a brand-new baby could talk, sometimes that
> baby might say, "No, I'm not!" When a baby grows up to be
> transgender, it means that the grown-up who said they were a boy or a
> girl made a mistake.

> When I was born, my mom and dad said, "It's a girl!" When I looked in
> the mirror, I saw a girl. Kind of. But because I'm transgender, I
> wanted to see a boy.

8.  After this upsetting interaction with my son, I wrote to Mr. Noble for an

explanation as to why this book was read to him and his classmates followed

by a discussion on gender identity. I asked him why he made a comment to

the class suggesting that it wasn't their fault that their parents assumed their gender when they were born and called them the wrong pronoun. I shared with him my dismay that he would suggest I "misgendered" my son when he was born.

9. Later that evening, Mr. Noble responded to my email. He did not acknowledge whether he made these comments to the class. Instead, he said the book was read to conform to the District's equity statement. There's nothing equitable about teaching a 5th grader that his parents might have misgendered him at all, let alone on the day of his birth.

10. He also informed me that this book was read as part of a reaction to recent bullying incidents. I responded that the incidences of bullying should be responded to specifically and individually. The District has an anti-bullying policy, and it states:

> Harassment and bullying of students and employees are against federal, state and local policy, and are not tolerated by the District. The District is committed to providing all students and staff with a safe and civil school and work environment in which all members of the school community are treated with dignity and respect.

11. Suggesting to my son that his parents may have misgendered him does not treat him or me with dignity or respect.

12. Eventually, I met with Mr. Noble virtually and he apologized that B.A. was made to feel uncomfortable but did not apologize for reading the book in the first place.

Executed on <u>December 19, 2023.</u>         <u>/s/ Jackie Abram</u>
                                              Jackie Abram

Exhibit B

Affidavit of David Alexander

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., <br><br> Defendants. | Case No. 4:23-cv-474-SHL-SBJ <br><br> **DECLARATION OF DAVID ALEXANDER** |

COMES NOW, David Alexander, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1.  My name is David Alexander, and I reside in Indianola, Iowa. My wife and I live within the Indianola Community School District.

2.  In Fall 2022, my seventeen-year-old son, S.A., enrolled in an English language course entitled "Survey of Literature" offered at Indianola High School.

3.  The curriculum included the book "The Kite Runner" by Khaled Hosseini. This work includes many graphically depicted adult themes including child exploitation, child rape, rape, and suicide.

4.  Parents were not notified this book would be required. My wife and I did not find out until we requested the information.

5.  My wife and I requested an alternative literary selection be offered for our son and we were informed that it would not be. The only accommodation

which the school offered to us was to have S.A. sit in the hallway during

discussions and not read the book.

6. Not wanting our son to be ostracized among his peers, my wife and I

acquiesced to the school's "requirement" and read the book with our son.

7. The graphic depictions of child rape and gun-inflicted suicide were

age-inappropriate, jarring, and traumatic for our son.  For example,

> Hassan lay with his chest pinned to the ground.
> Kamal and Wali each gripped an arm, twisted and
> bent at the elbow so that Hassan's hands were pressed
> to his back. Assef was standing over them, the heel of
> his snow boots crushing the back of Hassan's neck.
> ..."All I want you weaklings to do is hold him down.
> Can you manage that?" Wali and Kamal nodded. They
> looked relieved. Assef knelt behind Hassan, put his
> hands on Hassan's hips and lifted his bare buttocks.
> He kept one hand on Hassan's back and undid his own
> belt buckle with his free hand unzipped his jeans.
> Dropped his underwear. He positioned himself behind
> Hassan. Hassan didn't struggle. Didn't even whimper.
> He moved his head slightly and I caught a glimpse of
> his face. Saw the resignation in it. It was a look I had
> seen before. It was the look of the lamb....I stopped
> watching, turning away from the ally. Something
> warm was running down my wrist. I blinked, saw I
> was still biting down on my fist, hard enough to draw
> blood from the knuckles. I realized something else. I
> was weeping. From just around the corner, I could
> hear Assef's quick, rhythmic grunts…"

See Khaled Hosseini, The Kite Runner 75-77 (2007).

8. Following the passage of Senate File 496, this book was removed from the

"Survey of Literature" curriculum.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12/18/2023_____.      /s/ David Alexander
                                                      David Alexander

Exhibit C

Affidavit of Courtney Collier

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al.,<br><br>Defendants. | Case No. 4:23-cv-474-SHL-SBJ<br><br><br>**DECLARATION OF COURTNEY COLLIER** |

COMES NOW, Courtney Collier, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Courtney Collier. I am a resident of Waukee, Iowa and live within the Waukee Community School District. I have three sons in the District. H.G. is currently in 7th grade while C.G. and S.G. are in 6th grade.

2. During the 2020-2021 school year, my children attended school virtually from our home. As a stay-at-home mother at the time, I was able to overhear what my students were learning from their online classes.

3. In this same class, students were assigned to fill out surveys supposedly to assess the children's mental health. These surveys were not disclosed to me or their father. When I learned that these surveys would be assigned, I asked the teacher to send me the content of future surveys. One survey, in a veiled and suggestive manner, asked students to rate their comfortability with their

sexual or gender identity on a scale of one to five. A student chooses a one if they believe the statement is "[n]ot at all true" and a student chooses a five if they believe the statement is "[c]ompletely true." Some of these statements include:

- It is hard for people like me to be accepted at my school.
- Sometimes I feel as if I don't belong in my school.
- Teachers here are not interested in people like me.
- I feel very different from most other students at my school.
- Other students at my school like me the way that I am.

Upon learning the content of this survey, I directed the teacher not to administer it to C.G. and S.G.

4. At the beginning of the 2021-2022 school year, I sent a note to each teacher who had any of my sons in their classrooms, including the principal, directing them to exempt my sons from any instruction, curriculum, or promotion of any content related to sex, sexual orientation, or gender identity.

5. During the 2021-2022 school year, C.G. and S.G. were in 4th grade. In their computer typing class, a popup advertisement appeared that asked them to take a test to know if they are gay. When C.G. and S.G. came home, they told me about the popup on their screens. I then reached out to the principal of their school, Matthew Robie, to express my concern and opposition to this content. Mr. Robie informed me that because of the typing program the school uses, they could not control whether popups exist or their content. Mr. Robie also indicated to me that the entire class was exposed to this advertisement.

