IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - - - - - X
GLBT YOUTH IN IOWA SCHOOLS TASK FORCE     :
d/b/a IOWA SAFE SCHOOLS, et al.,          :
                                          :
     Plaintiffs,                          :
                                          :
vs.                                       : Case No. 4:23-cv-474
                                          :
KIM REYNOLDS, in her official capacity    :
as Governor of the State of Iowa, et al., :
                                          :
                                          :
     Defendants.                          :
- - - - - - - - - - - - - - - - - - - - X
PENGUIN RANDOM HOUSE LLC, et al.,         :
                                          :
     Plaintiffs,                          :
                                          :
vs.                                       : Case No. 4:23-cv-478
                                          :
JOHN ROBBINS, in his official capacity    :    MOTION FOR
as President of the Iowa State Board of    :   PRELIMINARY
Education, et al.,                        :    INJUNCTION
                                          :
                                          :
     Defendants.                          :
- - - - - - - - - - - - - - - - - - - - X

                         Courtroom 265, Second Floor
                         U.S. Courthouse
                         123 East Walnut Street
                         Des Moines, Iowa
                         December 22, 2023
                         9:14 a.m.


BEFORE:  THE HONORABLE STEPHEN H. LOCHER, District Judge




              TONYA R. GERKE, CSR, RDR, CRR
                United States Courthouse
            123 East Walnut Street, Room 197
                  Des Moines, IA 50309

APPEARANCES:

For 4:23-cv-474 Plaintiffs:   THOMAS D. STORY, ESQ.
ACLU of Iowa Foundation
505 Fifth Avenue, Suite 808
Des Moines, IA 50309

LAURA JOY EDELSTEIN, ESQ.
Jenner & Block LLP
455 Market Street, Suite 2100
San Francisco, CA 94105

NATHAN MAXWELL, ESQ.
Lamda Legal
65 East Wacker Place, Suite 2000
Chicago, IL 60601

For 4:23-cv-478 Plaintiffs:   FREDERICK J. SPERLING, ESQ.
ADAM J. DIEDERICH, ESQ.
ArentFox Schiff, LLP
233 South Wacker Drive, Suite 700
Chicago, IL 60606

MARK E. WEINHARDT, ESQ.
The Weinhardt Law Firm
2600 Grand Avenue, Suite 450
Des Moines, IA 50312

For Defendants:   DANIEL JOE JOHNSTON, ESQ.
ALEXA DEN HERDER, ESQ.
NICK DAVIS, ESQ.
LINDSEY PURDY BROWN, ESQ.
Office of the Attorney General
1305 East Walnut Street
Des Moines, IA 50319

ERIC H. WESSAN, ESQ.
Iowa Department of Justice
1305 East Walnut Street
Des Moines, IA 50319

LINDSAY A. VAUGHT, ESQ.
LOGAN S. BRUNDAGE, ESQ.
EMILY A. KOLBE, ESQ.
Ahlers & Cooney
100 Court Avenue, Suite 600
Des Moines, IA 50309

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  Good morning, everyone.

3          We're convened today in two different cases.  The

4    first is GLBT Youth in Iowa -- Iowa Schools Task Force, et al.,

5    versus Reynolds, et al.  That's Case Number 4:23-cv-474.  The

6    second case is Penguin Random House, LLC, et al., versus

7    Robbins, et al.  That's Case Number 4:23-cv-478.

8          The purpose of today's hearing is to hear from the

9    parties on motions for preliminary injunction.  The two cases

10   have not been consolidated in any formal sense, but because both

11   motions attack the constitutionality of the same law, I thought

12   given the timing and other constraints, it was appropriate to at

13   least consolidate this hearing.

14         I'd like to start by having counsel identify

15   themselves for the record, and I'm most interested in

16   understanding who's going to be arguing on behalf of each party.

17         So let me start with the plaintiffs in the GLBT Youth

18   case.  Who is going to be arguing today?

19         MR. STORY:  Thank you, Your Honor.  That will be me,

20   Your Honor, Thomas Story.

21         THE COURT:  All right.  And how about the plaintiffs

22   in the Penguin Random House case?

23         MR. SPERLING:  Good morning, Your Honor.  Fred

24   Sperling on behalf of the Penguin plaintiffs, and I'll be

25   arguing.

1          THE COURT:  How about for the State defendants?

2          MR. JOHNSTON:  Good morning, Your Honor.  Daniel

3    Johnston.

4          THE COURT:  All right.  And I don't know if the school

5    district defendants intend to make any argument today or not,

6    but if they do, who will be speaking on behalf of them?

7          MS. VAUGHT:  Lindsay Vaught.

8          THE COURT:  All right.

9          Good morning to all of you.

10         As I mentioned in a text order about a week ago, my

11   preferred order of events here is to hear from both sets of

12   plaintiffs first, first the GLBT Youth plaintiffs, then the

13   Penguin Random House plaintiffs.  Then I'll hear from the State.

14   Then if the districts do want to argue, I'll give them an

15   opportunity to do so, and then I'll give both plaintiff groups

16   an opportunity for rebuttal as well.

17         So with that in mind, Mr. Story, I'll hear from you

18   first.

19         MR. STORY:  Thank you, Your Honor.  May I use the

20   podium?

21         THE COURT:  You may.

22         MR. STORY:  Thank you.

23         THE COURT:  And my rule, for what it's worth, is if

24   you want to use the podium, you're welcome to.  If you want to

25   stay at counsel table if you're more comfortable arguing there,

1   that's fine too.  We've got a lot of ground to cover today, and

2   I want to make sure you're where you're most comfortable.

3         MR. STORY:  Perfect, Your Honor.  Thank you.

4         My name is Thomas Story.  I'm from the ACLU of Iowa.

5   I'm counsel for the plaintiffs in the GLBT Youth case or the

6   Iowa Safe Schools case.  I'm here together with my co-counsel

7   from Lamda Legal, Nathan Maxwell, and co-counsel from Jenner &

8   Block, Laura Edelstein.

9         I also want to acknowledge and welcome the presence of

10   some of our plaintiffs here today, both representatives from the

11   Iowa Safe Schools and some of the student plaintiffs and their

12   parents and thank them for coming.

13         Your Honor, to the extent we need to formally, I would

14   like to reserve some time for rebuttal, and I don't know how

15   long you had anticipated we --

16         THE COURT:  I don't either.  I have a lot of

17   questions, and I want to hear a lot from you, so nobody's going

18   to get cut off today.

19         MR. STORY:  Okay.  So that's good.

20         THE COURT:  You might get bored, but you won't get cut

21   off.

22         MR. STORY:  All right.  Thank you, Your Honor.

23         So let me begin.  The Court has said that America's

24   public schools are the nurseries of democracy; right?  This is

25   the place where we educate the young for citizenship.  We

1  develop in them an inquisitive mind and an appreciation for the

2  constitutional rights that are secured to them including the

3  First Amendment and the Fourteenth.

4          We're challenging SF 496 today because that law does

5  the opposite.  That law represents the State exercising control

6  in matters of opinion and thought, and in doing so, it's

7  violating the freedoms of speech, association, and equal

8  protection.  Yes, the State has a duty to educate, but it does

9  not have the authority to indoctrinate.

10          To attack and erase the LGBTQ+ community, SF 496

11  transforms the public school environment.  Students are now

12  self-censoring for fear of being stigmatized, harassed, or

13  getting their teachers in trouble.

14          THE COURT:  Is there any penalty that can be imposed

15  on a student for saying something about gender identity or

16  sexual orientation or anything else?

17          MR. STORY:  Your Honor, it's not actually clear from

18  the "don't say gay or trans" position, as we've referred to it,

19  that a student could not be penalized, but beyond that, Your

20  Honor, the -- what we need to look at here is that -- I'm sorry.

21  Hold on.  So -- excuse me, Your Honor.

22          The infringement on their right to self-cens -- or on

23  their right to speak, that is what is being imposed.  So maybe

24  the penalty cannot be assessed against the students, but it can

25  be assessed against their teachers, and what does that mean for

1  them?  That means -- right, Your Honor -- that they're losing

2  this educational environment that's affirming and inclusive.

3  I'd liken that to students in the Fifth and Tenth Circuit who

4  have challenged laws that remove the diversity in hiring

5  practices for their teachers.  The students are still harmed.

6          I'd also liken it to the *International Association of*

7  *Firefighters* case in which the Eighth Circuit recognized that,

8  yes, maybe this law that infringes on the husband's right to

9  speak could be constitutionally imposed, but it cannot be

10  imposed upon the wife, so the wife did not want to speak because

11  her husband would be disciplined, and that would affect her.

12  This is the type of indirect harm that I think that we are

13  entitled to sort of --

14          THE COURT:  So let me take a step back for a minute.

15  When you talk about this sort of harm, when I look at this law,

16  there are at least two and probably three discrete parts of it

17  in my view.  And I say discrete.  I don't mean there isn't

18  overlap; there is some.  But there are book restrictions in

19  school libraries; there are restrictions on promotion,

20  instruction, et cetera, of sexual orientation and gender

21  identity in grades K through 6, and then there are some parental

22  rights provisions relating to situations where the school would

23  have to notify a parent if, as I understand it, a student is

24  having questions about gender identity or something like that.

25          When you talk about the sort of chilling effect that

1    the law has on students, which of those three categories are you

2    referring to, or is it all three?

3            MR. STORY:  It's all three, Your Honor.  All three

4    represent this message of stigmatization; right?  And we can

5    look to the *Speech First* case -- that's 32 F.4th 1110 -- right?

6    In the context of the First Amendment, it does not matter that

7    the discipline is threatened or imposed.  What matters is that

8    the students themselves are being silenced; right?  So each of

9    these provisions individually and collectively are imposing this

10   harm; right?  To say that it doesn't matter because it doesn't

11   discipline the students is to be willfully blind to the intent

12   and the impact of this law.

13           So I'll jump in to the impermissible chilling speech

14   case and explain this in more detail, Your Honor.  I think we

15   start from the perspective that student speech about sexual

16   orientation and gender identity is absolutely protected.

17   There's no argument that it's not.  The State doesn't claim it

18   is not.  The State's claim, as you've said, is that it hasn't

19   infringed upon it, but the declarations from the plaintiffs

20   undisputedly establish that it has.

21           And I'll give an example with A.C., a fourth grader.

22   A.C. has known she's transgender since she could express

23   herself.  Her family describes her always being proud and

24   comfortable in who she is.  Her school supported her with pride

25   flags, posters, other signs of messages of affirmation and

1  inclusion.  You are welcome here.  This is a safe space.  And

2  they supported her by respecting her pronouns, educating

3  students in the event it was necessary and making books that

4  feature kids like her available and allowing her to organize

5  into a GSA.

6          Because of these three provisions, because of this

7  law, all of those things are gone now; right?  The messages have

8  been taken down.  The books have been removed.  The GSA has been

9  prohibited, and the teachers cannot engage proactively to

10 protect her from bullying and harassment.

11         THE COURT:  Let's talk about that last piece for a

12 minute.  If -- if she goes to a teacher and says, I have

13 questions about my gender identity or I don't think my gender

14 identity matches my biological sex at birth, under your

15 interpretation of the law, what is the teacher allowed to do, if

16 anything?

17         MR. STORY:  They can't affirm it.  They can't engage

18 in promotion of that.  They can't educate her or other students

19 about gender identity or sexual orientation, but they are

20 required to call her parents.  That's what this law is doing;

21 right?  Those are those two provisions that we mentioned.

22         THE COURT:  So there are also provisions of the law,

23 though -- I can't remember if they're in Senate File 496 or if

24 they're preexisting, but they -- wherever the origin, they still

25 exist, and those are provisions of the law that do impose an

1  obligation on teachers to stop bullying or to protect students

2  from bullying, so if A.C. was being bullied, are you saying that

3  the teacher couldn't stop the bullying even?

4          MR. STORY:  No, I'm not, Your Honor, but what I'm

5  saying is that even if you look at these bullying provisions in

6  the law in isolation, you have to combine them with the

7  forced-outing provision.

8          So there's two -- and then you have to combine them

9  with "don't say gay or trans;" right?  There's two things to

10  that.

11          One, you've got students today that are being bullied.

12  One of our plaintiff declarants speaks to this.  His members of

13  the GSA are being bullied for who they are, for their identity,

14  but they are not seeking out.  They are not seeking help.  They

15  are enduring the pain.  They're enduring being treated

16  differently by their classmates for who they are because they

17  know that if they come to their teacher for help, they will be

18  reported, and it will be worse for them at home.

19          And the other point is that under "don't say gay or

20  trans," these proactive efforts that schools used to engage in

21  by these messages of affirmation, by these, you know, social

22  stories, by just the mere presence of books in the library that

23  have LGBTQ+ kids, those all -- right -- help a student feel

24  welcome, and they also expose children to different perspectives

25  and thereby discourage bullying at the outset; right?  That's

1  the problem.

2          The message sent by this law to A.C. is that you are

3  not welcome; you are a risk to your peers; you must stay silent,

4  and you are a sexual deviant because of your identity.  This is

5  a fourth grader.  A.C.'s received the message.

6          THE COURT:  So that -- I mean, I don't doubt that that

7  is how A.C. feels, but that is not how the State characterizes

8  this law.  To them, they're hearing concerns from parents who

9  feel like some of these subjects kids in grades K through 6 just

10  aren't emotionally mature enough to handle, and I may set the

11  balance differently than the legislature did here, but that's --

12  my job isn't to say whether I think a law is good or bad; it's

13  just to say whether it's constitutional, and when the State is

14  able to articulate a reason like that for the law, how does that

15  factor in?

16          Whose perspective do I have to look to, and ultimately

17  what's the constitutional standard that I need to be applying?

18          MR. STORY:  Thank you, Your Honor.

19          The State says that this is age inappropriate, that

20  any sexual identity -- or sexual orientation or gender identity

21  is age inappropriate.  I don't see that as a legitimate -- if

22  we're talking about the test under *Hazelwood* a legitimate

23  pedagogical concern; right?

24          And it also betrays -- along with the declarations the

25  State has submitted today and the things said during the

1    enactment of the bill, the intent and effect of this law was not

2    to protect children; it was to harm and discriminate against

3    certain children.  Right?  So it depends on what the claim is

4    that we're talking about here.

5            But for the purposes of students' chilled speech,

6    that's core speech, that is content- and viewpoint-based

7    discrimination and strict scrutiny.

8            I want to give a couple of other examples of the

9    plaintiffs that have experienced this harm; right?

10           B.F. doesn't discuss their identity in front of

11   teachers.  P.B.-P. once led a protest but is terrified of

12   engaging in that core political speech now and says that his

13   pride has dwindled to a small pin on his bag and a sticker on

14   his water bottle.  P.C. doesn't feel safe because they have to

15   verify that their teachers are affirming before speaking to

16   them, and James Doe stays silent about queer themes in class,

17   and all of them fear being bullied, fear getting teachers in

18   trouble, and they feel that they have lost the support of the

19   school because they have.

20           THE COURT:  That's -- those students are all above

21   grade 6; right?

22           MR. STORY:  Those students are above grade 6, Your

23   Honor, but, Your Honor, the "don't say gay or trans" provision

24   has been applied above grade 6 in different ways, for example,

25   your GSAs; right?  There are schools that have deactivated or

1 imposed restrictions on GSAs because of the potential presence

2 of 6th graders; right?

3 And it's not just "don't say gay" that is causing

4 these students to self-censor. It is the law as a whole. It is

5 the loss of books that represent their identity. It is the

6 forced-outing provision.

7 Let's think about the kids that don't have the support

8 of their family; right? B.F., B.F.S., James Doe, Robert Smith

9 all talk about these students, as does ISS, and their fear for

10 them; right?

11 And I mentioned before the example of James Doe's

12 friend who is not speaking out. I just want to point out that

13 some of the State's declarants have said they're not aware of

14 any increase in bullying because of this. Well, that's why,

15 because students are afraid of speaking out because of that

16 forced-outing provision.

