IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

GLBT YOUTH IN IOWA SCHOOLS TASK
FORCE, BELINDA SCARROTT as Next
Friend for P. B.-P., RICHARD CARLSON, as
Next Friend for P.C. & A.C., ULRIKE
CARLSON, as Next Friend for P.C. & A.C.,
ERIC SAYLOR, as Next Friend for T.S.,
BRIGIT STEVENS, as Next Friend for B.F.S.,
JOSEPH STEVENS, as Next Friend for B.F.S.,
JANE SMITH, as Next Friend for ROBERT
SMITH, JOHN SMITH, as Next Friend for
ROBERT SMITH, LARA NEWSOM, as Next
Friend for B.F., JOHN DOE, as Next Friend for
JAMES DOE,

      Plaintiffs,

 vs.

KIM REYNOLDS, in her official capacity as
Governor of the State of Iowa, MCKENZIE
SNOW, in her official capacity as Director of the
Iowa Department of Education, IOWA
DEPARTMENT OF EDUCATION, IOWA
STATE BOARD OF EDUCATION, IOWA
CITY COMMUNITY SCHOOL DISTRICT,
SIOUX CITY COMMUNITY SCHOOL
DISTRICT, URBANDALE COMMUNITY
SCHOOL DISTRICT, WATERLOO
COMMUNITY SCHOOL DISTRICT, WEST
DES MOINES COMMUNITY SCHOOL
DISTRICT, et al.,

      Defendants.

Case No. 4:23-cv-00474

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
PRELIMINARY INJUNCTION**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| PENGUIN RANDOM HOUSE LLC, LAURIE HALSE ANDERSON, JOHN GREEN, MALINDA LO, JODI PICOULT, SCOTT BONZ as parent and next friend of HAILIE BONZ, IOWA STATE EDUCATION ASSOCIATION, MARI BUTLER ABRY, ALYSON BROWDER, and DANIEL GUTMANN, | | |
| Plaintiffs, | | |
| vs. | | Case No. 4:23-cv-00478 |
| JOHN ROBBINS in his official capacity as President of the Iowa State Board of Education, MCKENZIE SNOW, in her official capacity as Director of the Iowa Department of Education, CHAD JANZEN in his official capacity as Chair of the Iowa State Board of Educational Examiners, URBANDALE COMMUNITY SCHOOL DISTRICT BOARD OF DIRECTORS, ROSALIE DACA, in her official capacity as Urbandale School District Superintendent, NORWALK COMMUNITY SCHOOL DISTRICT BOARD OF DIRECTORS, and SHAWN HOLLOWAY, in his official capacity as Norwalk Community School District Superintendent, | | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | | |

2

## I.      INTRODUCTION.

Plaintiffs in two parallel cases seek a preliminary injunction against the enforcement of Senate File 496, which, as relevant here, does three things: (1) requires the removal of any book from Iowa public school libraries that contains a description or visual depiction of a "sex act"; (2) forbids school districts, teachers, and other licensed professionals from, among other things, providing programs, promotion, and instruction to students in grade six or below relating to "gender identity" and "sexual orientation"; and (3) requires school districts to notify a child's parents if the child requests an accommodation relating to gender identity, such as asking to use different pronouns than those in registration records.

As to the book restrictions, the Court GRANTS the Motions for Preliminary Injunction and ENJOINS the enforcement of Senate File 496. The law is incredibly broad and has resulted in the removal of hundreds of books from school libraries, including, among others, nonfiction history books, classic works of fiction, Pulitzer Prize winning contemporary novels, books that regularly appear on Advanced Placement exams, and even books designed to help students avoid being victimized by sexual assault. The sweeping restrictions in Senate File 496 are unlikely to satisfy the First Amendment under any standard of scrutiny and thus may not be enforced while the case is pending. Indeed, the Court has been unable to locate a single case upholding the constitutionality of a school library restriction even remotely similar to Senate File 496.

As to the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation, there appears to be a severe misunderstanding—in two different ways— by some of the parties about what Senate File 496 says. First, nothing in the law restricts the ability of school districts, teachers, or other professionals to provide programs, promotion, and/or instruction of gender identity and sexual orientation to students in grade seven and above. School districts instead have full freedom to offer gay-straight alliances ("GSAs") or similar clubs that provide resources and support for LGBTQ+ students in grades seven and above. Teachers and other licensed professionals are not restricted in any way from serving as advisors for such GSAs, displaying rainbow flags, providing instruction on gay and transgender rights, and otherwise performing their responsibilities in a manner that emphasizes inclusiveness and respect for LGBTQ+ students in grades seven and above. Likewise, students in grade seven and above are free to engage in whatever forms of expression they wish, subject only to generally applicable restrictions that apply equally to all students. To the extent school districts, teachers,

or students have been interpreting the law otherwise, they are simply wrong. It follows that none of the Student Plaintiffs in grade seven or above have standing to challenge the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation. There is nothing for them to challenge.

Second, but conversely, there is also a misunderstanding of Senate File 496 as it relates to students in grade six and below. The law forbids programs, promotion, and instruction to students in those grades relating to "gender identity" and "sexual orientation," but those terms are defined a neutral way that makes no distinction between cisgender or transgender identity or gay or straight relationships. Meaning: on its face, the law forbids any programs, promotion, or instruction recognizing that anyone is male or female or in a relationship of any sort (gay or straight). The statute is therefore content-neutral but so wildly overbroad that every school district and elementary school teacher in the State has likely been violating it since the day the school year started. This renders the statute void for vagueness under the due process clause of the Fourteenth Amendment because the State will have unfettered discretion to decide when to enforce it and against whom, thus making it all but impossible for a reasonable person to know what will and will not lead to punishment. Because at least two Plaintiffs—one fourth grade student and one sixth grade teacher—have standing to challenge this aspect of Senate File 496, the Court GRANTS the Motions for Preliminary Injunction and ENJOINS the enforcement of the restrictions on programs, promotion and instruction relating to gender identity and sexual orientation.

Finally, no Plaintiff has standing to challenge the provisions of Senate File 496 requiring school districts to notify a child's parents if the child asks for the use of pronouns that do not match the school's registration records or otherwise seeks an accommodation relating to gender identity. Only the GLBT Youth Student Plaintiffs challenge this portion of the law, but they are all already "out" to their families and therefore not affected in a concrete way by this requirement. Thus, the Court has no authority to do anything except DENY the GLBT Youth Student Plaintiffs' Motion for Preliminary Injunction as it relates to this aspect of Senate File 496.

## II.      FACTUAL AND PROCEDURAL BACKGROUND.

### A. Senate File 496.

In late April 2023, the Iowa Legislature passed Senate File 496. The Governor signed the bill into law on May 26, 2023. As relevant here, Senate File 496 amended Iowa law in three primary ways, one relating to the availability of books and other materials in school library programs, another addressing programs, promotion, and instruction relating to gender identity and sexual orientation for students in grade six and below, and a third involving parental rights. Some provisions took effect on or before July 1, 2023, while others are scheduled to take effect on January 1, 2024.

### 1.      Provisions of Senate File 496 Relating to School Libraries.

As it relates to school libraries, Senate File 496 amends Iowa Code § 256.11 to require each school district to establish a "kindergarten through grade twelve library program that is consistent with section 280.6 and with the educational standards established in this section, contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." The phrase "age-appropriate" is newly defined in section 256.11(19) to mean "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group. 'Age-appropriate' does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17." In turn, Iowa Code § 702.17 defines "sex act" to mean:

> any sexual contact between two or more persons by any of the following:
>
> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a [licensed professional].
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
>
> 6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

5

Senate File 496, on its face, does not permit school officials to take context into account when determining whether a book is "age-appropriate" or contains a "sex act." Meaning: the law prohibits such books even if the "sex act" was, say, an impetus for legislation (e.g., books describing the history of laws geared toward preventing sexual assault), important for historical reasons (such as "sex acts" that played a central role in political campaigns or served as the basis for impeaching a sitting president), or played an important role in an award-winning work of fiction like explaining a character's emotional development (as in the case of books written by some Plaintiffs here). The law also prohibits students from being involved in deciding whether a book should be removed or not. *See* Iowa Code § 279.81 ("[A] school district shall not allow a student to serve on any committee that determines, or provides recommendations related to, whether a material in a library operated by a school district should be removed.").

School districts and school employees are subject to graduated penalties for failing to remove non-age-appropriate materials from school library programs. *See* Iowa Code § 256.11(9)(a)(2). For the first offense, the Iowa Department of Education "shall issue a written warning to the board of directors of the school district or the employee, as applicable." *Id.* For a second or subsequent violation, the school district superintendent and/or employee "shall be subject to a hearing conducted by the board of educational examiners pursuant to [Iowa Code §] 272.2, subsection 14, which may result in disciplinary action." *Id.* The penalty provisions go into effect on January 1, 2024. *See id.*

On November 15, 2023, the Iowa State Board of Education issued Proposed Rules to assist school officials in implementing Senate File 496. (Penguin House Docket[1] ECF 1-2.) The Proposed Rules include a proposed new definition of "age-appropriate" in Iowa Admin. Code 281—12.2(256). (Id.) The proposed definition adopts the language of Iowa Code § 256.11(19) verbatim but adds one sentence (in **bold** typeface, with the immediately-preceding language also included for context): " . . . 'Age-appropriate' does not include any material with descriptions or visual depictions of a sex act. **A reference or mention of a sex act in a way that does not describe or visually depict a sex act as defined in that section is not included in the previous sentence** . . . ." (Id., p. 4.) The Iowa State Board of Education invited public comment and

---

[1] All references to "Penguin House Docket ECF" are to the docket entries on the electronic case filing ("ECF") system in Case No. 4:23-cv-00478. All references to page numbers are to the auto-populated page numbers by the ECF system, located in the upper-right corner of each page. These page numbers often do not correspond to the numbers placed by the parties on the bottom of their filings.

scheduled hearings for January 3 and 4, 2024. (Id., p. 3.) The Proposed Rules will not become final, if they become final at all, until after the penalty provisions in Iowa Code § 256.11(9)(a)(2) take effect on January 1, 2024.

According to declarations submitted by the Penguin House Plaintiffs, the enactment of Senate File 496 has led to many problems. <u>First</u>, there is widespread disagreement among school districts regarding which books must be removed to comply with the law. (Penguin House Docket ECF 34-9, ¶ 22; Penguin House Docket ECF 34-10, ¶¶ 13, 14.) Using five school districts as examples, the Penguin House Plaintiffs have submitted lengthy charts showing considerable variation in the books each district has concluded must be removed from school libraries. (Penguin House Docket ECF 34-14; Penguin House Docket ECF 34-15.) For example, the Nevada Community School District has removed 179 books that have not been identified for removal by any of the other four exemplar school districts. (Penguin House Docket ECF 34-14.)

<u>Second</u>, and relatedly, school officials are uncertain as to how to apply the "age-appropriate" standard. (Penguin House Docket ECF 34-2, pp. 2–4.) The confusion has led school districts and educators to err on the side of removing books out of fear of being penalized for failing to do so. (Penguin House Docket ECF 34-11, ¶ 18.) In total, and just considering the thirty-seven school districts that have made public the list of books they have removed from their libraries, there are more than 500 books that have been removed from at least one school library due to Senate File 496. (Penguin House Docket ECF 34-14.) Moreover, some teachers are hesitant to purchase new books for students that even arguably might contain prohibited material. (Penguin House Docket ECF 34-11, ¶ 15.) Many teachers have reduced or eliminated book collections in their classrooms out of fear of retaliation or discipline. (Penguin House Docket ECF 34-9, ¶ 12.) The Penguin House Plaintiffs allege that the Iowa State Board of Education did not provide any guidance prior to issuing the Proposed Rules on November 15, 2023, and that the Proposed Rules issued on that date do not provide adequate guidance for how to ensure compliance with the law.

