IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| IOWA SAFE SCHOOLS f/k/a GLBT YOUTH IN IOWA SCHOOL TASK FORCE, et al., | Case No. 4:23-cv-474 |
| *Plaintiffs*, | **PLAINTIFFS' BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION REGARDING THE PARENTAL NOTIFICATION ("FORCED OUTING") PROVISION OF SF 496** |
| v. | |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | |
| *Defendants.* | |

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7(d), Plaintiffs Iowa Safe Schools, on its own behalf and in its representative capacity on behalf of its members, which include both individual students and GSA noncurricular student clubs; P.B.-P., by his parent and next friend Belinda Scarrott; P.C. and A.C., by their parents and next friends Richard and Ulrike Carlson; T.S., by her parent and next friend Eric Saylor; B.F.S., by their parents and next friends Brigit and Joseph Stevens; Robert Smith, by his parents and next friends Jane and John Smith; B.F., by their parent and next friend Lara Newsom; and James Doe, by his parent and next friend John Doe, submit the following brief supporting Plaintiffs' Renewed Motion for Preliminary Injunction Regarding the Parental Notification ("forced outing") Provision of SF 496.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................................ii

INTRODUCTION ........................................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................................ 7

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ......................................... 7

        A.    The Forced Outing Provision Violates the Equal Access Act. ............................. 8

        B.    The Forced Outing Provision Deprives ISS Members of Freedom of Expressive Association in Violation of the First Amendment. ............................. 8

        C.    The Forced Outing Provision Deprives ISS Members of Freedom of Speech and Expression in Violation of the First Amendment. ........................... 10

        D.    The Forced Outing Provision is Void for Vagueness under the First and Fourteenth Amendments. ..................................................................................... 12

        E.    The Forced Outing Provision is Overbroad in Violation of the First Amendment. ........................................................................................................ 14

        F.    The Forced Outing Provision Violates the Equal Protection Clause. ................. 15

    II.    ISS, and Its Individual Student and GSA Members, Have Suffered Irreparable Harm Directly Caused by the Forced Outing Provision of SF 496 ................................. 17

        A.    Iowa Safe Schools Has Suffered Direct Irreparable Harm. ................................ 18

        B.    ISS' Individual Student and GSA Chapter Members Also Have Suffered Irreparable Harm. ............................................................................................... 19

    III.    The Court Previously Determined that the Balance of Equities Weighs in Favor of the Plaintiffs and is in the Public Interest. .................................................................... 20

CONCLUSION ............................................................................................................................ 20

Page(s)

**CASES**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
   75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom. Metro.Sch. Dist. Of Martinsville v.*
   *A.C.,* 144S.Ct. 683 (2024) ......................................................................................15

*Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.,*
   611 F.2d 684 (8th Cir. 1979) .................................................................................. 19

*Baskin v. Bogan,*
   766 F.3d 648 (7th Cir. 2014) .................................................................................. 15

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens,*
   496 U.S. 226 (1990) ................................................................................................. 8

*Bear v. Fleming,*
   714 F. Supp. 2d 972 (D.S.D. 2010) ........................................................................ 11

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020) ............................................................................................... 16

*Brandt by & through Brandt v. Rutledge,*
   47 F.4th 661 (8th Cir. 2022) .................................................................................. 15

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973) ............................................................................................... 15

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ......................................................................................... 15, 16

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.,*
   368 U.S. 278 (1961) ............................................................................................... 14

*D.M. by Bao Xiong v. Minnesota State High Sch. League,*
   917 F.3d 994 (8th Cir. 2019) .................................................................................. 17

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
   640 F.2d 109 (8th Cir. 1981) (en banc) .................................................................... 7

*Doe by & through Doe v. Boyertown Area Sch. Dist.,*
   897 F.3d 518 (3d Cir. 2018) ................................................................................... 11

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................................... 17

*Gay & Lesbian Students Ass'n v. Gohn*,
850 F.2d 361 (8th Cir. 1988) ............................................................... 9

*Gay Lib v. Univ. of Missouri*,
558 F.2d 848 (8th Cir. 1977) ............................................................... 9

*Gay Students Org. of Univ. of New Hampshire v. Bonner*,
509 F.2d 652 (1st Cir. 1974) .......................................................... 9, 10

*Glenn v. Brumby*,
663 F.3d 1312 (11th Cir. 2011) ......................................................... 15

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................... 12, 14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ................... 11

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ......................................................................... 18

*Heckler v. Mathews*,
465 U.S. 728 (1984) ......................................................................... 15

*Henkle v. Gregory*,
150 F. Supp. 2d 1067 (D. Nev. 2001) ................................................. 10

*Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*,
813 F.3d 1124 (8th Cir. 2016) ........................................................... 19

*Hill v. Colorado*,
530 U.S. 703 (2000) ......................................................................... 12

*Horton v. Midwest Geriatric Mgmt., LLC*,
963 F.3d 844 (8th Cir. 2020) ............................................................. 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ......................................................................... 19

*Johnson v. United States*,
576 U.S. 591 (2015) ......................................................................... 14

*Kadel v. Folwell*, No.,
22-1721, 2024 WL 1846802 (4th Cir. Apr. 29, 2024) ........................ 9, 16

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
594 U.S. 180 (2021) ......................................................................... 11

*Morrison ex rel. Morrison v. Bd. of Educ. of Boyd Cnty.*,
    419 F. Supp. 2d 937 (E.D. Ky. 2006) ........................... 12

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
    970 F.3d 1010 (8th Cir. 2020) ................................... 20

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................. 13

*NAACP v. State of Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ......................................... 8, 19

*Nat'l Fed'n of the Blind of Mo. v. Cross*,
    184 F.3d 973 (8th Cir. 1999) .................................. 18

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ............................................ 17

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) ............................................ 17

*Parents Defending Educ. v. Linn-Mar Cmty. Sch. Dist.*,
    83 F.4th 658 (8th Cir. 2023) ......................... 10, 13, 14