6. During the same school year, H.G. was in 5th grade. He and his classmates
   went to the library as part of their class activity. The librarian, Jess Elliott,
   presented to his entire class suggesting for the class that they could read a
   book about a little boy close in age to the students who was struggling with
   his gender identity and sexual orientation. My son came home and
   complained to me because he was uncomfortable with the book Ms. Elliott
   suggested to him and his classmates. He asked, "why can't I just go to school
   and learn?" and "why do my teachers have to talk to us about this stuff?" I
   became upset because I wrote to H.G.'s teachers at the beginning of the year
   that I didn't want him to be taught this type of content. I was disappointed
   that my instruction as H.G.'s parent was violated.

7. During the 2022-2023 school year, H.G. was in 6th grade. I sent the same
   letter to all of his teachers as I did the previous year directing them to
   exempt my son from any instruction, curriculum, or promotion of any content
   related to sex, sexual orientation, or gender identity.

8. During the first week of school, H.G.'s social studies teacher, Lisa Reno,
   assigned work to H.G. and the entire class asking them to create a cartoon
   version of themselves which suggested a range of "traits" to consider,
   including preferred pronouns. The activity was named the "Little Ms/Mr/Mx
   Activity." A slide introducing the assignment can be seen below.



9. Another slide introducing the assignment normalizes Instagram for 6th graders and suggests the students' cartoon versions of themselves could be "gender neutral" and represent "the nonbinary community." The slide can be viewed below.



10. Another slide provides various choices for preferred pronouns. The slide can be seen below.



11. During the 2021-2022 school year, I submitted a request for reconsideration regarding three books circulating in libraries at both Waukee high schools. The books I challenged, in conjunction with other concerned parents, were *Gender Queer: A Memoir* (herein "*Gender Queer*"), *All Boys Aren't Blue*, and *Lawn Boy*. I knew these books were available to students because they were listed in circulation according to the District's online library database.

12. I checked out each of these books from the Waukee public library where they are freely available to anyone with a library card. I read each book in their entirety.

13. The following illustrations are found in *Gender Queer*:

  




14. The following passages are found in *All Boys Aren't Blue*. Those provided are

only a sample of the many sexually explicit passages.

'Get your hand off my butt.' You giggled. 'That's not my hand.' 'You're lying,' I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me. You were fully erect at this point. I was nervous. 'We gonna get in trouble.' 'You can't tell anybody, okay?' you said. 'You promise that you not gonna tell anyone?' I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too.

You told me to take off my pajama pants, which I did. You then took off your shorts, followed by your boxers. There you stood in front of me fully erect and said, 'Taste it.' At first, I laughed and refused. But then you said, 'Come on, Matt, taste it. This is what other boys like us do when we like each other.' I finally listened to you.

The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy.

He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, 'Watch your teeth.' I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.

15. The following passages are found in *Lawn Boy*. Those provided are only a sample of the many sexually explicit passages.

But there's one thing I'd never tell Nick in a million years, not that it really matters: in fourth grade, at a church youth-group meeting, out in the bushes behind the parsonage, I touched Doug Goble's dick, and he touched mine. In fact, there were even some mouths involved.

'What if I told you I touched another guy's dick?' I said. 'Pfff.' Nick waved me off and turned his attention back to his beer. 'What if I told you I sucked it?' 'Will you please just shut up already?' 'I'm dead serious, Nick.' 'Well, I'd say you were a fag.' 'I was ten years old, but it's true. I put Doug Goble's dick in my mouth.'... 'I was in fourth grade. It was no big deal.' Cringing, Nick held his hands out in front of him in a yield gesture. 'Stop.' 'He sucked mine, too.'

16. After we submitted our reconsideration request, a meeting was arranged with both high school principals and both high school librarians. Together, they defended their decision to include these books in their circulation.

17. Later, a meeting was scheduled with the reconsideration committee, which comprised administrators, librarians from other schools, parents, and students. When we showed up to the meeting, we were received by Lindsay Law, Director of Student Equity. She informed us that she would be facilitating the meeting with the reconsideration committee. She also informed us that we were not allowed to present as a group, instead we had to present separately and that we would be presenting virtually, as the committee was cloistered in a separate room. When we asked why we had to present separately, and virtually, and why we weren't notified of this fact ahead of time, Ms. Law informed us that the committee did not feel safe being in the same room as us. When we asked these questions, Ms. Law became upset and left to retrieve another administrator.

18. After Ms. Law and the other administrator conferred, they brought the committee into the same room as us. The committee imposed arbitrary rules for speaking time and presentation of arguments that were not communicated ahead of time. The committee also called their own witnesses that spoke in favor of these books. We were not notified ahead of time that we could call our own witnesses or that the committee planned to call their own.

At the conclusion of the hearing, the committee met privately and decided to keep the books available to students.

19. We appealed the committee's decision to Superintendent Brad Buck. After meeting with Mr. Buck, we received a letter from him informing us that while *All Boys Aren't Blue* and *Lawn Boy* would remain in circulation, he had decided to remove *Gender Queer*. On February 18, 2022, Superintendent Buck wrote:

> As it relates to *Gender Queer: A Memoir*, I believe the book needs to be removed from the shelves in our school libraries. Specifically, because the format of the book is a graphic novel, it contains pictures that are beyond the scope of what might be reasonably expected to be observed in a school library.
>
> More specifically, when reading a book that is words only, the images that come to mind are at the maturity level of the reader. In this book, there are pictures and they may be at a level that is beyond the maturity level of the reader. And, different from written words, any person could pick up this book and come across the pictures as opposed to flipping through a book that is all words.
>
> The copies are being removed from our libraries today.

20. The passage of Senate File 496 will benefit, and has already benefitted, my children and the education they receive from the Waukee Community School District. It has made them more comfortable knowing they can learn about core subjects and avoid age-inappropriate content.