17 ISS talks about members of its organization that

18 disclose to them that we aren't out at home. We are scared of

19 speaking out. We -- we cannot continue to participate. So it

20 is infringing with their rights in various ways; right? B.F.

21 talks about friends who will be kicked out of their home if

22 they're outed. That's an unfortunate reality for a lot of kids.

23 As I was saying, we'll move on to the State saying

24 that it's neutral -- right -- that it restricts all sexual

25 orientations and gender identity, that it bans all descriptions

1  of sex act.

2       Your Honor, first, that concedes that it's a

3  content-based restriction.  That's unconstitutional and subject

4  to strict scrutiny as long as we're talking about non-curricular

5  speech, but it's not neutral; right?  The text targets, for

6  example, programs and promotions, these things that imply some

7  sort of positive relationship, that the idea of it being okay to

8  have a different gender identity or sexual orientation, that's

9  what's being restricted, and, again, the intent, effect, and

10  impact all target these pro LGBTQ+ viewpoints.

11       And for evidence let's look at what was said; right?

12  Senator Rozenboom:  For all of human history, it was not an

13  issue to ban books featuring LGBTQ+ kids.  And then the books

14  removed -- not just in grades K through 6, but in all grades --

15  if you look at the list, they're disproportionately those with

16  LGBTQ+ characters, themes, messages of affirmation or support,

17  or by LGBTQ+ authors.

18       When you have the Governor standing up and reading

19  from a book that is an example of something that needs to be

20  banned, the Governor does not choose the heterosexual sex scene

21  in 1984; it's All Boys Aren't Blue.  Right?  And then when the

22  House sponsor and now the State's declarants are holding up

23  comic books that they think violate the law, they're not holding

24  up the heterosexual sex scene in V for Vendetta.  It's Gender

25  Queer that they focus on.

1      So what this does is you have a school now where a

2   sticker that says "It's Cool to Be Who You Are" is okay.  That

3   can stay, but if it has a rainbow, it's got to go.  Right?

4   That's the message sent by the law.  Silencing LGBTQ+ students

5   is the goal, and it's per se unconstitutional as we have raised.

6      THE COURT:  Let me follow up on that.

7      MR. STORY:  Uh-huh.

8      THE COURT:  So this portion of Senate File 496 says

9   there can't be any promotion, instruction, et cetera, relating

10   to gender identity or sexual orientation to students in

11   kindergarten through grade 6.  Gender identity is then defined

12   as a gender-related identity of a person regardless of the

13   person's assigned sex at birth.

14      When I read that plain language, it does seem content

15   neutral to me.  People whose gender identification matches their

16   biological sex at birth still have a gender identity; it just

17   happens to match.  And there's similar neutrality in the sexual

18   orientation language.  It says actual or perceived

19   heterosexuality, homosexuality, or bisexuality.

20      Both groups of plaintiffs have acknowledged mostly in

21   footnotes that if you interpret that language to say what it

22   says, this law really is content neutral.  It's one of the most

23   bizarre laws I've ever read in my life, but it is content

24   neutral.

25      If I interpret it that way, would that mean that a

1   school, for example, could not have girls and boys bathrooms

2   because you would be promoting the idea of female and male

3   gender identity?  Could we not talk about historical figures and

4   refer to them as being male or female or referring to the nature

5   of their relationships?

6           Let's just say that I conclude that that's the only

7   way this law could be interpreted.  Is there a First Amendment

8   problem?  I think every teacher in the entire state is probably

9   violating the law, but is there a First Amendment problem?

10          MR. STORY:  Your Honor, for the reasons you've just

11  described, we know that's not how it was intended to be

12  interpreted, and that's not how it is being applied in schools.

13  It cannot be because they -- I guarantee you that this

14  legislature did not mean to get rid of boys and girls bathrooms;

15  right?  It cannot be that.  If it's neutral, it's absurd; right?

16  And it just simply cannot be interpreted that way.

17          So -- but we're talking about books.  I'll move on to

18  that.  If we have other questions, I'll be happy to take them,

19  but this has been an evolving situation for us; right?  The

20  state has now filed its briefing in both cases, and it appears

21  to concede that the "don't say gay or trans" provision doesn't

22  apply to library books.  I think that ignores what their own

23  proponents of the bill have said about it, and it also doesn't

24  deny that it is being applied to libraries, so the State can't

25  narrow the law by briefing.  That's not how we review statutes

1  for constitutionality.

2  　　　　Your Honor, removing books -- it deprives students of

3  the ideas within them.  Yes.  And it also tells them not to

4  express them; right?  That's why book bans are so repugnant to

5  the mission of a public school and the First Amendment; right?

6  When the State is banning a book, it's taking a side on a

7  competing viewpoint.  That's what it means to prescribe what

8  shall be orthodox, as in *Barnette;* to make an ideological or

9  religious-based reason to remove materials, as in *Pratt;* or

10  partisan and political reasons in *Pico* all unconstitutional, and

11  if we were to approve this law, that means stagnation in thought

12  and discourse in these kids.

13  　　　　So the State doesn't dispute that it is removing

14  books.  The State doesn't dispute that it is sending this

15  message.  What it says is that it is allowed to send the message

16  because it's government speech.

17  　　　　Your Honor, no court would ever go that far.  That

18  argument has been repeatedly rejected in every case to have

19  considered it.  The school library is a special place.  It's a

20  place of voluntary inquiry where kids can explore new ideas and

21  literally new worlds.  The government does not speak through it.

22  It does not take ownership of the message, and it does not

23  control the messages of the books within it, so it is

24  emphatically not government speech when we're talking about

25  books in a library.

1    So plaintiffs' declarations talk about why it's so

2  important for them to have representation; right?  P.B.-P.

3  describes how books not -- with featuring queer characters not

4  only help him understand himself, but it gives him hope for the

5  future that one day he says his life could be filled with as

6  much laughter and queer joy as those characters; right?  B.F.,

7  P.C., Robert Smith, T.S. -- they all say that representation

8  makes them feel seen.  Robert Smith just summarizes it:  It

9  helps us feel like we belong.

10    And, again, the State's not disputing that it is

11 removing those books.  It is not disputing that if you look at

12 the books removed, they're disproportionately those with LGBTQ+

13 ideas; right?

14    THE COURT:  So let me ask a question in this area.  So

15 I've read as many cases as I could find on book restrictions in

16 school libraries as well as other Supreme Court cases involving

17 First Amendment rights as it relates to free speech in schools,

18 and if there's one conclusion I can draw from them -- maybe the

19 most enduring lesson -- is that the Supreme Court cannot decide

20 what standard to apply to these challenges.  What standard are

21 you asking me to apply and based on what?

22    MR. STORY:  Thank you, Your Honor.

23    Well, first, we have to start that there is a right to

24 receive information.  That's beyond dispute.  Everybody in *Pico*

25 agreed with that.  Their question, as you noted, was just how to

1   apply it.

2          You've got *Pratt*.  That's an opinion that applies a

3   standard for ideological or religious reasons, but I think that

4   this case is fundamentally different from most of these

5   book-removal cases because we don't have, as in those, the sort

6   of local school saying these are the books we have to take out

7   and then, as in *Pratt,* you can review the reasons given.

8          What this is is this is a State, top down, saying

9   these are the contents, these are the viewpoints, as we allege,

10  that have to be removed, so I think that puts us back in the

11  world of regular content and viewpoint-based discrimination.

12         THE COURT:  But what is the viewpoint, though?

13  Because when I look at the books on the list that have been

14  removed -- I agree there are many that appear to be coming from

15  the perspective of someone who's gay or maybe transgender, but I

16  also see a lot of books on there involving heterosexual sexual

17  relationships, and those have been pulled off the shelves as

18  well.  Doesn't that support the idea that they are -- the law is

19  indeed content neutral?

20         MR. STORY:  Thank you, Your Honor.

21         Well, two things to that.  One is that to the extent

22  the K-through-6 portion of the law applies to libraries, it

23  cannot be; right?  And then for the all-ages ban, as we have

24  described it, yes, and in an example of the vagueness and

25  hopeless overbreadth of this law, there are books that are being

1  removed featuring heterosexual sex acts.

2          But that is not, I assert, the intent of this law.

3  This law is specifically designed to target the LGBTQ

4  viewpoints, and we look at that by what books they hold up as

5  examples of violating the law.

6          THE COURT:  But can I do that, though?  Don't I have

7  to evaluate the intent of the law based on the text that the

8  legislature chose as opposed to surrounding legislative history

9  or comments that politicians made at ceremonies?  What mechanism

10  am I supposed to go through on this?

11          MR. STORY:  Well, Your Honor, when it comes to

12  determining the legislature's intent, you're entitled to

13  consider what they've said.  You're entitled to consider the

14  legislative history of the enactment, so these statements are

15  relevant to determining that.  Just because the text may appear

16  neutral, it can still be intended, affected, and applied in a

17  content- and a viewpoint-based discriminatory way, and that's

18  what we're asserting here.

19          So I want to talk about why it's so harmful, that what

20  they're doing is harming these kids.  You've got B.F. who tells

21  the Court that removing books like this makes them feel that

22  they should be ashamed for who they are; T.S. says it feels like

23  who she is is being erased; and P.C. says that this shows LGBTQ+

24  students that they're inappropriate to exist with other children

25  as if their existence is somehow sexual or perverse, and that's,

1  Your Honor, stigmatization and action; right?  That is imposing

2  these feelings of shame and inferiority on the out group, and it

3  is also encouraging discrimination by everyone else.

4         This is what I'm talking about about we need to

5  consider the law as a whole and how it affects these kids;

6  right?  Ulrike Carlson, mother to P.C., talks about this, how

7  access to books containing diverse characters is an extremely

8  important factor in fostering tolerance and acceptance that is

9  needing to ensure members of the LGBTQ+ minority an access to

10  education free of harm without danger to their physical and

11  mental well-being, and P.C. reiterates removing books with

12  transgender characters prevents non-trans children from learning

13  about the topic in a child-appropriate way, and they're more

14  likely to react to their trans peers with confusion and

15  bullying.

16         There's no legitimate, let alone compelling, interest,

17  and we do assert that a compelling interest is required to

18  deprive these students of these books; right?

19         B.F., B.F.S., James Doe, P.B.-P, A.C., through their

20  parents Robert Smith, and T.S. -- I could have just said all of

21  our plaintiffs.  They all identify books or categories of books

22  that they want to access but cannot; right?  But it's more than

23  that.  The harm inflicted is more than that.  It's because of

24  this discriminatory stigmatizing message.

25         Your Honor, I assert that whatever test you apply, the

1  State cannot meet it because there is no interest for this law.

2  The State has said it's banning pornography; right?  Well, this

3  is not pornography.  It's not materials obscene for minors.

4  It's not porn because porn has already been prohibited to

5  provide to minors under Iowa criminal law, and it was already

6  excluded by Iowa librarians.

7         THE COURT:  Let me stop on that point because this is

8  another standard-based question that I want to make sure I

9  understand.

10         Are you saying that -- well, there's discussion in a

11  number of briefs about the obscenity standard.  Do you agree or

12  do you disagree that school districts can go beyond the

13  adult-obscenity standard in removing access to books for kids

14  under the age of 18?

15         MR. STORY:  I do agree, Your Honor.

16         THE COURT:  Okay.  Does the adult-obscenity standard

17  in your view nonetheless play some sort of anchoring role for

18  setting limits on what a school district can remove and what it

19  can't remove?

20         MR. STORY:  Yes, I do, Your Honor, and to be clear,

21  this is the variable obscenity definition that would be used in

22  cases like *Ginsberg*; right?  This is obscene as to minors.  So

23  we're not talking about books that are obscene as to everybody

24  but obscene as to minors.

25         No, the State does not have to stop all books that are

1  obscene as to minors or something right below that; right?

2  That's not where we're drawing the line, but it is relevant to

3  where they do it; right?  Because what they've done here is used

4  this blanket prohibition based on a sex act or based on books

5  with LGBTQ+ characters and themes; right?

6        The standard still matters, the obscenity standard,

7  because it still helps determine when something -- a restriction

8  on materials, on books, is overbroad or vague; right?  Does

9  every three of those factors work together to ensure that the

10  restriction is easily understandable, that the restriction can

11  be applied in a uniform way, but instead, here we've got this

12  blanket, overbroad, vague ban on the right to receive

13  information?

14        I'll talk about GSAs now.  They have a lot of

15  different names:  Gay-Straight Alliance, Gender Sexuality

16  Alliance, Queer Student Alliance.  I'm going to refer to them

17  all as GSAs and talk about how this law infringes upon a

18  student's right to express an association.

19        So what does a GSA do?  ISS talks about this.  It's a

20  non-curricular student organization of LGBTQ+ students and

21  allies with the goals of providing a safe space, addressing

22  anti-LGTBQ+ harassment and discrimination, promoting inclusive

23  and affirming school policies, and educating schools and their

24  communities about sexual orientation and gender identity, so

25  we're talking about student speech here organizing together to

1  engage in core political speech.

2         The tragic reality, Your Honor, is that LGBTQ+

3  students face a high risk -- disproportionately high risk of

4  suicidality and self-harm, so a GSA not only can enrich their

5  experience in school; it can literally save their life.

6         And one last thing on books is that both Gender Queer

7  and Melissa, both books banned under this law, they both talk

8  about the importance of a GSA in the protagonist in that book's

9  development in their finding community and identity.

10        So how is -- what has SF 496 done to GSAs?  Well,

11 A.C.'s and others have just been deactivated; right?  They're

12 just, no, because of SF 496, you've got to close.  And then in

13 others you've got faculty advisors that have been told not to

14 engage as they would in student discussion in other groups but

15 only to sit back and observe.  Some are requiring parental

16 permission.  Some are restricting the communication methods that

17 were available.

18        THE COURT:  And the restrictions you're talking about

19 right now -- those are in grades 7 and up?

20        MR. STORY:  I am, Your Honor.  Yes.

21        THE COURT:  And what's the -- what is it that the

22 school districts are seeing in the law that are leading them to

23 the conclusion that faculty involvement or the existence of GSAs

24 at all in grades 7 and up needs to be limited in the manner that

25 they're now articulating?

1        MR. STORY:  Program and promotion; right?  That's what

2   schools are saying, that if we let you, GSA, advertise -- right?

3   And that's the K through 6, but think about it.  If we let you

4   advertise in a space where a 6th grader might be present as it

5   is in middle schools or high schools, that could be promotion;

6   right?

7        They are also worried about the forced-outing

8   provision.  They don't want to have teachers getting involved

9   because that could put them in a position, right, during these

10  frank conversations about gender identity and sexual orientation

11  where they have to report home, and that has interfered with

12  both the ability to find sponsorship for GSAs -- as ISS and

13  Robert Smith talk about, right, teachers don't want to risk

14  this -- and the recruitment of GSAs as ISS, James Doe, Robert

15  Smith, and P.B.-P. all describe, that they know members or

16  would-be members that will not join this year because of that

17  fear of being outed.

18        So the right to speak, Your Honor, includes the right

19  to speak as a group.  There's no dispute about that, and the

20  harm being inflicted on these GSAs -- this harm that is actually

21  happening -- I understand that the State argues that SF 496

22  doesn't do this, but it is happening.

23        Schools are applying it in this way -- and I don't

24  think unreasonably so -- but they're only applying it to GSAs.

25  That is because of the content and viewpoint of the speech.

1   This is not happening to chess club.  It is not happening to

2   Bible study.  Because of that in this case, Your Honor, I'd

3   assert strict scrutiny applies.  There's no compelling

4   interests.  There's just a suppression of ideas.

5           I want to talk about overbreadth, and for here we'll

6   go through it provision by provision.  Overall I assert we need

7   to be going by claim by claim and looking at how the law as a

8   whole affects them.  Let's talk about provision for the purposes

9   of overbreadth.