<u>Third</u>, Senate File 496 has led to the removal from school libraries of non-fiction and fiction books alike, across a variety of genres. (Penguin House Docket ECF 34-14.) For example, school districts have removed well-known works of classic fiction by authors such as James Joyce (*Ulysses*), William Faulkner (*As I Lay Dying*), Joseph Heller (*Slaughterhouse Five*), Aldous Huxley (*Brave New World*), and Richard Wright (*Native Son*). (Id.) They also have

removed award-winning books by contemporary authors like Toni Morrison (*Beloved*, *Song of Solomon*, *The Bluest Eye*), Malinda Lo (*Last Night at the Telegraph Club*), Sapphire (*Push: A Novel*), John Green (*The Fault in Our Stars*, *Looking for Alaska*), Jodi Picoult (*Nineteen Minutes*), Laurie Halse Anderson (*Speak*, *Shout*), and Maya Angelou (*I Know Why the Caged Bird Sings*), among many others. (Id.; *see also* Penguin House Docket ECF 34-1, ¶¶ 5, 6; Penguin House Docket ECF 34-1.) Four of these authors are Plaintiffs in the Penguin House case and allege that Senate File 496 has taken away an important channel for them to speak to students—their intended audience—through their books. (Penguin House Docket ECF 34-5, ¶ 11; Penguin House Docket ECF 34-6, ¶ 7; Penguin House Docket ECF 34-7, ¶ 8; Penguin House Docket ECF 34-8, ¶ 7.) These authors also allege that Senate File 496 has stigmatized their books by falsely labeling them as "pornography." (E.g., Penguin House Docket ECF 34-8, ¶ 7.) Students likewise allege that Senate File 496 has rendered them unable to read or discuss books in school that they otherwise would have wanted to read and discuss. (Penguin House Docket ECF 34-3, ¶ 6; Penguin House Docket ECF 34-4, ¶¶ 6, 8–10.)

> 2. Provisions of Senate File 496 Relating to Gender Identity and Sexual Orientation.

Senate File 496 also enacted new Iowa Code § 279.80, entitled "Sexual orientation and gender identity – prohibited instruction." It states that "[a] school district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." Iowa Code § 279.80(2). "Gender identity" is defined in section 216.2(10) as "a gender-related identity of a person, regardless of the person's assigned sex at birth." "Sexual orientation" is defined in section 216.2(14) as "actual or perceived heterosexuality, homosexuality, or bisexuality." The Penguin House Plaintiffs argue that the plain language of section 279.80, when considered in conjunction with the definitions in section 216.2 (which section 279.80 says must be applied), make it impermissible for a book or lesson to mention gender identity (whether cisgender or transgender) and/or sexual orientation (whether gay or straight). (Penguin House Docket ECF 34, p. 12; Penguin House Docket ECF 34-10, ¶ 17.)

The plain meaning of section 279.80 supports the Penguin House Plaintiffs' position. The phrase "gender identity" is defined neutrally in section 216.2(10) to include cisgender and transgender students alike. Thus, for example, a biological girl who identifies as a girl has a "gender identity" under the plain language of section 216.2(10) that cannot be the subject of a

program, promotion, or instruction. Same for a biological boy who identifies as a boy. It follows that any program, promotion, or instruction that refers to students in grade six or below as "boys" or "girls" appears to be forbidden under the plain language of the statute. Schools apparently cannot, for example, offer "boys" or "girls" basketball teams for sixth graders, as the existence of such teams would amount to a "program [or] promotion . . . relating to gender identity." The same is true for "boys" and "girls" bathrooms: merely labeling them as such "promot[es]" the concept of "gender identity," in apparent violation of section 279.80. Similarly, under the plain language of the statute, it appears that a teacher cannot instruct students to refer to the teacher as "Mr. _____" or "Miss _____," as this would be an "instruction" that "relat[es] to" the teacher's "gender identity," which is a verboten topic. It also appears to be impermissible for teachers to identify historical figures or literary characters as being either male or female or use masculine or feminine pronouns to refer to them, as any such discussion would, again, amount to promotion or instruction that relates to the person's gender identity.

The definition of "sexual orientation" is similarly neutral, as it encompasses "actual or perceived heterosexuality, homosexuality, or bisexuality." Iowa Code § 216.2(14). On its face, this definition includes people who are heterosexual, homosexual, and bisexual alike. It follows—again, under the plain language of Senate File 496—that schools apparently may not provide students in grade six and below any program, promotion, or instruction relating to sexual orientation in any form, including heteronormative relationships. This means teachers must, for example, be careful when talking to students about their families, as any such discussion might "promote" or "instruct" the idea that the student's parents have a sexual orientation (gay or straight), which is a forbidden topic. It likewise appears that teachers cannot incorporate discussion of their own spouses—male or female—into classroom instruction, as this would reveal the teachers' sexual orientation and thus, again, amount to "instruction relating to . . . sexual orientation."

Stated differently, opponents of Senate File 496 have sometimes described it as a "don't say gay" or "don't say trans" bill. Based on the plain language of the statute, this is not an accurate description. It is actually a "don't say anything" bill. On its face, it prohibits school districts and teachers from providing any program, promotion, and instruction that relates to gender identity (cisgender or transgender) or sexual orientation (gay, straight, or otherwise) in any way.

The Court understands, of course, that this is likely not what the Iowa Legislature was trying to accomplish when it passed Senate File 496. Indeed, the State Defendants[2] and GLBT Youth Plaintiffs alike characterize this interpretation of the law as "absurd," and both argue—for different reasons—that the law is designed to prohibit discussion of homosexuality and transgenderism. (The Penguin House Plaintiffs, by contrast, correctly interpret the plain language of the law.) The problem, however, is that the Court cannot interpret Senate File 496 as targeting transgender identities and homosexual relationships without substituting the Court's own choice of words for the ones chosen by the Legislature. This the Court cannot do.

The Penguin House Plaintiffs allege that section 279.80 is "vague and impossible to apply in a consistent or constitutionally permissible manner." (Penguin House Docket ECF 34, p. 12.) They argue that school officials are uncertain as to whether or how the law applies to school libraries; for example, some districts have interpreted section 279.80 to mean that "libraries are not allowed to have books that include LGBTQ+ characters." (Penguin House Docket ECF 34-10, ¶ 17.) Others have interpreted it, in conjunction with other aspects of Senate File 496, to mean that students in grade six and below cannot have access to books with LGBTQ+ characters, but those in grades seven through twelve are not so restricted (provided, of course, that the books for seventh through twelfth graders are "age-appropriate" and do not contain "sex acts"). The State Defendants concede, to some degree, that section 279.80 does not apply to school libraries, although they also allege that it prohibits teachers in grades six and below from assigning or reading books with gay or transgender characters. Similarly, one Iowa legislator made public statements to the effect that the law is only intended to prohibit schools from making books with gay or transgender characters available to students in kindergarten through sixth grade. (Penguin House Docket ECF 34-18, p. 4.)

### 3. Provisions of Senate File 496 Relating to Parental Rights.

Finally, Senate File 496 added various provisions to the Iowa Code related to parental rights in education. Newly enacted Iowa Code § 601.1(2) states that "a parent or guardian bears the ultimate responsibility, and has the fundamental, constitutionally protected right, to make decisions affecting the parent's or guardian's minor child, including decisions relating to the minor child's medical care, moral upbringing, religious upbringing, residence, education, and

---

[2] The Court will use "State Defendants" to refer, collectively, to Governor Kim Reynolds, McKenzie Snow, John Robbins, Chad Janzen, the Iowa Department of Education, and the Iowa State Board of Education in the GLBT Youth case and, collectively, John Robbins, McKenzie Snow, and Chad Janzen in the Penguin House case.

extracurricular activities. Any and all restrictions of this right shall be subject to strict scrutiny." There are exceptions for emergency medical care and suspected child abuse. Iowa Code § 601.1(3), (4).

Senate File 496 also enacted new Iowa Code § 279.78, entitled "Parental rights in education." Section 279.78(2) prohibits a school district from "knowingly giving false or misleading information to the parent or guardian of a student regarding the student's gender identity or intention to transition to a gender that is different than the sex listed on a student's official birth certificate . . . ." Section 279.78(3) requires a "licensed practitioner" to inform a school district administrator if a student "requests an accommodation that is intended to affirm the student's gender identity . . . including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." In turn, the school district administrator "shall report the student's request to the student's parent or guardian." *Id.*

The phrase "licensed practitioner" is defined, in two parts, in Iowa Code § 272.1. "Licensed" means, in relevant part, "the authority that is given to allow a person to legally serve as a practitioner," while "practitioner" means "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." Iowa Code § 272.1(4), (7). Thus, the "licensed practitioners" who must report requests for gender identity accommodations under section 279.78 include, among others, teachers, librarians, and administrators.

Like the school library provisions, Senate File 496 establishes graduated penalties for "licensed practitioners" who violate the disclosure requirements, starting with a "written warning" from the Iowa Department of Education for a first offense, followed by a disciplinary hearing, "which may result in disciplinary action," for a second or subsequent offense. Iowa Code § 279.78(4).

### B. Procedural History.

The GLBT Youth Plaintiffs filed their Complaint and Motion for Preliminary Injunction on November 28, 2023. (GLBT Youth Docket[3] ECF 1; GLBT Youth Docket ECF 2.) The

---

[3] All references to "GLBT Youth Docket" are to the docket entries on the ECF system in Case No. 4:23-cv-00474. All references to page numbers are to the auto-populated page numbers by the ECF system, located in the upper-right corner of each page. These page numbers often do not correspond to the numbers placed by the parties on the bottom of their filings.

Penguin House Plaintiffs filed their Complaint on November 30, 2023, and Motion for Preliminary Injunction on December 8, 2023. (Penguin House Docket ECF 1; Penguin House Docket ECF 28.) The State Defendants resist each motion in its entirety. (GLBT Youth Docket ECF 53; Penguin House Docket ECF 45.) The School District Defendants[4] take no position on the motions, as they contend that they have no standing to challenge the constitutionality of a state law and instead simply must follow it. (GLBT Youth Docket ECF 48; Penguin House Docket ECF 40.) Separately, but on essentially the same grounds, the School District Defendants have moved to dismiss. (GLBT Youth Docket ECF 51; Penguin House Docket ECF 46.)

The Court has not formally consolidated the two cases, but, in the interest of efficiency, held a single hearing on the separate motions for preliminary injunction. For similar efficiency reasons, the Court is issuing this single ruling in both cases.

## III.   PRELIMINARY INJUNCTION STANDARDS.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (citation omitted). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

"While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). For actions that seek to enjoin the enforcement of a duly enacted state statute, the moving parties must show that they are likely to prevail on their claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies in other preliminary injunction cases. *See id.* "We apply a higher standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic

---

[4] The Court will use "School District Defendants" to refer, collectively, to the School Districts, School District Boards of Directors, School District Board Members, and School District Superintendents in both cases.

processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (internal punctuation and citation omitted).