*Police Dep't of City of Chicago v. Mosley*,
    408 U.S. 92 (1972) ............................................. 11

*Powell v. Noble*,
    798 F.3d 690 (8th Cir. 2015) .................................. 17

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ............................................ 17

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................ 16

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
    826 F.3d 1030 (8th Cir. 2016) ................................... 7

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................. 8

*Rodgers v. Bryant*,
    942 F.3d 451 (8th Cir. 2019) ................................... 7

*Romer v. Evans*,
    517 U.S. 620 (1996) ............................................ 17

*SAGE v. Osseo Area Schs.–Dist. No. 279,*
   471 F.3d 908 (8th Cir. 2006)...................................................... 8, 17

*SAGE v. Osseo Area Schs.–Dist. No. 279,*
   540 F.3d 911 (8th Cir. 2008)...................................................... 8

*Sessions v. Dimaya,*
   584 U.S. 148 (2018) .................................................................. 13

*Sessions v. Morales-Santana,*
   582 U.S. 47 (2017) .................................................................... 15

*Shelley v. Kraemer,*
   334 U.S. 1 (1948) ...................................................................... 17

*Snider v. City of Cape Girardeau,*
   752 F.3d 1149 (8th Cir. 2014)................................................ 14, 15

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .................................................................. 18

*Stephenson v. Davenport Cmty. Sch. Dist.,*
   110 F.3d 1303 (8th Cir. 1997)................................................ 12, 14

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
   600 U.S. 181 (2023) .................................................................. 19

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .................................................................. 10

*Telescope Media Grp. v. Lucero,*
   936 F.3d 740 (8th Cir. 2019).................................................... 18

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) .................................................................. 12

*U.S. Dep't of Agric. v. Moreno,*
   413 U.S. 528 (1973) .................................................................. 16

*United States v. Stevens,*
   559 U.S. 460 (2010) .................................................................. 14

*United States v. Virginia,*
   518 U.S. 515 (1996) .................................................................. 16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) .................................................................. 16

*Wachovia Sec., L.L.C. v. Stanton*,
   571 F. Supp. 2d 1014 (N.D. Iowa 2008) ................................................................ 20

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................................. 19

*Weaver v. Nebo Sch. Dist.*,
   29 F. Supp. 2d 1279 (D. Utah 1998) .................................................................... 10

## STATUTES

20 U.S.C. § 4071(b) ...................................................................................................... 8

20 U.S.C. §§ 4071(a)-(b) .............................................................................................. 8

29 U.S.C. §§ 794, 794a ............................................................................................... 13

30 U.S.C. §§ 1400 *et seq.* ........................................................................................... 13

42 U.S.C. §§ 12131 ..................................................................................................... 13

Iowa Code § 279.78(1), (3)-(4) ...................................................................................... 2

Iowa Code § 279.78(4) ................................................................................................... 3

Iowa Code §§ 232.96A(1)–(17), 102(1)–(10) ............................................................... 3

Senate File 496, 2023 Iowa Acts ch. 91 ............................................................... passim

## RULES

*General accreditation standards ARC 7169C*, 46 Iowa Admin. Bull. 3929
   (proposed Dec. 13, 2023) ..................................................................................... 11

## OTHER AUTHORITIES

Brodie Frasier et al., *LGBTIQ+ Homelessness: A Review of Literature,* 16 Int'l J. Env't
   Rsch. Pub. Health (2019), https://tinyurl.com/4xut35n6 ........................................ 6

Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018),
   https://tinyurl.com/mvzmmr7k (last accessed May 13, 2024) ................................ 5

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), https://tinyurl.com/ymnsuzda (last accessed May 13, 2024) ...................................................... 5

Kristopher M. Goodrich & Melissa Luke, *LGBTQ Responsive School Counseling*, 3 J. of LGBT Issues in Counseling, 113 (2009).................................................................................. 5

M. H. Morton et al., *Missed Opportunities: LGBTQ Youth Homelessness in America,* Chapin Hall at University of Chicago (2018), https://tinyurl.com/4e5hftw7 ........................... 6

The Trevor Project, 2022 *Nat'l Survey on LGBTQ Youth Mental Health By State (Dec.* 2022), https://tinyurl.com/yeyvz3zy (last accessed May 13, 2024)........................................... 5

The Trevor Project, *Research Brief: Acceptance from Adults Is Associated With Lower Rates of Suicide Attempts Among LGBTQ Young People* (Sept. 2023), https://tinyurl.com/3y6f4f27 .................................................................................................... 5

**<u>INTRODUCTION</u>**

Plaintiffs' amended complaint and renewed motion for preliminary injunction provide sufficient evidentiary and legal support for the Court to enjoin the forced outing provision of Senate File 496, 2023 Iowa Acts ch. 91 ("SF 496" or "the law"). The Court previously enjoined the don't say gay or trans provision and book ban provision to stop harm caused by the law, but it did not reach the merits of Plaintiffs' challenge to the forced outing provision. The amended complaint and this renewed motion demonstrate that Plaintiff Iowa Safe Schools ("ISS") has standing to seek redress for its own direct injury caused by the forced outing provision and to seek redress for its student members and gender sexuality alliance ("GSA") chapter members whose interests it represents and who also have been harmed by the provision, including Plaintiffs James Doe, P.B.-P., A.C., and Robert Smith.

SF 496's forced outing provision mandates that school officials notify a student's parent or guardian when a student asks to use a name or pronouns different from those in the school's records, even if officials are aware that a student will be rendered unsafe or vulnerable to abuse as a result. This provision has substantially limited the ability of ISS to pursue its mission and has irreparably harmed ISS individual student members and GSA chapter members in violation of the United States Constitution and the Equal Access Act.