Executed on <u>December 19, 2023.</u>          */s/ Courtney Collier*
                                              Courtney Collier

Exhibit D

Affidavit of Deb Davis

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., <br><br> Defendants. | Case No. 4:23-cv-474-SHL-SBJ <br><br><br> **DECLARATION OF DEB DAVIS** |

COMES NOW, Deb Davis, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Deb Davis. I am a resident of Johnston, Iowa and a current elected Johnston School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. Our library collections are subject to a regular review of the materials they contain. Books are removed, for among other reasons, for low or non-existent check-out rates. One such book that was recently removed prior to the enactment of Senate File 496 was *Lucky* by Alice Sebold. The author details

her firsthand account of being violently raped. The book includes the

following passages:

> He reached out and grabbed them- my breasts- in his two hands. He
> plied them and squeezed them, manipulating them right down to my
> ribs. Twisting. I hope that to say this hurt isn't necessary here. 'Please
> don't do this, please,' I said. 'Nice white titties,' he said. And the words
> made me give them up, lobbing off each part of my body as he claimed
> ownership- the mouth, the tongue, my breasts.

> 'Lie down.' I did. Shaking, I crawled over and lay face up against the
> cold ground. He pulled my underpants off me roughly and bundled
> them in his hand. He threw them away from me and into a corner
> where I lost sight of them. I watched him as he unzipped his pants and
> let them fall around his ankles. He lay down on top of me and started
> humping. He worked away on me, reaching down to work with his
> penis. . . He called me bitch. He told me I was dry.

> He began to knead his fist against the opening of my vagina. Inserted
> his fingers into it, three or four at a time. Something tore. I began to
> bleed there. I was wet now. It made him excited. He was intrigued. As
> he worked his whole fist up into my vagina and pumped it, I went into
> my brain.

> I thought it was over. I was trembling but I thought he'd had enough.
> Blood was everywhere and so I thought he'd done what he'd come for.
> 'Give me a blow job,' he said. He was standing now. I was on the
> ground, trying to search among the filth for my clothes. He kicked me
> and I curled into a ball. 'I want a blow job.' . . . He grabbed my head.
> 'Put it in your mouth and suck,' he said. 'Like a straw?' I said. 'Yeah,
> like a straw.' I took it in my hand. It was small. Hot, clammy. It
> throbbed involuntarily at my touch. He shoved my head forward and I
> put it in. It touched my tongue. The taste like dirty rubber or burnt
> hair. I sucked in hard… 'Bitch,' he said. His penis still limp, he held it
> with two fingers and peed on me. Just a little bit. Acrid, wet, on my
> nose and lips. The smell of him- the fruity, heady, nauseating smell-
> clung to my skin.

4.   Upon learning that the man identified as the author's attacker was recently

exonerated many years later, and that the West Des Moines School District

removed it from their collections, I asked former Johnston superintendent,

Laura Kacer, to remove the book from the Johnston High School library. Ms. Kacer informed me that she removed the book from the library because library records showed it was rarely checked out. I am not aware of any teachers or faculty that objected to this circulation decision.

5.  After Senate File 496 passed, Superintendent Nikki Roorda communicated to board members and faculty that the District would move forward and follow the law.

6.  Johnston enforces an Internet Appropriate Use Regulation. This policy calls for schools to use a "technology protection measure that provides blocks to internet sites that are deemed inappropriate in content, graphic, message, or intent (i.e. sites that are obscene, child pornography, or harmful to minors)."

7.  None of these policies have been affected by the enactment of Senate File 496.

8.  Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I witnessed any negative impact on education provided by District employees to their students.

9.  I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 19, 2023.</u>     */s/ Deb Davis*
                                        Deb Davis

Exhibit E

Affidavit of Davis Eidahl

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>KIM REYNOLDS, in her official capacity<br>as Governor of the State of Iowa, et al.,<br><br>    Defendants. | Case No. 4:23-cv-474-SHL-SBJ<br><br><br>**DECLARATION OF<br>DAVIS EIDAHL** |

COMES NOW, Davis Eidahl, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Davis Eidahl, and I am the Superintendent of the Solon Community School District ("District") in Solon, Iowa.

2. I have been in education for twenty-nine (29) years as a teacher, curriculum lead, principal, and superintendent.

3. I have been superintendent of the District since 2015. In my role as superintendent, I have the responsibility of the oversight of the District. Our District is comprised of four school buildings: (a) pre-school through third grade; (b) fourth and fifth grade; (c) sixth through eighth grade; and (d) ninth through twelfth grade. The District has a total of roughly 1500 students with 450 students at the pre-school through third grade level and an average of 125 students for every other grade.

4. My educational philosophy is, and has been, that the District does not replace parents. Decisions on whether a child is an appropriate age to review a

specific type of material is for parents to make. Each of the families in the District may each have different values, but, my view is that those values are for them to instill – not the District.

5. Senate File 496 did not change our practice significantly regarding parental notification. Prior to the passage of the legislation, the District had an administrative practice that nothing be kept from parents: major or minor. Since that time, we have continued to adhere to that practice. For example, if a student reports to the nurse's office with a headache and would need medication, parents are notified.

6. After the passage of Senate File 496, myself, the assistant superintendent, and the District librarian review the content of books prior to placing them in the school buildings or library. If there are explicitly descriptive sexual passages—regardless of the nature of the relationship or the gender of the participants depicted—the materials are removed from the library. Depending upon concerns of age-appropriate content, sexual or otherwise, a book may then be moved to our Middle or High School buildings, if appropriate, or removed from the district library entirely.

7. In September 2023, the following books were moved from our elementary or middle school buildings to our high school building based upon age-appropriate content concerns:

    a. "The Fault in Our Stars" by Lois Green

    b. "Everything, Everything" by Nicola Yoon

    c. "The Hate U Give" by Angie Thomas

    d. "Drama" by Raina Telegmeier

8. In August-September 2023, several books were removed from our school district based upon age-appropriate content concerns, including:

    a. "Absolutely True Diary of a Part-Time Indian" by Sherman Alexie

    b. "Looking for Alaska" by John Green

    c. "Nineteen Minutes" by Jodi Picoult

    d. The "Court of Thorns and Roses" Series by Sarah J. Maas including:

        i. "A Court of Thorns and Roses"

        ii. "A Court of Wings and Ruin"

        iii.   "A Court of Frost and Starlight"

        iv.   "A Court of Mist and Fury"

9. If a parent or student wants to challenge the determination not to offer the book in the Library, there is a school board protected process for doing so. A hearing is heled before a committee ("Committee") comprised of educators, administrators, high school students, parents, and a community member. These individuals will then have the ability to determine whether the specific book be included in the Library.