10          To determine overbreadth, we have to determine what

11  the legitimate purpose is.  What's the sweep here?  And so for

12  our book banning provisions -- and by book banning, I mean both

13  the K through 6 and the all-ages ban -- the State has said that

14  that's to limit pornography, and they put up the examples that

15  they've put up, but that misstates what the law does.  As I said

16  before, if that was the case, then it was never necessary

17  because Iowa already did that, and if it's that, then it's

18  duplicative, so it has to be overbroad by capturing far, far

19  more.

20          That is where that obscenity/variable obscenity

21  standard comes in in overbreadth because it doesn't ask what

22  community standards would say is suitable for minors.  It

23  doesn't ask what interest the work appeals to, whether it's

24  prurient or otherwise.  It doesn't ask the independent value,

25  and it doesn't even review the work as a whole.  It just says

1    any description, any promotion is banned; right?

2             On forced outing, that provision of parental rights,

3    as they've tried to call it -- ostensibly, that's to encourage

4    parental participation, but schools already were doing this.

5    The professionals that we have in our schools -- the teachers,

6    counselors, librarians, administrators -- they know how to do

7    this.  They know how to engage parents.

8             But what this law does is it interferes with the

9    relationship.  It disrupts the relationship.  It makes it so

10   students don't know who to trust at their school, and in all

11   doing this, it never even requires the parental consent or

12   involvement that it says is necessary to encourage.  It's a --

13            THE COURT:  So let me pause on that point.  Are you

14   saying that at the beginning of the school year if a parent

15   said, If my child expresses questions or concerns about gender

16   identity, then I want to be notified of that, would that make

17   this law okay in your view?

18            MR. STORY:  Would that make this law okay?  No.

19            Your Honor, I'm not -- we're not challenging that

20   piece about not lying to a parent or student.  That's not what

21   we're talking about.  We're challenging that as part of, like,

22   we're challenging everything else in this law for its

23   discriminatory animus and its purpose.

24            THE COURT:  Let me -- let me stay on this path,

25   though, for a minute.  I mean, usually -- first of all, I

1  understand that if the student is having questions about gender

2  identity, that can be a very emotionally wrought issue.  It's

3  complicated, and there are emotions that go with it, and it may

4  impact their performance in school.  It may impact their

5  performance in other areas of their life.

6        Most of the time if a teacher notices that a student

7  is struggling with something, we would want that teacher to tell

8  the parents; right?  Because then the parents and teachers can

9  try to work together to figure out what it is and help the

10  students.  And here you're saying that that very same

11  communication that in most instances we want is actually what

12  makes the law unconstitutional.

13        MR. STORY:  I disagree, Your Honor.  I do agree that

14  we generally want parents to be involved.  I'm a dad myself;

15  right?  I'm always talking to my kids' teachers.  Absolutely.

16        But what this law does is that it removes any amount

17  of discretion that the teachers might have had.  When they know

18  that a child is in an unsafe space at home, that's the

19  difference.

20        There was a part -- a day of this law where it

21  actually said during the process that there was an alternative

22  if you know that the child's going to be abused or harmed at

23  home if you initiate this report.  That was removed in the

24  process.  That's why this is overbroad, Your Honor, because it

25  doesn't -- its goals do not align with what it's actually trying

1 to accomplish.  Its goal may be okay, but it's not aligned with

2 this law.  The law doesn't actually advance it.

3        So on to the K through 6, the "don't say gay or trans"

4 provision, yeah, ironically when asserting a need for this law,

5 Senator Chapman said it was to prevent a sinister agenda to

6 indoctrinate our children.  The State now says what they mean

7 is, you know, protecting them from age-inappropriate topics.

8        Your Honor, only one party before the Court is

9 engaging in indoctrination, and sexual orientation and gender

10 identity aren't age inappropriate.  These are things that if

11 applied neutrally, everybody has and we all have to acknowledge.

12        But it doesn't just prohibit instruction.  This law

13 doesn't do that.  It prohibits programs, curriculums, tests,

14 surveys, questionnaires, promotions, or instructions, and all if

15 they merely relate to this topic.  That is not a rational way to

16 ensure that children discover their gender identity when they

17 are ready.  That only exposes the intent of the law, right, to

18 erase LGBTQ+ persons.

19        I will tell you, Your Honor, no law will ever succeed

20 in erasing the LGBTQ+ community, but this law is inflicting a

21 lot of harm along the way, and I agree with the State on one

22 thing that's been said.  It is wrong to push political agendas

23 in the classroom.  I agree.

24        We'll talk a little bit about vagueness, Your Honor.

25 This law is hopelessly vague, and to see that, we only need to

1  look at what happened.  All right.  Completely inconsistent book

2  ban lists start coming out.  Then they're getting revised.

3  They're still coming out as of just the other week.  I'm getting

4  notices of book ban lists.  Schools are pleading with the State

5  for guidance, and then the proposed rule-making finally comes,

6  and it's useless, and now you've got the State trying to refine

7  the law further in its filings.  This is because nobody knows

8  what this thing means or how to apply it.

9          Again, I'll go provision by provision.

10          The vagueness and the all-ages ban of any description

11 or depiction of a sex act, that vagueness is intentional.  It is

12 intentional to encourage more removals and more censorship and

13 to allow those enforcing it to draw lines based on what they do

14 and do not like so that the senator can stand up and say that

15 1984, my favorite book, needs to stay but not Gender Queer which

16 I don't like.

17          In the "don't say gay or trans" provision, the State

18 again has claimed that it has been -- that it should be

19 interpreted and applied evenly.  As you and others have pointed

20 out, that would be nothing left in the school.  So it's

21 understood that people enforcing this law can exercise arbitrary

22 and discriminatory reasons to remove things, take actions that

23 they don't like; right?

24          So while this is happening, these schools, fearful for

25 the consequences, are removing anything that might make not just

1  children welcome but specifically an LGBTQ+ child welcome.

2  That's why safe space stickers, pride flags, books like Who Was

3  Harvey Milk and And Tango Makes Three, which if you don't know

4  is about two male penguins raising a baby penguin, have been

5  removed but not any of the other books or any of the other signs

6  that say, you know, "It's Cool to Be Who You Are" or "Diversity

7  is Okay."

8         Vagueness in the forced outing provision -- the truly

9  insidious feature about this one is that those students who are

10 most vulnerable to it, those students that are most insecure in

11 their identities because of what they're dealing with at home,

12 those are the ones who are most likely to be intimidated by the

13 State coming in and making this rule.

14        So even students, though, who are out with their

15 families -- the State points out, well, all of your plaintiffs

16 have the support of their families.  Sure, but they don't want

17 to get a teacher in trouble.  They don't know what this law

18 means.  We have to look at the age and experience of the speaker

19 when determining whether something is vague or self-censoring;

20 right?

21        These kids are likely to be intimidated by the

22 government.  The government's a big kid on the playground;

23 right?  So it can't be -- it just can't be that any gender

24 identity, any request for an accommodation is what the State

25 intended because that would be unworkable; right?

1    Pronouns are but one of the things we do to express

2  our gender identity.  It's just -- so enforcers decide that this

3  applies to non-cisgender identities, or requests to affirm must

4  be a request to affirm you from something different than what

5  you are which is why Thomas can say, I want my name to be Tom,

6  and that will not trigger a report home, but Alex cannot say, I

7  want my name to be Alexis, because that would trigger a report.

8  That's vagueness that is allowing arbitrary and discriminatory

9  enforcement.

10    To the extent the State asserts that the rule-making

11  has clarified things, which I'm not sure it has, but they

12  haven't.  It's offered no clarity.  There's nothing to work with

13  in the text, so I'm not surprised, but when we try and draw

14  lines between a reference and a mention and a description and

15  depiction, I'm just not sure what that means when we're talking

16  about the creative arts, the innumerable means of expressing

17  ourselves in books or music.  How do you draw that line between

18  one or the other?  It's -- it cannot be done, not in that

19  context.

20    As far as the rule that says a neutral statement about

21  sexual orientation or gender identity will be fine but not if it

22  crosses the line to promotion -- and I'll note that in giving an

23  example for that, counsel for the DOE actually was talking about

24  books featuring a character.  So, again, I -- we are all

25  confused as to why the State is saying that this provision

1  doesn't apply to books now.

2          But, regardless, what is a neutral statement?  It is

3  completely unclear.  Is it based on fact or opinion?  What if

4  the fact is students benefit from a school environment that

5  affirms their gender identity?  That's a fact, but that sounds a

6  lot like promotion.  That doesn't sound neutral to me.  It's

7  impossible to draw the line of when is expression promotion,

8  Your Honor.

9          And in the forced-outing provision, the State has

10  attempted to clarify the law by saying it only applies when

11  intended to affirm a gender identity.  That doesn't really do

12  much beyond what the text already does.  And, again, pronouns

13  are just one means of expression.  That's what everyone seems to

14  be focusing on, but, you know, people can wear their hair long

15  or short or dresses or, you know, all these things.

16          So the word accommodation as well, Your Honor --

17  accommodation in the school context I've always understood to be

18  a 504 plan or an IEP.  The State cannot be arguing that that's

19  what they want to happen.

20          So in the First Amendment context, that's what we're

21  dealing with.  This is why -- these problems that we're talking

22  about -- this is why the State needs to be narrow and specific

23  in what it's doing, and, Your Honor, if this law is nothing

24  else, it is certainly vague.

25          I'll move on to the equal protection claim.  A

1  classification based on sex, sexual orientation, gender

2  identity, transgender status -- these all warrant at least

3  heightened scrutiny both in and of themselves and as forms of

4  sex discrimination.  The case law cited indicates that.  And

5  separate and apart from that, this law was motivated by animus.

6  That makes this law unconstitutional right away without needing

7  to do any further analysis.

8       So it's not -- and addressing the intent, impact, and

9  effect, it is not the cisgender, heterosexual students who are

10  feeling unwanted and shameful like B.F. describes.  It is not

11  the cishet students who are feeling unsafe like P.C. and Robert

12  Smith describe, and it's not, again, the books with heterosexual

13  sex that are being targeted, not like it is the LGBTQ+ books.

14       When we talk about intent, I had mentioned this

15  before.  Normalizing sexually deviant behavior was said as the

16  reason for this law, that they needed to stop that.  That term

17  has loaded historical connotations about discriminating against

18  LGBTQ+ people because of who they are and criminalizing them.

19  That's what that means.  The Governor holds up books and calls

20  them nasty and pornographic.  The books held up are those with

21  queer persons.

22       When the Senate sponsor was asked about the

23  ambiguities and the forced outing -- like I mentioned before, if

24  a boy wants to wear his hair long, does that trigger a report?

25  If a girl wants to wear it short -- the senator responded, We

1   all know what we're talking about here.  Sure.  We're talking

2   about outing transgender students.

3           And if we go back in time to when this law was first

4   introduced by the Governor, it was introduced at a town hall by

5   a group that is recognized by the Southern Poverty Law Center as

6   a hate group, at Moms for Liberty, and many of whom have

7   submitted declarations to this Court today, and then we're

8   working on the -- the legislature is working on the statute, and

9   they're rejecting every single time an amendment that might

10  protect an LGBTQ+ kid from this law.

11          The declarations the State has submitted today --

12  again, they all look to the books with queer characters.  They

13  all cite that it was the acknowledgment of a transgender child

14  that felt -- that they were offended by and felt that the law

15  needed to be enacted to address.

16          This is an intent; it has effect and impact

17  discriminating against a class of persons.  That means it's

18  subject to at least heightened scrutiny, Your Honor, and it

19  can't pass it.

20          Even if we're talking about legitimate government

21  interests under rational basis, it can't pass it.  There's no

22  legitimate, let alone an exceedingly persuasive or compelling

23  interest.  There's no reason to create disfavored classes in

24  schools.  There's no reason to enact duplicative laws when

25  existing law is already ensuring protection from

1   age-inappropriate material and keeping parents informed.

2          There is no justification that can advance this law

3   except to disadvantage a disfavored group because of a personal

4   or religious objection.  That, Your Honor, is animus that

5   renders this unconstitutional without further analysis.

6          Lastly, we have our statutory claim under the Equal

7   Access Act.  This is brought by ISS, Robert Smith, James Doe,

8   and P.B.-P.  The Equal Access Act is a fairly straightforward

9   law.  It prevents content and viewpoint-based restrictions on

10  student groups, access on the same grounds as other student

11  groups, and the defendant school districts have appeared before

12  the Court, and they don't object to an injunction on these

13  grounds; they just say that it's because of SF 496 that these

14  actions have been taken.

15         We talked about this earlier in the expressive

16  association claim.  Robert Smith has lost his faculty sponsor.

17  James Doe and P.B.-P. have declining members.  ISS goes into

18  great detail about the other indignities that have been suffered

19  by GSAs including that loss of a method of communication which

20  is precisely the type of loss of access that the EAA is designed

21  to prevent.  As P.B.-P. describes, SF 496 has interfered with

22  students' ability to create a supportive community for one

23  another.

24         So the State's only defense then to this is that

25  they're not subject to the EAA.  Your Honor, it's the State's

1  law.  It's the State's supervisory authority over school

2  districts that is causing them to do this, so if the injunction

3  only was issued against school districts, then would the school

4  district be placed in the impossible choice of either following

5  Your Honor's order or following State law?  I agree with the

6  State.  It may be unusual to bring an EAA claim against it, but

7  it's appropriate here, and we're only seeking declaratory and

8  injunctive relief.

9          As for irreparable harm, Your Honor, again, our

10 likelihood of our success on any one of our First Amendment

11 claims -- chilled speech, right to receive, association,

12 overbreadth, vagueness -- means automatically that we have shown

13 irreparable harm because a minimal deprivation of a First

14 Amendment right is irreparable.

15         The State says that these students and their parents

16 could buy these books elsewhere.  That does not replace losing

17 their access in the library.  The book case law is very clear on

18 that, and it doesn't consider the other harms that are imposed

19 by this law like the stigmatization from losing access and from

20 the message sent, like the bullying and harassment, like the

21 loss of school support for these kids.

22         Your Honor, this is school.  It's K through 12 school.

23 It's supposed to be a good, if really challenging, time for

24 these kids, because the experiences that they have are going to

25 stay with them forever.  You only get one chance to lead your

1  GSA in high school like P.B.-P.  If you read <u>Gender Queer</u> when

2  you're learning about your own identity and finding yourself

3  like T.S. wants to, that's not the same as if you have to wait

4  until you're an adult or after college.

5       When you're A.C. and you experience bullying and

6  you're in fourth grade and you see the school not do enough to

7  help you, that teaches you something about authority that's

8  going to stay with you forever.  That's irreparable harm.  It's

9  precisely the type of temporally limited opportunities that the

10  irreparable harm factor is meant to address.  These kids are not

11  going to get this time back.

12       As for the State's assertion that we've delayed, I'll

13  respond to it.  The text itself, yes, is unconstitutional, but

14  the harm has been manifesting and accruing over time.  It's been

15  changing as well, so the law may have been signed in the summer,

16  but the school year didn't start until late August.  The book

17  bans didn't start coming out until September.  They're still

18  changing and still coming out.  Schools' responses to the other

19  pieces of the law outside of books have been changing.  They've

20  been trying to navigate this.  That's a feature of the vagueness

21  and overbreadth of the law.

22       You know, at the end of the day, we've been moving

23  faster than the State which in its briefing is still trying to

24  revise the law.

25       I'll move on to the balance of the equities.  The

1   defendants don't experience any harm from enjoining this law.

2   They can still prohibit obscene materials.  They can still apply

3   existing educational standards as far as selection and removal

4   criteria in libraries.  There's still these procedures on book

5   challenges that every school district has which the declarants,

6   the State's declarants, actually took advantage of, and they can

7   still opt their own children out.  There's no harm here from

8   enjoining this, not to the State.

9         And the public interest -- protecting constitutional

10   rights is always in the public interest.  Your Honor knows that.

11   The *D.M. by Vao Xiong* case -- more than that.  The State's

12   vision of public education under this law is alarming.