With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable injury is likely in the absence of an injunction." *Sleep No. Corp.*, 33 F.4th at 1018 (citations omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, [the Court] weigh[s] 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys.*, 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, No. 422-cv-00183-SMR-HCA, 2022 WL 2287805, at *3 (S.D. Iowa June 24, 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id*. at 1048.

## IV.   LEGAL ANALYSIS: STANDING.

### A.  Legal Standards.

The preliminary question is which of the plaintiffs in the two cases, if any, have standing to challenge Senate File 496. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Braden*, 588 F.3d at 591 (quoting *Warth v. Seldin*, 422 U.S. 490, 500, (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Braden*, 588 F.3d at 591.

Both the GLBT Youth and Penguin House cases revolve primarily around the First Amendment, in conjunction with the Fourteenth Amendment. "A plaintiff claiming an abridgment of the [First Amendment] right to free speech has standing to seek pre-enforcement review of a policy 'under circumstances that render the threatened enforcement sufficiently imminent.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). "A plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quoting *Driehaus*, 573 U.S. at 159 (internal quotation omitted)).

> B. *All Plaintiffs Have Standing to Challenge the Book Restrictions, But None Have Standing to Challenge the Parental Rights Provision and Only a Few Have Standing to Challenge the Restrictions on Programs, Promotion and Instruction Relating to Gender Identity and Sexual Orientation.*

1. Educator Plaintiffs.

The Court will analyze standing in groups, starting with the educators (the "Educator Plaintiffs") in the Penguin House case. The Court concludes that the Educator Plaintiffs have standing to challenge Senate File 496 with respect to both the book restrictions and the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation.

As it relates to the latter, Plaintiff Daniel Gutmann has standing because he teaches sixth grade students (among others) and therefore is directly implicated by the restrictions in Iowa Code § 279.80. (Penguin House Docket ECF 34-12, ¶ 1.) In particular, he makes books available to his students that he worries will be deemed to constitute a "program" or "promotion" relating to gender identity and sexual orientation, resulting in potential sanctions against his licensure and loss of employment. (Id., ¶ 13.) Gutmann has standing because he wishes to engage in speech that is "arguably affected with a constitutional interest," there is a credible threat of enforcement if he does so, and his injury is fairly traceable to potential enforcement of the law by the Iowa Department of Education or other state officials. *See Parents Defending Educ.*, 83 F.4th at 666.

Another Educator Plaintiff, Alyson Browder, teaches seventh grade but makes books available to sixth, seventh, and eighth graders alike, some of which she fears (as to sixth graders) will be considered "promotion" of gender identity or sexual orientation, causing her to limit the

accessibility of those books to seventh and eighth graders only. (Penguin House Docket ECF 34-11, ¶¶ 5–6, 14.) She worries that she will be subjected to sanctions against her licensure or loss of employment if anyone makes a complaint against her regarding the books in her classroom. (Id., ¶ 17.) She, too, has standing under *Parents Defending Educ.* to challenge the restrictions in section 279.80 relating to gender identity and sexual orientation.

The same is true for the third Educator Plaintiff, Mari Butler Abry, who is a school librarian for her school district and involved in making decisions as to which books will be made available to students in libraries throughout the district. (Penguin House Docket ECF 34-10, ¶¶ 1, 11.) As it relates to section 279.80, she has been required to remove materials that may be deemed to constitute a "program" or "promotion" of gender identity or sexual orientation. (Id., ¶ 12.) She worries that she will be subjected to sanctions against her licensure or termination of her employment if she is deemed to have violated the law. (Id., ¶¶ 4–6.)

Finally, the fourth Educator Plaintiff, the Iowa State Education Association ("ISEA"), has organizational standing to challenge the restrictions on programs, promotion and instruction relating to gender identity and sexual orientation because ISEA is a labor union that includes the three other Educator Plaintiffs as members, along with thousands of other teachers and librarians across the State of Iowa. (Penguin House Docket ECF 34-9, ¶¶ 4, 5.) Organizations "can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). In addition, organizations have standing in some circumstances when "the interests at stake [are] germane to the organization's purpose." *Mo. Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008). Here, as it relates to restrictions on programs, promotion and instruction relating to gender identity and sexual orientation, Senate File 496 directly affects ISEA's members in a manner that would give the members standing to sue in their own right because violations of the law could lead to loss of the members' licenses or employment. This is enough to give ISEA itself standing. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986–88 (8th Cir. 2011) (holding that organizations had standing because, *inter alia*, individual members were at imminent risk of concrete injury). Similarly, Senate File 496 threatens interests that are "germane to [ISEA's] purpose" of providing support for teachers and other licensed education professionals. *See Mo. Coal. for Env't*, 544 F.3d at 957 (holding that organization had standing due to increased risk of harm to organization's purpose). This, too, is sufficient to establish standing.

During the preliminary injunction hearing, it briefly appeared that the dispute between the Educator Plaintiffs and Defendants had been rendered moot with respect to the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation. The State Defendants conceded, to some degree, that these restrictions did not apply to library programs or make it impermissible for a teacher to have a classroom library that includes books with gay characters, same-sex relationships, or other discussion of gender identity or sexual orientation. After drilling down further, however, the Court is unable to conclude the issue is moot. The State Defendants walked back the concession to some degree, with their counsel acknowledging that a teacher in grade six or below could not assign a book to students that contains a gay character. (Tr.[5] 84.) Moreover, the State Defendants' concession appears to have been premised on their position that section 279.80 only forbids "compulsory curriculum" related to gender identity or sexual orientation. For reasons explained above, this premise is inconsistent with the plain language of the law, which forbids a broader range of conduct, including "programs" and "promotion," among other things. Teachers like the Educator Plaintiffs here who make books available to sixth graders for the specific purpose of, among other things, helping them understand their sexuality, making them feel comfortable about who they are, or otherwise addressing student questions or concerns have likely engaged in "promotion" of gender identity and sexual orientation under the plain language of Senate File 496. The State Defendants' promise not to enforce the law as written in such situations is therefore not enough to render the dispute moot or defeat standing. *See United Food & Com. Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc.*, 857 F.2d 422, 430 (8th Cir. 1988) (plaintiff had standing even though defendants "had no present intention to enforce the statutes"); *see also 281 Care Comm. v. Arenson*, 638 F.3d 621, 628 (8th Cir. 2011) (plaintiffs had standing because they "alleged that they wish to engage in conduct that could reasonably be interpreted as [violating the regulation]").

All four Educator Plaintiffs also have standing to challenge the aspects of Senate File 496 relating to the removal of books and other materials that are not "age-appropriate" as defined under the law. As a school librarian, Abry is particularly affected by the "age-appropriate" restrictions because she is at the center of her school district's efforts to comply with Senate File 496. (Penguin House Docket ECF 34-10, ¶¶ 1, 11.) She will be subject to penalties, up to and

---

[5] All cites to "Tr." are to the rough draft of the transcript from the preliminary injunction hearing on December 22, 2023.

including license suspension and termination of employment, if she violates Senate File 496. (Id., ¶ 22.) The other Educator Plaintiffs—Browder and Gutmann—also maintain libraries or book collections in their classrooms that are made available to students. (Penguin House Docket ECF 34-11, ¶¶ 5, 13; Penguin House Docket ECF 34-12, ¶¶ 5, 6.) They, too, credibly worry that they will be subject to penalties, up to and including license suspension and termination of employment, if their classroom libraries include books or materials that are not "age-appropriate" as defined under the law. (Penguin House Docket ECF 34-11, ¶ 17; Penguin House Docket ECF 34-12, ¶ 13.) Indeed, according to information provided by the State Defendants, the availability of books in the classroom (not merely the library) is part of what led to the passage of Senate File 496. (Penguin House Docket ECF 45-1, p. 76.) It follows that there is a substantial risk of classroom teachers being subject to discipline if they fail to follow the age-appropriate requirements. This is enough to give the Educator Plaintiffs standing. Finally, the ISEA has standing because its members would have individual standing in their own right and Senate File 496 threatens interests germane to the organization's interests. *See, e.g.*, *Sierra Club*, 645 F.3d at 986–88; *Mo. Coal. for Env't*, 544 F.3d at 957.

2.  Publisher/Author Plaintiffs.

The Publisher/Author Plaintiffs are situated differently than the Educator Plaintiffs because none of them are licensed by the State of Iowa or employed by an Iowa school district. They therefore cannot "violate" Senate File 496 at all, much less in a way that would cause them to face formal discipline. Even so, the Publisher/Author Plaintiffs have standing to challenge the book restrictions in Senate File 496 due to the alleged impact on their First Amendment rights. The Supreme Court has recognized that authors and publishers have standing to challenge regulations that prohibit them from reaching their intended audience or impose financial disincentives on their work. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (holding that publishers had standing to challenge prison regulations limiting access to written materials); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (explaining that publishers and authors are interchangeable with respect to making First Amendment challenge to statutory restrictions on book profits). Both are present here.

The Publisher/Author Plaintiffs also have standing because they are "stigmatized" by the removal of their books from public school libraries in Iowa. Elected officials in Iowa have characterized Senate File 496 as being designed, in relevant part, to remove "pornography" from

17

schools. The Publisher/Author Plaintiffs insist, however, that their books are not "pornography" and that any discussion of sex acts instead serves an important literary purpose like helping explain a character's social or emotional development or sending a message about sexual assault, bullying, or other topics of pedagogical importance to students. Under Eighth Circuit precedent, the stigma associated with these works being banned from schools is a standalone basis for standing. *See Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 622–23 (8th Cir. 2012) (holding that organization had standing due to stigma associated with its website being labeled "unreliable" and included on the same list as websites denying the Holocaust); *see also Meese v. Keene*, 481 U.S. 465, 467 (1987) (holding that state senator had standing to raise First Amendment claim due to potential impact of law on his "personal, political, and professional reputation").

      3.   <u>Student Plaintiffs.</u>

One Plaintiff in the Penguin House case and eight Plaintiffs in the GLBT Youth case are students. The Penguin House Student Plaintiff, Hailie Bonz, is a senior at Urbandale High School and sues through her father as "next friend." (Penguin House Docket ECF 1, ¶ 26.) She has standing to challenge the "age-appropriate" book restrictions in Senate File 496 because they directly limit the books and materials she can obtain from the school library. She does not challenge the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation, nor does she challenge the parental notification requirements.

The GLBT Youth Student Plaintiffs include one elementary school student (fourth grade), two middle school students (eighth grade), and five high school students, all of whom sue through their parents as "next friends." (GLBT Youth Docket ECF 1, ¶¶ 11–18.) They have standing to challenge the "age-appropriate" book restrictions in Senate File 496 for the same reason as Hailie Bonz.

The GLBT Youth Student Plaintiffs also challenge the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation, as well as the parental notification requirements. The GLBT Youth Student Plaintiffs allege that these aspects of Senate File 496 have caused them to "close[] off forms of expression in which they used to engage." (GLBT Youth Docket ECF 2-1, p. 12.) For example, they are "more reluctant to be 'out' about their identities at school," "wear clothing that fits their identity or acknowledges [their gender identity or sexual orientation]," ask teachers and fellow students to use preferred

names and pronouns, or otherwise engage in forms of expression. (Id.) Even students with supportive families have felt more isolated and hopeless at school. (Id., pp. 12–13.). An organization called GLBT Youth in Iowa Schools Task Force (d/b/a "Iowa Safe Schools") is also a Plaintiff in the GLBT Youth case. (GLBT Youth Docket ECF 1, ¶ 8; *see also id.*, p. 2.) It is a not-for-profit organization based in Des Moines, Iowa, that provides resources and support for students throughout Iowa. (Id., ¶ 8.) It serves at least 4,000 students representing over 100 Gender Sexuality Alliances ("GSAs") in school districts across the state. (Id., ¶ 9.)