Some ISS GSA chapter members have ceased meeting altogether because faculty sponsors have declined to remain sponsors out of fear of being required by the forced outing provision to report student participants to their parents or guardians. Other GSAs' membership, and thus their capacity to achieve their goals and the experience offered the remaining members, has dwindled because students fear enforcement of the forced outing provision. The forced outing provision has deprived closeted and openly LGBTQ+ students alike of the ability to associate and find community in a GSA. It prevents LGBTQ+ students from seeking vital and potentially life-saving assistance and mental health resources from school counselors, psychologists, and other officials

because such a request could reveal a student's gender identity and trigger a mandatory report home. The forced outing provision impermissibly chills students' constitutionally protected freedoms of expressive association, speech, and expression in violation of the First Amendment.

GSAs also continue to receive confusing or prohibitive directives that impede their ability to meet on the same terms as other noncurricular student groups in violation of the Equal Access Act. The forced outing provision limits or prohibits students' ability to associate and form GSAs.

The forced outing provision has directly harmed the core mission of ISS, which is to provide a safe, supportive, and nurturing learning environment and community for LGBTQ+ youth and their allies. Participation in ISS's professional development services has declined, reducing the organization's funding. ISS also has had to divert its resources and time from its mission of developing systems and policies to support LGBTQ+ students and their allies to determining what support remains permissible under the law and navigating school policy implementing the law.

In its purpose and its frightening, chilling effect, the forced outing provision discriminates against LGBTQ+ people and those who support them. It should be enjoined.

## **FACTUAL BACKGROUND**

The forced outing provision mandates that school officials notify a student's parent or guardian when a student asks for "an accommodation" intended to affirm their gender identity, even if officials are aware that such a disclosure will render a student unsafe at home. SF 496, Div. II, § 14 (Iowa Code § 279.78(1), (3)-(4)). The forced outing provision includes one example of what might qualify as a requested "accommodation": "a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." *Id*. The law, however, does not clarify what other conduct might constitute a reportable request and does not limit the obligation to requests made during school hours or school activities.[1] The forced outing provision mandates notification regardless of the

---

[1] For example, is the notification requirement triggered when Samantha asks to be called Sam,

student's own wishes or plans for sharing this information, or whether the student may have a reasonable expectation of confidentiality when speaking with a school psychologist, counselor, or nurse, and regardless of ethical obligations these professionals may have to protect confidentiality.

The law contains no process for determining whether the student's safety or wellbeing will be threatened by such a disclosure. It also does not contain any exception allowing for a school employee to avoid reporting when the employee *knows* that such notification imminently will endanger the student. The law is, at best, utterly indifferent to the harm that may befall a student upon compliance with this provision.[2] Yet it requires Defendant Iowa Department of Education to enforce this mandate by investigating potential violations and imposing disciplinary action ranging from written warnings to proceedings that could result in loss of licensure or certification for teachers. *Id.* (Iowa Code § 279.78(4)).

This Court determined that other provisions of SF 496 should be interpreted as neutral with respect to sexual orientation and gender identity, but the forced outing provision is incapable of such a neutral reading. Because the provision targets solely those students who seek accommodations to affirm their gender identities, it targets transgender and gender nonconforming students as a class as a matter of law. *See Infra* at 9.

The forced outing provision already has had a devastating impact on individual LGBTQ+ students across the state. It has impeded students' ability to form and meet within GSAs, which

---

or Cameron merely Cam? Must teachers report if they know the request is related to a student's gender identity and expression even if not specified by the student? What if the teacher merely suspects that is the reason? The concerns are uniquely worrying for GSA faculty sponsors. Must they report the names on attendance lists at GSA meetings? Can students announce their identities or the preferred pronouns at the meeting without asking the faculty sponsor explicitly to respect their preferences? If a teacher overhears a student asking peers to refer to them with appropriate pronouns, must it be reported? The law—silent on these issues—leaves teachers and schools guessing what conduct is violative.

[2] In an earlier version of the bill, if the school determined that the notification "was likely to lead to a case of child abuse," the school was required to report its "safety concerns to the department of health and human services so that the department may determine whether the minor child is a child in need of assistance" under Iowa law, i.e., proceedings to determine whether the child should be removed from the home. S.S.B. 1145, § 16; *see generally* Iowa Code §§ 232.96A(1)–(17), 102(1)–(10). Yet, despite acknowledging the risks posed to children with parents or guardians who do not accept or affirm their identities, lawmakers removed the language, thus ensuring the severe consequences of reporting fall only upon the targeted students.

are student-run voluntary organizations that seek to "unite LGBTQ+ and allied youth to build community and organize around issues impacting them in their schools and communities." *What is a GSA Club?*, GSA Network (Dec. 16, 2022), https://tinyurl.com/4cvbehbs. Since the passage of SF 496, certain GSAs stopped meeting altogether, either because school districts have prohibited them from meeting to avoid triggering the forced outing provision, or because teachers have declined to serve as sponsors to avoid confronting the forced outing provision's reporting requirements. (Ex. 1 Smith Supp. Decl. ¶ 7; R. Carlson Decl. ¶¶ 7-9, ECF No. 2-10; Tayler Decl. ¶¶ 21–29, ECF No. 2-08; Ex. 2 Mitchell Decl. ¶ 24.) In other schools, SF 496 has led to a steep decline in membership in ISS member GSAs as students from non-affirming homes have become terrified of joining such groups for fear of SF 496's forced outing requirement. (Ex. 3 Doe Supp. Decl. ¶ 9–11; Ex. 4 P.B.-P. Supp. Decl. ¶ 5; Tayler Decl. ¶¶ 25–29; Mitchell Decl. ¶¶ 24, 27; Ex. 5 A.J. Decl. ¶ 23; Smith Supp. Decl. ¶ 10.) Among ISS member GSAs still able to meet after SF 496, this decline in membership has also come with a decline in engagement among remaining members, including some choosing not to introduce themselves or use their names at meetings, frustrating the GSAs' goals and lessening the experience of their members. (Mitchell Decl. ¶ 27; A.J. Decl. ¶¶ 25, 28, 31–32; Ex. 6 R. Carlson Supp. Decl. ¶ 9; P.B.-P. Supp. Decl. ¶¶ 4-5; Doe Supp. Decl. ¶ 10.) In other GSAs, members are reluctant to take on leadership roles or participate in group events. (P.B.-P. Supp. Decl. ¶ 5; Doe Supp. Decl. ¶ 10; A.J. Decl. ¶ 32.) Finally, some schools have prevented faculty advisors from participating in GSA meetings—for fear of triggering a report—interfering with the ability of these student clubs to meet and promote on terms comparable to other clubs. (Tayler Decl. ¶¶ 21–29; A.J. Decl. ¶¶ 20-40; Mitchell Decl. ¶¶ 24-25.)