10. No efforts are made by our educators or administrators to remove books or other materials from the Solon Public Library—which is not affiliated with the District. Further, no efforts are made by our educators or administrators to restrict District students' access to the Solon Public Library. Annually, the children's librarian from the Solon Public Library visits the elementary school to provide students information about access to the public library.

11. I have worked to partner with our language arts faculty in reviewing materials to have robust discussion regarding what type of restrictions the law places on sexual content and what is age-appropriate for their particular students. These discussions are evolving and on-going.

12. Since the passage of Senate File 496, the Solon Community District High School's Gay-Straight Alliance ("GSA") has continued its nine-years as a club uninterrupted. The GSA continues to have a faculty advisor who, to my knowledge, has faced no retribution from any students or faculty members for being so-affiliated.

13. Since the passage of Senate File 496, to my knowledge, no students have faced bullying or harassment which has been reported to the District based on their gender identity or sexual preference.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  12 – 19 – 2023 .

Davis Eidahl

Exhibit F

Affidavit of Clint Evans

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., <br><br> Defendants. | Case No. 4:23-cv-474-SHL-SBJ <br><br><br> **DECLARATION OF CLINT EVANS** |

COMES NOW, Clint Evans, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Clint Evans. I am a resident of Urbandale, Iowa and a current elected Johnston School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. After Senate File 496 was signed by the Governor, Superintendent Nikki Roorda informed myself and other that the District would follow the law. In my experience, I have not heard or witnessed faculty or administrators struggling to understand or implement the law.

4. The Johnston Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

5. The District has created, and abides by, its own anti-bullying policies at each of its schools. The Board's policy for all students and faculty requires that "school employees, volunteers, and student shall not engage in bullying or harassing behavior…"

6. The Anti-Bullying/Anti-Harassment Policy also requires that "[w]ithin 24 hours of receiving a report that a student may have been the victim of conduct that constitutes bullying and/or harassment, the district will notify the parent or guardian of the student."

7. The District also enforces a policy regarding the formation and content of after-school clubs. It is broadly applicable and not particular to a single group.

8. None of these policies have been affected by the enactment of Senate File 496.

9. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I witnessed any negative impact on education provided by District employees to their students.

10. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 19, 2023.</u>　　　　*/s/ Clint Evans*
　　　　　　　　　　　　　　　　　　　Clint Evans

Exhibit G


Affidavit of Mandy Gilbert

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., | Case No. 4:23-cv-474-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF** |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | **MANDY GILBERT** |
| Defendants. | |

COMES NOW, Mandy Gilbert, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Mandy Gilbert. I am a resident of Johnston, Iowa and live within the Johnston Community School District. I am the mother of three children who attended Johnston community schools until 2021-2022 school year.

2. My oldest child, A.G., was a sophomore at Johnston High School in the Fall of 2021.

3. Because of months of online school due to the COVID-19 pandemic, my daughter became very depressed. She was spending hours a day alone in her room without in-person human interactions and her grades began to suffer. Although Johnston schools eventually began bringing students back to the classroom on a part-time basis, this hybrid model did not provide the needed stability and normalcy for my daughter to reach her academic potential. She

disengaged from her family and was temperamental. She would make borderline suicidal comments. Only when classes returned full-time and student activities resumed did my daughter experience a relief from her stress. That is, until the school faculty introduced her and her classmates to sexually inappropriate books.

4. During the 2021 Fall semester, my child was enrolled in Advanced Placement (A.P.) English. During the first week of school in August, A.G.'s teacher, Kristi Miller, sent home a curriculum notification that requested a parent to sign and acknowledge the class activities and books assigned. Nowhere in this notification was a description of the content of these books or information that a student could opt out and how to do so. Among those books was *The Absolutely True Diary of a Part-Time Indian* (herein "*True Diary*") and *The Hate U Give*.

5. Upon reading in the notification and the titles of the books available in the class, I researched the content of *True Diary* and *The Hate U Give*, which included renting the books from the public library and reading their entirety.

6. Upon reading *True Diary*, I learned it contains the following passages:

> And the thing is, Miss Warren was hugging me so tight that I was pretty sure she could feel my, er, physical reaction. I was kind of proud, you know?
>
> Yep, that's right, I admit that I masturbate. I'm proud of it. I'm good at it. I'm ambidextrous. If there were a Professional Masturbators League, I'd get drafted number one and make millions of dollars. And maybe you're thinking, 'Well, you really shouldn't be talking about masturbation in public.' Well, tough, I'm going to talk about it because EVERYBODY does it. And EVERYBODY likes it. And if God hadn't

wanted us to masturbate, then God wouldn't have given us thumbs. So I thank God for my thumbs. But, the thing is, no matter how much time my thumbs and I spend with the curves of imaginary women.

7. Upon reading *The Hate U Give*, I learned it contains the following passage:

> Let me clarify, my butt against his crotch, my back against his chest, I'm bumping up against him trying to figure out how to get the ball back in the hole. It sounds way dirtier than it actually is especially in this position.

8. Once I discovered the sexually explicit content in these books, I shared with A.G. that this book contained inappropriate, sexually explicit content and that I would not sign the curriculum acknowledgment.

9. A.G. then asked me, "Why would a teacher want me to read that?"

10. I reached out to Ms. Miller and Principal Ryan Woods and met with them and Teaching and Learning Coordinator, Mary Cooksley, along with my husband. We expressed our opposition to A.G. reading such sexually explicit content. I brought printed excerpts from *True Diary* and asked Mr. Woods to read them aloud, to which he obliged. When he reached portions about how a young character masturbates and how his teacher in the book can feel his erect penis as they hugged, Mr. Woods fell silent and stopped reading aloud. I was never given a response as why it was appropriate for students to read this content. Ms. Miller and Mr. Woods suggested that another book could be added to the list of titles. I then asked Ms. Miller and Mr. Woods, that although *True Diary* was one of several books available to the A.P. English class, why it was required reading for the entire sophomore class not enrolled in the A.P. English track. They informed me that if I was challenging the 10th

grade curriculum, that I would have to work through the reconsideration process.