13         I'll use Lara Newsom, one of our declarants.  Public

14   schools serve the public.  They allow children to interact with

15   other students who are not like them and to learn and work with

16   and listen to people with different perspectives and

17   backgrounds.  Kids learn tolerance in public schools along with

18   mass -- math, history, and reading.  SF 496 is contrary to these

19   basic goals that serve the public interest, and, therefore, an

20   injunction is emphatically in the public interest.

21         For those reasons, Your Honor, we'd respectfully

22   request an injunction against the enforcement and implementation

23   of SF 496 during this entire -- during these proceedings.  No

24   other relief would be adequate to do this.

25         THE COURT:  Thank you, Mr. Story.

1          MR. STORY:  Thank you, Your Honor.

2          THE COURT:  Mr. Sperling, let me hear from you.

3          MR. JOHNSTON:  Your Honor?  Having approached

4    essentially midmorning, I was going to respectfully ask the

5    Court if we might be able to take a very short five-minute

6    restroom break.

7          THE COURT:  You know what?  That's fine.  I was going

8    to take one after Mr. Sperling, but we can do it now.  Why don't

9    we take -- we'll take about 10 so I can give the court reporter

10   an adequate break, and we've got a lot of people in the audience

11   and not that many bathrooms in the courthouse, so we won't start

12   back up again before about 10 minutes.  That way everyone can

13   get back who wants to, so we'll be adjourned.

14         MR. JOHNSTON:  Thank you, Your Honor.

15         (Recess at 10:10 a.m. until 10:22 a.m.)

16         THE COURT:  Please be seated.

17         Mr. Sperling, go ahead.

18         MR. SPERLING:  Thank you, Your Honor.

19         At the outset, I want to emphasize that this case is

20   far narrower in scope than the GLBT Youth case.  The focus is

21   solely on books in libraries and classroom libraries.

22         Senate File 496 is an unprecedented assault on school

23   libraries, and it's resulted in the removal of literally

24   hundreds of books from school and classroom libraries in Iowa

25   school districts.

1          The law requires the removal of an ambiguously defined

2    category of books based on the so-called age-appropriate

3    standard.  The age-appropriate standard requires the removal of

4    any book that contains a description of a sex act, and it does

5    so without distinction for students from kindergarten through

6    12th grade.  The prohibition doesn't take into account the value

7    of any book considered as a whole as the Supreme Court requires.

8    It simply requires the removal of any book that contains even a

9    single sentence describing a sex act.

10          THE COURT:  What's the -- what is your articulation of

11   the First Amendment right that's at issue here?  And there may

12   be more than one, and that's fine too.  But what exactly is the

13   right?  The First Amendment right to do what?

14          MR. SPERLING:  So, Your Honor, with respect to the

15   age-appropriate standard, we're relying on three claims, and

16   I'll address those in more detail later, but let me answer your

17   question right now as to what the right is.

18          So the first claim is that the age-appropriate

19   standard is an impermissible content-based restriction, and the

20   constitutional right at issue is the right under the First

21   Amendment that publishers and authors have to speak without

22   impermissible content-based restrictions and the right the

23   students have to receive information from school libraries

24   without impermissible content-based restrictions.  That's the

25   first claim.

1          The second claim, Your Honor, is that the

2    age-appropriate standard is overbroad, and the constitutional

3    right at issue under the First Amendment is that even if a

4    content-based restriction covers some unprotected speech,

5    restrictions that are overbroad violate the First Amendment

6    rights of publishers and authors, so it assumes that there is

7    some content-based speech that's unpredicted -- unprotected,

8    but, nevertheless, the restriction falls because of its

9    overbreadth.

10          The third claim is that the age-appropriate standard

11   is vague.  This claim is brought under the due process clause of

12   the Fourteenth Amendment.  People who are subject to a statute

13   or regulation have a right to understand what's required of

14   them.  This right is heightened when the underlying statute

15   targets First Amendment activity, as the Supreme Court has

16   repeatedly emphasized.

17          Those are the three rights that we're addressing, Your

18   Honor.

19          THE COURT:  So the -- the first right you talked

20   about, the right for publishers to speak without content-based

21   restrictions, I understand the articulation of that right

22   vis-à-vis the publishers, but you've got -- you've got at least

23   one student plaintiff, and you've got educator plaintiffs as

24   well.  Is there a First Amendment right to receive information

25   that is a foundation for your position as well?

1          MR. SPERLING:  Yes.  So the Supreme Court has made

2     clear that the natural consequence of the right to speak is the

3     right to receive information, and I'll address that in more

4     detail when I address that specific claim, Your Honor, but, yes,

5     that is the claim.

6          THE COURT:  Okay.

7          MR. SPERLING:  Your Honor, on its face the

8     age-appropriate standards prohibition is so broad that the text

9     of the definition which the law incorporates violates the

10    standard.  In other words, you can't even have a book with the

11    statute in a library without violating the statute itself.

12    Obviously there's nothing pornographic or obscene about the

13    statute, but that's just an example of how extraordinarily

14    overbroad the statute is.

15         THE COURT:  And your point there is that by defining

16    what sex act means, you are indeed violating the rule about

17    having books in the library that describe sex acts.

18         MR. SPERLING:  Exactly.

19         It's a misnomer to call this the age-appropriate

20    standard, Your Honor, because it completely ignores the age of

21    the reader.  It treats kindergarten students the same as high

22    school students.  That makes no sense, and it's contrary to law.

23         Now, Your Honor we have a second set of claims

24    regarding the identity and orientation prohibition.  The State

25    defendants now agree that it's not applicable to libraries, but

1  they have not yet agreed to advise the school districts of the

2  fact that it's not applicable.  We have hundreds of books that

3  have been removed based on this provision and books that are

4  presently being removed, and I'll address that further when I

5  turn to that.

6          The age-appropriate standard has resulted in confusion

7  and fear throughout the Iowa education community.  School

8  districts including Defendants Urbandale and Norwalk are erring

9  on the side of censorship to avoid being penalized and to

10  protect their educators from penalties.  Educators can lose

11  their jobs and lose their licenses if they violate this

12  provision.

13          Defendant John Robbins, the president of the Iowa

14  State Board of Education, stated during a State Board meeting

15  that in talking with educators about Senate File 496, quote,

16  There is a lot of confusion, unquote, about the law.  He also

17  said, quote, We're kind of guessing, unquote.  That's not a

18  constitutional standard particularly when people are at risk of

19  losing their jobs.

20          The confusion has chilled protected speech, and it's

21  led to overbroad interpretations.  I'd like to present just a

22  few examples, Judge.

23          Numerous award-winning books have been removed

24  including classics that have been on library shelves for

25  decades.  In the height of irony, George Orwell's 1984 and Alex

Huxley's <u>Brave New World</u> have been included on the removal lists of multiple Iowa school districts.  Both of these books are commonly on AP exams, so students don't have available to them in their libraries the very books they're going to be tested on.

The Way We Work:  Getting to Know the Amazing Human Body, an anatomy text, has been prohibited under this law. There's nothing obscene or pornographic about an anatomy text. It's about the human body.

<u>Beloved</u> by Toni Morrison won the Pulitzer Prize for Fiction.  It's commonly included on advanced placement exams. Several school districts have yanked it off the shelf.

<u>As I Lay Dying</u> by Nobel Prize award-winning William Faulkner is regularly ranked among the finest novels of the 1900s.  It's commonly included on advanced placement exams. It's been taken off by several school districts.

<u>Nineteen Minutes</u> by Jodi Picoult is a widely praised novel that centers on a school shooting.  It's not obscene. It's not pornographic.  It was number 1 on the New York Times Best Seller list.  It's been yanked by several school districts.

<u>Speak</u> by Laurie Halse Anderson, an award-winning book that's based on the author's personal experience of having been sexually assaulted, it's been taken off by several school districts.

Kirk Vonnegut's <u>Slaughterhouse-5</u> which is a classic anti-war novel that won the National Book Awards for Fiction has

1  been yanked off by multiple school districts.

2      The Color Purple by Alice Walker, which tells the

3  story of a poor, young, educated black girl who lives in rural

4  Georgia in the early 1900s, won the Pulitzer Prize for Fiction,

5  won the National Book Award, is commonly included on advanced

6  placement exams, and has been taken off by multiple school

7  districts.

8      Native Son by Richard Wright, a powerful award-winning

9  novel about racial inequality in Chicago in the 1930s, has been

10  removed by several school districts as well.

11      These books are not pornographic.  These books are not

12  obscene.

13      Your Honor, unless the Court has concerns or questions

14  about standing and timing, I'll move on to the merits.

15      THE COURT:  Yeah.  Let's talk about standing as it

16  relates your challenge to the sexual orientation and gender

17  identity provisions.

18      The first question, is there sufficient overlap

19  between those provisions of Senate File 496 and the other

20  provisions of the law that your position is that as long as you

21  have standing to challenge one aspect of it, you can challenge

22  the whole thing?  That's my first question.

23      MR. SPERLING:  Well, stepping back one step further,

24  Your Honor, I believe because the position the State defendants

25  have taken that that prohibition does not apply to books in

1  libraries and classroom libraries, I don't believe there is a

2  live issue on this any longer.  The only issue is the need to

3  inform the school districts that it is not applicable.  They

4  have been taking books off because they believe it's applicable.

5  　　　　In the resistance to the Penguin plaintiffs' motion

6  for preliminary injunction, the State defendants took the

7  position that that provision does not apply to libraries and

8  classroom libraries, and counsel for the State defendants this

9  morning reaffirmed that that remains the position of the State

10  defendants.

11  　　　　But as to standing, Your Honor, yes.  The standards on

12  standing are that if any plaintiff has standing, that is

13  sufficient, and if any plaintiff has standing for any aspect of

14  the law, that is sufficient.

15  　　　　THE COURT:  Because let me -- let me tell you

16  something that -- and I think I may not quite have your position

17  pinned down, and I'm hoping you'll help me.  I only saw one

18  teacher teaching grade 6 or below identified as a plaintiff in

19  either case, and that was in your case -- I think it is

20  Mr. Gutmann I think is how you pronounce it.  Are you

21  challenging the grade 6 and below teaching restrictions --

22  promotion restrictions on gender identity and sexual

23  orientation -- in and of themselves or only insofar as they

24  would relate to what can and cannot be in a school library?

25  　　　　MR. SPERLING:  Only as they relate to the removal of

1  the books.

2         THE COURT:  Okay.  That's the answer I needed.  That's

3  helpful.  That was really the only question I had on standing

4  for you.

5         MR. SPERLING:  That's part of why this is a narrower

6  and more focused case than the other case.

7         Does the Court have any questions about timing?  If

8  so, I can address them.

9         THE COURT:  No.  Let's move on to the substance.

10        MR. SPERLING:  So restrictions on First Amendment

11  rights are required to withstand greater scrutiny in the context

12  of school libraries than they would for curricular decisions,

13  and there are many cases that reach this conclusion.

14        A student's involvement with school libraries is

15  entirely voluntary.  Students have autonomy to decide whether to

16  check out and read library books at all and if they do which

17  books to read.  And as the State defendants state in their

18  resistance, school library books are not required reading.

19        In contrast, curriculum and textbooks are mandatory,

20  and they're meant to actively inculcate students.  That's a

21  completely different situation.

22        A school library is meant to expose students to a

23  broad range of ideas and viewpoints even if the government

24  disagrees with those ideas, so for these reasons, as many Courts

25  have held, a school board's decision to remove books, in the

1 words of the Fifth Circuit in the *Campbell* case, quote, must

2 withstand greater scrutiny within the context of the First

3 Amendment than would a decision involving a curricular matter.

4      THE COURT: So let's talk about what the -- and maybe

5 you're going to get there, but let's talk about what the exact

6 standard is.

7      I mentioned to Mr. Story and I'll make the same point

8 to you when I read the Supreme Court cases in the context of

9 First Amendment school speech, they cannot agree on what the

10 appropriate standard is to apply. We've got *Tinker* talking

11 about substantial disruption and then *Fraser* and later cases

12 saying sometimes but not here. In a few cases the Supreme Court

13 is very upfront about the fact that they can't decide what the

14 appropriate standard is, but they know this particular conduct

15 either violates it or doesn't violate it.

16      I do get a little bit of guidance from *Pratt* which I

17 think you correctly pointed out is an Eighth Circuit case, still

18 binding authority on me, and it talks about whether or not there

19 is a substantial and reasonable government interest in the

20 removal of a book from a school library. Is that the standard I

21 should apply, or is it something else?

22      MR. SPERLING: So, Judge, taken together, we think the

23 cases do provide a standard. The standard is whether any

24 restriction is justified in light of the purpose of school

25 libraries, and let me explain why.

1          In the *Counts* decision, a District Court decision

2    within the Eighth Circuit that involved the removal of books

3    from school libraries, the Court required the government to show

4    that the removal decisions were, quote, justified by some

5    exigency of the educational environment, unquote.  And the Court

6    in *Counts* relied extensively on the Supreme Court's decision in

7    *Tinker* which remains good law which required the restrictions on

8    First Amendment rights in schools have to be, quote, necessary

9    to avoid material and substantial interference with schoolwork

10   or discipline, unquote.

11         This standard is similar to and consistent with

12   Supreme Court decisions on non-public forums which require that

13   content-based restrictions have to be, quote, reasonable in

14   light of the purpose of the forum, for example, in the *Minnesota*

15   *Voters versus Mansky* in 2018 by the Supreme Court.

16         So then what is the law on content-based restrictions?

17   First, content-based laws which target speech based on its

18   content are presumptively unconstitutional.  They can only be

19   justified if the government proves that they're narrowly

20   tailored to serve a compelling state interest, *Reed v. Town of*

21   *Gilbert*, the Supreme Court in 2015.

22         Second, the First Amendment applies to minors.  As the

23   Supreme Court held in *Erznoznik*, quote, Speech that is neither

24   obscene as to use nor subject to some other legitimate

25   proscription cannot be suppressed solely to protect the young

1  from ideas or images that a legislative body thinks unsuitable

2  for them.  In most circumstances the values protected by the

3  First Amendment are no less applicable when the government seeks

4  to control the flow of information to minors.

5          Third, the First Amendment applies to public schools.

6  It permits only reasonable regulation of speech-connected

7  activities in carefully restricted circumstances, unquote.

8          Fourth, school libraries are at least non-public

9  forums.  A non-public forum is a space that's not by tradition

10 or designation a forum for public communication, but in a

11 non-public forum content-based restrictions have to be

12 reasonable in light of the purpose of the forum, most recently

13 articulated by *Minnesota Voters*, 2018, United States Supreme

14 Court.

15          And let me repeat that again.  It has to be reasonable

16 in light of the purpose of the forum.  So, in sum, the

17 defendants have to establish that the age-appropriate standard

18 as applied to school library books is justified in light of the

19 purpose of school libraries.

20          Now, what do the State defendants say in response?

21 They essentially say the First Amendment doesn't apply to school

22 libraries because a selection of books in a library is governing

23 speech.  Many courts across the country have been presented with

24 this argument, and every one of them, without exception, has

25 rejected it.

1          The law is very clear.  The government speech doctrine

2    applies only when three criteria are met, criteria that the

3    State defendants did not address at all.

4          First, the State has to have been historically

5    communicating messages through the medium.

6          Second, the medium has to be closely identified in the

7    public mind with the State such that the government has endorsed

8    the message.

9          And, third, the State has to directly control the

10   messages conveyed.

11          The standard's set forth in *Walker*, 2015, United

12   States Supreme Court; *Pleasant Grove*, 2009, United States

13   Supreme Court, and it's been followed by countless courts of

14   appeals.

15          The government speech doctrine is a narrow, limited

16   exception because what it means is the First Amendment doesn't

17   apply at all which is, of course, contrary to numerous Supreme

18   Court decisions that say the First Amendment most assuredly does

19   apply.