The GLBT Youth Student Plaintiffs do not have standing to challenge the provisions of Senate File 496 requiring teachers and other licensed professionals to notify parents when a student has asked to have an "accommodation" relating to gender identity, such as the use of a different name or pronoun. All GLBT Youth Student Plaintiffs report that they are already "out" to their parents, families, and/or schools, and thus none of them are directly affected by this feature of the law. (GLBT Youth Docket, ECF 2-2; ECF 2-3; ECF 2-4; ECF 2-5; ECF 2-6; ECF 2-7; ECF 2-9.) Instead, at most, they simply allege that the parental notification requirement contributes to the overall perception that the law targets the LGBTQ+ student community. This is not the type of concrete injury that confers standing. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) (explaining that standing requires real threats, not "subjective apprehensions"). The Court therefore will not engage in further analysis of the constitutionality of the parental notification requirements. The Court has no authority to enjoin them.

Most of the GLBT Youth Student Plaintiffs also lack standing to challenge the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation in grade six and below. The injuries they have experienced—such as feeling "closed off" or uncomfortable revealing their true identities at school—are based on a misunderstanding of the law. Nothing in Senate File 496 prohibits them from expressing themselves at school in the same manner they would have before the law was enacted. At most, the GLBT Youth Student Plaintiffs have been harmed by their *perception* of the law rather than its actual *language*. Standing does not exist in these circumstances. *See Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 792–93 (8th Cir. 2004) (affirming dismissal of First Amendment claim for lack of standing where the only alleged "chilling effect" was on speech that was not forbidden by the statute).

Consider, for example, the GLBT Youth Student Plaintiffs' argument that Senate File 496 makes them concerned about asking for support or guidance from high school teachers, whom the Student Plaintiffs fear will get into trouble if they assist LGBTQ+ students. While the Court does not doubt the sincerity of these concerns, they do not emanate from the language of the statute. There is no restriction in Senate File 496 on the ability of school districts, teachers, and other professionals to provide programs, promotion, and/or instruction relating to gender identity and sexual orientation to students in grade seven and above. School districts may, for example, offer GSAs that provide resources and support for LGBTQ+ students in those grades. Indeed, it likely would be unconstitutional for a school district *not* to allow such GSAs in the same manner as any other student club for grades seven and above. Similarly, teachers and other licensed professionals are not restricted in any way from serving as advisors for such GSAs, displaying rainbow flags, providing instruction on gay and transgender rights, and otherwise performing their responsibilities in a manner that emphasizes inclusiveness and respect for LGBTQ+ students in grades seven and above. The GLBT Youth Student Plaintiffs themselves are similarly free to be "out" at school, join GSAs, communicate their support for LGBTQ+ rights, and otherwise do and say what they wish on topics of gender identity and sexual orientation. To the extent the GLBT Youth Student Plaintiffs in grades seven and above are interpreting the law as forbidding such activities, they are incorrect. It follows that the GLBT Youth Student Plaintiffs in grades seven and above (which is all but one of the GLBT Youth Student Plaintiffs) do not have standing to challenge the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation. *See Klobuchar*, 381 F.3d at 792–93; *see also Laird v. Tatum*, 408 U.S. 1, 13 (1972) (plaintiffs lacked standing to raise First Amendment challenge where alleged injuries merely included perception that government action was improper and "speculative apprehensiveness" for how they might be affected).

Only one GLBT Youth Student Plaintiff, A.C., is in grade six or below and therefore directly affected by the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation. As a fourth grader, those restrictions squarely apply in A.C.'s classroom and thus place her in a different position than all other GLBT Youth Student Plaintiffs. Still, the State Defendants argue that Senate File 496 does not limit A.C.'s free speech rights because the penalty provisions only apply to teachers or other licensed

practitioners. In other words, they argue, A.C. cannot be "punished" for saying or doing anything.

The Court concludes, for three reasons, that A.C. nonetheless has standing. <u>First</u>, although Senate File 496 does not mention penalties against students, students nonetheless remain subject to generally applicable disciplinary policies and procedures. These policies and procedures must, among other things, "provide opportunities for students to exercise self-discipline and practice cooperative classroom behavior." Iowa Code § 279.66. If A.C. tried to express herself in the classroom as being transgender, give a presentation on transgender rights, or ask questions about the gender identity or sexual orientation of a book's characters, this would disrupt the class by raising topics that the teacher could not allow the class to discuss. If the disruption was pervasive enough, this could lead to a verbal admonishment, trip to the principal's office, or some other form of discipline for A.C. This is enough to establish standing. *See Parents Defending Educ.*, 83 F.4th at 666 (potential for discipline on the basis of speech is sufficient to establish standing)

<u>Second</u>, regardless of who can be punished for violating the law, Senate File 496 forces students like A.C. to engage in self-censorship. Unless she was intentionally trying to be disruptive (which, again, would lead to potential discipline in its own right), it would be pointless for A.C. to bring up a subject like gender identity or sexual orientation in the classroom that she knows the teacher cannot discuss or allow other students to discuss. Thus, "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also Parents, Fams., & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 897 (W.D. Mo. 2012) (concluding that student had standing to sue based on chilling effect of school district regulation).

<u>Third</u>, because section 279.80 prohibits "promotion" of gender identity or sexual orientation for students in grade six and below, a reasonable school district could interpret it as forbidding students in those grades, such as A.C., from being allowed to join GSAs and other student organizations designed to provide support for transgender and gay students. This, in turn, impairs A.C.'s First Amendment right to free speech in the form of freedom of expressive association. *See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 368 (8th Cir. 1988).

A.C. therefore has standing to challenge the restrictions on programs, promotion, and instruction relating to gender identity and sexual orientation. *See id.*

       4.  <u>Standing: Summary.</u>

In summary, the Court concludes: (i) all Penguin House Plaintiffs and all GLBT Youth Plaintiffs have standing to challenge the book restrictions in Senate File 496; (ii) the Educator Plaintiffs (Gutmann, Abry, Browder, and ISEA) in the Penguin House case have standing to challenge the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation; (iii) one GLBT Youth Student Plaintiff, A.C., has standing to challenge the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation; and (iv) no GLBT Youth Student Plaintiffs have standing to challenge the parental notification requirements in Senate File 496.

## V.    LEGAL ANALYSIS: THE CONSTITUTIONALITY OF SENATE FILE 496 AS IT RELATES TO SCHOOL LIBRARY PROGRAMS.

To evaluate the constitutionality of Senate File 496, it is important to start by identifying the constitutional rights at issue. Broadly speaking, all parties agree that the cases revolve in large part around the First Amendment. Beyond this broad agreement, however, the parties disagree on the proper formulation of the specific rights at issue; i.e., the First Amendment right *to do what*? The parties further disagree on the appropriate standard that must be applied. The Court therefore must begin by: (i) identifying the constitutional rights implicated by the challenges to each of the provisions of Senate File 496; and (ii) determining the governing standard for evaluating the law's constitutionality. As explained below, existing Supreme Court and Eighth Circuit precedent provide helpful guidance in some ways but very little clarity in others. The most enduring lesson appears to be that there is no single standard of scrutiny that applies to restrictions on First Amendment rights in the school setting; instead, there is a sliding scale that varies according to context.

    *A.  The Book Restrictions in Senate File 496 Implicate Constitutional Issues in At Least Three Ways, Each With its Own Level of Scrutiny.*

As it relates to book restrictions in school libraries, there are at least three different forms of constitutional analysis that must be undertaken, only one of which is governed by a clear standard under existing Supreme Court and Eighth Circuit precedent. For reasons explained below, the Court concludes that the issues and governing standards are as follows: <u>First</u>, the Student Plaintiffs have the First Amendment right to receive information in school libraries free

from suppression based on viewpoint, ideology, or other reasons amounting to the suppression of ideas. The constitutionality of the book restrictions in Senate File 496 depends on whether the State Defendants have shown a "substantial and reasonable governmental interest" for those restrictions. Second, the Publisher/Author Plaintiffs and Student Plaintiffs have affirmative First Amendment free speech rights that require the Court to decide whether Senate File 496 is overbroad. The applicable standard of scrutiny is unclear but somewhat higher than the "substantial and reasonable governmental interest" test and must take into account the extent to which the "age-appropriate" standard in Senate File 496 deviates from the definition of "obscenity" for adults, as reasonably adjusted for minors. Third, the Educator Plaintiffs have the Fourteenth Amendment due process right to be free from laws that are so vague that a person of ordinary intelligence does not have fair notice of what is prohibited.

1. The Student Plaintiffs Have a First Amendment Right to Receive Information in School Libraries, But This Right May Be Limited When There Is a "Substantial and Reasonable Governmental Interest."

The Student Plaintiffs in the Penguin House and GLBT Youth cases assert, first, that they have a constitutional right to receive information through their school libraries. The State Defendants deny that any such constitutional right exists and argue, in any event, that Senate File 496 does not violate it. The Court agrees with the Student Plaintiffs that they have a First Amendment right to receive information in the circumstances presented here.

The Supreme Court and Eighth Circuit have each addressed the constitutionality of restrictions on access to books and other materials in school libraries: the former in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), and the latter in *Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771 (8th Cir. 1982). In *Pico*, a local school board ordered the removal of nine books from school libraries based on the board's belief that the content of the books did not match their "conservative educational philosophy" and were "irrelevant, vulgar, immoral, and in bad taste." 457 U.S. at 859 (plurality opinion). The Supreme Court was asked to decide whether the school board's actions violated the students' First Amendment rights.

The Supreme Court's decision was fractured, with a three-justice plurality opinion concluding the board's actions would violate the First Amendment if the board members removed the books "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other

matters of opinion.'" *Id.* at 872 (plurality opinion) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). A fourth justice mostly agreed with the plurality opinion but offered a "somewhat different perspective on the nature of the First Amendment right involved," namely, that "the State may not suppress exposure to ideas—for the sole *purpose* of suppressing exposure to those ideas—absent sufficiently compelling reasons." *Id.* at 877 (Blackmun, J., concurring). In dissent, four justices concluded that the First Amendment does not encompass "a right to have particular books retained on the school library shelf." *Id.* at 888 (Burger, C.J., dissenting). Three of those same dissenting justices also recognized, however, that school boards may not exercise their discretion to "determine the content of their school libraries . . . in a narrowly partisan or political manner." *Id.* at 907 (Rehnquist, J., dissenting). Finally, one justice—the deciding vote—concluded the Court should not decide the constitutional question at all and instead should simply remand for trial. *Id.* at 883 (White, J., concurring in the judgment). Despite not having the support of any of his colleagues, Justice White's concurring opinion carried the day and resulted in remand.