The Mount Vernon GSA, an ISS member, has been forced to meet without a faculty advisor, even though faculty advisors have the key role of ensuring meetings proceed safely and productively, and the presence of a faculty advisor in group meetings is required for every other

extracurricular group on campus. (A.J. Decl. ¶¶ 10, 20-22, 24, 28-30.) The school's principal explained that the presence of a faculty advisor would put that faculty member within earshot of conversations between students that could trigger the forced outing requirement. (*Id*. at ¶¶ 21-22.) The absence of a faculty advisor has undermined the ability of this GSA to function. (*Id*.)

The forced outing provision also has deprived LGBTQ+ students of resources that would otherwise be available to them at school, such as access to school counselors, social workers, and psychologists who otherwise could assist in addressing bullying, sexual harassment or assault, or mental health crises. (Mitchell Decl. ¶ 27; Doe Decl. ¶ 6, ECF No. 2-06.) Having a confidential relationship with a trusted school staff member—like a counselor—is of utmost importance for LGBTQ students and directly impacts whether they seek potentially vital assistance and support from their schools.[3] But many students already are reluctant to seek support at school for fear that school employees will "out" them to family members.[4] The forced outing provision causes students who fear rejection or abuse at home to be even less likely to seek essential support at school, depriving them of important or lifesaving support from their schools.

LGBTQ+ youth who are out and accepted by their parents or caregiver are about 40% less likely to have attempted suicide within the past year than their peers who are out but not accepted at home.[5] This is a tremendous gap, especially considering that in 2022 nearly half of all LGBTQ+

---

[3] *See* Kristopher M. Goodrich & Melissa Luke, *LGBTQ Responsive School Counseling*, 3 J. of LGBT Issues in Counseling, 113, 116 (2009).

[4] *See* Joseph G. Kosciw et al., GLSEN*, The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 74 (2022), https://tinyurl.com/ymnsuzda (last accessed May 13, 2024). A 2018 Human Rights Campaign report surveyed LGBT youth, asking them to describe the most important problems they faced--the top three problems were: (1) non-accepting families, (2) school/bullying problems, and (3) fear of being out or open about their identity. Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018), p. 9, https://tinyurl.com/mvzmmr7k (last accessed May 13, 2024). Nearly three-quarters of LGBTQ+ youth in Iowa have reported being discriminated against because of their sexual orientation or gender identity. The Trevor Project, 2022 *Nat'l Survey on LGBTQ Youth Mental Health By State* 87, 89 (Dec. 2022), https://tinyurl.com/yeyvz3zy ("Trevor Project Survey") (last accessed May 13, 2024). Consequently, LGBTQ+ youth are in need of vital support, but less likely to seek it.

[5] The Trevor Project, *Research Brief: Acceptance from Adults Is Associated With Lower Rates of Suicide Attempts Among LGBTQ Young People* 2 (Sept. 2023), https://tinyurl.com/3y6f4f27.

youth in Iowa had seriously considered suicide or attempted suicide just within the year prior.[6] Forcing young people to come out to their parents or guardians before they are ready can have serious consequences, including becoming alienated from the family or being kicked out of the home altogether. LGBTQ+ youth represent 40% of all unhoused youth in America and are at more than double the risk of homelessness as their non-LGBTQ+ peers.[7] Unhoused LGBTQ+ youth also experience double the rate of early death compared to unhoused non-LGBTQ+ youth.[8] Considering these dire consequences, it is no surprise that this provision of SF 496 substantially and reasonably influences closeted or questioning students' decision-making, precludes them participating in GSAs when they fear their attendance could trigger a report home, and chills their speech and expression. As long as the forced outing provision remains in effect, ISS student and GSA members will continue to experience these harms.

ISS's mission is to provide a safe, supportive, and nurturing learning environment and community for LGBTQ+ youth and their allies. (Tayler Decl. ¶¶ 3-4; Ex. 7 Mix Decl. ¶ 2.) But ISS has had to completely recalibrate its focus from providing these services to instead responding to and providing education about this one law in particular. (Tayler Decl. ¶¶ 19-22; Mitchell Decl. ¶¶ 20-25; Mix Decl. ¶¶ 9–10, 13.) Some ISS employees have shifted virtually their entire focus from ISS's primary mission because of the law. (Mitchell Decl. ¶¶ 22-23; Mix Decl. ¶¶ 16–17.) ISS has diverted resources into addressing issues arising from the forced outing provision, which directly and indirectly inhibits GSAs from organizing in their normal course of business. (Mitchell Decl. at *id*.; Tayler Decl. ¶ 28 ("SF 496's forced outing provision has had particularly disruptive results for students, in and out of GSAs."), ¶ 29 ("GSA advisors have pointed to the law's forced outing provision as the cause of the restrictions and/or closure of GSAs.").)

---

[6] Trevor Project Survey, *supra* note 4, at 87.
[7] M. H. Morton et al., *Missed Opportunities: LGBTQ Youth Homelessness in America,* Chapin Hall at University of Chicago (2018), https://tinyurl.com/4e5hftw7; Brodie Frasier et al., *LGBTIQ+ Homelessness: A Review of Literature,* 16 Int'l J. Env't Rsch. Pub. Health (2019), https://tinyurl.com/4xut35n6.
[8] Morton, et al., *supra note* 7.