11. Ms. Miller and Mr. Woods never followed back up with me after the meeting about proposed alternative books or how they would prevent A.G. from being singled out or ostracized as potentially being the only one in the class reading an alternative book.

12. A.G. and her friends discussed amongst themselves that they thought it was ridiculous that they had to read *True Diary* because of the graphic sexual content and because it normalized harmful male and female relationships and the objectification of women. They didn't understand why it was acceptable to read these books when it seemed to contradict the #MeToo movement.

13. When I informed school administrators that I wanted to pursue a curriculum challenge to *True Diary*, I was informed that the hearing wouldn't take place until after the school board elections in November, approximately two months later after my initial complaint. During the second of two reconsideration hearings, I was heckled and harassed by parents and students, and even a then-current school board member, who want this book available to every child. At the conclusion of this hearing, and in front of a hostile and angry crowd of people in support of this book, the reconsideration committee made zero alterations to the availability of this book both in the A.P. English class and as part of the entire 10th grade curriculum.

14. At the end of the 2021-2022 school year, Johnston Middle School, which educates the eighth and ninth graders in the District, and where my son would be attending during the next school year, allowed a student to publish in the annual yearbook an editorial bullying me and my family by extension for raising the issue that students should not be subjected to books that include descriptions of masturbation and student-on-teacher sexual touching. I was called a nazi, racist, and homophobic. When I asked why the school allowed a student to publish such an article, administrators could only express regret for how it made my family and me feel.

15. After my children and I experienced these indignities, I no longer send my children to the Johnston Community School District.

Executed on <u>December 19, 2023.</u>      */s/ Mandy Gilbert*
                                       Mandy Gilbert

Exhibit H

Affidavit of Pamela Gronau

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., | Case No. 4:23-cv-474-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF** |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | **PAMELA GRONAU** |
| Defendants. | |

COMES NOW, Pamela Gronau, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Pamela Gronau, and I am a resident of Urbandale, Iowa. I live within the Urbandale Community School District. My son, C.G., currently attends Urbandale High School.

2. The Urbandale High School Library contained the following books: *Lawn Boy*, *All Boys Aren't Blue: A Memoir-Manifesto* (herein *All Boys Aren't Blue*), and *Gender Queer: A Memoir*.

3. Myself, along with seven other parents, requested the books be removed from the Urbandale High School Library or that parent permission be required for checkout.

4. A hearing was held before a book-review committee ("Committee") formed by the Urbandale School District.

5.  During the hearing, the book *All Boys Aren't Blue* by George M. Johnson was evaluated.

6.  The following passages are found in *All Boys Aren't Blue*. Those provided are only a sample of the many sexually explicit passages.

> 'Get your hand off my butt.' You giggled. 'That's not my hand.' 'You're lying,' I said. You then placed both hands on my hips, as we lay side by side. There was still something poking me. You were fully erect at this point. I was nervous. 'We gonna get in trouble.' 'You can't tell anybody, okay?' you said. 'You promise that you not gonna tell anyone?' I promised. You then grabbed my hand and made me touch it. It was the first time I had ever touched a penis that wasn't my own. I knew what was happening wasn't supposed to happen. Cousins weren't supposed to do these things with cousins. But my body didn't react that way. My body on the inside was doing something, too.
>
> You told me to take off my pajama pants, which I did. You then took off your shorts, followed by your boxers. There you stood in front of me fully erect and said, 'Taste it.' At first, I laughed and refused. But then you said, 'Come on, Matt, taste it. This is what other boys like us do when we like each other.' I finally listened to you.
>
> The whole time I knew it was wrong, not because I was having sexual intercourse with a guy, but that you were my family. I only did that for about forty-five seconds before you had me stop. Then you got down on your knees and told me to close my eyes. That's when you began oral sex on me as well. It was the strangest feeling in the world. Unfortunately, I didn't have a handbook to earn sexuality as a queer boy.
>
> He reached his hand down and pulled out my dick. He quickly went to giving me head. I just sat back and enjoyed it as I could tell he was, too. He was also definitely experienced in what he was doing, because he went to work quite confidently. He then came up and asked me if I wanted to try on him. I said sure. I began and he said, 'Watch your teeth.' I didn't want to let him know I was inexperienced. So, I slowed down and took my time and luckily got into a good rhythm. He didn't know I was a virgin, and I did my best to act dominant like my favorite porn star. I was an actor, and this was my movie.

I remember the condom was blue and flavored like cotton candy. I put some lube on and got him up on his knees, and I began to slide into him from behind. I tried not to force it because I imagined that it would be painful; I didn't want this moment to be painful. So I eased in, slowly, until I heard him moan.

7. Despite findings from the Committee that "students who have been sexually abused might find this triggering" and "graphic depiction of sexual acts" that "if students were not prepared, they could be harmed" the Committee determined the book should remain in the library. A picture from the committee meeting weighing the obscenity harms against the instructional value is attached to show what we saw:



8. Also, during the course of the hearing, the Committee reviewed the book
   *Gender Queer* by Maia Kobabe. *Gender Queer* contains the following
   illustrations.

  

 

9. In spite of Committee findings that "casual examination of the content (i.e. flipping through) might expose images they are not prepared to see" and the content being "very mature" the Committee determined the book should remain in the library.



10.  The Committee also reviewed the book, *Lawn Boy* by Jonathan Evison. The following passages are found in *Lawn Boy*. Those provided are only a sample of the many sexually explicit passages.

> But there's one thing I'd never tell Nick in a million years, not that it really matters: in fourth grade, at a church youth-group meeting, out in the bushes behind the parsonage, I touched Doug Goble's dick, and he touched mine. In fact, there were even some mouths involved.