20          THE COURT:  So --

21          MR. SPERLING:  So there --

22          THE COURT:  Let's talk about this for a minute, and

23   I'm not going to articulate this exactly, the government speech

24   doctrine, but there's no First Amendment right for an author to

25   have a book put into a school library; right?  I mean, if I

1 write a book and it isn't very good, I can't go to court and

2 make the school district put it in a library anyway; fair?

3          MR. SPERLING:  That's correct.

4          THE COURT:  Okay.  So I know we're dealing with the

5 inverted form of that here because the books are coming out as

6 opposed to going in, but why does that principle not still have

7 some application here, that an author can't force a book to be

8 in a school library?

9          MR. SPERLING:  Well, the selection of books for school

10 libraries has traditionally been made by librarians,

11 professionals whose focus is the selection of books, and I

12 agree, Your Honor, that an author whose books was not chosen

13 would not have a claim of the proper exercise of discretion.

14          If the reason the book was not chosen was for an

15 impermissible basis, there would be a claim, and so let's take

16 1984 as an example.  If it's constitutionally permissible to

17 remove 1984, it would be impermissible not to buy it because of

18 that statute which said it would have to be removed.  But we do

19 not challenge the broad discretion afforded librarians to make

20 decisions based on the age of students.  There are books that

21 are appropriate for 12th graders that may not be appropriate for

22 9th graders or for 6th graders or for 3rd graders, and court

23 after court has applied the standards which I'll turn to on an

24 age-appropriate basis.  That's the moniker the statute uses and

25 then completely obliterates by applying the same standard for

1  K through 12.

2         THE COURT:  So let me -- before I let you keep going,

3  let's talk about what content-based restrictions means.  If

4  somebody says 1984 can't be in the school library because we

5  don't like the anti-government message, that would be, it seems

6  to me, a pretty clear example of a content-based restriction.

7  Same if there was a book that was written by a Democrat and the

8  school board said, We don't allow books by Democrats to be

9  here -- that would be a content-based restriction -- or race or

10  any number of other things.

11         Here the State law is using sex act or age-appropriate

12  as the defining criteria.  Is that a content-based restriction?

13  And if so, why?

14         MR. SPERLING:  Yes, it is.  Obscenity is not

15  constitutionally protected.  It's totally permissible for the

16  State to exclude obscene books from school libraries.

17         And, Your Honor, I don't suggest that the State is

18  constrained to only remove books that contain obscenity.  There

19  are other considerations based on the age of students.  There

20  are non-obscene books that may be appropriate for a 12th grader

21  but not appropriate for a 3rd grader.  By the way, I would note

22  that many of the books that have been removed have never been

23  made available to 3rd graders or 6th graders.

24         But what the Supreme Court made clear in *Miller* and

25  other courts have held is it's too narrow to just focus on

1    whether there's some description of a sex act.  There are other

2    considerations that *Miller* requires that have to be taken into

3    account, and many of these books deal with issues of sexual

4    assault, violence, other -- other circumstances.  They don't

5    remotely rise to the level of being pornographic or obscene.  An

6    example, Your Honor, is the anatomy text.  Yes, this is a

7    content-based restriction that's impermissible because it

8    doesn't comply with the standards the Supreme Court has set

9    forth in that area.

10          THE COURT:  So we've got -- we've got a situation here

11   where *Miller* sets an adult-obscenity standard at one level, and

12   I think I hear you saying -- and in any event I think the law's

13   pretty clear on this -- that school districts can go further

14   than the adult-obscenity standard in restricting access to books

15   to minors.

16          MR. SPERLING:  Absolutely.  So for --

17          THE COURT:  But then we've got the question of how

18   far.  It's the sort of classic line-drawing question.  Why

19   should I as a federal judge draw that line instead of the

20   legislature getting to draw it?  And you know what?  If their

21   definition is more puritan than I think might be appropriate, I

22   should have run for office rather than ending up in this

23   position, so why -- why -- if that's my concern, why is that

24   concern wrong?

25          MR. SPERLING:  You can defer to the legislature if

1 they act constitutionally.  The standard they set forth is an

2 unconstitutional standard.  It simply says if there's a single

3 sentence in a book that refers to a sex act, off the shelves it

4 goes.  That's inconsistent with Supreme Court jurisprudence.

5          The *Miller* standards apply based on the audience it

6 applies to, and so what is obscene to a 12th grader -- or looked

7 at the other way, what's not obscene to a 12th grader may well

8 be obscene to a 9th grader or a 6th grader or a 3rd grader, but

9 all three prongs have to be taken into account.

10          It's very telling.  The State defendants say all this

11 does is incorporate the standards from the existing obscenity

12 law, but it doesn't.  It incorporates one of the three prongs of

13 *Miller*.  That's the problem, Judge.  They've taken out all of

14 the other considerations that the Supreme Court says have to be

15 taken into account, and that's the problem.

16          THE COURT:  Do you interpret the law as prohibiting a

17 student from going out to a bookstore and getting one of these

18 books and then using it to write a class paper?

19          MR. SPERLING:  No.

20          THE COURT:  That was my only question on that, so I'll

21 let you go on.

22          MR. SPERLING:  No, but let me address the significance

23 of that.  It's not good enough to say that if you have the money

24 and resources to otherwise obtain books that are going to be on

25 an AP test that are neither pornographic nor obscene nor

1  pervasively vulgar, which is another term that courts have

2  sometimes used, that that's okay.  That's not the First

3  Amendment jurisprudence.

4         So returning -- returning for a moment -- and this is

5  the core argument the State defendants make.  You don't have --

6  they say you don't have to be concerned, Judge, because the

7  First Amendment doesn't apply at all.

8         So factor one on the government speech doctrine.

9  School libraries have not historically communicated messages

10  from the State.  What they've done is they've served as vehicles

11  to expose students to a broad array of ideas and messages from

12  authors who express unique personal points of view, and the

13  Supreme Court has noted when there are opposing points of view,

14  that's an indication that the State is not expressing its view,

15  and, of course, that's exactly what we have in school libraries

16  in Iowa.

17         The second factor.  Iowa school libraries are not

18  closely identified with the State of Iowa such that the State

19  has endorsed the messages in the books.  They're diverse.

20  They're often contradictory.  It would be absurd for the State

21  defendants to claim that by including the Bible, the Koran, Mein

22  Kampf, The Communist Manifesto, or the sayings of Chairman Mao

23  in a school library, the State of Iowa has endorsed those

24  messages.

25         As Justice Alito explained, the government speech

1  doctrine doesn't extend to speech that expresses contradictory

2  views.  In that case, he called it a doctrine that's susceptible

3  to dangerous misuse.

4       And let's take Mein Kampf as an example.  So this is

5  the book that Hitler used to build support for his Nazi ideas in

6  Germany in the 1930s.  It is an historically significant book.

7  Iowa libraries might decide that it's important for high school

8  students to read that book and to understand what Hitler and the

9  Nazis were doing in Germany in the 1930s, but they're certainly

10 not endorsing Nazism when they include that book.

11      So the State defendants fail on the second factor as

12 well.

13      And, finally, the State of Iowa doesn't maintain

14 direct control over messages conveyed in school library books.

15 The State doesn't, to paraphrase the Supreme Court in the *Matal*

16 case, dream up the books or edit the books that are submitted

17 for inclusion.

18      And as I noted, the State defendants don't even

19 attempt to address these three factors.  They focus a great deal

20 on *United States versus American Library Association*, and let's

21 be clear.  That was a case about an internet filter for obscene

22 and child pornographic images.  It's not a traditional or a

23 designated public forum case, and indeed we don't argue for that

24 standard.

25      The Court recognized that school libraries are most

1 like non-public forums, and they addressed as an analogous

2 context other cases in which the Supreme Court had applied

3 non-public forum standards. That's the appropriate way to

4 address this. The First Amendment is not written out. It does

5 apply to libraries.

6 So what's the standard? Books that comprise protected

7 speech have to be considered as a whole. That's the *Miller*

8 test. But the age-appropriate standard requires removal of a

9 book that simply contains a sentence that describes a sex act.

10 The assertion that any book that contains a description of a sex

11 act is pornography is wrong. The assertion that it's obscenity

12 is wrong.

13 If the State's justification is to prohibit obscenity

14 in schools, not only is there an existing statute, but this

15 standard doesn't satisfy the *Miller* test, and the State's

16 disapproval of library books that have a sentence about a sex

17 act is not a basis to remove them from libraries. The Supreme

18 Court in *Erznoznik* stated, quote, Speech that is neither obscene

19 as to youths nor subject to some other legitimate proscription

20 cannot be suppressed solely to protect the young from ideas or

21 images that a legislative body thinks unsuitable for them.

22 And yet this standard has resulted in the removal of

23 hundreds of books that don't remotely come close to satisfying

24 the *Miller* standard. They've done exactly what the Supreme

25 Court said you can't do.

1            THE COURT:  So if you were advising the legislature to

2    get it right, we already talked about how they don't have to

3    apply a strict version of the *Miller* standard because we're

4    talking about minors, and in some instances we're talking about

5    kids all the way down to kindergarten, 1st grade, 2nd grade.

6    What should the language be?  Does it need to be like the

7    language in *Ginsberg*?  Is it like an obscenity-light standard?

8    Is it a sliding scale?  What should it look like?

9            MR. SPERLING:  So I am hesitant to write a statute

10   that's not before us.

11           THE COURT:  That's why I asked the question, to make

12   you uncomfortable.

13           MR. SPERLING:  The problem we have is this statute is

14   clearly unconstitutional on its face.  The *Miller* standard

15   properly applied is a sliding standard based on age, and so I

16   believe the State could completely, successfully, and

17   constitutionally accomplish its goal by putting those other two

18   prongs in that it left out.

19           But there's certainly other books that could be

20   excluded, for example, books that are vehemently anti-Black or

21   anti-Semetic.  They're not obscene.  They're not pornographic.

22   They're certainly within reasonable bounds of legislature or of

23   librarians to decide not to include those books.  If there is,

24   as the Supreme Court once used the phrase, pervasive vulgarity,

25   that might certainly counsel for not including a book

1  particularly for younger students, so we don't mean to suggest

2  that there's nothing other than obscenity that can be used as a

3  basis, but we do absolutely state that this standard doesn't

4  pass constitutional muster.

5         And what you have is you have -- you have students

6  like Hailie Bonz, one of the plaintiffs in this case, and other

7  high school students who have lost access to countless

8  award-winning books that are not pornographic, that are not

9  obscene, and that are included on their AP exams.  Penguin

10 Random House and the authors have had their books removed for

11 impermissible reasons as well.

12        And so, Your Honor, while the legislature might be

13 able to craft a law that addresses the issues in addition to

14 obscenity, the law it's passed here only seems to be aimed at

15 obscenity but does so by omitting the required constitutional

16 standards, and so it's impermissible and should not be enforced.

17        So that's the content-based standard.  That's the

18 first basis, Judge, on which we challenge the so-called

19 age-appropriate standard which isn't age focused at all.

20        Our second standard is that it's wildly overbroad.

21 The governing standard is a restriction on speech is overbroad

22 if a substantial amount of protected speech is prohibited or

23 chilled in the process of restricting unprotected speech, so

24 that assumes that there may be books that are unprotected, but

25 if you sweep up in your net lots of protected speech, that's not

1 permissible.

2 THE COURT: You're talking about overbreadth as being

3 separate and apart from the content-based challenges --

4 challenge, but I see those two as being really closely related.

5 MR. SPERLING: They are closely related, and in many

6 instances they overlap, but they are distinct rights that have

7 been recognized by the Supreme Court, and let me get into the

8 reasons why this is overbroad, and hopefully that will help

9 clarify.

10 This standard in the statute doesn't account for the

11 value of books as a whole, and so it restricts books that aren't

12 obscene, and that does overlap with the content-based

13 restriction. It also applies to all students equally without

14 regard to their age or maturity, and so it fails to account for

15 the different standards that should be applied to a

16 kindergartner or 3rd grader or 6th grade or 9th grader or 12th

17 grader. Books should be considered in relation to the age and

18 maturity of the students who can access them, and that's the

19 point the Supreme Court made in *Erznoznik*.

20 Ironically, Judge, the age of consent in Iowa is 16,

21 so 16-year-olds in Iowa can engage in sexual activity, but books

22 that describe a sexual act have been taken out of their

23 libraries. It makes no sense, and it's not constitutionally

24 permissible.

25 Under the plain language of the age-appropriate

1    standard, as I noted, the statute itself can't be included in

2    the school libraries, and even if the age-appropriate standard

3    covers some obscene speech -- and we're not here saying that

4    every book that has been removed should be put back on the

5    shelves, but even if it covers some obscene speech, the

6    overwhelming majority of the speech that it covers is protected

7    speech.

8           The third basis, Your Honor, for challenging this

9    provision is the standard is vague.  We bring this claim under

10   the due process clause, and the Supreme Court has made clear

11   that laws that regulate persons or entities have to give fair

12   notice of the conduct that's forbidden or required.  It's

13   hopelessly vague.

14          THE COURT:  And your evidence on that is what?  Is it

15   the varying experiences of the school districts in terms of

16   which books are actually being removed?

17          MR. SPERLING:  Yes.  It's been unclear to everyone.

18   It's been unclear to the State defendants who say you have to

19   guess what it means.  It's been unclear to the educators.  It's

20   been unclear to the school districts, and each school district

21   appears to apply the law differently resulting in different

22   removal lists.

23          Your Honor, Exhibit L-1 was an exhibit to our motion

24   for a preliminary injunction, but I can hand up another copy to

25   the Court.

1          THE COURT:  I've looked at it.

2          MR. SPERLING:  Excuse me.  I also want to refer to

3    Exhibit L-2, which is the checkerboard.  It's wildly

4    inconsistent constructions of what this statute requires, and

5    the State hasn't provided any useful guidance.

6          So as a result of this, you have people yanking books

7    off because they're afraid they're going to lose their jobs.

8    The extraordinary inconsistency between the school districts is

9    confirmation of how hopelessly vague the statute is.

10         Now, the proposed rule --

11         THE COURT:  What's the -- what's the standard in a

12   void-for-vagueness challenge?

13         MR. SPERLING:  Yeah.  The standard is, as the Supreme

14   Court said, it has to give fair notice of the conduct that's

15   forbidden or required, and that's the -- in many decisions.  The

16   *FCC versus Fox Television Stations* in 2012 contains that

17   language, and many others do as well.

18         Basically a person of ordinary intelligence has to

19   have fair notice.  Here you have highly trained educators,

20   school district employees, and the State defendants themselves

21   who can't figure out what it means, and now you have proposed

22   rules.  They don't go into effect yet, Judge.  There's not even

23   a hearing on them until after the penalty provisions take

24   effect.

25         The State defendants talk about timing.  The

1 plaintiffs have been asking the -- the educator plaintiffs have

2 been asking since May for guidance.  They've gotten none, and

3 understandably, that's had a chilling effect, and they've been

4 pulling off hundreds and hundreds of books.

5          The proposed rules aren't helpful.  The difference

6 between a reference or a mention in the description is unclear.

7 It's unclear what level of detail would be required.  Is it

8 impermissible to say that two people had sexual intercourse?  Is

9 it impermissible to say that he penetrated her?

10          And every school district is interpreting this

11 differently.  There's one example which I think really brings

12 home the problem here.  So the State Defendants' Exhibit G, the

13 Gilbert declaration, concerns the book The Hate U Give.  It's

14 about a police shooting.  It was removed for sexually explicit

15 content based on the passage, quote, my butt against his crotch,

16 unquote.

17          Judge, that's not about sex.  It's about a basketball

18 game.  We're removing books that talk about a basketball game in

19 the zealous application of this unconstitutional standard.

20 That's certainly crazy, but it's also unconstitutional.

21          Judge, I'd like to turn to the identity and

22 orientation prohibition, but unless the Court wants me to

23 address the merits of it, I don't think it's necessary because

24 the State defendants have agreed that it does not apply to

25 libraries or classroom libraries.  They have not yet told us

1  whether they're willing to let the school districts know of

2  that, and, of course, the result is many, many books that have

3  been taken off based on that provision remain off the shelves,

4  and others are being removed now.