Notwithstanding the splintered nature of the decision, *Pico* provides some guidance that remains applicable today. Almost all the justices concluded that school boards can violate the Constitution in *some* circumstances when making decisions about whether to remove books from the school library. Indeed, then-Justice Rehnquist, in an otherwise forceful dissent, "cheerfully concede[d]" that school boards would violate the Constitution if they removed all books "written by or in favor of Republicans" or "an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas*." *Id.* at 907 (Rehnquist, J., concurring) (quoting *id.* at 871 (plurality opinion)). In addition, "all Members of the Court, otherwise sharply divided, acknowledged that the school board has the authority to remove books that are vulgar." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (discussing *Pico*). Beyond these areas of agreement, however, it would be difficult to apply *Pico* without additional guidance.

Fortunately, *Pico* does not stand alone in the universe of precedential cases involving the removal of books from school libraries. In *Pratt*, the Eighth Circuit addressed the same issue, stating:

> There has been a flurry of cases recently in which the federal courts have considered First Amendment challenges to the removal of books from libraries. Those courts have generally concluded that a cognizable First Amendment claim exists if the book was excluded to suppress an ideological or religious viewpoint with which the local authorities disagreed . . . We believe that this focus provides the proper framework for analysis here.

670 F.2d at 776. *Pratt* held that "to avoid a finding that it acted unconstitutionally, the board must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777. "At the very least, the First Amendment precludes local authorities from imposing a 'pall of orthodoxy' on classroom instruction which implicates the state in the propagation of a particular religious or ideological viewpoint." *Id.* at 776. Based on *Pico* and *Pratt*, the Court concludes that: (a) the Student Plaintiffs have a First Amendment right not to have books and materials removed from the school library based on ideological, religious, or other grounds designed to suppress ideas or impose a "pall of orthodoxy" over the classroom; and (b) the State must establish a "substantial and reasonable governmental interest" that justifies the school library restrictions. *See Pratt*, 670 F.2d at 776–77; *see also Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995) (applying "greater scrutiny" to school board's decision to remove books than would apply in a decision involving school curriculum).

   2.   The Publisher/Author Plaintiffs and Student Plaintiffs Have First Amendment Free Speech Rights Against Overbroad Restrictions.

In addition to asking the Court to apply *Pico* and *Pratt*, the GLBT Youth Plaintiffs and Penguin House Plaintiffs urge the Court to evaluate the book restrictions in Senate File 496 pursuant to the overbreadth doctrine and with reference to the adult "obscenity" standard, as adjusted for minors. "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. St. Grange v. Wash. St. Repub. Party*, 552 U.S. 442, 449 n.6 (2008)). "Invalidation for overbreadth is 'strong medicine' that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (some internal punctuation omitted).

To determine the appropriate standard for the overbreadth challenge, it is necessary to evaluate whose First Amendment rights are at issue, and what those rights are. For the Publisher/Author Plaintiffs, this is a straightforward task. Their First Amendment free speech

rights are impaired when a state law limits their ability to reach their intended audience based on the content of their speech. *See Thornburgh*, 490 U.S. at 408. Their rights are similarly impaired when a law stigmatizes their reputations by implying that their books are pornographic or otherwise unsuitable for the target audience. *See Bruininks*, 678 F.3d at 622–23. The overbreadth analysis for the Publisher/Author Plaintiffs therefore emanates from their affirmative First Amendment free speech rights.

It is less clear whether Senate File 496 impairs the affirmative free speech rights of the Student Plaintiffs, although the Court concludes that it does. The State Defendants insist that students may read and discuss any of the books in question in school; they simply must obtain them somewhere other than the school library. The Court does not read the law so narrowly. As amended by Senate File 496, the unnumbered introductory paragraph of Iowa Code § 256.11 "require[s]" schools to implement an educational program that "shall be taught from an age-appropriate, multicultural, and gender-fair approach." By using the words "require" and "age-appropriate," the Legislature has tied in the definition of "age-appropriate" from Senate File 496 in a way that appears to prohibit teachers and students from using books that depict "sex acts" in any aspect of the curriculum at any grade level. *See* Iowa Code § 256.11(19) (defining "age-appropriate"). Or, at least, this is how a reasonably cautious school district or teacher would interpret the law. *See Parents Defending Education*, 83 F.4th at 668–69 (rejecting school board's argument about the purportedly narrow scope of a policy because "the plain meaning of the policy is not so limited"). If so, a student likely would be prohibited from using a book that contains a "sex act" for a book report, essay, or other project. This, in turn, will limit the student's ability to "engage in an 'open exchange of ideas' and to express beliefs that others might find disagreeable or offensive." *Id.* at 667; *see also Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d at 897 (finding standing where regulation had chilling effect on student speech).

The next question is what standard of scrutiny the Court should apply. The answer is unclear because the Supreme Court has never settled on a single, governing standard for First Amendment challenges in school settings. In *Tinker v. Des Moines Independent Community School District*, for example, the Supreme Court held that schools could not restrict student speech unless the speech would "materially and substantially disrupt the work and discipline of the school." 393 U.S. 503, 506 (1969). In later cases, however, the Supreme Court emphasized that the "mode of analysis set forth in *Tinker* is not absolute" and "the constitutional rights of

students in public school are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 404–05 (2007). In two of the most recent school First Amendment cases, the Supreme Court conspicuously declined to endorse any particular standard of scrutiny. *See id.* at 404 ("We need not resolve this debate [about the appropriate level of scrutiny] to decide this case."); *see also Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2047–48 (2021). As relevant here, the main takeaway from these cases is that there is no one-size-fits-all standard for school-related First Amendment challenges.

Senate File 496 is a perfect illustration for why the Supreme Court has been unable to settle on a single standard of scrutiny in the school setting. On the surface—and as discussed in the preceding section—Senate File 496 resembles cases like *Pico* and *Pratt* because it involves restrictions on the contents of school libraries. Hence the Court's conclusion above that it should apply the "substantial and reasonable governmental interest" test from *Pratt*. Closer review, however, shows a gaping difference between the *Pico/Pratt* line of cases and the book restrictions in Senate File 496. This difference causes the Court to conclude that Senate File 496 also must be evaluated under a separate and somewhat more burdensome level of scrutiny as it relates to the free speech rights of the Publisher/Author Plaintiffs and Student Plaintiffs.

The Court reaches this conclusion because *Pico* and *Pratt* each involved one school board's decision to remove a small number of materials—nine books in *Pico*, 457 U.S. at 858, and a single film (plus a trailer for the same film) in *Pratt*, 670 F.2d at 773. Other reported cases emanating from *Pico* similarly involve the removal of a small number of books or materials by a local school board. *See, e.g.*, *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177 (11th Cir. 1995) (one book); *Campbell*, 64 F.3d at 185 (one book); *Bicknell v. Vergennes Union High Sch. Bd. of Directors*, 638 F.2d 438 (2d Cir. 1980) (two books); *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980) (one book); *Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*, 598 F.2d 535 (10th Cir. 1979) (ten books); *C.K.-W. by & through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 910 (E.D. Mo. 2022) (eight books); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 677 F. Supp. 1547 (M.D. Fla. 1988) (one textbook); *Salvail v. Nashua Bd. of Ed.*, 469 F. Supp. 1269 (D.N.H. 1979) (one magazine). One of the recurring tensions in these cases is whether and to what extent federal judges should get into the business of reviewing *ad hoc* decisions by local school boards regarding the removal of individual books from school libraries. *See, e.g.*, *Pico*, 457 U.S. at 890–

91 (Burger, C.J., dissenting) ("Discretion must be used, and the appropriate body to exercise that discretion is the local elected school board, not judges . . . [L]ocal control of education involves democracy in a microcosm. In most public schools in the United States the *parents* have a large voice in running the school.").

Here, by contrast, the evidence shows that the Iowa Legislature enacted Senate File 496 because local school boards would *not* remove books from school libraries. (*See, e.g.*, Penguin House Docket ECF 45-1, pp. 47–48, 50–59, 73–76.) In other words, the Legislature was dissatisfied with local decision-making by local officials and decided an across-the-board solution was necessary for a problem that local school boards apparently did not believe existed in the first place. The result is a statewide law that has thus far been interpreted as requiring the removal of, collectively, more than 500 books. (*See* Penguin House Docket ECF 34-14.) Senate File 496 sweeps so broadly that Iowa school districts have, by way of example, removed:

- historical classics like *As I Lay Dying* (William Faulkner), *Ulysses* (James Joyce), *Brave New World* (Aldous Huxley), *The Picture of Dorian Gray* (Oscar Wilde), and *Native Son* (Richard Wright);

- modern award-winners like *I Know Why the Caged Bird Sings* (Maya Angelou), *Song of Solomon, Beloved,* and *The Bluest Eye* (Toni Morrison), *The Kite Runner* (Khaled Hosseini), *Nineteen Minutes* (Jodi Picoult), *Speak* and *Shout* (Laurie Halse Anderson), *Looking for Alaska* and *The Fault in Our Stars* (John Michael Green), and *Last Night at the Telegraph Club* (Malinda Lo);

- non-fiction books designed to help minors avoid being victimized by sexual assault, *Sexual Predators* (Laurie Willis, ed.), and *The Truth About Rape* (Robert Golden, ed.);

- non-fiction history books about the Holocaust, *Night* (Elie Wiesel), and the massacre of innocent civilians in China in the early stages of World War II, *The Rape of Nanking* (Iris Chang);

- non-fiction books about how to make safe and informed decisions about sex, *Making Sexual Decisions* (L. Kris Gowen); and

- dozens (if not hundreds) of other works of fiction geared toward the emotional and intellectual challenges associated with being a junior high school or high school student.

(Penguin House Docket ECF 34-14.) The State Defendants have not identified, nor has the Court been able to locate, a single case upholding school library restrictions as broad as those set forth in Senate File 496. In essence, the Iowa Legislature has used a bulldozer where school boards in prior cases merely employed a scalpel.

Against this backdrop, it is difficult to conclude that the mode of analysis in the *Pico* line of cases is the exclusive—or even most appropriate—method for evaluating the constitutionality of Senate File 496. Indeed, *Pico* contemplates that courts will analyze the subjective motivations of each school board member to determine why individual books were removed from a school library. *See, e.g.*, *Campbell*, 64 F.3d at 190. This is very difficult in the context of a statewide law enacted through the votes of more than one hundred legislators and resulting in the removal of more than 500 books. There could be one hundred different answers for why each of the 500 books was removed.

The Court therefore agrees with the Penguin House Plaintiffs that the analysis must go beyond *Pico* and take into account Supreme Court precedent from related First Amendment areas, including, especially, the obscenity doctrine. In *Miller v. California*, the Supreme Court defined "obscenity" as "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. 15, 23–24 (1973). The Penguin House Plaintiffs correctly admit that school districts have greater freedom to remove books from school libraries and curricula than just those that meet the adult obscenity standard. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) ("[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings . . . and must be applied in light of the special characteristics of the school environment." (internal punctuation and citations omitted)). In other words, the Iowa Legislature was not constitutionally required to adopt the adult obscenity standard in Senate File 496.

All the same, the Supreme Court has repeatedly recognized that laws imposing restrictions on the availability of materials for minors must be at least somewhat tethered to the adult obscenity standard. For example, in *Ginsberg v. State of New York*, the Supreme Court upheld a New York law prohibiting bookstores from selling certain books to minors. 390 U.S. 629 (1968). The law used a watered-down version of the then-prevailing adult definition of "obscenity," with the restrictions limited to books with "nudity, sexual conduct, sexual excitement, or sadomasochistic abuse [that] (i) predominantly appeals to the prurient, shameful or morbid interest **of minors**, and (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and (iii) is utterly without redeeming social importance **for minors**." *Id.* at 646 (emphasis added). *Ginsberg* held

that it was permissible for a state to "adjust[] the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . . of such minors.'" *Id.* at 638 (quoting *Mishkin v. State of N.Y.*, 383 U.S. 502, 509 (1966)).