SF 496 has also caused a steep decline in ISS's paid professional development services, resulting in a loss of ISS's funding. These paid services provide opportunities for educators to gain the skills to better understand and meet the needs of LGBTQ+ youth and their allies. (Mix Decl. ¶¶ 6, 11, 14). Educators and administrators now fear that implementing ISS's advice to provide a safe and environment for LGBTQ+ youth would subject them to discipline under SF 496 and put their students at risk of being forcibly outed. (Mix Decl. ¶ 8). Because of this, in-person and direct consultation has become infrequent, registration for ISS-offered licensure renewal and graduate credit coursework has sharply declined, and attendance at ISS's three annual conferences has dropped so much that ISS has canceled two of the conferences going forward. (Mix Decl. ¶ 7 (noting decline from 31 instances of direct professional development services to 8); ¶ 12 (noting decline from 2,481 course registrants to 1,147); ¶¶ 14-15 (noting cancellation due to lack of attendance of two of three conferences).) ISS has been forced to adjust its professional development content to meet educator needs of navigating SF 496 and school policy regarding the same, rather than further developing its core content of building out the safest and most affirming environment possible for LGBTQ+ students. (Mix Decl. ¶¶ 10, 13, 16-17).

## ARGUMENT

### I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs satisfy the four *Dataphase* factors, entitling them to preliminary injunctive relief: (1) Plaintiffs are likely to succeed on the merits; (2) they face irreparable harm absent the injunction; (3) Defendants incur no harm by injunction; and (4) the public interest supports enjoining SF 496's forced outing provision. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (likelihood of success on First Amendment claim generally satisfies other injunction requirements); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (likelihood of success need only be shown on any one of multiple claims).

**A.    The Forced Outing Provision Violates the Equal Access Act.**

The Equal Access Act ("EAA") prohibits any public secondary school from discriminating against students who wish to conduct a meeting within a limited open forum based on the "religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. §§ 4071(a)-(b); *Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 235 (1990). "A 'limited open forum' exists whenever a public secondary school 'grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.'" *Mergens*, 496 U.S. at 235 (quoting 20 U.S.C. § 4071(b)); *SAGE v. Osseo Area Schs.–Dist. No. 279*, 540 F.3d 911, 913 (8th Cir. 2008). Thus, once a school permits any noncurricular group to meet, the EAA requires the school to allow GSAs on the same terms as other noncurricular clubs. *See, e.g.*, *SAGE v. Osseo Area Schs.–Dist. No. 279*, 471 F.3d 908, 913 (8th Cir. 2006).

The forced outing provision has caused multiple secondary schools to impose restrictions on GSAs that are not imposed on other clubs or to shutter GSAs altogether because of the content and viewpoint of student speech during these meetings that seeks recognition of LGBTQ+ students' gender identities. *Supra*, at 4-5. In other secondary schools, the forced outing provision has caused the number of GSA members to dwindle as a result of students' fears they will be reported and outed to their parents if they attend. *Id*. It has further impeded the ability of GSA members to participate openly, which, combined with the decline in membership, obstructs GSA goals and reduces the quality of members' experience. *Id*. Because the forced outing provision of SF 496 requires secondary schools across Iowa to obstruct the ability of GSAs, including ISS member GSAs, to meet on the same terms as other noncurricular clubs, the law violates the EAA.

**B.    The Forced Outing Provision Deprives ISS Members of Freedom of Expressive Association in Violation of the First Amendment.**

The First Amendment protects the freedom of expressive association. *Roberts v. U.S. Jaycees,* 468 U.S. 609, 617–18 (1984). The freedom to "engage in association for the advancement

of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). These protections apply to students who wish to come together in noncurricular clubs such as GSAs in school settings for purposes of social networking, political advocacy, mutual support, and public education. *See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 367–68 (8th Cir. 1988) (denial of funding to GSA viewpoint discriminatory); *Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 856 (8th Cir. 1977); *Gay Students Org. of Univ. of New Hampshire v. Bonner*, 509 F.2d 652, 660–62 (1st Cir. 1974).

Defendants may argue that the text of the forced outing provision, on its face, applies equally to all students—both transgender and cisgender—triggering a report home even when a cisgender boy asks to use the boys' restroom, or when Jonathan asks to be referred to as Jack because either could be viewed as an accommodation to affirm the student's male gender identity.[9] But such an interpretation defies common sense and is wrong as a matter of law. Cisgender students have no need for an accommodation to affirm their gender identities. This provision has practical implications only for transgender and gender nonconforming students. By singling out solely students who seek accommodations that affirm their gender identities for mandatory reports home, the law targets by proxy transgender and gender nonconforming students as a class and therefore is in no way neutral. *See Kadel v. Folwell*, No. 22-1721, 2024 WL 1846802 at *12 (4th Cir. Apr. 29, 2024) (*en banc*) (laws that "aim at addressing incongruity between sex assigned at birth and gender identity" go to "the very heart of transgender status," and target transgender people by proxy on their face) (collecting authorities).

---

[9] This Court relied on the text of the don't say gay or trans provision to determine it is content-neutral, although the Court subsequently found it to be impermissibly vague and recognized that such a neutral interpretation "is likely not what the Iowa Legislature was trying to accomplish when it passed Senate File 496." (*See generally* ECF No. 65 at 10, 41.) Indeed, State Defendants concede, and legislative history confirms, that references to sexual orientation and gender identity in the law were intended to target solely LGBTQ+ orientations and identities notwithstanding facially neutral text. *Id.*

The forced outing provision, on its face and as implemented, discriminates on the basis of content and viewpoint and has obstructed the ability of students to associate in a school setting for purposes of social networking, political advocacy, mutual support. Defendants have restricted the ability of ISS student members and member GSAs to express themselves and associate with others on equal terms to other student groups, and have done so in a manner that is unreasonable in light of the purposes noncurricular clubs serve in the school setting. Defendants have prohibited and— unless enjoined—will continue to prohibit ISS members from enjoying the support, inclusion, and affirmation such groups provide, causing irreparable harm.

ISS members—GSAs and individual students both—have suffered irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the forced outing provision of SF 496. They have no other plain, adequate, or speedy remedy at law.