> 'What if I told you I touched another guy's dick?' I said. 'Pfff.' Nick waved me off and turned his attention back to his beer. 'What if I told you I sucked it?' 'Will you please just shut up already?' 'I'm dead serious, Nick.' 'Well, I'd say you were a fag.' 'I was ten years old, but it's true. I put Doug Goble's dick in my mouth.'… 'I was in fourth grade. It was no big deal.' Cringing, Nick held his hands out in front of him in a yield gesture. 'Stop.' 'He sucked mine, too.'

11. Despite Committee findings that "sexual interaction that was depicted was presented early on in the book without context or preparation – felt 'traumatic'" and "language (cursing offensive names) present from the first page on with no indication of this in reading the jacket cover" the Committee determined the book should remain in the library.



12. Myself, and seven other parents, supported the appeal of the Committee's determination to the Principal of Urbandale High School pursuant to school policy. The Principal determined the books should remain in the library.

13. Myself, and seven other parents, supported the appeal of the Principal's determination to the superintendent. The superintendent determined the books should remain in the library.

14. After passage of Senate File 496, these books were ultimately removed from the library.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12/18/2023_____.    /s/ Pamela Gronau_____
                                         Pamela Gronau

Exhibit I

Affidavit of Teri Patrick

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al.,<br><br>Defendants. | Case No. 4:23-cv-474-SHL-SBJ<br><br><br>**DECLARATION OF TERI PATRICK** |

COMES NOW, Teri Patrick, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Teri Patrick. I am a resident of Clive, Iowa and live within the West Des Moines Community School District. In the Fall of 2021, my son attended Valley High School.

2. That year, I had heard rumors that there were books that contained sexually explicit content in schools across Iowa. In order to see if this information was true, I searched the online library catalog for West Des Moines schools. I learned that Valley Southwoods, the school that educates ninth graders in the District, circulated, *Gender Queer: A Memoir* (herein "*Gender Queer*").

3. *Gender Queer* contains the following illustrations:











4. The book also informs the reader that a landmark previously "housed the filming studios of kink.com," an actual pornographic website that markets its content as "Authentic Bondage & Real BDSM Porn Videos" and that it "[D]emystify[ies] and celebrat[es] alternative sexuality by providing the most authentic kinky videos. Experience the other side of porn."

5. In October 2021, I emailed West Des Moines school board member, Jeff Hicks, alerting him of the sexually explicit and inappropriate content in this book and that it was available at Valley Southwoods. He directed me to the reconsideration policy found in the West Des Moines Community Schools Board Policy 605.05.

6. In November 2021, I submitted a reconsideration request to the Principal of Valley Southwoods, Mitchell Kuhnert, related to *Gender Queer*. I objected to the pornographic illustrations and sexual content of the text citing many examples throughout the over-200-page book. Mr. Kuhnert responded saying that a reconsideration committee had been selected and that I would receive the decision in a few weeks. I was never notified who was appointed to the committee other than each member's status in relation to the district (e.g., teacher, student, administrator, etc.). I requested to present in front of the committee if there was the potential the book would not be removed, but my requests were ignored.

7. In December 2021, Mr. Kuhnert informed me that the reconsideration committee voted unanimously to keep the book available in the library. The

committee decided the primary purpose of the book was autobiographical. The committee also stated that the book had received two literary awards. One of the awards was an Alex Award, which is given to "ten books *written for adults* that have special appeal to young adults, ages 12-18" (emphasis my own). The fact that this book won an award is irrelevant in addressing the obscene material contained in the book, which was the basis of the reconsideration request. In addition, the very requirement of the Alex Award is that the book is written for adults, not teens or younger.

8. I appealed the committee's decision for the following reasons: age appropriateness for minors, sexually graphic content, crude language, justification provided for keeping it, and committee selection process. The initial committee review was not impartial, nor did it have any chance to be, because membership of the committee was determined solely by Principal Kuhnert. Further, minors were asked to sit on the committee. By appointing students, if the material was deemed to be obscene and not educational, it would be a violation of Iowa code section 728.2. If the book was found to contain obscene content lacking educational value, the school would have in effect disseminated obscene content, in violation of the law, to students on the committee and in the school library.

9. My appeal was reviewed by the Teaching and Learning Services Advisory Committee, which affirmed the original decision. I then appealed the decision to the full West Des Moines School Board. I read a statement to the school

board at the beginning of the hearing. After I had sat down following my statement to the board, I was called to the microphone where board members questioned me for approximately 20 minutes about my values as a person, and very little about *Gender Queer* itself. They affirmed the original decision 6-1. One board member, Anadelia Morgan, stated that a picture of a bearded naked man on his knees reaching to fondle the penis of a smaller naked male couldn't be assumed to be pedophilia as it might just be a smaller man that had shaved, so it might be consenting adults.

10. I appealed the decision again. This time to the Iowa Board of Education. A hearing in June of 2022 was convened, and my attorney questioned West Des Moines Community School District Superintendent Dr. Lisa Remy. Here is a transcript of their exchange:

> **Lawyer:** Categorically would you consider a book that had photographs of naked adults in sexual situations be inappropriate in any school library?
>
> **Superintendent:** So I believe that if we had a book that someone had a concern about, we would follow policy 605.05 and determine if that book should be allowed in the library.
>
> **Lawyer:** So the answer to my question is no, it's not categorically inappropriate, you would have to look at the book and make a decision through your process, is that right?
>
> **Superintendent:** We would use the policy and follow the policy to make the decision, yes.

11. The Board of Education eventually dismissed the challenge on procedural standing grounds, stating that because my son was not a current student at

Valley Southwoods, I was not able to bring a challenge. Standing doctrine was only raised relatively late in the process, in a request for supplemental briefing issued in July.

12. After the Board of Education made its ruling, and at the beginning of the new school year that started later that month, I learned that *Gender Queer* was not only in Valley High School, where my son was a student, but that it was displayed at the front of a classroom where students could view it and check it out from the teacher. A picture of that classroom display can be seen below.



13. I asked the Board of Education to reconsider its decision that I did not have proper standing (and which I don't believe I need) but it never responded to my request.