5        And so we still do need the Court's help on that until

6  and unless the State defendants agree to advise the school

7  districts of their determination that it's not applicable to

8  libraries and classroom libraries.  We agree with their

9  conclusion on that, and so that's why it remains in the case.

10        If Your Honor would like, I will address the

11  overbreadth and vagueness challenges on that, but, again, I

12  don't think that's a live issue given their concession that it's

13  not applicable.

14        THE COURT:  Let's do this.  You can skip it for now.

15  I'll hear from the State.  If you're not satisfied with their

16  position on that when they articulate it here in court, you'll

17  have your time on rebuttal to address it.

18        MR. SPERLING:  Thank you.

19        Your Honor, it's well established that the loss of

20  First Amendment freedoms even for a minimal period of time

21  constitutes irreparable harm.  The Supreme Court has held that

22  in innumerable cases, and courts of appeal across the country

23  have done so as well.

24        The balance of equities and the public interest

25  strongly favors the plaintiffs.  The Eighth Circuit has held it

1  is always in the public interest to protect constitutional

2  rights, and the remedy we seek is very straightforward, Judge.

3  It's an injunction restraining the defendants from enforcing or

4  acting in furtherance of the age-appropriate standard and the

5  identity and orientation prohibition.

6          Judge, we ask that the Court not require a bond.  The

7  defendants will not sustain any costs or damages as a result of

8  the requested injunction other than what they would otherwise

9  sustain as a result of defending the lawsuit.

10          Your Honor, the motto of the State of Iowa is, Our

11  liberties we prize and our rights we will maintain.  This

12  statute is at war with that motto.  It's at war with the First

13  Amendment.  It's constitutionally impermissible.

14          THE COURT:  Thank you, Mr. Sperling.

15          Mr. Johnston, I'll hear from you on behalf of the

16  State.

17          MR. JOHNSTON:  Thank you, Your Honor, and may it

18  please the Court.

19          Books with graphic illustrations of people performing

20  oral sex on each other are circulating in Iowa schools, and

21  before Senate File 496, schools were refusing to remove them.

22          I do want to address the vagueness issues that

23  plaintiffs for the authors just addressed here, and both sets of

24  plaintiffs here obfuscate the law when they discuss the

25  age-appropriate standard.  The law is very specific about the

1  exact sexual contact that needs to be removed from the

2  age-appropriate standard.

3       I know the Court has read the law and knows its

4  contents, but I need to address their vagueness challenge and

5  just discuss a couple of these.  For example, it would forbid

6  descriptions or visual depictions of the penetration of the

7  penis into the vagina or anus.  It would forbid descriptions or

8  visual depictions of contact between the mouth and genitalia or

9  mouth and anus or contact between the genitalia of one person

10 and the genitalia or anus of another person, and it goes on --

11       THE COURT:  Let me ask you a question.

12       MR. JOHNSTON:  Yes.

13       THE COURT:  In the 1990s, we had a President who was

14 impeached.  It was only the second time that it ever happened in

15 American history.  In order to understand why he was impeached,

16 it's necessary in my view to understand what sex act he did and

17 didn't engage in.  Would the age-appropriate standard forbid a

18 school from having a book about the impeachment in the 1990s of

19 the President?

20       MR. JOHNSTON:  The age-appropriate standard insofar as

21 whatever the book said, it would be very specific as to what its

22 description or visual depiction of that would be.

23       THE COURT:  So it might.  It might prohibit the book.

24       MR. JOHNSTON:  Potentially, but it would have to fall

25 within the statutory definition which is extremely narrow here,

1 Your Honor, and so a passing reference to sex or anything of

2 that nature would not be problematic.  If there is a visual or

3 graphic or descriptive explanation of that explaining --

4 describing the penis going into the anus or the vagina, these

5 types of -- these types of very graphic and visual descriptions

6 is what is in view in the law and is what has been provided to

7 the Court in the State defendants' affidavits which very clearly

8 depicts people doing oral sex on each other, and that's what the

9 law is targeting, Your Honor.

10         THE COURT:  Well, I mean, the law defines sex act to

11 mean any sexual contact -- and it's true that penetration of the

12 penis into vagina or anus is one aspect of it, but then there's

13 five more:  contact between the finger, hand, or other body part

14 of one person and the genitalia or anus of another; contact

15 between the mouth and genitalia of one or another; ejaculation;

16 use of artificial sex organs.  I mean, it isn't just about

17 penetration.

18         But let me ask this.  Would it be unreasonable for a

19 school to conclude in trying to comply with the law that they

20 needed to remove books about the impeachment in the 1990s?

21 Would that be an unreasonable interpretation for a school to

22 take?

23         MR. JOHNSTON:  Solely based on the content of those,

24 there may be some concerns depending on how the First Amendment

25 standards shake out under *Pico* and that sort of line of cases,

1 and the Court has rightly noted we are in rookie territory when

2 we deal with particularly school libraries.  I do intend to

3 address that in detail in a little bit, but the pure content

4 base of that is not what this law is targeting.  It is only

5 targeting those very specific depictions or descriptions of

6 these very specific sex acts which author plaintiffs

7 inconsistently argue are too specific and simultaneously too

8 vague to give any direction to school districts.

9         THE COURT:  In the 2016 presidential election, there

10 were some salacious allegations there regarding alleged sex

11 acts.  Would it be unreasonable for a school to decide that it

12 couldn't have books about the 2016 election in their school

13 library?

14         MR. JOHNSTON:  Election, the -- all the context around

15 it, it would likely not be reasonable.  I'm hedging a little bit

16 because there's -- there's a certain First Amendment analysis I

17 want to think about with regard to the *Pico* line of cases and

18 the extent to which those principles would apply here, but,

19 again, the concern is really the focus on the descriptions of

20 the sex acts.

21         THE COURT:  The plaintiffs' counsel has identified

22 some examples of books, <u>Slaughterhouse-5</u> is one that's a

23 well-known anti-war book.  Was it appropriate in the State's

24 view for some school districts to have removed that book from

25 the school library, or was that an inappropriate decision?

1          MR. JOHNSTON:  With regard to specific books, Your

2    Honor, I have not had a chance to review all of them in detail.

3    There is a certain extent to which also I would -- I don't think

4    my subjective view on it is relevant, and I don't really want to

5    sort of take the -- I guess you would say usurp the role of,

6    like, a school board in evaluating these, but what I would say

7    is what the law is -- what the law is saying is the law is

8    clear, and so to the extent school districts have not been

9    applying that and have been taking out books that just passively

10   reference characters engaged in sex, that's not what the law is

11   targeting.

12          THE COURT:  Let me ask you this.  So Exhibit L-1 that

13   one of the plaintiffs' groups attached to their pleading

14   identified by my count 567 books that have been removed from

15   school libraries up to this point.  In the State's view -- and,

16   by the way, I think that's only the 37 school districts that

17   have reported, and there are about 300 school districts total,

18   so the actual number's probably much bigger.  But let's assume

19   it's 567.  From the State's perspective, does that number sound

20   about right?  Is it too high?  Or is it too low?

21          MR. JOHNSTON:  Apologies, Your Honor.  From the

22   State's perspective, I have no idea.  The -- what I would say is

23   with regard --

24          THE COURT:  If the State doesn't know, how is the

25   school district supposed to know?

1     MR. JOHNSTON:  Oh, I might be misunderstanding your

2   question.  In terms of whether the number is correct or not --

3   the State's position is that the application of the text of the

4   law is clear, and I can't explain why some districts would apply

5   it to a passive reference to characters engaging in sex.

6     And I would also note that Your Honor is correct that

7   there are many more school districts in the state.  We have an

8   affidavit from school districts -- at least a couple, I believe,

9   that believe this law is clear, and so the Court I do believe is

10  mindful that the school districts here have been selected for

11  this litigation and may not be representative of the entire

12  state.

13     THE COURT:  That's a fair point.

14     Let me -- let me talk about the world I have to live

15  in which is finding and applying precedent.  I have read every

16  single school library removal case that I could find.  *Pico* and

17  *Pratt* strike me as the most important because *Pico* is the U.S.

18  Supreme Court; *Pratt* is the Eighth Circuit.

19     *Pico* involved removal of 9 books.  *Pratt* involved the

20  removal of 1 film plus a trailer for that film.  I found cases

21  at the Court of Appeals level and also District Court level all

22  over the country that involved 1 book, 1 book, 2 books, 1 book,

23  10 books, 8 books, 1 textbook, and 1 magazine.

24     Can you point me to a single case where a state law

25  has been upheld as constitutional that resulted in the removal

1  of more than 500 books from school libraries across the state?

2         MR. JOHNSTON:  I do not have such a case, Your Honor.

3  One thing I would note is one difference between this case and

4  some of these authorities is that we are -- we are dealing with

5  a state law that sets education and curriculum standards.  Some

6  of these cases involve school boards which function in a very,

7  very different way, and so some of those cases may not be

8  applicable either in terms of the evidentiary analysis or the

9  decision that they reached.

10        THE COURT:  Yeah.  And I agree with that actually.

11 That's what's interesting is the State of Iowa here is doing

12 something statewide that in these other cases typically seem to

13 be happening on more of a school-district-by-school-district

14 basis.  Does that make it easier for you to defend the

15 constitutionality of the law or harder and why?

16        MR. JOHNSTON:  I think easier, and I share the Court's

17 concern with regard to the -- the murkiness of this area, and I

18 think I've had some of those same frustrations that the Court

19 has had trying to review some of this law in preparation for

20 this hearing.

21        So my -- here's my approach to this issue, Your Honor,

22 is this issue is school libraries.  It lies at the intersection,

23 I think, of four streams of First Amendment jurisprudence.

24        The first is this government speech doctrine which

25 plaintiffs here -- all parties here are quibbling about the

1  scope and extent of that, but there is the government speech

2  doctrine, and there's a line of cases that specifically applies

3  this to schools.  There's also a line of First Amendment

4  authority related to the Government speech doctrine that deals

5  with instances when the Government compiles the speech of third

6  parties, and when they do that, courts have held that that

7  constitutes a communicative act.

8         The third stream is that the courts -- and these are

9  all developments since this *Pico* case.  The third stream

10 addresses this issue of the reciprocal right to receive that

11 both sets of plaintiffs here rely on.  What those cases have

12 found in the government speech context is that although there is

13 this reciprocal right to receive information that's

14 constitutionally protected, the courts have looked at that and

15 said, Well, we can't let private people control the government's

16 message, and so they don't apply that the same way in the

17 government speech context.

18        And then there's also the Supreme Court's holding that

19 public libraries are not subject to forum principles, and we

20 would argue that, yes, American Library Association is dealing

21 with a public library, and, yes, it is dealing with the Child

22 Internet Protection Act, which was meant to shield children from

23 access to sexually explicit material on computer terminals in

24 the library, but the reasoning there applies even stronger in

25 the school library context where children are subjected to a

1  compulsory environment and then also where parents entrust their

2  kids to schools to not expose them to inappropriate materials.

3       So those four streams of First Amendment jurisprudence

4  have developed since *Pico*, and so to the extent *Pico* would be

5  read as being in some way in opposition to what's happening

6  here, that case should be narrowly construed.

7       We also contend, though, that the most on-point cases

8  that do deal with this specific issue with school libraries --

9  it is *Pico*.  Unfortunately *Pico* is such a badly-fractured

10  decision that courts generally don't know what to do with it.

11  The issue, though, is that they -- that even that court said in

12  the school environment, schools are allowed to shield children

13  from vulgarity.  And, importantly, Your Honor, neither *Pico* nor

14  *Pratt* applied a *Miller* analysis, and this is consistent with the

15  stream of authority that recognizes that at least to some extent

16  in the school environment and in the library, we're dealing with

17  a government speech issue, and the Government has to have

18  discretion over what content it shows to the children in that

19  environment.

20       And so, yes, it's a murky area, but I'd also contend,

21  Your Honor, that it is their burden at this stage in the

22  litigation to prove a likelihood of success on the merits.  If

23  the standard is not certain, they can't show that.

24       THE COURT:  So one of the big differences between this

25  law and a law that was up -- the law that was upheld in

1  *Ginsberg*, to use this as a counterpoint example, was that

2  *Ginsberg* was at least still tethered to the adult-obscenity

3  standard.  It talked about all of the elements of that standard

4  as it then existed.  The standard changed a little bit five

5  years later in *Miller*, but still *Ginsberg* talked about what was

6  then the prevailing adult obscenity standard, and it applied the

7  very same standard but just adjusted a little bit to account for

8  the fact that in that case they were dealing with access of

9  books to minors, so it was sort of a -- I read *Ginsberg* as sort

10  of an obscenity-light standard, and the Supreme Court said it

11  was okay.

12       Senate File 496 doesn't apply an obscenity-light

13  standard.  It applies something way, way more restrictive.  At

14  what point does that become a First Amendment problem?

15       MR. JOHNSTON:  So part of this does press into the

16  challenge in figuring out how to apply those types of standards

17  in this case.  Our reading of this First Amendment jurisprudence

18  is that in order to apply some of these standards, you actually

19  have to be on sure footing to begin with that you're triggering

20  the free-speech clause of the First Amendment, and when we're

21  talking about government speech, there is a serious question --

22  well, the government speech unquestionably does not trigger the

23  free-speech clause.

24       We also contend, though, Your Honor, that in the

25  school library environment and in the school that government

1　speech doctrine does apply.  It does meet the criteria for that.

2　It is compiling third-party speech, and in particular it's

3　exercising discretion over how to present that material to

4　school children.

5　　　　THE COURT:  So let me push back on that a little bit.

6　If this is government speech, does that mean that the State

7　could order the removal of every single book, period, from a

8　school library and not run into First Amendment problems?

9　　　　MR. JOHNSTON:  That's where this gets very murky, Your

10　Honor.  That case is not this case, and so this case is firmly

11　within the boundaries, and what it seems like the Supreme Court

12　is trying to figure out and the circuit courts right now are

13　trying to figure out is maybe where that line goes because this

14　does come at the intersection of government speech and these

15　other forum principles, but this case certainly does not require

16　removal of really that many books except those that really very

17　graphically describe sex acts.

18　　　　THE COURT:  Yeah.  And, I mean, that's -- that's

19　really interesting to me, though, that you keep saying that,

20　except that's not how school districts are interpreting it.  So

21　doesn't that seem like pretty strong evidence that we have a

22　vagueness problem?

23　　　　MR. JOHNSTON:  No, Your Honor.  The reason is that --

24　now, I can't explain this on maybe a social or cultural or

25　psychological level.  I know there's been a lot of messaging

1   about this law that is not really consistent with what this law

2   actually accomplishes.  It doesn't -- it doesn't help that

3   people make certain public statements about things that maybe

4   aren't supported by the text.

5         What I can tell you, Your Honor, though, is that the

6   error that people are making with regard to interpreting the

7   statute that both sets of plaintiffs commit here is they have

8   tunnel vision when they look at the statute and they look at the

9   word "description" in isolation from the rest of the text,

10   particularly the statutory definition of sex acts, or they see

11   the phrase sex act, and they have tunnel vision on that, and

12   they kind of disconnect that from the actual statutory

13   definition that makes it very explicit and clear.

14         And so if you pick up the law and you see sex acts and

15   it says, As defined in our criminal code, but you don't flip to

16   the criminal code and you're looking at sex acts, it's like,

17   well, gosh, that's -- that's really vague because a book that

18   just references people having sex, that can come within that.

19   That's not what it's saying.  People have to flip to the actual

20   criteria.

21         THE COURT:  Yeah.  I mean, it depends on how you

22   include -- or how you define the word "descriptions" or

23   "depictions," because it says age-appropriate does not include

24   any material with descriptions or depictions of a sex act.  If

25   there's a book that says, Two people had sex and nine months

1 later a baby was born -- I mean, that's sort of a description of

2 a sex act, isn't it?