Later Supreme Court cases have repeatedly attached significance to the fact that *Ginsberg* started with the adult definition of "obscenity" when determining which materials could not be made available to minors. In *Erznoznik v. City of Jacksonville*, for example, the Supreme Court struck down a city ordinance prohibiting films with nudity from being shown in drive-in theaters. 422 U.S. 205 (1975). *Erznoznik* rejected the city's argument that the ordinance was designed to protect against the possibility of minors viewing the films, holding that "[c]learly all nudity cannot be deemed obscene even as to minors." *See id.* at 213 n.10. *Erznoznik* suggested the *Ginsberg* standard—which is characterized as a "variation of the adult obscenity standards"— would have been a more appropriate mechanism for protecting against First Amendment concerns than an across-the-board prohibition with no room for nuance. *See id.* Similarly, in *Reno v. American Civil Liberties Union*, the Supreme Court struck down portions of the Communications Decency Act on First Amendment grounds, in part because the law did not adopt the *Ginsberg* standard or otherwise allow for consideration of whether the restricted materials had serious literary, artistic, political, or scientific value. 521 U.S. 844, 865 (1997). Finally, in *Brown v. Entertainment Merchants Association*, the Supreme Court reiterated the importance of "adjust[ing] the definition of obscenity" as it relates to minors as opposed to dispensing with the definition altogether. 564 U.S. 786, 794 (2011). *Brown* explained that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14).

*Ginsberg*, *Erznoznik*, *Reno*, and *Brown* recognize a sort of "obscenity-light" standard for minors that must be considered when a legislature enacts a law with sweeping implications on the ability of minors to access books or other materials. Given that Senate File 496 is a statewide law with across-the-board implications for publishers, authors, teachers, and students—as opposed to an isolated decision about an individual book by a local school board—the Court concludes that the obscenity-light standard must play a role in deciding whether the book restrictions in Senate File 496 comply with the First Amendment. The closer Senate File 496 comes to the obscenity-light standard, the more likely it is to pass constitutional muster.

3. The Educator Plaintiffs Have the Due Process Right to Fair Notice of Prohibited Conduct.

The final constitutional question is whether the book restrictions in Senate File 496 are void for vagueness in violation of the due process rights of the Educator Plaintiffs, who are subject to discipline if they violate the age-appropriate standard. Unlike the other constitutional questions, the governing legal principles are clear: a statute "is unconstitutionally vague if it fails to 'provide adequate notice of the proscribed conduct' and lends 'itself to arbitrary enforcement.'" *Parents Defending Educ.*, 83 F.4th at 668 (quoting *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)). School policies "need not be as detailed as a criminal code that imposes criminal sanctions." *Id.* "But when a school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'" *Id.* (quoting *Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303, 1308–09 (8th Cir. 1997)). "As such, 'while a lesser standard of scrutiny is appropriate because of the public school setting, a proportionately greater level of scrutiny is required because the regulation reaches the exercise of free speech.'" *Id.* (quoting *Stephenson*, 110 F.3d at 1308–09).

4. The School Library Restrictions in Senate File 496 Are Not "Government Speech."

Before turning to the merits, one other issue warrants attention. The State Defendants urge the Court not to apply any of the standards described above, but rather to treat the book restrictions in Senate File 496 as a form of "government speech" for which no First Amendment rights are implicated at all. *See People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("The First Amendment's Free Speech Clause does not limit the government as speaker."). The State Defendants' position arises largely out of the Supreme Court's plurality opinion in *United States v. American Library Association, Inc.*, which held that a public library is not a "traditional" or "designated" public forum for First Amendment purposes and therefore does not need to satisfy heightened constitutional scrutiny when deciding which content to include in a collection. 539 U.S. 194, 205 (2003) ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."); *see also Gittens*, 414 F.3d at 28 ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude.").

There are several problems with the State Defendants' argument. First, *Pico*, *Pratt*, and other cases recognize that the *removal* of books from a school library is different for First

Amendment purposes than the *acquisition* of books. *See Pratt*, 670 F.2d at 776 ("Notwithstanding the power and discretion accorded them, school boards do not have an absolute right to remove materials from the curriculum."); *Fayetteville Pub. Lib. v. Crawford Cnty., Ark.*, No. 5:23-CV-05086, 2023 WL 4845636, at *20 (W.D. Ark. July 29, 2023) ("Setting aside *Pico*, Defendants are unable to cite any legal precedent to suggest that the state may censor non-obscene materials in a public library because such censorship is a form of government speech."). As binding Eighth Circuit precedent, the Court cannot ignore *Pratt* without clear guidance from a higher court that it is no longer good law. None of the cases cited by the State Defendants provide that level of clarity.

Second, the fact that a library is not a "traditional" or "designated" public forum with respect to the selection of content does not mean content decisions are altogether free from First Amendment scrutiny. Instead, courts have recognized that libraries are a "limited public forum" for which the government may not impose unreasonable or viewpoint-specific restrictions. *See Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1261 (3d Cir. 1992); *see also Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (describing the standard for a limited public forum). This is similar—if not identical—to the "substantial and reasonable governmental interest" standard applied in *Pratt*.

Third, *Am. Libr. Ass'n* involved Internet filtering restrictions imposed by Congress on public libraries that receive federal assistance. The case therefore addressed the limits on Congress's *spending* power, not limits on the regulation of private conduct. 539 U.S. at 209 n. 4. Moreover, library patrons in *Am. Libr. Ass'n* had the ability to access the restricted content; all they needed to do was ask to have the filtering technology turned off. *Id.* at 209. Indeed, the decisive fifth vote came from Justice Kennedy, whose concurring opinion was based entirely on this fact. *See id.* at 215 (Kennedy, J., concurring) (holding that the "legitimate, and even compelling" interest in protecting minors from pornography was sufficient to sustain the constitutionality of the law given that adult access to the filtered material was not "burdened in any significant degree"). Justice Breyer also concurred in the result, stating that he believed an intermediate level of scrutiny should apply. *Id.* at 216 (Breyer, J., concurring) ("I would apply a form of heightened scrutiny, examining the statutory requirements in question with special care.")

Here, by contrast, there is no process for students to obtain from the school library books that Senate File 496 has declared off limits. There is not, for example, a sealed section of the school library that students can access if they have parental consent. To the contrary, school librarians and teachers would face discipline for making such books available to students under any circumstances. Moreover, Senate File 496 limits the affirmative free speech rights of the Student Plaintiffs by limiting what can be discussed in the school setting. This makes Senate File 496 substantially different from the spending-related restrictions upheld in *Am. Libr. Ass'n*.

<u>Fourth</u>, and finally, even if the Court adopted the State Defendants' position that the selection of books in a school library constitutes "government speech," Senate File 496 still would have to be evaluated under the vagueness doctrine. For purposes of a void for vagueness claim, the conduct in question "need not be grounded in [First Amendment] constitutional protections because the claim is based on adequate notice of proscribed behavior." *Stephenson*, 110 F.3d at 1307.

In sum, the Court declines to treat the book restrictions in Senate File 496 as a form of government speech for which no First Amendment scrutiny is appropriate, nor would treating it as such resolve the constitutional issues anyway.

> *B. The Student Plaintiffs Are Likely to Prevail on Their Claims that the Book Restrictions in Senate File 496 Violate <u>Pico</u> and <u>Pratt</u>.*

Turning to the merits, the Court must first evaluate whether the Student Plaintiffs have established that the book restrictions in Senate File 496 are based on impermissible ideological, religious, or other grounds amounting to the "suppression of ideas" or imposition of a "pall of orthodoxy" over the classroom, or if the State Defendants instead have shown a "substantial and reasonable governmental interest" for those restrictions. *See Pratt*, 670 F.2d at 777. The Court concludes that the Student Plaintiffs are likely to prevail on this issue.

The Court reaches this conclusion largely based on Senate File 496's expansive definition of "age-appropriate." There very well may be individual books that the Iowa Legislature (or a local school board) could remove from school libraries without running afoul of the First Amendment due to the book's level of vulgarity and the potential for access by younger students. *See, e.g.*, *Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d at 917 (holding that school librarian did not violate First Amendment by removing three books with sexually explicit content that could have been viewed by third graders). The problem here, however, is that Senate File 496 makes no attempt to target such books in any reasonable way. Instead, it requires the wholesale removal of

every book containing a description or visual depiction of a "sex act," regardless of context. The underlying message is that there is no redeeming value to any such book even if it is a work of history, self-help guide, award-winning novel, or other piece of serious literature. In effect, the Legislature has imposed a puritanical "pall of orthodoxy" over school libraries. This is impermissible under *Pico*, *Pratt*, and similar cases. *See Pico*, 457 U.S. at 871 ("Our Constitution does not permit the official suppression of *ideas*."); *see also Tinker*, 393 U.S. at 511 ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.").

The State Defendants argue, in part, that the book restrictions do not violate the First Amendment because students still can obtain the books from a public library or bookstore; they simply cannot get them through the school library. The Eighth Circuit rejected a nearly identical argument in *Pratt*, holding that "[r]estraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression." 670 F.2d at 779; *see also Reno*, 521 U.S. at 880 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.") (internal punctuation and citation omitted). The availability of the books through other channels therefore does not save the restrictions in Senate File 496 from constitutional scrutiny. *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1000 (W.D. Ark. 2003) (rejecting argument that student's ability to access book at home precluded First Amendment challenge to school board regulation).

The State Defendants also argue that the breadth of the book restrictions in Senate File 496 help it satisfy constitutional muster. At first glance, this is an odd argument: one would not ordinarily expect the First Amendment to provide weaker protection in the context of broader restrictions. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831–32 (1995) ("[E]xclusion of several views on [a topic] is just as offensive to the First Amendment as the exclusion of only one . . . The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways."). Here, however, the State Defendants' position is understandable. *Pico* and *Pratt* focused largely on whether the school board was trying to suppress a particular viewpoint or idea when it ordered the removal of a book or material. By contrast, Senate File 496 adopts a definition of "age-appropriate" that,

although broad, does not on its face target any ideology. It simply forbids "sex acts" for the sake of them being "sex acts."

The Court returns, however, to the problem of the "pall of orthodoxy" that Senate File 496 imposes. The statute's broad and unyielding requirement that books be removed whenever they describe or depict a "sex act" may seem viewpoint-neutral in the sense of not being targeted toward, say, Republicans or Democrats, but it is nonetheless content-specific in the sense of communicating that no book with a description or visual depiction of a sex act is appropriate for minors, regardless of educational or literary value. The fact that the Bible and other religious texts are exempted from the law makes the problem even worse, as it communicates that religious books with descriptions of sex acts have value after all, while all others do not. This amounts to "discriminat[ion] among [books] solely on the basis of content." *Erznoznik*, 422 U.S. at 211 (holding that a ban on all films containing nudity was a content-based restriction); *see also Epperson v. Ark.*, 393 U.S. 97, 104 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."). This type of discrimination is impermissible in the absence of a "substantial and reasonable governmental interest." *Pratt*, 670 F.2d at 777.