### C. The Forced Outing Provision Deprives ISS Members of Freedom of Speech and Expression in Violation of the First Amendment.

SF 496 is a façade for content and viewpoint discrimination. Its various parts are meant to work together to achieve its full goal of LGBTQ+ erasure. But even when viewed in isolation, the forced outing provision violates ISS members' constitutional and statutory rights. By design, the forced outing provision suppresses speech on the basis of viewpoint and content, and its enforcement mechanisms chill LGBTQ+ people from engaging in speech that discloses their gender identity or seeks support, resources, and community. It does not suppress comparable speech or expressive conduct by people who are not transgender or gender nonconforming.

Courts long have held that coming-out speech constitutes protected First Amendment activity. *See, e.g.*, *Gay Students Org. of Univ. of New Hampshire*, 509 F.2d at 660–62 (student speech); *Henkle v. Gregory*, 150 F. Supp. 2d 1067, 1075–77 (D. Nev. 2001) (same); *Weaver v. Nebo Sch. Dist.*, 29 F. Supp. 2d 1279, 1284–85 (D. Utah 1998). Indeed, a student's speech about gender identity can constitute core political speech subject to the most exacting scrutiny. *Parents Defending Educ. v. Linn-Mar Cmty. Sch.*

*Dist.*, 83 F.4th 658, 666–67 (8th Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–62 (2014)). Expression of gender identity[10] through one's appearance such as by wearing gender-appropriate clothing also is protected expression. *See Bear v. Fleming*, 714 F. Supp. 2d 972, 981 (D.S.D. 2010) (a transgender student's choice to wear clothing that accords with the student's gender identity may be a sufficient proxy for speech to enjoy full constitutional protection).

On its face and as applied, the forced outing provision, based on content and viewpoint, targets and chills students from coming out as transgender or gender nonconforming. As the law's text and the Iowa State Board of Education's proposed rules interpreting this provision recognize, a "request is governed by this subrule only if the request is *an accommodation intended to affirm a student's identity.*" *General accreditation standards ARC 7169C*, 46 Iowa Admin. Bull. 3929 (proposed Dec. 13, 2023) (hereinafter, "Proposed Rules") (emphasis added). Thus, a transgender girl faces consequences from the forced outing provision for speech such as "I am a girl," or "Please call me Susan." By contrast, a cisgender girl may say the same words but it would not be considered an accommodation to affirm her gender identity. The forced outing provision thus attaches different consequences to the same student speech based on the speaker's identity, constituting impermissible viewpoint discrimination. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Moreover, LGBTQ+ students face these penalties for speech beyond the classroom—in noncurricular activities or outside of school altogether. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190 (2021) ("[R]egulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day. That means courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of

---

[10] The unique experience of transgender students has been recognized by other courts. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 596 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ("Transgender students face unique challenges in the school setting,"); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) ("When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening[.]").

speech at all.").

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and schools may not restrict student speech merely to avoid controversy or the "discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 509 (1969); *Morrison ex rel. Morrison v. Bd. of Educ. of Boyd Cnty.*, 419 F. Supp. 2d 937, 941 (E.D. Ky. 2006) ("The private, noncurricular speech of students is entitled to almost blanket constitutional protection."), *aff 'd sub nom. Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602 (6th Cir. 2008). The forced outing provision violates the First Amendment because it forces students to remain silent about their gender identities—even to peers and even in noncurricular settings—if they reasonably fear their parents or guardians would react with hostility or dangerously after receiving a report home. ISS members have been silenced by the threat of enforcement of the forced outing provision.

### D. The Forced Outing Provision is Void for Vagueness under the First and Fourteenth Amendments.

The forced outing provision is unconstitutionally vague because it fails to provide "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Grayned v. City of Rockford*, 408 U.S. 104,108–09 (1972); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). Students cannot know what behavior will trigger a potentially life-changing report home and accordingly overcorrect by declining to participate in expressive associations and by self-censoring their speech out of fear. Other students who gladly would participate openly in GSA meetings are deprived of the opportunity because faculty sponsors reasonably do not understand what conduct would trigger forced outing, and therefore have refused to sponsor such clubs, forcing them to close.

 First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in

our society," which is why the "government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963); *see also id.* at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression."). The severity of SF 496's enforcement mechanism—loss of professional licensure and even potential loss of school accreditation—encourages schools to overreport speech or other expression that might indicate a non-cisgender gender identity, which in turn discourages students from making constitutionally protected speech. *See Sessions v. Dimaya*, 584 U.S. 148, 154-8 (2018). As this Court has recognized, "when a school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'" Order, ECF 65 at 38 (quoting *Parents Defending Educ.*, 83 F.4th at 668).

School districts' varied positions and enforcement measures directed against GSAs evidence the vagueness of the provision. For example, neither SF 496 nor the Proposed Rules satisfactorily defines a "request" for a gender-affirming "accommodation" that would trigger the law's forced outing provision. Teachers and administrators ordinarily understand an "accommodation" in the context of education to encompass those obligations required by federal special education and anti-discrimination laws, such as a change in standard procedure warranted by and subject to the substantive and procedural safeguards of the Individuals with Disabilities Education Act, 30 U.S.C. §§ 1400 *et seq.;* § 504 of the Rehabilitation Act, 29 U.S.C. §§ 794, 794a; or Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.* However, such a meaning appears inconsistent with the forced outing provision's broad scope. Teachers and administrators would not expect a student's request to use a nickname or particular pronouns to be an "accommodation" as those federal laws use that term. The Iowa legislature's sporadic use of legal terms of art in contexts where they do not apply further confounds interpretation of its intent.