14. I enrolled my son at a private school for language arts classes his junior year of high school because we had heard of a language arts teacher displaying *Gender Queer* in her classroom. He attended all other classes through Valley

High School. In the spring semester of that same school year, I met with the Principal, the Curriculum Coordinator, and his counselor and they told me that they would not accept his credit for language arts and if he did not take the four remaining language classes, he would not be allowed to graduate from Valley High School. I did not want him to have to redo those classes at Valley and so I opted then to have him open enroll during his senior year. He will not graduate with a diploma from Valley High School. Because I felt the content in the language arts classrooms was obscene, and because I had challenged books in the District and didn't want him to face repercussions, I enrolled my son in alternative language arts programming. Because of that, my son will not receive a diploma from Valley High School, something he has worked for his whole life.

15. In September of 2022, I submitted another request for reconsideration. This time for seven books at Valley High School, three of which that were also circulating at Valley Southwoods. This reconsideration was much slower than the reconsideration process for *Gender Queer*. I did not hear back from the reconsideration committee for more than six months regarding the books at Valley High School and I never heard back from the books challenged at Valley Southwoods. It was never communicated to me why West Des Moines Community Schools Board Policy 605.05 was not followed.

16. I believe the obscene content of *Gender Queer* and the other books I challenged outweighs any literary value that might be found in them.

17. *Gender Queer* is available at the West Des Moines and Urbandale public
    libraries and it can be purchased at bookstores and online retailers.


Executed on <u>December 19, 2023.</u>    */s/ Teri Patrick*
                                         _____
                                         Teri Patrick

Exhibit J

Affidavit of Matt Rollinger

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., <br><br>     Plaintiffs, <br><br>   v. <br><br> KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., <br><br>     Defendants. | Case No. 4:23-cv-474-SHL-SBJ <br><br><br> **DECLARATION OF** <br> **MATT ROLLINGER** |

COMES NOW, Matt Rollinger, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Matt Rollinger. I am a resident of Marion, Iowa and a current elected Linn-Mar School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. In this district, faculty are mandatory reporters of suspected abuse or neglect of their children. This District notifies parents when their child is injured on school grounds or during school activities. Parents of disabled children may request notification on a variety of topics related to their child, including

issues related to medication, behaviors in the classroom, and bullying incidents.

4. I believe that any confusion on how to interpret or implement Senate File 496 is illegitimate and purposefully obtuse. As an example, the new law requires parental notification if a student requests a gender-identity affirming accommodation, including a request to be addressed by a name or pronoun different than assigned in the school's registration forms or records. The Alburnett Community School District notifies every parent at the beginning of the school year informing them that if they want their child to use a preferred name, that the parent should let the school know. It's a simple implementation of a simple policy. Conversely, Linn-Mar schools requires teachers to refer to students by their legal name until the parents reach out to the school first. One of these school districts took a commonsense approach; the other did not.

5. Linn-Mar has standards for appropriate internet usage by students. Students are prohibited from using District devices or networks to access or share inappropriate content. Inappropriate use includes, but is not limited to, "accessing . . . or distributing pornographic, obscene, profane, abusive, threatening, sexually explicit or otherwise inappropriate material, or material encouraging or promoting discrimination towards individuals or groups of individuals based upon a legal protected trait or characteristic." I

am also aware that Linn-Mar schools engage filters to prevent students from accessing inappropriate content on the internet.

6. The Linn-Mar Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

7. Linn-Mar has standards for appropriate student conduct. Linn-Mar requires students to "conduct themselves in a manner fitting to their age level and maturity and with respect and consideration for the rights of others while" in or on school property or at school-related events.

8. In addition to generally applicable policies against bullying, Linn-Mar has a policy that specifically addresses transgender students, Policy 504.13. This policy states: "The Linn-Mar Community School District is committed to serving the educational needs of the [transgender] community and underscores its commitment by supporting all students in a safe learning environment." Linn-Mar does not have a specific policy addressing any other protected class of people. This policy was adopted prior to the enactment of Senate File 496 and has not been modified since.

9. The District's anti-bullying and internet use policies remain unaffected after the enactment of Senate File 496.

10. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I

witnessed any negative impact on education provided by my colleagues to

their students.

11. I am not aware of any increase in harassment or bullying since Senate File

496 was enacted.

Executed on <u>December 18, 2023.</u>     */s/ Matt Rollinger*

Matt Rollinger

Exhibit K

Affidavit of Whitney Smith McIntosh

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al.,<br><br>    Defendants. | Case No. 4:23-cv-474-SHL-SBJ<br><br><br>**DECLARATION OF<br>WHITNEY SMITH MCINTOSH** |

COMES NOW, Whitney Smith McIntosh, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Whitney Smith McIntosh. I am a resident of Altoona, Iowa and a current elected Southeast Polk School Board member.

2. I support curricula and library books in our kindergarten through 12th grade schools that contain only age-appropriate material. I also believe that our district should not provide any program, curriculum, test, survey, questionnaire, promotion or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six.

3. I believe that the Senate File 496 uses language that educators are capable of understanding. Many faculty and administrators have diplomas in advanced degrees. I believe if any confusion exists on what the law covers or how it is to be implemented, it is feigned and overblown. If the law is confusing to

teachers and administrators, then they aren't in the best position to be educating students.

4. Earlier during the COVID-19 pandemic, Southeast Polk Schools received federal money to help mitigate the effects of COVID-19. Some federal funds went to replacing library books that were lost because they were never returned, whether due to the chaos imposed by the pandemic, or other reasons. Librarians and administrators responsible for purchasing new books did not replace the lost books with new copies. Instead, new titles were purchased. These new books contained sexual themes.

5. The Southeast Polk Community School District abides by Iowa Code section 280.28 which prohibits harassment and bullying, which among other things, states that "school employees, volunteers, and students in Iowa schools shall not engage in harassing or bullying behavior."

6. The District has created, and abides by, its own anti-bullying policies at each of its schools. As an example, the 2023-2024 Southeast Polk Junior High Student Handbook declares that students "will not bully others" and "will help students who are bullied." The Handbook outlines procedures for what students and faculty should do if they experience or witness bullying.

7. The District also maintains a policy that governs internet and technology usage. "Sending or displaying offensive messages or pictures" or "[u]sing obscene language" is not permitted. Further, "[a]ccess to district networks and electronic information resources is a privilege and not a right, and will be

provided for the student as is appropriate to the school building and grade level."