3      MR. JOHNSTON:  No, it's not a description of a penis

4 entering a vagina or an anus, Your Honor.

5      THE COURT:  Why didn't the State -- well, let me ask

6 you this.  Do you agree that there are books that will be

7 removed from school libraries or have been removed from school

8 libraries as a result of this statute that you think were

9 properly removed that also have considerable literary or

10 artistic or scientific or political value?

11      MR. JOHNSTON:  What I know -- so from our own

12 affidavits, one of our -- one of our affiants had said -- I

13 believe it was the book Gender Queer had been removed, and

14 that -- that particular book has descriptions as graphic

15 illustrations of things that would offend the statute.  Having

16 not reviewed that book, I can't answer that question, Your

17 Honor, as to -- as to its merits beyond that, but what I -- what

18 I would say is that those -- those -- those pictures in that

19 book very clearly violate the standard.

20      THE COURT:  There are Pulitzer Prize-winning books

21 that are being removed from school libraries.  Are you saying

22 those Pulitzer Prize winners don't have any literary or artistic

23 or social or political value?

24      MR. JOHNSTON:  So I want to be somewhat careful.  I

25 don't want to make factual concessions.  I just haven't dealt

1   with the school districts that have made certain removal choices

2   or whether, in fact, these books have actually been removed.  So

3   I can't -- I can't necessarily comment on that part of it.

4          THE COURT:  When I looked at the list of books that

5   had been removed, there were quite a few that jumped out at me.

6   One was a nonfiction book called Marriage Rights and Gay Rights:

7   Interpreting the Constitution.  Was it appropriate for a school

8   district to have removed a book from school libraries about how

9   to interpret the Constitution?

10         MR. JOHNSTON:  On the basis of merely that content,

11  no, likely not under the *Pico* standard.  Again, that being sort

12  of a murky area, that standard being one about -- actually

13  affirming that schools have a very -- they have tremendous

14  discretion.  They just can't do -- they can't make removal

15  choices based on political criteria or eliminating all books

16  written by Democrats or something to that effect.

17         THE COURT:  I also noticed on the list there were

18  nonfiction books that are designed to help minors avoid being

19  victimized by sexual assault.  There was a book called Sexual

20  Predators, a book called The Truth About Rape.  Assuming which I

21  think is likely given the subject matter that those books had to

22  include at least some discussion of a sexual event, was it

23  appropriate for the school districts to decide to remove those

24  nonfiction books that are designed to help people avoid being

25  victimized by sexual assault?

1      MR. JOHNSTON:  Yeah.  So without having actually --

2  without having reviewed the books, what I can say is to the

3  extent that they actually describe oral sex, they actually

4  describe penises coming into contact with anuses, those type of

5  things, those are the curricular standards that the State has

6  set, and they pass a rational-basis review, so in terms of the

7  appropriateness, constitutionally it's fine, and some of these

8  are really policy questions that would be left to the

9  legislature and how to craft it.

10      THE COURT:  I noticed also there were nonfiction

11  history books about the Holocaust, for example, Night by Elie

12  Wiesel, another award-winning book.  There was another book

13  about the massacre of innocent civilians in China in the early

14  stages of World War II.  It's called The Rape of Nanking.  If

15  those books contained sex acts, was it appropriate for school

16  districts to remove those nonfiction history books from school

17  libraries?

18      MR. JOHNSTON:  Sex acts coming within the definition,

19  they -- they could be removed under the statute.

20      THE COURT:  Does it concern the State that so many

21  history books and nonfiction books are being swept up in this

22  law?  Isn't that something that we should all be concerned

23  about?

24      MR. JOHNSTON:  Well, it's something that I want to

25  take a closer look at, Your Honor, as this case plays out in the

1    litigation to see why some of these books are being removed.  My

2    inclination is that there has been an overremoval, but it's --

3    it, again, comes back to that issue of reading the statute with

4    tunnel vision, not going to the statutory definition of sex

5    acts, and applying things where there's passive references to

6    so-and-so was raped.  That doesn't require the book to be taken

7    out.

8         THE COURT:  At what point would so-and-so was raped

9    cross the line?  So-and-so was pulled into the back room, and

10   two men raped her?  Is that too far?

11        MR. JOHNSTON:  I would not think so, Your Honor.  It's

12   my subjective opinion.  I wouldn't want to substitute that for a

13   school board.  But if the book came within the statute

14   describing a rape where it's actually describing the penis

15   penetrating, those types of things, that -- then it could be --

16   then it would come within the statute.

17        THE COURT:  Okay.  I've interrupted you with a million

18   questions.  If you've got more that you want to say about the

19   book restriction provisions of the law, I'm happy to hear your

20   additional argument.  Otherwise, I'd like to move on to the

21   restrictions on promotion and instruction and so on relating to

22   gender identity and sexual orientation.  But first things first.

23   Is there more you want to make sure to cover on the book

24   restriction?

25        MR. JOHNSTON:  With regard to the library program,

1  Your Honor, I'm satisfied that we've covered it, so I would be

2  happy to take the Court's questions on the provisions.

3  　　　　　THE COURT:  Good.  And actually I do want to confirm

4  something that Mr. Sperling talked about.  I got the impression

5  that you must have talked with him this morning or maybe he's

6  reading something into your briefs, but he was concerned about

7  some crossover between the promotion and instruction

8  restrictions and school library programs, and he got an answer

9  from you that seemed to satisfy him, but I want to make sure he

10  understood the answer right.  What is the State's position on

11  that crossover?

12  　　　　　MR. JOHNSTON:  That's correct.  The criteria of

13  this -- what we're calling the instruction section does not

14  apply to the -- the library program or the books in the library.

15  What the concern was -- and I think the concern by both sets of

16  plaintiffs -- is that the instruction section -- really all's it

17  does is it says instruction on these topics, we're going to

18  reserve that until after sixth grade, and so their concern was

19  that if this applied to the libraries as well, then books that

20  merely had, like, a gay character in it, then school libraries

21  would have to remove the book containing the gay character.

22  That's -- that's not -- that's not how the statute operates.

23  　　　　　We do lay out a statutory interpretation argument in

24  our brief, and I know the Court can review that, so I don't want

25  to go through all of that in detail.  The two points I would

1  make from that is that the Senate File was fairly clear when it

2  was adopting the criteria of that instruction program into other

3  provisions, and it didn't do that with this.  It wasn't saying

4  that the library program is, quote, unquote, subject to the

5  instruction section.

6        And then the library program can't be enforced against

7  any -- the only -- the scope of the enforcement refers only to

8  sex acts, so it's not referring to gender identity, sexual

9  orientation, and so to Your Honor's questions earlier about why

10  there are so many books being removed, someone had given the

11  impression without carefully looking at these sections side by

12  side that the one is requiring something that it wasn't actually

13  requiring.

14        THE COURT:  And so just to give a concrete example, a

15  fourth grade teacher can have a book that has a gay character

16  and share that book with students?  Yes or no?

17        MR. JOHNSTON:  So the distinction, Your Honor, would

18  be curriculum, and so what the instruction section addresses --

19  it's called prohibited instruction.  What that -- what that

20  section concerns is the compulsory educational environment to

21  the classroom, and so what the State explained in its brief was

22  just that that book can be in the library; the teacher cannot

23  use that as curriculum.

24        THE COURT:  What if the teacher wants every student to

25  read a book and write a three-paragraph paper about it?  Can

1  that book be one of the options for the students to choose from

2  if they're in sixth grade or below?

3          MR. JOHNSTON:  Yes, Your Honor.  And so the way

4  that -- the way that this operates is the statute -- it sets

5  educational standards and criteria, which is an important

6  thing we kind of keep coming back to.  What it does is it

7  forbids school districts from adopting or providing program

8  instruction, promotion, et cetera, and it's prohibited

9  instruction.  It refers only to the compulsory part of the

10 classroom.

11         So a teacher could say, I want all the students to

12 write a student essay.  If that student then themselves goes to

13 the library and selects a book about gay characters, that's

14 perfectly fine.

15         THE COURT:  So let's talk about statutory

16 interpretation then even more deeply.

17         First off, just as sort of a fundamental question, if

18 I interpret the text of a statute and I think there's only one

19 possible way to interpret it and I think that is probably

20 different than what the legislature was trying to accomplish, is

21 my obligation to interpret it according to the text or to

22 interpret it to what I think the legislature was trying to

23 accomplish?

24         MR. JOHNSTON:  Yeah.  I think -- my approach, Your

25 Honor, is to divine the intent from the text of the statute and

1  that stray comments by legislatures -- legislators are

2  irrelevant with regard to the meaning, and so when the Senate

3  File is reviewed as a whole and not interpreted in isolation,

4  most of these provisions are clear.

5          There is sort of towards the back of the bill kind of

6  a policy explanation of protecting parents' rights and the

7  well-being of their kids, so that would be relevant to the

8  intent of the statute.  Nothing in the text of the statute or

9  anything there is viewpoint discriminatory, any of that kind of

10  stuff.

11          THE COURT:  So let's talk about how it should be

12  interpreted then.  It says -- this provision of it -- it's Iowa

13  Code section 279.80.  A school district shall not provide any

14  program, curriculum, test, survey, questionnaire, promotion, or

15  instruction relating to gender identity or sexual orientation to

16  students in kindergarten through grade 6.  Then if you cross

17  over to the other provision, gender identity is defined as a

18  gender-related identity of a person, regardless of the person's

19  assigned sex at birth.

20          On day one to a fourth grade class, if I was a

21  teacher, could I tell the students that I wanted them to refer

22  to me as Mr. Locher, or would that be instruction related to my

23  gender identity because I'd used the word mister?

24          MR. JOHNSTON:  That -- so one principle to apply there

25  would be that we don't assume that the legislature intended

1  absurd results, so when they've -- when they've drafted this

2  section -- I think both sets of -- or at least the student

3  plaintiffs here have argued that, well, this applies to, you

4  know, sort of carte blanche everything because everybody has an

5  identity.  The proposed rules make this clear, and I think it's

6  kind of common sense and basic from the text that these sort of

7  neutral statements are not coming within the -- coming within

8  the provision.

9            And, again, it is this -- this section is talking

10 about school districts adopting curricula and adopting --

11           THE COURT:  Except -- I mean, it says the school

12 district shall not provide any program, curriculum -- that's one

13 word, but it also says program, test, survey, questionnaire,

14 promotion or instruction, so you're highlighting one word and

15 sort of forgetting all the others, and that's the concern for

16 the teachers.

17           MR. JOHNSTON:  Um --

18           THE COURT:  Is there -- they don't get to be an

19 assistant attorney general and say, oh, well, this must be what

20 it is; they've got to look at what it actually says and modify

21 their behavior accordingly.

22           MR. JOHNSTON:  Yes, Your Honor.  And so in reviewing

23 that -- that section, the title of sections are also relevant to

24 the interpretation.  It says Prohibited Instruction, and when

25 we're talking about what it is -- that which the district

1  adopts, we're talking about those things that it's providing in

2  its compulsory instructional environment, and so I refer to that

3  sometimes offhand as curriculum or instruction, but it's talking

4  about what the school district is requiring to be put in front

5  of children.

6          THE COURT:  This is sort of an unfair question because

7  I know it's a long bill, but is the word "compulsory" in Senate

8  File 496 anywhere?

9          MR. JOHNSTON:  I have not -- I have not done a

10 control F on the Senate File.  A relative question that I also

11 have related to that is the sections that the Code is amending

12 are relevant to look at, and so there's the Senate File, but

13 then there's also Iowa Code section 279, Iowa Code section 280.

14 There's various Code chapters that these sections of the bill

15 are being inserted into, and so that fuller sort of contextual

16 analysis when looking at the school education standards which is

17 what these sections are addressing -- in that fuller context, I

18 think it's fairly clear this is talking about compulsory

19 environment.

20         THE COURT:  All right.  And actually I was able to

21 pull it up, and I did a control F.  It appears one time in the

22 entire bill, and it says, A child of compulsory attendance age

23 who is identified as requiring special education, and then it

24 talks about a special education program, so I don't see the word

25 compulsory anywhere when it comes to what can or can't be done

1  in the classroom relating to gender identity and sexual

2  orientation.  Instead, I see program, curriculum, test, survey,

3  questionnaire, promotion, or instruction which seems really

4  broad to me and goes well beyond what's compulsory or not

5  compulsory.

6          MR. JOHNSTON:  Right, Your Honor.  And there's a --

7  there's a familiar interpretive canon -- I forget the Latin name

8  of it but -- a word is known by the company it keeps, and so

9  what every single one of those terms has in common is that they

10  are features of a compulsory classroom environment, and that's

11  why there's an educational standard governing what the school

12  districts can provide that is being required for children.

13          THE COURT:  If I conclude that by sticking to the text

14  I can only interpret this law one way and it prohibits boys and

15  girls bathrooms and it prohibits boys and girls basketball teams

16  and it prohibits any instruction related to whether somebody is

17  male or female, would the State want that law enjoined?

18          MR. JOHNSTON:  I can't speak on behalf of the State

19  whether the State would want it enjoined.  I -- what my position

20  would be is that the question is whether the law is

21  constitutional under the broad discretionary authority that

22  schools have to set curriculum, and I would argue that the

23  section does not extend to bathrooms and those types of

24  absurdities.  I think the -- that the statute just doesn't apply

25  to those kinds of things so . . .

1        THE COURT:  So one of the ways that I could go that I

2   would agree with you on that is if I started looking at

3   legislative comments about it, but then we run into a different

4   problem because Mr. Story especially has pointed out that there

5   were some comments made by legislators that did seem very

6   viewpoint specific.  Do you agree with that, or do you interpret

7   those legislative comments as not being viewpoint specific?

8   What is your view on whether I should even take that into

9   account and, if so, what conclusion it leads to?

10        MR. JOHNSTON:  My view is that the stray comments are

11  irrelevant.  I don't want to make any factual concessions about

12  what was actually said, but supposing hypothetically even if --

13  even if they made certain comments about it, what we have is the

14  bill that they actually passed, and, I mean, I won't pass

15  comments on why people say various things that they say, but

16  the -- I do think that when -- when -- both when the Senate File

17  is read as a whole and when it's read in the context of the Code

18  section that it is amending, it's -- it's much more clear than

19  people have given it credit for.

20        THE COURT:  Again, I've interrupted you with a million

21  questions, so I want to let you make any additional points you

22  want to make on this aspect of the law or anything else.

23        MR. JOHNSTON:  That is -- I think we have covered that

24  section of the law as well, Your Honor.

25        And in terms of sort of keeping things organized,

1  my -- I think kind of what I would like to address further is

2  the -- the chill and the standing issue with regard to the

3  initial student plaintiffs.

4          The -- I do think that the -- to try to bring some

5  clarity and organization to this, I do think the First Amendment

6  issues here -- the first bucket to review these is this

7  government speech doctrine.  Even the author plaintiffs have

8  essentially conceded both in their oral argument and in their

9  briefing that schools have broad authority over curriculum, and

10  they very wisely and intelligently have focused on the one

11  aspect of the law that could possibly trigger free speech

12  concerns, and that's the *Pico* line of cases regarding school

13  libraries.

14          The remaining First Amendment claims involve this sort

15  of concept of chill, but to throw -- to -- to show a credible --

16  to state a claim for -- for chill or to have sufficient standing

17  for it, they would have to show that they have a credible threat

18  of prosecution or discipline for engaging in protected speech.

19          Now, the law itself -- the reason that all of their

20  claims are premised on this theory of chill is that the law

21  itself doesn't regulate any private speech, so their

22  interpretation -- they're chilled by a misinterpretation of the

23  law that they've received that they say stigmatizes them.

24  They're responding to what they believe the law represents, and

25  as a consequence of that, they say that they have an Article III

1  injury.  That's not sufficient to raise an Article III injury.