The State Defendants have presented no evidence that student access to books depicting sex acts was creating any significant problems in the school setting, much less to the degree that would give rise to a "substantial and reasonable governmental interest" justifying across-the-board removal. Instead, at most, the State Defendants presented evidence that some parents found the content of a small handful of books to be objectionable. (E.g., Penguin House Docket ECF 45-1, pp. 50–59; 89–106.) This is not enough to justify the removal of not just that small handful of books, but also hundreds of others. *See Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 959–60 (8th Cir. 2003) ("Nowhere in [its precedent] does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to governments to regulate what minors read and view."). The Student Plaintiffs therefore are likely to prevail on their position that Senate File 496 violates their First Amendment right to receive information in school libraries.

    *C. The Publisher/Author Plaintiffs and Student Plaintiffs Are Likely to Prevail on Their Overbreadth Challenge to the Book Restrictions in Senate File 496.*

For similar reasons, the Publisher/Author Plaintiffs and Student Plaintiffs are likely to prevail on their First Amendment overbreadth challenge, which requires the Court to analyze

whether a "substantial number" of the applications of Senate File 496 are unconstitutional, "judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473.

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). As explained above, Senate File 496 uses a broad and inflexible definition of "age-appropriate" and "sex act" that requires the removal from school libraries of an extraordinary range of literature. School districts have removed books about the Holocaust and World War II, works of fiction and nonfiction about or by survivors of sexual assault, self-help guides, historical fiction, contemporary fiction, countless novels about the emotional and physical challenges associated with being a teenager or young adult, and even—in the height of irony—novels about the dangers of government censorship and overreach. The law has a staggeringly broad scope. Even the dictionary and Iowa Code are likely prohibited book. *See Sexual Intercourse*, MERRIAM-WEBSTER ONLINE DICTIONARY[6] ("heterosexual intercourse involving penetration of the vagina by the penis"); Iowa Code § 702.17(1) ("Penetration of the penis into the vagina or anus.").

Moreover, the definitions of "age-appropriate" and "sex act" allow for no consideration whatsoever to be given to a book's political, artistic, literary, or scientific value, nor does the law allow a school district to consider the age of students who might have access to the book. As the Penguin House Plaintiffs correctly point out, Senate File 496 treats a seventeen-year-old high school student like Hailie Bonz (who is beyond the age of consent under Iowa law) the same as a five-year-old in kindergarten. The law therefore comes nowhere close to the one that passed constitutional muster in *Ginsberg*, which was carefully tethered to the then-prevailing adult definition of "obscenity," as applied to minors. *See* 390 U.S. at 646; *see also Erznoznik*; 422 U.S. at 213 (striking down city ordinance as overbroad despite possibility that minors would witness nudity).

The Iowa Legislature easily could have applied an obscenity-light standard in Senate File 496. Indeed, that standard exists in Iowa Code Chapter 728, which criminalizes the dissemination and exhibition of "obscene material" to minors. *See* Iowa Code § 728.1(5) (defining "obscene material" based on the adult definition of obscenity, as adjusted for "community standards with respect to what is suitable material for minors"). The Legislature

---

[6] https://www.merriam-webster.com/dictionary/sexual%20intercourse (last accessed December 28, 2023).

chose not to adopt such a standard for school libraries, however, instead enacting a sweeping law leading to the removal of hundreds of works, including history books, Pulitzer Prize winning novels, self-help guides for how to avoid being victimized by sexual assault, and historical classics like *Ulysses*. *See Fayetteville Pub. Lib.*, 2023 WL 4845636, at *11 ("*Ulysses* is widely viewed as one of the most influential modernist novels in the English language. The idea of banning it would seem absurd to most modern Americans."). If anything, based on the Court's interpretation of the plain language of Senate File 496, Iowa school districts are not going far enough in removing books.

The State Defendants all but admit the overbreadth problem in how they defend the law. At oral argument, counsel's very first words were that "[b]ooks with graphic illustrations of people performing oral sex on each other are circulating in Iowa schools, and before Senate File 496, schools were refusing to remove them." (Tr. 67.) Similarly, the declarations submitted in support of the State Defendants' position place considerable emphasis on one specific book with a graphic depiction of oral sex: *Gender Queer: A Memoir*. (Penguin House Docket ECF 45-1, pp. 20, 50, 71, 90.) But Senate File 496 did not merely remove one book from school libraries; it removed hundreds. Thus, the fact that one book—or even a small handful—arguably could have been removed without violating the First Amendment does not sustain the law against an overbreadth challenge.

Although the context is different, Senate File 496 is similar in many ways to the statute prohibiting depictions of "animal cruelty" that the Supreme Court struck down in *United States v. Stevens*, 559 U.S. 460. "Animal cruelty" was defined as any depiction "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." *Id.* at 464. On its face, the law had "alarming breadth," which the Government attempted to mitigate by arguing that it applied only to "extreme" material. *Id.* at 473–74. The Supreme Court rejected the Government's argument as being inconsistent with the plain language of the statute. *Id.* at 480. "The Government's assurance that it will apply [the statute] far more restrictively than its language provides is pertinent only as an implicit acknowledgement of the potential constitutional problems with a more natural reading." *Id.*

The same problem is present here. Although the State Defendants attempt to justify Senate File 496 by reference to a few books with extensive descriptions or visual depictions of sexual conduct, the statute sweeps far more broadly and includes books that have as little as a

single sentence describing a sex act. To that end, in contrast to the relatively small number of books identified by the State Defendants that they believe are highly vulgar, the Penguin House Plaintiffs have identified dozens—if not hundreds—of books that have been removed from one or more school districts despite undeniable political, artistic, literary, and/or scientific value. This includes books and materials that: (a) are commonly covered on high school Advanced Placement exams, such as *The Color Purple*, *Native Son*, *The Handmaid's Tale*, *As I Lay Dying*, *Beloved*, *1984*, and *Brave New World*; (b) address bullying, racism, sexual assault, and other forms of trauma, such as *Nineteen Minutes*, *I Know Why the Caged Bird Sings*, *The Bluest Eye*, *Song of Solomon, Speak*, *Shout*, *Push*, *Looking for Alaska*, *The Fault in Our Stars*, and *Last Night at the Telegraph Club*; (c) are designed to help students understand the human body and human anatomy, such as *The Way We Work: Getting to Know the Amazing Human Body*; (d) are designed to help people avoid being victimized by sexual assault, such as *Sexual Predators* and *The Truth About Rape*; (e) depict important historical events, such as *Night* and *The Rape of Nanking*; and (f) are widely recognized as classic works of literature or cinema, such as *Ulysses*, *The Picture of Dorian Gray*, *Animal Farm*, *Forrest Gump*, and *Memoirs of a Geisha*. The imbalance between the number of books identified by the State Defendants as justifying the restriction and the number of books identified by the Penguin House Plaintiffs as having been swept up in it show that a "substantial number" of the applications of Senate File 496 are unconstitutional when "judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. The Publisher/Author Plaintiffs and Student Plaintiffs are therefore likely to prevail on this aspect of their constitutional challenge.

> ### D. The Educator Plaintiffs Are Likely to Prevail on Their Void for Vagueness Challenge to the Book Restrictions in Senate File 496.

A law or regulation is void for vagueness if it "fails, (1) to define the offense with sufficient definiteness that ordinary people can understand prohibited conduct; and (2) to establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998). "[S]chool disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. "But when a school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'" *Parents Defending Educ.*, 83 F.4th at 668 (quoting *Stephenson*, 110 F.3d at 1308–09).

The Penguin House Plaintiffs' void for vagueness argument revolves principally around the question of what constitutes a "description[] . . . of a sex act" for purposes of Iowa Code § 256.11(19). They present evidence that school districts in Iowa are all over the map on the issue, with some districts like the Nevada Community School District having removed hundreds more books than others like the United Community School District. (Penguin House Docket ECF 34, p. 34.) Similarly, certain books like *1984*, *The Fault in Our Stars*, and *The Handmaid's Tale* have been removed from some school library programs but not others. (Id.) One of the major areas of uncertainty is the level of detail a book passage must have before it constitutes a description or visual depiction of a sex act; for example, is a passage stating that two characters "made passionate love" or "had sexual intercourse" enough to require removal? (Id., p. 27.) The State Defendants say "no" and insist the law only requires the removal of books that literally talk about the "penetration of the penis into the vagina or anus," "contact between the finger, hand, or other body part of one person and the genitalia or anus of another person," or some other "sex act" as defined in Iowa Code § 702.17. To that end, the Proposed Rules issued by the Iowa State Board of Education on November 15, 2023, state that a "reference or mention of a sex act in a way that does not describe or visually depict a sex act as defined in that section is not included" in the definition of "age-appropriate." (Penguin House Docket ECF 1-2, p. 4.)

The Court concludes that the Educator Plaintiffs are likely to prevail on their argument that the definition of "age-appropriate" is void for vagueness. *See Parents Defendant Educ.*, 83 F.4th at 668 (holding that plaintiffs were likely to prevail in void for vagueness argument based on ambiguity of the word "respect"). According to Merriam-Webster, the word "description" means "an act of describing," "discourse intended to give a mental image of something experienced," or "a statement or account giving the characteristics of someone or something: a descriptive statement or account." *Description*, MERRIAM-WEBSTER ONLINE DICTIONARY.[7] In the context of Senate File 496, this definition is elastic enough to leave considerable uncertainty about what crosses the line. In the Court's view, for example, a statement that two characters "made passionate love," "had sex on the bed," or even just "had sex" is a "description" of a "sex act," albeit not a terribly detailed one. Accordingly, reasonable school districts could decide to remove books with such language. Reasonable school districts also could decide *not* to do so,

---

[7] https://www.merriam-webster.com/dictionary/description (last visited December 28, 2023).

however, concluding that such language does not contain sufficient visual imagery to constitute a "description."

To take a real example from a real book, similar uncertainty applies to the passage from Malinda Lo's book *Last Night at the Telegraph Club* about a character who "took Kath's hand and moved it to the cleft of her body . . . Kath put her hand between Lily's legs." (Penguin House Docket ECF 34, p. 32, n. 21.)  The Court interprets this as a "description" of "contact between the . . . hand . . . of one person and the genitalia . . . of another person." Other reasonable observers, however, might not agree since the contact is merely strongly implied rather than unequivocally stated. This places school districts and licensed professionals like the Educator Plaintiffs in the untenable position of having to decide whether to remove *Last Night at the Telegraph Club* from the school library—thereby interfering with the First Amendment rights of students—or leaving it on the shelves and facing potential discipline, up to and including termination. By forcing them into this predicament, Senate File 496 likely violates the due process clause. *See Parents Defending Educ.*, 83 F.4th at 669 (enjoining vague school district policy requiring students to "respect" the gender identity of other students); *Stephenson*, 110 F.3d at 1310 (striking down regulation prohibiting gang symbols due to ambiguity in the word "gang" and potential for arbitrary enforcement); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) (striking down statute as void for vagueness based on failure to define "violence").