What exact words and phrases will trigger a report home and how would students have notice of what those words and phrases are? How are teachers to know whether any action is

"intended to affirm" a student's identity? The law as written is too vague to know. The "grave uncertainty," *Johnson v. United States*, 576 U.S. 591, 597 (2015), and the significant consequences—to faculty GSA sponsors found to be noncompliant for failing to report a student, to students vulnerable to abuse at home, and to students who remain closeted, self-censor, or fail to seek resources because they fear a report home—unavoidably has closed GSA chapters, imposed restrictions on others, and chilled student speech. *See also Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961) (a vague law abutting First Amendment freedoms "operates to inhibit the[ir] exercise"). Vague prohibitions inhibit freedom of speech when individuals do not know whether their speech is permitted and choose not to exercise their rights for fear of the consequences. *See Grayned,* 408 U.S. at 109. The forced outing provision's lack of clarity has resulted in arbitrary enforcement on an *ad hoc* and subjective basis and is void for vagueness. *See Parents Defending Educ.*, 83 F.4th at 669; *see also Stephenson*, 110 F.3d at 1310.

### E. The Forced Outing Provision is Overbroad in Violation of the First Amendment.

Even if the forced outing provision had a legitimate purpose (it does not), it sweeps far too broadly. It is a "prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). It covers a "a substantial amount of expressive activity;" indeed, "[i]t is hard to imagine any scenario in which the elements of the statute would be met and yet the actions would constitute non-expressive conduct." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1158 (8th Cir. 2014).

The objective of the forced outing provision, which is ostensibly to encourage parental participation in the child's upbringing, does not align with its effect. It does not address parental consent or support for gender-affirming "accommodations." It focuses only on disclosure. Moreover, by mandating reporting on any undefined and thus broadly interpreted "request" for an "accommodation" (regardless of whether that request occurs in school), the provision operates as little more than a penalty on expression. Most alarmingly, it makes no exception for children in unsafe or unstable home environments.

Finally, "a limiting construction or partial invalidation" cannot rescue the forced outing provision. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). "No limiting construction would be consistent with any plausible understanding of the legislature's intent," *see Snider*, 752 F.3d at 1159, and none has been offered. The Department's Proposed Rules continue to require the erasure of LGBTQ+ identities and topics and put children at risk. *See generally* Proposed Rules.

The forced outing provision has resulted in severe restrictions on the operations of GSAs. Because of such overbreadth, ISS members have been deprived of protected First Amendment rights of speech and expressive association.

### F. The Forced Outing Provision Violates the Equal Protection Clause.

The forced outing provision targets transgender and gender nonconforming students' coming out speech and their ability to find community with one another through GSAs, while imposing no such burdens on non-LGBTQ+ students and student groups. *See Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (laws that discriminate by perpetuating archaic and stereotypic notions about a disfavored group, or that target members of the group as innately inferior, cause cognizable dignitary injury); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. Of Martinsville v. A.C.,* 144 S.Ct. 683 (2024) (equal protection guarantee prohibits schools from enacting policies that discriminate against transgender students). Because SF 496 singles out LGBTQ+ people for differential treatment and lacks adequate tailoring in service of even a legitimate governmental purpose, let alone the exceedingly persuasive one required, it violates the Equal Protection Clause.

Classifications based on sex, sexual orientation, and gender identity/transgender status all warrant heightened scrutiny. *See, e.g.*, *Sessions v. Morales-Santana*, 582 U.S. 47, 56-9 (2017) (sex); *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669–70 (8th Cir. 2022) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654–657 (7th Cir. 2014) (sexual orientation); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (transgender status). Because these traits "generally provide no

sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), the Equal Protection Clause requires that government provide an "exceedingly persuasive justification" for legislation that differentiates on those bases, *United States v. Virginia*, 518 U.S. 515, 531 (1996). Classifications based on transgender status warrant such scrutiny both in and of themselves and as forms of sex discrimination. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) (discrimination on the bases of sexual orientation and transgender status "necessarily entails discrimination based on sex"); *accord Horton v. Midwest Geriatric Mgmt., LLC*, 963 F.3d 844, 847 (8th Cir. 2020). Finally, as previously explained, any attempt to cast the forced outing provision as neutral on its face and, thus, avoid triggering suspect classification analysis cannot save it. *Supra* at 9 (citing *Kadel*, 2024 WL 1846802 at *12).

SF 496's forced outing provision fails to serve even a legitimate governmental purpose, let alone the compelling one required. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (strict scrutiny applies both to content-based restrictions on speech, and to laws that, while facially content-neutral, either cannot be justified without reference to the content of the regulated speech or were adopted by the government because of disagreement with its message). The purpose and effect of this provision is to target speech and expressive association by transgender and gender nonconforming people while leaving untouched comparable speech and expressive associations by cisgender people. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (even a facially neutral law may nonetheless violate Equal Protection Clause if it has a discriminatory purpose and effect). Indeed, the law targets students for reports home based explicitly on whether their request to be referred to by a name or pronoun reveals them to be transgender or gender nonconforming. *Kadel*, 2024 WL 1846802 at *16. Even under the lowest level of scrutiny, governmental action must not disadvantage a disfavored group for its own sake, *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and must bear at least a rational relationship to a legitimate governmental interest, *City of Cleburne*, 473 U.S. at 446.

The State cannot justify the law as promoting "parental rights in education." The government may not enact a law endorsing the hostility of certain parents to acknowledging the existence of LGBTQ+ people in school. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("private biases" are not "permissible considerations for" governmental action); *see also Obergefell v. Hodges*, 576 U.S. 644, 672 (2015) (personal religious or philosophical objections to gay people may not constitutionally be given the imprimatur of the Government). "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948). Protecting the interests of people with personal or religious objections to LGBTQ+ people cannot be a valid rationale for any law. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (such a law was "a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit."). Moreover, any interest in protecting parental rights must yield to a compelling interest such as the need to protect vulnerable young people from harm, *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944), and the forced outing provision deprives school officials of discretion even in instances when officials know that a report will result in abuse. In sum, the forced outing provision lacks any legitimate justification, let alone narrow tailoring in service of a compelling one.

## II.    ISS, and Its Individual Student and GSA Members, Have Suffered Irreparable Harm Directly Caused by the Forced Outing Provision of SF 496

The forced outing provision has caused direct irreparable harm to ISS and to the individual student and GSA chapter members it represents. It has deprived them of their rights under the First and Fourteenth Amendments and the Equal Access Act. "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (students denied opportunities based on sex suffer irreparable harm sufficient to warrant preliminary injunction in equal protection claim); *SAGE*, 471 F.3d at 913

(preliminary injunction granted under EAA).

A.    **Iowa Safe Schools Has Suffered Direct Irreparable Harm.**

An organization suffers a direct, cognizable harm when it can show that the challenged law or action has caused (1) mission frustration, or (2) diversion of resources. *Nat'l Fed'n of the Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) ("Standing may be found when there is a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests."). This inquiry otherwise is essentially the same as examining individual standing, as the entity still must "establish (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) that a favorable decision is likely to redress their injury." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Mission frustration or diversion of resources are adequate injuries for the standing calculus. *See Havens Realty Corp.*, 455 U.S. at 379.

Since SF 496 passed, ISS has been forced shift its focus from its mission to responding to and providing education about SF 496. *Supra* at 6-7. ISS continues to divert resources into addressing issues arising from the forced outing provision, which directly and indirectly inhibits GSAs from organizing in their normal course of business. *Supra* at 7. ISS's mission is therefore frustrated by the law. SF 496 has also caused a steep decline in engagement with ISS's professional development offerings—and thus a loss of its funding—with fewer schools participating in direct services, fewer educators using ISS courses for license renewal and graduate credit, and fewer educators attending its annual conferences. *Supra* at 7.  ISS can therefore "establish (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) that a favorable decision is likely to redress their injury[.]" *Telescope Media*, 936 F.3d at 749 (citing *Spokeo*, 578 U.S. at 338). ISS has suffered substantial mission frustration and diversion of its resources as a result of SF 496 and thus has direct standing to challenge the law.

**B.     ISS' Individual Student and GSA Chapter Members Also Have Suffered Irreparable Harm.**

ISS also seeks relief on behalf of its individual student and GSA chapter members,[11] who have been directly harmed by the forced outing provision. *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). An association has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (citation omitted); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An entity can have associational standing even if only one member has standing, *id* at 342, and even if the entity is not itself directly injured, *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016); *cf. also Warth v. Seldin*, 422 U.S. 490, 511 (1975).

ISS' GSA chapter members have been restricted or closed because of the forced outing provision and student members of ISS have declined to participate in GSAs or limited their participation because of fears about sharing their identities. *See supra* at 4-5. Additionally, ISS student members who are out and who are participating in GSAs also have been harmed because the forced outing provision has deprived them of the ability to join in expressive association with peers who are more vulnerable at home. *Supra*, at *id*. ISS has representational standing on behalf

---

[11] The Supreme Court has held that an association has standing to present the constitutional claims of its members when compelling the individual members to present their claims "would result in nullification of the right at the very moment of its assertion." *NAACP v. Alabama,* 357 U.S. 449, 459 (1958). It is hard to imagine a more poignant or appropriate application of that precedent than this one. ISS student members who are vulnerable at home cannot sue on their own behalf and must rely instead on the organization of which they are a member to represent their interests. Although potential nullification of a right is not necessary for representational standing, ISS can demonstrate it here. *See Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 688 (8th Cir. 1979) (representational standing does not require possibility of nullification of rights).

of its members whose constitutional and statutory rights have been violated by the forced outing provision.

### III. The Court Previously Determined that the Balance of Equities Weighs in Favor of the Plaintiffs and is in the Public Interest.

In balancing the equities, the court also weighs the threat of irreparable harm against any injury the injunction will inflict on other parties, *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020), including consideration of harm to the public, *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). This Court previously determined that these final two factors weigh in favor of enjoining SF 496. The Court's findings remain unchanged when considering the forced outing provision.

There is no harm to Defendants in maintaining the status quo that existed prior to SF 496. School counselors, psychologists, teachers, and other officials were empowered to and charged with supporting students and their parents and guardians in encouraging open communication with families and supporting the mental and physical wellbeing of students. Prior to the forced outing provision, school officials had the discretion to keep students safe in exigent circumstances, and to protect the freedom of student expression and association at school. All Iowa schools benefit when students can express themselves and explore their identities. Indeed, limiting the freedom to learn and grow is contrary to the goals of public education. No legitimate public interest is served by suppressing statutory and constitutional rights.

## <u>CONCLUSION</u>

For the foregoing reasons, enforcement of the forced outing provision of SF 496 should be enjoined during the pendency of this action.

Dated: May 23, 2024

Respectfully submitted,

/s/Thomas D. Story
Thomas D. Story, AT0013130 (Lead Counsel)
Rita Bettis Austen, AT0011558
Shefali Aurora, AT0012874
**American Civil Liberties Union**
  **of Iowa Foundation**
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988
thomas.story@aclu-ia.org
rita.bettis@aclu-ia.org
shefali.aurora@aclu-ia.org

Laura J. Edelstein*
Katherine E. Mather*
**Jenner & Block LLP**
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com
KMather@jenner.com

Anna K. Lyons*
Effiong Dampha*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
ALyons@jenner.com
EDampha@jenner.com

*Admitted pro hac vice.
** Member of the Arizona bar. Practicing
under the supervision of a member of the Illinois bar.

Camilla B. Taylor*
Nathan Maxwell* **
**Lambda Legal Defense**
  **and Education Fund, Inc.**
65 E. Wacker Pl., Suite 2000
Chicago, IL 6060
(312) 663-4413
ctaylor@lambdalegal.org
nmaxwell@lambdalegal.org

Karen L. Loewy*
Sasha J. Buchert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
kloewy@lambdalegal.org
sbuchert@lambdalegal.org

Daniel R. Echeverri*
Christopher J. Blythe*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
DEcheverri@jenner.com
CBlythe@jenner.com

Joshua J. Armstrong*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
JArmstrong@jenner.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

Dated: May 21, 2024

*/s/ Thomas D. Story*
Thomas D. Story