8. The District's anti-bullying and technology policies remain unaffected after the enactment of Senate File 496.

9. Since the enactment of Senate File 496, there has been no negative impact on the quality of education that the District provides to students, nor have I witnessed any negative impact on education provided by my colleagues to their students.

10. I am not aware of any increase in harassment or bullying since Senate File 496 was enacted.

Executed on <u>December 19, 2023.</u>        */s/ Whitney Smith McIntosh*
                                            Whitney Smith McIntosh

Exhibit L

Affidavit of Joshua Briggs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IOWA SAFE SCHOOLS, et al., | Case No. 4:23-cv-474-SHL-SBJ |
| Plaintiffs, | |
| v. | **DECLARATION OF** |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | **JOSHUA BRIGGS** |
| Defendants. | |

COMES NOW, Joshua Briggs, and pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. My name is Joshua Briggs, and I reside in Urbandale, Iowa.  I live within the Waukee Community School District.

2. I grew up in Waukee, Iowa, and relocated my family to the area for the academic reputation of the Waukee Community School District.

3. In the Fall of 2021, my daughters M.B. and B.B. attended elementary school in the Waukee Community School District.

4. As my children matriculated into Waukee schools, I became very concerned regarding the books available at the Waukee High School Library.

5. It came to my attention that several age-inappropriate books were available to Waukee High School students in the Waukee High School Library.

6.  Included among these titles was the book "Gender Queer" by Maia Kobabe.

    This graphic novel included sexual content with depictions of sex acts and

    anatomy as shown below:








7. My wife and I formally requested "Gender Queer" be pulled from the high

school library. Our request was denied by the librarians, principals, and a

committee of teachers at both Waukee high schools.  Eventually, this book
was removed by the superintendent of Waukee schools.

8. During the reconsideration process for this book, I was disappointed in the
Waukee school district's failure to create healthy boundaries for children
when it comes to sexual content.

9. After these events, my wife and I removed our children from
the Waukee School District based upon our concerns about the
content they had access to.

10. After our oldest two children were enrolled in private school, we continued
to have concerns about the Waukee schools prior to our youngest children
becoming school age.

11. We formally requested the removal of the book graphic novel *Let's Talk
About It: The Teen's Guide to Sex, Relationships, and Being a Human* a book
published by Penguin Random House which, among other sexual content
advises students how to send nude photos to one another without being
detected.

12. As shown below, the book also includes explicit discussions of sexual
behavior with visual depictions of anatomy:

Copyrighted Material

What is . . . this book? -   -   -   -   -   -   -   1

What is . . . first?   -   -   -   -   -   -   -   9

What is . . . a relationship?   -   -   -   -   -   25

What are . . . gender and sexuality?   -   -   -   41

What is . . . body image?   -   -   -   -   -   57

What is . . . your body?   -   -   -   -   -   71

Where do you . . . start?   -   -   -   -   -   93

What is . . . masturbation?   -   -   -   - 107

What is . . . safe sex?   -   -   -   -   - 125

What is . . . climax?   -   -   -   -   - 137

What is . . . sexting?   -   -   -   -   - 147

What are . . . kinks, fantasies, and porn? -   - 155

What is . . . aftercare?   -   -   -   -   - 169

Where are . . . friends in all this? -   -   - 177

What is . . . jealousy? -   -   -   -   - 185

What is . . . rejection? -   -   -   -   - 197

What is . . . next?   -   -   -   -   - 219

Furthur reading   -   -   -   -   -   - 228

Authors' note   -   -   -   -   -   - 230

Index   -   -   -   -   -   -   - 231

Copyrighted Material

Copyrighted Material





Copyrighted Material

Copyrighted Material



But...but... If that's right, then... I'm probably NOT a virgin?!

Ha! I don't know what sort of sexy stuff you might have done, but yeah, chances are you're not the "perfect virgin."

See, "virginity" is this silly label people came up with to describe a person who hasn't done a *specific sexual act*, traditionally, a cisgender man or woman who hasn't yet had penis-in-vagina intercourse.





But since there are SO many ways to have sex between SO many different kinds of people and body parts, you can be a virgin in one kind of sex act and totally NOT a virgin in others. "Virginity" just doesn't work anymore in today's world.

Don't get me wrong, it's okay to avoid sexy activities if they don't interest you or if they have a special importance for you. It's okay to never have sex if you know it's not for you; that's often called abstinence. What's important is that you do what feels right.



18

Copyrighted Material

Copyrighted Material





Copyrighted Material



PAGE 15 (174 for kindle)



But here's a heads-up: pornography is a performance. It's not a blueprint on how to have sex in real life, just like an action movie isn't a guide on how to drive a car.

Watching porn uncritically can leave you with unrealistic expectations about what to do in the bedroom, so do yourself a favor and consume it with a hefty pinch of salt. At the same time, remember that the people you see on camera are real human beings who deserve your respect.

Ha, sometimes I worry I watch too much porn, you know?

Yeahhh, I know that worry! But there's nothing wrong with enjoying some porn; it's a fun sugary treat! Though if the amount of porn you're watching feels like it's impacting your life, then it's probably time to pull back and give it some thought.

185

















If you ARE feeling ready, one of the best first steps you can take is connecting with your body by learning to masturbate.

When you're safe and alone, give yourself permission to touch and explore your bod.

Relax, let your mind wander, and let your hands roam. There's no perfect way to touch yourself.

Try running the palms of your hands up and down your body. Touch ALL the different parts of you and not just the "naughty bits."

Your hands can do so many different things; they can press, massage, squeeze, pat, stroke, lightly pinch, and flick.

What kind of touch does your thigh like? Does your butt like being squeezed? What happens when you gently pat yourself? Does your nipple like to be pinched? Start light and apply more pressure. Discover what makes you feel good.

115



13. I requested this book be removed from the library, and the librarian denied our request. Eventually, the principal removed this book from the library.

14. My wife and I currently pay $21,000.00 for school tuition a year so our children are not exposed to the environment of hyper-sexualization in the Waukee School District.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on _12/19/2023____.           /s/ Josh Briggs
                                        _____
                                        Joshua Briggs