2          And then the second point there is that none of the

3  student plaintiffs have a credible threat of prosecution or

4  discipline under the law.  Only the educators -- and as I

5  understand it, there's only a couple educators in the Penguin

6  Random House case that have even come forward to challenge this,

7  and they're the only ones that can be prosecuted.  The children

8  cannot assert some sort of third-party or vicarious harm to

9  confer standing upon themselves.

10          That provision -- this enforcement provision also has

11  been mischaracterized as Draconian.  A first violation results

12  only in a written warning, and then it's only subsequent,

13  multiple, repeat knowing violations -- they include that mens

14  rea component to it -- that could eventually lead to a -- sort

15  of a disciplinary action that could affect somebody's license,

16  and so these are really, really attenuated, really hypothetical,

17  and, in fact, just disconnected from the student plaintiffs.

18          I did want to briefly address the equal protection

19  claim.  We -- we have already addressed kind of the statute on

20  the gender -- the instruction section, but, again, the statute

21  doesn't really create a gender classification or require any

22  sort of differential treatment.  Some of their claims are just

23  based on things like they can't access certain literature in the

24  library.  Again, this is a misinterpretation of the statute

25  about what can or cannot be in the library.  But similar

1  situated students, even if that were true, also cannot access

2  the material. There's no differential treatment under the law.

3  Essentially most of the claims are rooted in a mis --

4  overreaction to a mischaracterization of the law that they have

5  received from other people. I didn't see a single affidavit

6  filed by the student plaintiffs wherein they alleged that they

7  had actually read the text of the law, and so they're relying on

8  whatever they're being told about it and receiving stigma

9  essentially from that.

10  In terms of the equal access argument, I would

11  reiterate, Your Honor, that the -- the statute -- if you go to

12  the equal access statute, it prohibits secondary schools from

13  denying equal access to clubs because of religious, political,

14  philosophical, or content-based reasons. Again, going back to

15  the text of the law, it doesn't require that. It doesn't

16  regulate students -- student clubs, non-curricular groups. It

17  doesn't regulate that at all. I can't speak to why somebody

18  might apply the law in such a way that it did, but it's not an

19  application of the law that is -- that is required by the text.

20  And then, finally, with regard to that, none of the state

21  defendants that I represent are, in fact, secondary schools, and

22  I've not seen authority where they can make some sort of

23  vicarious liability-type claim with regard to that statute.

24  I did want to address one claim that came up. I think

25  both sets of plaintiffs made it, but I know for sure the

1   publisher plaintiffs did where they've argued that all of the

2   authority that they've reviewed comes down contrary to the

3   government's position in this case, and that's just false.

4   That's not correct, Your Honor, and I can give you a few case

5   citations.  I'm not going to promise that this is an exhaustive

6   list.  We have put these together as fast as we can, but the

7   Eastern District of Missouri, there is a district court case

8   there that involved a similar issue in a school library and

9   removal of books.  They have applied essentially the analysis

10  that we're following.  They express the same sort of misgivings

11  about *Pico*.  That case -- that's *C.K.-W. versus Wentzville*, 619

12  F. Supp. 3d 906.

13          The Western District of Missouri also in the Eighth

14  Circuit here has then applied and cited that case favorably, and

15  it reached a similar result upholding the removal of library

16  books.  The -- that's an unreported case, but the citation there

17  is 2023 Westlaw 2180065.

18          The Eleventh Circuit is also dealing with these cases.

19  These were filed earlier this year, and they're working their

20  way through the district courts there, but they've also dealt

21  with similar-type cases before, so *ACLU versus Florida* -- or

22  *ACLU of Florida versus Miami-Dade County*, 557 F.3d 1177.  Those

23  are just three examples of cases, Your Honor, that have adopted

24  essentially the reason that the State has put forward here.

25          And this does seem to be the trend, and so one thing I

1  would ask the Court to be mindful of when you're reviewing the

2  State's authority, reviewing the plaintiffs' authority is that

3  cases that predate *Pico* are seriously problematic.  Any case --

4  even cases close in time to *Pico* could be problematic.  Those

5  four streams of First Amendment jurisprudence, Your Honor, that

6  I was talking about -- these are all developments that happened

7  much later, and those cases don't take into account those

8  jurisprudential developments.

9          I'd also just go back to the *Pico* standard, and even

10 they said that school libraries can shield children from

11 vulgarity.  The standard there was that school libraries

12 couldn't remove books in a -- for partisan reasons.  Both that

13 case and *Pratt* -- both of those cases are concerned about the

14 suppression of ideas, and the examples and the hypotheticals

15 that they gave were a Democratic board requiring removal of

16 books written by or in favor of Republicans.

17         This book -- this statute that we're considering, Your

18 Honor, is very narrow.  It does not invade the space of ideas.

19 It really is focused on the sex acts.

20         And then, finally, Your Honor, I did want to address

21 the irreparable harm claims.  There was a delay in filing here.

22 They didn't have to wait for proposed rules.  That doesn't hold

23 any water at all.  Plaintiffs challenge laws all the time before

24 rule-making, and they have very strategic reasons for doing so.

25 Mr. Story and the ACLU challenged Iowa's abortion law even

1  before it was enacted, so there's zero reason that they needed

2  to wait for the proposed rules as a basis for why they didn't

3  file this action.

4         The law has also been in effect since -- portions of

5  it have been in effect since May 26. There are three portions

6  of the bill that include anti-bullying provisions. Those went

7  into effect immediately as deemed of immediate importance. It's

8  worth noting that the student plaintiffs have asked for a facial

9  injunction on the entire statute, so that would encompass many

10  clearly constitutional provisions and anti-bullying provisions.

11  The remainder of the statute did go into effect on July 1st,

12  2023. The only thing remaining to go into effect is the one

13  provision in January 1st of 2024.

14         As I mentioned earlier, I won't repeat all of it

15  again, but that law is not Draconian. It requires repeated,

16  knowing violations before somebody could face discipline.

17  There's no accidental tripwire attached to that.

18         And I would also, Your Honor, push back on this claim

19  that the State has no -- no irreparable injury here. The State

20  is always irreparably harmed whenever its presumptively

21  constitutional democratic statutes are enjoined. This law keeps

22  graphic illustrations of sex acts out of Iowa schools, and the

23  law is in the public interest.

24         Those Missouri cases that I cited earlier also cite to

25  a principle that given the ubiquitous nature of people's access

1  to information today that the removal of a book from a library,

2  even if it was running afoul of some kind of First Amendment

3  concern, isn't sufficiently irreparable harm for them to grant a

4  preliminary injunction.

5  So for these reasons, Your Honor, I would ask that you

6  deny both of the requests for preliminary injunction.

7  Thank you very much.

8  THE COURT:  Thank you, Mr. Johnston.

9  Ms. Vaught, would you like to be heard today?

10  MS. VAUGHT:  No, Your Honor.

11  THE COURT:  All right.  That's easy.

12  We've been going a long time.  I promised Mr. Story

13  and Mr. Sperling that I'd give you a little bit of rebuttal

14  time.  I'm only going to give you five minutes, but I'll let you

15  have that five minutes.

16  Mr. Story, you first.

17  MR. STORY:  Yes, Your Honor.

18  All right.  Five minutes.  Thank you, Your Honor.

19  Let's go.

20  So the State's big argument today was that the purpose

21  of the law was to get these depictions of oral sex that are

22  circulating in our schools out of our schools and that the

23  definition of a sex act -- that definition -- not description

24  and depiction but the sex act in the criminal law is super

25  clear, and in support of this, every one of their declarants or

1  most of them hold up Gender Queer; right?  They're talking about
2  that panel, that one panel that we have all seen, and they
3  object to it, and they include it in their declarations.

4         And the problem, Your Honor, is that that panel
5  doesn't meet the definition of a sex act.  It's an artificial
6  sexual organ.  Under the law an artificial sexual organ
7  cannot -- it's not a sex act unless it makes contact with a
8  vagina or anus.  It never mentions oral sex.

9         So I'm not saying we need to go through each panel and
10 each page of all these books and decide if this or that doesn't
11 meet the definition, but I am pointing this out because the
12 State itself cannot seem to figure out what this law means, and
13 I have read Gender Queer, and it does have value.  It has won
14 awards.  As a whole, it's about finding your identity.  It's
15 about finding your community.  It's about exploring your
16 feelings that are extremely confusing and isolating, and even
17 that panel that they hate is about expressing and respecting
18 consent and defining limits sexually.  This is important stuff
19 for schools to know.

20         On equal protection, Your Honor, the State said
21 that -- the bottom line is they can't have it both ways; right?
22 If it's neutral for equal protection but you can interpret it
23 differently for free speech but you can't look at what the
24 legislature said but you also need to enter -- it doesn't make
25 sense.  Your Honor is correct.  Once you go to what the

1 legislature has said, what these members, what the proponents

2 have done, the State has a problem, and they've entirely failed

3 to address it.

4      On equal access, the State says it doesn't regulate

5 student clubs, but it does.  It can't throw up its hands and

6 say, It's not our fault, while the school districts also throw

7 up their hands and say that we're only following State law.

8 Someone has to answer for this because this is happening to

9 these GSAs.

10      The State kind of towards the end talked about whether

11 the Court should break up the law or asserting at least some

12 parts of it are constitutional.  Your Honor, I'm not conceding

13 that this law can or should be broken up.  The entire law was

14 discriminatory.  The entire law was passed with animus.

15 Ultimately, what we're asking for is the broadest relief

16 possible which at a minimum includes those provisions that we've

17 emphasized.

18      How much time have I got, Your Honor?

19      THE COURT:  You've got with one minute.

20      MR. STORY:  One minute.  All right.

21      On the "don't say gay or trans" provision, Your Honor,

22 the State has again shown its hand that it's not neutrally

23 applied.  Your Honor, you asked them about, okay, teacher reads

24 a book in front of a class and it features a gay character.

25 Would that violate the statute?  And the answer was yes; right?

1  Would the State feel like it was violating the statute if that

2  book had a straight character?  Absolutely not.  But that's why

3  the law may textually be neutral, but as applied in effect and

4  its intent, we all know the difference.  Again, when the Court

5  asked about it being written neutrally, the State again

6  indicated it would only be applied to non-cishet identities

7  orientations.

8         Your Honor, the State has not made a compelling case

9  for why this law is necessary.  They haven't clarified that it's

10 not vague or ambiguous.  They haven't established that it is not

11 discriminatory.  They've just said that it's the government and

12 they can say what they want, and, Your Honor, that is not an

13 effective position, and it's not constitutional.  So we'd ask

14 that this law be enjoined.

15         THE COURT:  Thank you, Mr. Story.

16         Mr. Sperling, your five minutes.

17         MR. SPERLING:  Thank you, Your Honor.

18         Counsel for the State defendants argued that there are

19 not existing procedures to deal with books that should not be in

20 school libraries.  One of their own declarations shows how a

21 book was moved -- removed based on parental complaints under the

22 existing procedures before this new law went into effect.  Each

23 district has appropriate procedures for parents to complain

24 about books that are of concern to them.

25         It's an entirely appropriate procedure which takes me

1  to the cases that counsel for the State defendants just argued

2  to you, but they're -- they're not about the subject that you

3  were told they are about.  They're about the discretion that

4  librarians have to remove books.  They're not about imposing a

5  standard for the State, and we address this specifically, Your

6  Honor, in the footnote 8 on page 6 of the Penguin plaintiffs'

7  reply.

8           The State defendants just won't answer your question

9  about whether books are improperly removed.  What they did say

10 several times is that it's murky.  They're right.  It's murky.

11 That's why it's vague.  That's why you have such inconsistent

12 decisions on removals of books.

13          Your Honor, you asked about standards.  Two cases that

14 are useful in this regard were the *Counts* decision, 295

15 F.  Supp. 996, and the *Fayetteville* decision, 2023 Westlaw

16 4845626.  That's a decision from this year.  But this Court

17 doesn't have to write the statute and shouldn't write the

18 statute for the Iowa legislature.  That's up to the legislature.

19          As to the government speech doctrine, Your Honor,

20 there is no case that has ever applied that to school libraries.

21 This would be the first Court in our nation ever to have done

22 so, and in answer to Your Honor's question if the government

23 speech doctrine applies, they can take all the books out or any

24 books at all that they want because the First Amendment simply

25 doesn't apply under the government speech doctrine.  That's why

1  Justice Alito called it susceptible of serious misuse and a

2  dangerous doctrine.

3          The book removal provision exemption shows the kind of

4  factors that should be considered under *Miller*.  The Bible and

5  other religious books are allowed.  What the legislature is

6  doing there is in that limited circumstance applying the *Miller*

7  standard to look at the other considerations that should have

8  been taken into account.

9          Counsel for the State defendants repeatedly talked

10  about the statute pertaining to really graphic descriptions of

11  sex acts.  You can read that statute as often as you want.  You

12  won't find the term graphic in there.  That was just added on.

13          The State said that someone gave the impression that

14  the identity and orientation prohibition applies to library

15  books.  Yes, they did.  State officials gave that impression.

16  Educators have been asking for six months for clarification.

17  The State has refused to answer the question.  It now refuses to

18  inform school districts of its new position, and that position,

19  Your Honor, is clearly stated in the resistance to the Penguin

20  plaintiffs' motion for preliminary injunction on page 18 where

21  the State defendants state, quote, The instruction section does

22  not apply to the library program because it does not apply to

23  non-curricular books on library shelves, unquote.

24          So they state it in a submission to this Court, they

25  reaffirmed that position today, but they won't agree to let the

1  school districts know that they shouldn't be removing books from
2  the shelves based on that provision.  That is why an injunction
3  is necessary regarding that provision.

4          Your Honor, there is extensive evidence in the record
5  about the hundreds and hundreds of books that have been removed,
6  books that are in no respect for any age group pornographic or
7  obscene, books that are important for students to have access
8  to, and Your Honor gave examples of books there.  The State
9  defendants have no answer.

10          The problem is this is a substantially overbroad,
11  vague, and content-based restriction that simply can't survive
12  First Amendment scrutiny.  The idea that there's no real risk to
13  the educators because they just get a warning at first is
14  completely inconsistent with First Amendment jurisprudence.
15  Clearly it has a chilling effect.  That's why these books are
16  being removed in vast droves out of concern.

17          We ask our educators to do a lot.  It's a hard job.
18  We ask them to educate the children of Iowa, and they're having
19  to guess because it's murky, because it's uncertain, because
20  it's unclear.  It's simply incompatible with the First Amendment
21  to ask people to be guessing on a vague and overbroad statute
22  when their own careers are at risk.

23          The rights of students such as Hailie Bonz have been
24  infringed.  The rights of publishers have been infringed.  Your
25  Honor, this statute cannot withstand the First Amendment

1  scrutiny.  We're facing a January imposition of penalties going

2  into effect.  We ask the Court to enjoin the application of the

3  statute to the school libraries and classroom libraries.

4         THE COURT:  Thank you, Mr. Sperling.

5         I appreciate the briefing and argument from both

6  sides.  I know it was a lot of work in a short amount of time.

7  I do intend to try to rule on this on or before January 1st.

8  I'm not going to rule on it right now.  There's a lot that I

9  still need to think about and digest, but I do appreciate the

10  argument.  It's been helpful in all respects, but for now we're

11  adjourned.

12         (Proceedings concluded at 11:59 a.m.)

13

14                 C E R T I F I C A T E
           I, Tonya R. Gerke, a Certified Shorthand Reporter of
15  the State of Iowa and Federal Official Realtime Court Reporter
   in and for the United States District Court for the Southern
16  District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
   Section 753, that the foregoing is a true and correct transcript
17  of the stenographically reported proceedings held in the
   above-entitled matter and that the transcript page format is in
18  conformance with the regulations of the Judicial Conference of
   the United States.
19         Dated at Des Moines, Iowa, December 22, 2023.

20

21         /s/ Tonya R. Gerke
           Tonya R. Gerke, CSR, RDR, CRR
22         Federal Official Court Reporter

23

24

25