The Proposed Rules—which state that a "reference or mention of a sex act in a way that does not describe or visually depict a sex act" is not forbidden—does not solve the vagueness problem. For starters, the Proposed Rules will not yet be final at the time the penalty provisions in Senate File 496 take effect on January 1, 2024. Indeed, they may never become final at all. Accordingly, the Proposed Rules do nothing at present to protect the Educator Plaintiffs and other licensed professionals from the consequences of making a misjudgment about the scope of Senate File 496. Even if the Proposed Rules become final, they do little to clarify the definition of "sex act." Is a statement that two characters "had sex on the bed" or "made passionate love" a mere "reference or mention of a sex act," or does it "describe" the sex act by stating where ("the bed") or how ("passionately") it occurred? Perhaps the answer depends on whether the book already described what the characters look like, or what clothes they were wearing, or the dimensions of the room they were in. Perhaps not. All the Court can say for now is that it likely

violates the due process rights of the Educator Plaintiffs to have to make this judgment call at risk of their employment and licensure. *See Parents Defending Educ.*, 83 F.4th at 669 (enjoining policy due to "lack of clarity [that] makes the policy susceptible to arbitrary enforcement").

**VI.   LEGAL ANALYSIS: THE CONSTITUTIONALITY OF SENATE FILE 496 AS IT RELATES TO RESTRICTIONS IN GRADE SIX AND BELOW ON PROGRAMS, PROMOTION, AND INSTRUCTION RELATING TO GENDER IDENTITY AND SEXUAL ORIENTATION.**

Unlike the book restrictions, the Court need not dig deeply into First Amendment principles and precedent in connection with the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation. Instead, the Court will simply evaluate those restrictions under void for vagueness principles. For reasons set forth below, the Court concludes the Educator Plaintiffs and the one GLBT Youth Student Plaintiff with standing (A.C.) are likely to prevail on their argument that the restrictions are void for vagueness under the due process clause.

A.   *The Breadth of the Restrictions on Programs, Promotion, and Instruction Relating to Gender Identity and Sexual Orientation Make It All but Certain that the State Will Enforce Those Restrictions in an Arbitrary Manner.*

As explained in detail above, the Court for the most part does not find the language of Iowa Code § 279.80, as enacted by Senate File 496, to be ambiguous. It does, however, find the language to be staggeringly broad. On its face, the law prohibits school districts and teachers from providing any "program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to any students in kindergarten through grade six." Based on the neutral definitions of "gender identity" and "sexual orientation," Senate File 496 unambiguously prohibits instruction relating to *any* gender identity (cisgender or transgender) and *any* sexual orientation (gay or straight). *See* Iowa Code § 216.2(10) (defining "gender identity" as "a gender-related identity of a person, regardless of the person's assigned sex at birth"); Iowa Code § 216.2(16) ("defining "sexual orientation" as "actual or perceived heterosexuality, homosexuality, or bisexuality"). It follows that any teacher in grade six or below who incorporates gender identity or sexual orientation into the curriculum in any way has violated section 279.80. This would include, for example, teachers or other licensed professionals like the Educator Plaintiffs who make books available to students that refer to any character's gender or sexual orientation; which is to say, virtually every book ever written. Similarly, a math teacher will have violated the law by requiring students to take an exam stating

that Sally bought eight apples and ate three and asking how many "she" has left. This is a forbidden "test . . . relating to gender identity." Any number of other examples also could be given.

The Court must interpret the law this broadly not just because of the neutral definitions of "gender identity" and "sexual orientation"—although that is, of course, an important part of the analysis—but also because the Legislature chose to forbid programs/promotion/instruction/etc. "relating to" those neutrally-defined topics. The Supreme Court has consistently emphasized that the words "relating to" in legislative enactments must be interpreted "expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018); *see also, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (describing "relating to" as a "broad phrase"). "The ordinary meaning of these words is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with' . . ." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). The State Defendants confirm the same, taking the position that a school district cannot, for example, have students in grade six or below read a book with a gay or transgender character as part of the compulsory curriculum, as such a book would "relate to" sexual orientation or gender identity. (Penguin House Docket ECF 45, p. 19; *see also* Tr. 84 ("[A book with a gay character] can be in the library; the teacher cannot use that as curriculum.")). Once the State Defendants' admission on the breadth of "relating to" is combined with the broad but neutral definitions of "gender identity" and "sexual orientation," the conclusion becomes unavoidable that any program, promotion, or instruction that incorporates or acknowledges the gender identity or sexual orientation of any person in any way "relates to" those topics and is impermissible.

The Court is aware that the GLBT Youth Plaintiffs and State Defendants alike believe this is an "absurd" interpretation of Senate File 496. (The Penguin House Plaintiffs, by contrast, correctly recognize that it is the only way to interpret the plain language of the law.) Neither the GLBT Youth Plaintiffs or State Defendants, however, offer any alternative interpretation of the law that actually takes into account the statutory language. The GLBT Youth Plaintiffs instead rely on isolated statements by legislators to argue that the law targets gay and transgender students, while the State Defendants make no meaningful attempt to wrestle with the neutral definitions of "gender identity" and "sexual orientation" at all.

The Court is not at liberty to interpret Senate File 496 according to stray comments by individual legislators. Nor may the Court apply its own subjective judgment, divorced from the statutory text, about what the Legislature was probably trying to accomplish. Instead, the analysis must focus squarely on the statutory language. *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) ("When [the text of a statute] enables us to resolve the interpretive question, our sole function is to apply the law as we find it, not defer to some conflicting reading the government might advance." (internal punctuation and citation omitted)). And for good reason: it would violate principles of separation of powers for the Court to pretend the Legislature wrote a different statute than it did. *See, e.g.*, *Ross v. Blake*, 578 U.S. 632, 639 (2016) ("Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to."); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) ("[W]e are not at liberty to rewrite the statute to reflect a meaning we deem more desirable.").

The incredible breadth of the actual text of section 279.80, as enacted by Senate File 496, makes it likely that the Educator Plaintiffs and A.C. will prevail on their void for vagueness challenge. As to the Educator Plaintiffs, although the State Defendants promise—for now—that section 279.80 does not apply to school library programs, this promise is inconsistent with the statutory language, which specifically uses the word "program" to describe what is forbidden. *See Parents Defending Educ.*, 83 F.4th at 669 (rejecting the school district's attempt for litigation purposes to narrow the scope of a policy beyond the plain meaning). Moreover, because the statutory language prohibits even instruction relating to heterosexual and cisgender characters, a sixth-grade teacher like Gutmann is theoretically subject to discipline no matter what he does. Finally, as discussed in an earlier section, the word "promotion" is broad enough that the State could decide, consistent with the statutory language, to bring disciplinary measures against Gutmann and other teachers (like Browder) or licensed professionals (like Abry) who make books with gay or transgender characters available to sixth graders, particularly if the teacher does so after learning that a student has questions or concerns about gender identity or sexual orientation. This combination of circumstances "makes the policy susceptible to arbitrary enforcement" on an "ad hoc and subjective basis." *Id.* It follows that the Educator Plaintiffs are likely to prevail on their void for vagueness challenge. *See id.*; *see also Stephenson*, 110 F.3d at 1310.

The same is true for A.C. The breadth of the law means that a reasonable school district would not permit her to join a GSA, thus interfering with her First Amendment rights to expressive association. *See Gay & Lesbian Students Ass'n*, 850 F.2d at 368. A.C. also could say any number of things in the classroom about gender identity or sexual orientation that the State or a school district might decide is impermissible, thus giving the State or school district virtually "unfettered discretion" to decide she was disrupting the class by raising inappropriate topics. *Stephenson*, 110 F.3d at 1310. Granted, one would hope the State or school district would never do such a thing, but a void for vagueness challenge ultimately rises or falls on the "plain meaning" of the statute, not the State Defendants' position that it means something other than what it says. *Parents Defending Educ.*, 83 F.4th at 668–69. A.C. is therefore likely to prevail on her void for vagueness challenge.

### B. The State Defendants' Promise to Only Enforce the Law in a Discriminatory Fashion Does Not Solve the Constitutional Problem.

Although the State Defendants never address head-on the neutral definitions of "gender identity" and "sexual orientation" in Senate File 496, their briefing and argument leave the unmistakable impression that they believe the law only forbids programs, promotion, and instruction relating to transgender people and non-heteronormative relationships. In other words, in the State Defendants' view, the law permits a sixth-grade teacher to assign a book in which a man and woman married to each other but prohibits the same teacher from assigning a book in which two men are married to each other. Similarly, according to the State Defendants, it is fine if an assigned book's characters are "boys" and "girls" so long as this description matches their biological sex, but not if one of those characters is transgender.

Because this position is inconsistent with the plain language of the statute, it is not terribly relevant to the Court's analysis except in one sense: it confirms that the most likely enforcement of Senate File 496 will be against teachers and students who want to discuss same-sex relationships or transgenderism. This adds a new layer to the constitutional problems described above because it inhibits the ability of students to "express beliefs that others might find disagreeable or offensive." *See id.* at 667. Under *Parents Defending Educ.*, it likely would violate the First Amendment to allow students to discuss heterosexual relationships or cisgender people as much as they wish but cut off any discussion of same sex relationships or transgender people. *See id.* The State Defendants' putative interpretation of the statute therefore reinforces the constitutional problems, rather than resolving them.

## VII.    APPLICATION OF THE PRELIMINARY INJUNCTION FACTORS.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Thus, injunctive relief is appropriate simply because: (i) all Penguin House Plaintiffs and GLBT Youth Plaintiffs are likely to prevail on the merits of their challenge to the book restrictions in Senate File 496; and (ii) the Educator Plaintiffs and the one GLBT Youth Plaintiff with standing are likely to prevail on the merits of their challenge to the restrictions in Senate File 496 on programs, promotion, and instruction relating to gender identity and sexual orientation. *See id.*; *see also Carson*, 978 F.3d at 1059 ("While no single factor is determinative, the probability of success factor is the most significant." (internal punctuation and citation omitted)).[8] Nonetheless, the Court will briefly analyze the other factors as well.

The irreparable harm factor weighs squarely in favor of imposing a preliminary injunction. "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373)). Here, the Student Plaintiffs and Publisher/Author Plaintiffs face such a loss. Moreover, the Educator Plaintiffs are at risk of termination, loss of licensure, or other consequences if they are deemed to have violated either aspect of Senate File 496. By contrast, while the temporary invalidation of portions of a duly enacted state law is a serious and significant remedy, school districts retain the discretion they have always had to control curriculum, make decisions about school libraries, and otherwise set expectations for students and teachers. The balancing of equities therefore weighs in favor of injunctive relief, as does the public interest. *See Parents Defending Educ.*, 83 F.4th at 669 (awarding preliminary injunctive relief).

## VIII.   CONCLUSION.

The Court GRANTS the Motion for Preliminary Injunction filed by the Penguin House Plaintiffs and GRANTS IN PART the Motion for Preliminary Injunction filed by the GLBT Youth Plaintiffs. All Defendants are hereby ENJOINED from enforcing or acting in furtherance of the provisions of Senate File 496 that: (i) require the removal of books from school libraries

---

[8] Because the analysis of the First Amendment and due process issues is sufficient to satisfy the Court that a preliminary injunction should be entered, the Court will not analyze—and expresses no view on—the merits of the GLBT Youth Plaintiffs' arguments under the Equal Access Act and equal protection clause.

that are not "age-appropriate"; and (ii) prohibit any "program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." No bond or other security will be required.

The Court DENIES IN PART the Motion for Preliminary Injunction filed by the GLBT Youth Plaintiffs as it relates to the provision of Senate File 496 that requires school districts to notify parents if a student requests an accommodation relating to gender identity. This provision of the law remains in effect and fully enforceable.

**IT IS SO ORDERED.**

Dated: December 29, 2023

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE