**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| IOWA SAFE SCHOOLS f/k/a GLBT YOUTH IN IOWA SCHOOLS TASK FORCE; P.B.-P., by his parent and next friend, BELINDA SCARROTT; A.C., by her parents and next friends, RICHARD and ULRIKE CARLSON; T.S., by her parent and next friend, ERIC SAYLOR; B.F.S., by their parents and next friends, BRIGIT and JOSEPH STEVENS;  B.F., by their parent and next friend, LARA NEWSOM; JAMES DOE, by his parent and next friend, JOHN DOE; DANIEL GUTMANN; and ALYSON TELFORD, | Case No.    4:23-cv-474 |
| | **FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs,* | |
| v. | |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa; MCKENZIE SNOW, in her official capacity as Director of the Iowa Department of Education; JOHN ROBBINS, in his official capacity as President of the Iowa State Board of Education; MATT DEGNER, in his official capacity as Iowa City Community School District Superintendent; MOLLY ABRAHAM, SHAWN EYESTONE, CHARLIE EASTHAM, JAYNE FINCH, RUTHINA MALONE, MITCH LINGO, and LISA WILLIAMS, in their official capacities as board members of the Iowa City Community School District; ROD EARLEYWINE, in his official capacity as Sioux City Community School District Superintendent; DAN GREENWELL, LANCE EHMCKE, JAN GEORGE, TREYLA LEE, JOHN MEYERS,  BOB MICHAELSON, and EARL MILLER, in their official capacities as board members of the Sioux City Community School District; ROSALIE DACA, in her official capacity as Urbandale Community School District Superintendent; KATHERINE HOWSARE,  RACHEL KENT, JENNY MEADE, JASON MENKE, JOSH VAN RSWYK, CARISSA WILLIAMS, and MARGARET YOUNG, in their official capacities as board members of the Urbandale Community School District; JARED SMITH, in his official capacity as Waterloo Community School District Superintendent; JONATHAN COX, JESSE KNIGHT, ASTOR | |

WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, and KRYSTAL MADLOCK, in their official capacities as board members of the Waterloo Community School District; MATT ADAMS, in his official capacity as West Des Moines Community Schools Superintendent; JEFF HICKS, MICHAEL ANDRESKI, ELIZABETH LARSON, LILA P. MONTOYA STARR, FANNETTE ELLIOTT, JILL CATON JOHNSON, and ANADELIA MORGAN, in their official capacities as board members of the West Des Moines Community Schools District,

*Defendants.*

Plaintiffs IOWA SAFE SCHOOLS f/k/a GLBT YOUTH IN IOWA SCHOOLS TASK FORCE ("IOWA SAFE SCHOOLS"); P.B.-P., by his parent and next friend BELINDA SCARROTT; A.C., by their parents and next friends RICHARD and ULRIKE CARLSON; T.S., by her parent and next friend ERIC SAYLOR; B.F.S., by their parents and next friends BRIGIT and JOSEPH STEVENS; B.F., by their parent and next friend LARA NEWSOM; JAMES DOE, by his parent and next friend JOHN DOE, DANIEL GUTMANN; and ALYSON TELFORD by and through their undersigned counsel, respectfully bring this challenge to recently enacted Senate File 496, 2023 Iowa Acts ch. 91 ("SF 496" or "the law"), an unconstitutional law that violates Plaintiffs' First Amendment, Fourteenth Amendment, and Equal Access Act rights. Plaintiffs submit to the Court this First Amended and Supplemental Complaint requesting a declaratory judgment and preliminary and permanent injunctive relief against all Defendants, their employees, agents, and successors in office. Contemporaneously with this First Amended and Supplemental Complaint, Plaintiffs submit a Renewed Motion for Preliminary Injunction with Brief and Declarations in support. In support of their First Amended and Supplemental Complaint and Renewed Motion for Preliminary Injunction, Plaintiffs state the following:

## PRELIMINARY STATEMENT

1.      Plaintiffs are a non-profit advocacy organization serving lesbian, gay, bisexual, transgender, queer, or questioning ("LGBTQ+") Iowa youth, which brings suit on behalf of the organization itself and on behalf of the organization's members comprising both individual students and gender sexuality alliance chapters[1] ("GSAs"), six LGBTQ+ students from Iowa who attend Iowa public schools and whose ages range from ten to seventeen, and two educators. They challenge as unconstitutional and unlawful under federal statute SF 496, a sweeping piece of legislation signed into law by Governor Kim Reynolds on May 26, 2023, which primarily amends portions of Title VII (Education and Cultural Affairs) of the Iowa Code.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988 and seeks to secure equitable relief under an Act of Congress, 20 U.S.C. § 4071.

3.      This Court has personal jurisdiction over Defendants because Defendants are domiciled in the State of Iowa and the deprivation of Plaintiffs' rights arises out of and relates to Defendants' official duties in the State of Iowa.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### Plaintiffs

5.      Plaintiff IOWA SAFE SCHOOLS is a mission-driven not-for-profit 501(c)(3)

---

[1] GSAs are noncurricular clubs for LGBTQ+ students and their allies to find fellowship and community.

organization founded in 2002 and based in Des Moines, Iowa. The mission of IOWA SAFE SCHOOLS is to provide safe, supportive, and nurturing learning environments and communities for LGBTQ+ and allied youth through education, outreach, advocacy, and direct services. IOWA SAFE SCHOOLS pursues this mission by providing services to its members, which include individual students and GSAs. IOWA SAFE SCHOOLS' flagship program is the GSA Network, through which IOWA SAFE SCHOOLS provides services and resources to student members and member GSAs to empower them in pursuing inclusive school policies, combating anti-LGBTQ+ bulling, and supporting one another. IOWA SAFE SCHOOLS provides individualized support to its student members and member GSAs, including through on-site, in-person visits, direct consultation, and connections and coordination with other student groups and IOWA SAFE SCHOOLS opportunities. IOWA SAFE SCHOOLS hosts multiple annual student-focused events for its members and maintains regular contact with them to provide guidance and address their needs at school. IOWA SAFE SCHOOLS assists its student members and member GSAs in their advocacy efforts, and additionally advocates on their behalf through coordination with members' educators and school districts. IOWA SAFE SCHOOLS further performs data collection with respect to incidents of anti-LGBTQ+ bullying, harassment, and discrimination, and provides services and resources to its members experiencing trauma or tragedy, most notably the loss of a friend and fellow member to suicide.

6.     IOWA SAFE SCHOOLS also pursues its mission by providing professional development, licensure renewal, and graduate credits to educators individually and district-wide. IOWA SAFE SCHOOLS provides these services through direct consultation programs, in which it meets with Iowa educators and school districts to provide guidance on understanding and meeting the needs of LGBTQ+ students; an online Iowa Safe Schools Academy that offers

coursework for the fulfillment of license renewal obligations and graduate credits, coursework that is primarily focused on supporting different student groups, including LGBTQ+ students; and multiple annual conference and symposium opportunities, including the Engage and Empower Summit, the Trans Education Summit, and the Anti-Violence Symposium. Through these services, IOWA SAFE SCHOOLS works with and provides guidance and programming to educators and school districts in developing and implementing school policies and practices inclusive of LGBTQ+ students and respectful of LGBTQ+ students' rights.

7.    IOWA SAFE SCHOOLS appears in a dual capacity because as an organization its Article III standing can be satisfied in two ways.

    a.  With respect to certain claims[2] asserted herein, IOWA SAFE SCHOOLS asserts direct organizational standing on its own behalf because SF 496 has perceptibly impaired its ability to provide services and referral services to students, both individually and through its member GSAs. By chilling the speech and expressive association of its member GSAs and students, the law directly interferes with core mission and business of IOWA SAFE SCHOOLS. SF 496 has further directly interfered with the core mission and business of IOWA SAFE SCHOOLS by prohibiting, discouraging, and heightening the risk to students and educators pursuing or implementing the inclusive school policies and practices advocated by IOWA SAFE SCHOOLS.

    b.  With respect to other claims asserted herein, IOWA SAFE SCHOOLS asserts representational standing by appearing on behalf of its members, which includes

---

[2] Individual counts alleged herein specifically identify the capacity in which IOWA SAFE SCHOOLS appears in bringing them.

both GSAs as well as individual students who may or may not be currently active in a GSA.

8.    Plaintiff P.B.-P. is a 17-year-old boy who lives in Waterloo in Black Hawk County, Iowa. He is a senior at Waterloo West High School. P.B.-P. is the president of Waterloo West High School's GSA, which is a member of IOWA SAFE SCHOOLS's GSA network. P.B.-P. is transgender. He brings this suit by and through his next friend and parent, BELINDA SCARROTT.

9.    Plaintiff A.C. is a 10-year-old girl who lives in Iowa City, Johnson County, Iowa, with her parents. She attends Twain Elementary School in the 5th grade. A.C. is transgender. A.C. brings this suit by and through her parents and next friends, RICHARD and ULRIKE CARLSON. A.C. is a member of Twain Elementary School's GSA, which is a member of IOWA SAFE SCHOOLS's GSA network.

10.    Plaintiff T.S. is a 16-year-old girl who lives in Urbandale, Polk County, Iowa. T.S. attends Urbandale High School in the 11th grade. T.S. is a lesbian. T.S. brings this suit by and through her parent and next friend, ERIC SAYLOR.

11.    Plaintiff B.F.S. is a 14-year-old gender-fluid teenager who lives in Clive, Polk County, Iowa. B.F.S. attends Valley Southwoods Freshman High School in West Des Moines, Iowa. B.F.S. brings this suit by and through their parents and next friends, BRIGIT and JOSEPH STEVENS.

12.    Plaintiff B.F. is a 17-year-old non-binary teenager who lives in Urbandale, Polk County, Iowa. B.F. is a senior at Urbandale High School. B.F. is pansexual. B.F. brings this suit by and through their parent and next friend, LARA NEWSOM.

13.    Plaintiff JAMES DOE is a 17-year-old boy who lives in Sioux City, Iowa. He attends high school and is an officer of his high school's GSA, which is a member of IOWA SAFE

SCHOOLS's GSA network. JAMES DOE is transgender. JAMES DOE brings this suit by and through his parent and next friend, JOHN DOE.

14.     Plaintiffs P.B.-P., A.C., T.S., B.F.S, B.F., and JAMES DOE are referred to collectively as the "Plaintiff Students."

15.     Plaintiff Daniel Gutmann is an Iowa educator. Mr. Gutmann teaches fourth grade in a kindergarten through fifth grade elementary school in the Des Moines Public School District. Mr. Gutmann holds a standard license issued by the Iowa Board of Educational Examiners with endorsements in K-6 Teacher Elementary Classroom, K-8 Reading, 5-8 Middle School Language Arts, and 5-8 Middle School Social Studies. Mr. Gutmann also serves as co-chair of the Des Moines Public School District LGBTQ+ Staff Affinity Group.

16.     Plaintiff Alyson Telford née Browder is an Iowa educator. Ms. Telford teaches seventh-grade English in a sixth through eighth grade middle school in the Norwalk Community School District. Ms. Telford holds a standard license issued by the Iowa Board of Educational Examiners with endorsements in K-6 Teacher Elementary Classroom, K-8 Reading, 5-8 Middle School Language Arts, and 5-8 Middle School Social Studies.

17.     Plaintiffs Daniel Gutmann and Alyson Telford are referred to collectively as "Plaintiff Educators."

### Defendants

18.     Defendant KIM REYNOLDS is the Governor of the State of Iowa and, as such, is the Chief Executive for the state, responsible for ensuring the enforcement of the state's educational statutes. Iowa Const. art. IV, § 9. Defendant REYNOLDS introduced the original version of the bill that became SF 496 and ultimately signed it into law. Defendant REYNOLDS is sued in her official capacity as Governor of the State of Iowa.

19.    Defendant MCKENZIE SNOW is the Director of the Iowa Department of Education ("IDOE") and is responsible for its acts and omissions. IDOE, part of which now includes the Iowa Board of Educational Examiners, is responsible for enforcing SF 496 by investigating school districts, issuing written warnings, and taking disciplinary action, including revocation of licensure. IDOE is further responsible for recommending to the Iowa State Board of Education the rules necessary to implement SF 496 and can independently issue guidance on Iowa's education laws and standards. Defendant SNOW is sued in her official capacity as Director of IDOE.

20.    Defendant JOHN ROBBINS is the President of the Iowa State Board of Education ("ISBE") and is responsible for its acts and omissions. The ISBE is responsible for adopting rules necessary to administer SF 496. Defendant ROBBINS is sued in his official capacity as President of ISBE.

21.    Defendants REYNOLDS, SNOW, and ROBBINS (together, "State Defendants") are responsible for adopting rules necessary to implement and administer SF 496.

22.    Defendant MATT DEGNER is the Superintendent of the Iowa City Community School District. Superintendent DEGNER is sued in his official capacity. As Superintendent, under the policies of the Iowa City Community School District Board of Directors, DEGNER is responsible for the oversight and enforcement of all policies in Iowa City Community School District, including those being challenged here. In addition, DEGNER has broad discretion to act independently of the Iowa City Community School District Board of Directors under the Board's policies, including to develop standard practices and procedures necessary to enforce SF 496.

23.    Defendant ROD EARLEYWINE is the Superintendent of the Sioux City Community School District. Superintendent EARLEYWINE is sued in his official capacity. As

Superintendent, under the policies of the Sioux City Community School District, EARLEYWINE is responsible for the oversight and enforcement of all policies in Sioux City Community Schools district, including those being challenged here. In addition, EARLEYWINE has broad discretion to act independently of the Sioux City Community School District Board of Directors under the Board's policies, including to develop standard practices and procedures necessary to enforce SF 496.

24.    Defendant ROSALIE DACA is the Superintendent of the Urbandale Community School District. Superintendent DACA is sued in her official capacity. As Superintendent, under the policies of the Urbandale Community School District, DACA is responsible for the oversight and enforcement of all policies in Urbandale Community School District, including those being challenged here. DACA has broad discretion to act independently of the Urbandale Community School District Board of Directors under the Board's policies, including to develop standard practices and procedures necessary to enforce SF 496.

25.    Defendant JARED SMITH is the Superintendent of the Waterloo Community School District. Superintendent SMITH is sued in his official capacity. As Superintendent, under the policies of the Waterloo Community School District, SMITH is responsible for the oversight and enforcement of all policies in Waterloo Community School District, including those being challenged here. SMITH has broad discretion to act independently of the Waterloo Community School District Board of Directors under the Board's policies, including to develop standard practices and procedures necessary to enforce SF 496.

26.    Defendant MATT ADAMS is the Superintendent of the West Des Moines Community Schools District. Superintendent ADAMS is sued in his official capacity. As Superintendent, under the policies of the West Des Moines Community Schools district, ADAMS

is responsible for the oversight and enforcement of all policies in West Des Moines Community Schools district, including those being challenged here. ADAMS has broad discretion to act independently of the West Des Moines Community Schools Board of Directors under the Board's policies, including to develop standard practices and procedures necessary to enforce SF 496.

27.    Defendants Superintendent DEGNER, EARLEYWINE, DACA, SMITH, and ADAMS are referred to collectively as the "Superintendent Defendants."

28.    Defendants MOLLY ABRAHAM, SHAWN EYESTONE, CHARLIE EASTHAM, JAYNE FINCH, RUTHINA MALONE, MITCH LINGO, and LISA WILLIAMS are members of the Iowa City Community School Board. These defendants are responsible for the enactment and oversight of all policies in the Iowa City Community Schools District, including those challenged here. Each Iowa City Board Defendant is sued in their official capacity. The Iowa City Community School Board delegates authority to Superintendent DEGNER, school principals, and other school executives to enforce provisions of SF 496. Together with Superintendent DEGNER, Defendants ABRAHAM, EYESTONE, EASTHAM, FINCH, MALONE, LINGO, and WILLIAMS are referred to as "Iowa City Community School District Defendants."

29.    Defendants DAN GREENWELL, LANCE EHMCKE, JAN GEORGE, TREYLA LEE, JOHN MEYERS, BOB MICHAELSON, and EARL MILLER are members of the Sioux City Community School District Board. These defendants are responsible for the enactment and oversight of all policies in the Sioux City Community School District, including those challenged here. Each Sioux City Board Defendant is sued in their official capacity. The Sioux City Community School District Board delegates authority to Superintendent EARLEYWINE, school principals, and other school executives to enforce provisions of SF 496. Together with Superintendent EARLEYWINE, Defendants GREENWELL, EHMCKE, GEORGE, LEE,

MEYERS, MICHAELSON, and MILLER are referred to as "Sioux City Community School District Defendants."

30.     Defendants KATHERINE HOWSARE, RACHEL KENT, JENNY MEADE, JASON MENKE, JOSH VAN RYSWYK, CARISSA WILLIAMS, and MARGARET YOUNG are members of the Urbandale Community School Board. These defendants are responsible for the enactment and oversight of all policies in the Urbandale Community School District, including those challenged here. Each Urbandale Board Defendant is sued in their official capacity. The Urbandale Community School Board delegates authority to Superintendent DACA, school principals, and other school executives to enforce provisions of SF 496. Together with Superintendent DACA, Defendants HOWSARE, KENT, MEADE, MENKE, RYSWYK, WILLIAMS, and YOUNG are referred to as "Urbandale Community School District Defendants."

31.     Defendants JONATHAN COX, JESSE KNIGHT, ASTOR WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, and KRYSTAL MADLOCK, are members of the Waterloo Community School Board. These defendants are responsible for the enactment and oversight of all policies in the Waterloo Community School District, including those challenged here. Each Waterloo Board Defendant is sued in their official capacity. The Waterloo Community School Board delegates authority to Superintendent SMITH, school principals, and other school executives to enforce provisions of SF 496. Together with Superintendent SMITH, Defendants COX, KNIGHT, WILLIAMS, SCHMITT, MILLS, EWING, and MADLOCK are referred to as "Waterloo Community School District Defendants."

32.     Defendants JEFF HICKS, MICHAEL ANDRESKI, ELIZABETH LARSON, LILA P. MONTOYA STARR, FANNETTE ELLIOTT, JILL CATON JOHNSON, and ANADELIA MORGAN are members of the West Des Moines Community Schools Board. These

defendants are responsible for the enactment and oversight of all policies in the West Des Moines Community Schools district, including those challenged here. Each West Des Moines Community Schools Board Defendant is sued in their official capacity. The West Des Moines Community School Board delegates authority to Superintendent ADAMS, school principals, and other school executives to enforce provisions of SF 496. Together with Superintendent ADAMS, Defendants HICKS, ANDRESKI, LARSON, MONTOYA STARR, ELLIOTT, JOHNSON, AND MORGAN are referred to as "West Des Moines Community Schools Defendants."

33.     Defendants MOLLY ABRAHAM, SHAWN EYESTONE, CHARLIE EASTHAM, JAYNE FINCH, RUTHINA MALONE, MITCH LINGO, LISA WILLIAMS, DAN GREENWELL, LANCE EHMCKE, JAN GEORGE, TREYLA LEE, JOHN MEYERS, BOB MICHAELSON,  EARL MILLER, KATHERINE HOWSARE, RACHEL KENT, JENNY MEADE, JASON MENKE, JOSH VAN RYSWYK, CARISSA WILLIAMS, MARGARET YOUNG, JONATHAN COX, JESSE KNIGHT, ASTOR WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, KRYSTAL MADLOCK, JEFF HICKS, MICHAEL ANDRESKI, ELIZABETH LARSON, LILA P. MONTOYA STARR, FANNETTE ELLIOTT, JILL CATON JOHNSON, and ANADELIA MORGAN are referred to collectively as the "School Board Member Defendants."

34.     The State Defendants, the Superintendent Defendants, and the School Board Member Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment. Defendants are therefore liable for their violations of Plaintiffs' First Amendment and Equal Protection rights and violation of the Equal Access Act under 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

### Statutory Background

35.    SF 496 has altered the landscape for Iowa schools and students through its unconstitutional and discriminatory provisions.

36.    SF 496, as a whole, in its intent, purpose, and effect, is designed to and is accomplishing the silencing and marginalization of students, particularly LGBTQ+ students.

37.    Plaintiffs highlight three particular provisions of SF 496 that have caused and will continue to cause the most damage: those relating to the content of school libraries, those relating to the discussion of gender identity or sexual orientation, and those requiring the reporting of students expressing a wish for affirmation in their gender identity.

### The Library Restriction

38.    SF 496 includes multiple provisions that impact and restrict the availability of books and other materials in Iowa schools.

39.    Of particular note is the provision of SF 496 that provides: "Each school district shall establish a kindergarten through grade twelve library program that is consistent with section 280.6 and with the educational standards established in this section, contains only age-appropriate materials, and supports the student achievement goals of the total school curriculum." SF 496, Div. I, § 2 (codified at Iowa Code § 256.11(9)(*a*)(2)).

40.    Prior to SF 496, Iowa Code used the term "age appropriate" only in reference to health class. The term, which has a common understanding of meaning suitable for a particular age or age group, was defined separately as "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." Iowa Code § 279.50(10)(*a*).

41.     Rather than relying upon the ordinary understanding or existing definition in Iowa Code, SF 496 created a new definition, which begins by reiterating the above, but then includes an express exception: "Age-appropriate" does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17." SF 496, Div. I, § 4 (codified at Iowa Code § 256.11(19)(*a*)(1).

42.     As noted, the term "sex act" is separately defined in Iowa's criminal law, alongside the term "sexual activity"; specifically, for purposes of offenses such as lascivious conduct. *See* Iowa Code § 702.17. The criminal law defines these terms as "any sexual contact between two or more persons by any of the following," before listing six examples of qualifying contact between two or more persons' various body parts. *See id.*

43.     In short, these provisions of SF 496 obligate Iowa schools to remove any material that includes a description or depiction of a sex act. These provisions of SF 496 have been referred to as "book bans." Hereinafter, this will be referred to as the "Library Restriction" of SF 496.

44.     Most terms within the Library Restriction are undefined.

45.     The term "library program" itself has no separate definition within SF 496 or the Iowa Code. The term has been reasonably understood in various Iowa school districts as the entire offering of books within the school for student access, including those within a teacher's classroom; a separately designated space within each school for the storage, display, and student access of books and other materials; an arrangement with a local community library to provide student access during school hours to the books and materials available; or even a "Little Free Library" consisting of a container of books freely donated and removed by students located on or near school grounds.

14

46.    The term "materials" is not given a definition, either. In context with the word "library," some school districts have reasonably understood it to include books, periodicals, or other examples of a tangible, written word. However, the Library Restriction does not give any indication as to its potential application to portable digital media, such as audiobooks or CDs, nor as to publications and other information—or "materials"—available on computers provided in school libraries for student access.

47.    Crucially, the Library Restriction fails to define what constitutes a "description or visual depiction."  Whether a word, collection of words, or image "describes" or "depicts" something is inherently a subjective inquiry; only the reader or viewer of the material receives the mental image created by the description or depiction, influenced by their own understanding and experiences.

48.    The Library Restriction does not, for example, provide qualifying or quantifying language that would address how specific a description or depiction must be, how frequent such descriptions or depictions must occur within a work, or how explicitly they must reveal to the recipient of their message that they are referencing the occurrence—real or fictional—of a "sex act." Whether a description or depiction may be offensive or benign to the reader is immaterial to its removal.

49.    Given the creative medium of expression it seeks to regulate, the Library Restriction noticeably declines to include any authorization for a school or school employee to consider the intended effect of a material, such as whether it appeals to a prurient interest, meaning a material containing any description or depiction, even if not intended to evoke sexual excitement in the reader, must automatically be removed.

50.    Similarly, the Library Restriction declines to authorize those applying it to consider the merit or quality of the material as a whole. Any isolated description or depiction of a sex act mandates the material's removal from the library program, regardless of whether the work is considered a historic or modern-day classic, an essential piece of reading for a college preparatory class, or expressing a message of support or inclusion of particular relevance and importance to its intended audience.

51.    Nor does the Library Restriction allow those applying it to consider the grade level or levels to which the material is made available. Students in grades 11 and 12 are limited in their access to books in the same way as a student in kindergarten.

52.    The Library Restriction contains a single exception from its scope: compliance with Iowa Code § 280.6, which states, "Religious books such as the Bible, the Torah, and the Koran shall not be excluded from any public school or institution in the state." Accordingly, the Library Restriction permits such religious books regardless of whether they include a description or depiction of a sex act. SF 496, Div. I, § 2 (Iowa Code § 256.11(9)(a)(1)); *see also* Iowa Code § 280.6.

53.    SF 496 enforces compliance with the Library Restriction mainly through a newly created system of investigation and discipline. SF 496 charges the Department of Education with investigating library programs in Iowa schools for potential violations of the Library Restriction and, upon finding a violation, with issuing progressively severe disciplinary action—up to revocation of an educator's license and even loss of school accreditation. SF 496, Div. I, § 2 (codified at Iowa Code § 256.11(9)(*a*)(3)(a)–(b)).

54.    SF 496 also encourages third party monitoring of schools' and school employees' compliance with the Library Restriction, by requiring the online publication of all books made

16

available to students in the school district and authorizing anonymous requests for removal of any such book or any other "book, article, outline, handout, video, or other educational material that is available to students." SF 496, Div. II, § 13 (codified at Iowa Code § 279.77(3), (4)).

55.    Prior to the Library Restriction, the books and materials within Iowa schools were selected, in the case of separately identified school library spaces, by qualified teacher–librarians applying their expertise to select and maintain an appropriate collection of books and materials of benefit to the students, and the students' education, in the applicable building. Individual teachers also maintained typically smaller collections of books and materials relevant to their students' coursework or otherwise suitable for the students accessing their classrooms. These decisions were, in either case, subject to the oversight of the local school board, which is authorized to hear and decide objections to the inclusion of books and materials.

56.    Since the Library Restriction was enacted, there has been a statewide culling of books and materials available in Iowa schools, whether in designated school libraries or in individual teacher classrooms. The number of books removed is estimated to be at least around 3,400, a figure that is likely underreported as many schools quietly remove books without publicizing having done so. Iowa students have thus lost access to untold quantities of information that had otherwise been carefully selected for them as suitable for their age and educational development.

**The Gender Identity/Sexual Orientation Prohibition**

57.    SF 496 includes a sweeping section titled, "Sexual orientation and gender identity—prohibited instruction," that forbids any mention of sexual orientation or gender identity from kindergarten through the sixth grade, in or outside of the classroom. Specifically, the law prohibits school districts from providing "any program, curriculum, test, survey, questionnaire,

17

promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." SF 496, Div. II, § 16 (Iowa Code § 279.80(1)-(2)). This provision of SF 496 has been referred to as a "don't say gay or trans" law. Hereinafter, this provision of SF 496 will be referred to as the Gender Identity/Sexual Orientation Prohibition, or "GISO Prohibition."

58.    Unlike the Library Restriction, the GISO Prohibition does not include an exception for human growth and development instruction, i.e., health class. *Id*. § 2 (Iowa Code § 256.11(2)-(3)); SF 496, Div. II, § 9 (Iowa Code § 279.50(1), (1A)). The seven separate prohibited types of speech under the GISO Prohibition—any program, curriculum, test, survey, questionnaire, promotion, or instruction—taken together would encompass all activities remotely associated with a school.

59.    By using these terms without separate definition, elaboration, or other reference, the GISO Prohibition fails to set any limits or bounds on the circumstances to which it applies, such that its restrictions conceivably apply to:

    a.   with respect to "program": in-class and out-of-class activities, coursework, school libraries, extracurricular groups, school performances, sports teams, bathrooms, after-school events, field trips, or any other offering or activity that may conceivably occur on or off school grounds if associated with the school;

    b.   with respect to "curriculum": the courses offered, the assignments or projects given, students' self-directed work or the presentation of their work in class, or an educator's statements or guidance in class;

    c.   with respect to "survey": formalized surveys such as the Iowa Youth Survey or the CDC's Youth Risk Behavior Survey, or general questions posed to or

assessments taken of a student or group of students (nor whether a "survey" holds a separate meaning from "questionnaire" or "test");

d.  with respect to "promotion": displays in school hallways or classrooms, a display of books or other materials, in-class reading or discussion, educators' self-identification, acknowledgement or affirmance of students, extracurricular groups or events, or any other speech, act, or symbol that may be construed as "promoting" a prohibited concept; and,

e.  with respect to "instruction": a lecture given to a seated class, discussions with students on lessons or their ideas or general wellbeing, discussions between students and educators to form a positive relationship to facilitate class participation, or even the permission of a student's own speech or expressive conduct in or out of class.

60.    As shown by this non-exhaustive list of potential circumstances to which the GISO Prohibition, by its use of seven undefined terms, may apply, the GISO Prohibition makes no distinction based upon whether the activity is mandatory or permissive, curricular or extracurricular. The GISO Prohibitions use of such an expansive list indicates instead that it is intended to apply to all.

61.    Compounding this expansive list of circumstances to which it may apply, the GISO Prohibition uses a phrase that must ordinarily be given a very permissive meaning: "relating to."

62.    Accordingly, the GISO Prohibition is violated if an activity falling within a listed circumstance has merely a relation with or nexus to the prohibited concepts, without regard for the closeness of that link or the intention of the persons engaging in the activity.

63.    The concepts prohibited by the GISO Prohibition are "gender identity" and "sexual orientation." The GISO Prohibition adopts the definition given these terms in the Iowa Civil Rights Act; as to "gender identity": "a gender-related identity of a person, regardless of the person's assigned sex at birth"; and, as to "sexual orientation": "actual or perceived heterosexuality, homosexuality, or bisexuality." The GISO Prohibition does not, on its face, distinguish between LGBTQ+ identities and orientations, and cisgender identities and heterosexual orientations. This textual failing creates inconsistencies with other Iowa statutes recently passed by the legislature, including a requirement that sports teams be designated by gender and prohibits participation in girls teams based on the student's sex assigned at birth (*see* Iowa Code § 261I.2(1)(*a*)–(*b*)); as well as a "bathroom bill" that prohibits access to restrooms, changing areas, overnight accommodations, and other spaces based upon the student's sex assigned at birth (*see* Iowa Code § 280.33(1)–(2)).

64.    Notwithstanding these otherwise neutral definitions of gender identity and sexual orientation, State Defendants have taken the position in this litigation that an interpretation of the GISO Prohibition that would include within its scope cisgender identities and heterosexual orientations would be absurd. State Defendants have articulated an interpretation of the GISO Prohibition that applies only to LGBTQ+ identities and orientations, and subjects only the concepts of non-cisgender identity and non-heterosexual orientation to prohibition. For example, in giving an example of "mandatory" instruction that would violate the GISO Prohibition, State Defendants noted an in-class reading of a book featuring gay or transgender characters.

65.    The GISO Prohibition also includes complications in application and enforcement due to the grade levels chosen. Iowa schools do not uniformly, if even generally, designate buildings solely for use by kindergarten through sixth grade; rather, it is common for sixth graders to attend either middle schools or junior highs along with students in grades seven or eight, thus

20

subjecting those students otherwise falling outside its restrictions to restraints on their activity to ensure compliance as to the sixth graders in their presence.

66.     Unlike the Library Restriction, the GISO Prohibition includes no separately described enforcement mechanism. Instead, SF 496 makes its obligations a condition of a school district's accreditation. SF 496, Div. I, § 2 (codified at Iowa Code § 256.11(2)(3)).

67.     Prior to the GISO Prohibition, many Iowa schools engaged in proactive efforts to support the inclusion, affirmation, and safety of students who were LGBTQ+ themselves or came from families with LGBTQ+ members. Among these efforts were the display of symbols or messages of support for the LGBTQ+ community, sponsoring and facilitating LGBTQ+ student groups, providing students with factual information on transgender and nonbinary gender identities in response to or to protect against anti-transgender bullying and harassment, ensuring the availability of books and materials that included LGBTQ+ representation alongside traditionally represented straight and cisgender characters, checking in with students to ensure they felt included and represented in class, and allowing student speech and conduct, including the preparation and presentation of classroom projects or assignments, on issues relating to LGBTQ+ identities, orientations, and rights.

68.     Since the GISO Prohibition, these Iowa schools have eliminated or rolled back all such efforts and have instead taken steps to ensure issues relating to LGBTQ+ identities and orientations are not acknowledged or addressed in the school or school-related environments. In addition to direct prohibitions on student speech, conduct, and association, this curtailment of LGBTQ+ inclusion and its consequent message of LGBTQ+ exclusion has chilled students and forced them to self-censor on topics related to their or their friends' and family members' LGBTQ+ identity or orientation. In addition to the negative consequences this restriction on expression and

deprivation of information has had on these students' educational outcomes and emotional wellbeing, it has further put LGBTQ+ students at increased risk of anti-LGBTQ+ bullying and harassment.

**The Gender Identity Notification Provision**

69.     Finally, SF 496 includes a Gender Identity Notification Provision, which has been referred to as a "forced outing" provision. The Gender Identity Notification Provision forces school officials to notify a student's parent or guardian whenever a student asks school officials to respect the student's gender identity, even when the school has reason to believe that doing so will result in imminent harm, homelessness, or abuse of the student at the hands of their parents or guardians. SF 496, Div. II, § 14 (Iowa Code § 279.78(3)).

70.     Specifically, the Gender Identity Notification Provision states: "If a student . . . requests an accommodation that is intended to affirm the student's gender identity from a licensed practitioner employed by the school district," the licensed practitioner must "report the student's request to an administrator," who then "shall report the student's request to the student's parent or guardian." *Id*.

71.     The Gender Identity Notification Provision includes only one example of what might qualify as a requested "accommodation," noting that this term is "including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." *Id*. As the example of a request for gender-affirming names or pronouns is only one of the circumstances "includ[ed]" within its scope, the Gender Identity Notification Provision leaves significant room for other reportable requests.

72.     The Gender Identity Notification Provision does not include limiting language that would exempt from its reporting obligation common expressions of a transgender or gender nonconforming student's gender identity, such as organizing a GSA and participating openly in its meetings and events, and thus actions can necessitate a report home.

73.     As a GSA's mission is to support free expression of LGBTQ+ identity and inclusion of LGBTQ+ persons by providing students with a safe environment to freely express themselves, find support and community, access resources, and advocate for appropriate changes to school policy, the Gender Identity Notification Provision thus necessarily impacts GSAs' operations in ways inapplicable to other student-led, noncurricular groups, in addition to its impact on the students themselves.

74.     Furthermore, the Gender Identity Notification Provision contains no exception for incidents of anti-LGBTQ bullying or harassment. Under the Gender Identity Notification Provision, a student who reports being bullied or harassed because of their transgender or gender nonconforming status must also expect they will be outed to their parents or guardians.

75.     Similarly, the Gender Identity Notification Provision contains no exception for disclosures made while the student is receiving school-provided mental health counseling or social services, regardless of the student's expectation of confidentiality or, indeed, the psychologist's, counselor's, social worker's, or nurse's own ethical obligations. A student who privately reveals their gender identity to a trusted professional may be blindsided when that professional breaks confidentiality to initiate a mandated report to the student's parents or guardians.

76.     The Gender Identity Notification Provision requires that school districts, including Defendant School Districts, their administrators, and their employees, make this notification to parents and guardians regardless of the student's wishes or plans for sharing this information with

their parents or guardians; regardless of whether a student will be rendered unsafe as a result; regardless of whether a student may have a reasonable expectation of confidentiality when speaking with a school psychologist, counselor, social worker, or nurse; and regardless of ethical obligations these professionals may have to protect confidentiality. The law contains no process for determining whether the student's safety or wellbeing will be threatened as result of such a disclosure. It also does not contain any exception allowing for a school employee to avoid parental notification when the employee already knows that such notification imminently will endanger the student.

77.     The enforcement mechanism for the Gender Identity Notification Provision is similar to the Library Restriction, in that an investigation and disciplinary procedure specific to this provision has been added by SF 496. In short, the Department of Education is required to enforce this mandate by investigating potential violations and imposing disciplinary action ranging from written warnings to proceedings that could result in loss of licensure or certification.  (Iowa Code § 279.78(4)). As is the case with any violation of state law, upon disciplinary action, superintendents and school boards have the ability to terminate a teacher. *See* Iowa Code § 279.27(1)–(2).

78.     Prior to the Gender Identity Notification Provision, Iowa educators, based on their training, experience, and the positive impact apparent, would endeavor to form trusting relationships with their students. With this trust in place, Iowa educators had greater insight into a student's emotional wellbeing, including their home situation, and consequently a greater opportunity to address the challenges a student was facing in their academic performance. This relationship further allowed educators to fulfill their obligations as mandatory reporters, as students felt comfortable seeking out these trusted adults for help with abuse at the hands of their

parents or guardians. Separately, Iowa educators facilitated LGBTQ+ student groups and allowed open discussion on issues relating to gender identity within them, to create a safe space for students to engage with each other and form support structures in the school environment. Facilitating such groups further allowed Iowa educators to head off unsafe or inappropriate behavior, and additionally provided the opportunity to encourage and provide guidance to transgender or gender nonconforming students in disclosing their gender identity at home.

79.    Since the Gender Identity Notification Provision, Iowa educators have been reluctant to form these bonds with students, given the risk that a student from a non-affirming home environment could feel safe—and then betrayed—in revealing their gender identity to a trusted educator. Students similarly have been reluctant to ask questions or share their struggles with gender identity, effectively placing a wall between them and those with the obligation to report them. Meanwhile, students from homes that are affirming of their gender identity have refrained from engaging with or encouraging teacher engagement with fellow students believed to be struggling with their gender identity in a non-affirming home environment, not wanting to put either the student at risk of abuse at home or the educator at risk of discipline in failing to make a required report. The Gender Identity Notification Requirement has thus forced students to engage in self-censorship, exposed them to domestic violence and homelessness, prevented them from forming or continuing a trusted a relationship with an adult teacher or advisor, increased the likelihood of isolation and ostracization by peers, and undermined any expectation that they may have had that their school environment would be a safe space for learning where teachers could help protect them from bullying or abuse.

**Rulemaking and Policymaking**

80.     On November 15, 2023, Defendant ISBE issued proposed rules implementing SF 496, including new enforcement mechanisms the law requires. Although the rulemaking purports to clarify aspects of SF 496, the proposed rules raise new questions and do not address the vagueness of the statutory language in any meaningful way.

81.     For example, the proposed rules purport to limit the definition of "age-appropriate," which the statute defines as excluding "any material with descriptions or visual depictions of a sex act," by adding, "A reference or mention of a sex act in a way that does not describe or visually depict a sex act as defined in that section is not included in the previous sentence." Iowa State Board of Education, Notice of Intended Action, Item 2 (amending Iowa Admin. Code r. 281-12.2) (hereinafter, "Proposed Rules").

82.     This proposed rule does not clarify when a "reference" or "mention of a sex act" does or does not qualify as "describ[ing]" a "sex act."

83.     This proposed rule also does not explain whether enforcement turns on the brevity of the description, whether the description is merely implicit, the degree to which the description plays a role in a broader narrative, whether the average person would find the reference to appeal to the prurient interest, or take into account the literary, artistic, political, or scientific value of the work.

84.     The proposed rules modify the enforcement provisions of SF 496's Library Restriction by specifying that Defendant IDOE "may exercise enforcement discretion if any violation is voluntarily and permanently corrected prior to the department making a determination of a violation." Proposed Rules, Item 4 (amending Iowa Admin. Code r. 281-12.3(12)(d)(3)).

26

85.    This enforcement "discretion," however, is merely an inducement to greater curtailment of expression, inviting school districts to remove books in response to even a hint of an anonymous challenge, without ever having determined whether the specific text meets the statute.

86.    With respect to SF 496's GISO Prohibition, the proposed rules add: "In monitoring and enforcing this subrule, the department will not conclude that a neutral statement regarding sexual orientation or gender identity violates [the law]." Proposed Rules, Item 5 (amending Iowa Admin. Code r. 281-12.3(15)).

87.    Far from clarifying the statute, this proposed rule prompts further questions, highlights, and doubles down on the impermissibly content-based and viewpoint-based nature of SF 496's prohibitions. For example, what qualifies as a *neutral* statement about sexual orientation or gender identity? Would a GSA advisor violate the rule if she allowed sixth grade GSA members to meet to discuss the need for greater LGBTQ+ civil rights, but comply if students instead mentioned their sexual orientations incidentally while introducing themselves and discussed the lunch menu? Does a book in a fourth-grade classroom violate the rule if it portrays a child's same-sex parents as loving and attentive, but comply if the reference to gay parents is merely an aside?[3]

88.    The proposed rules also fail to provide clarity to school districts with mixed K-12 library programs or that use the local community library for their students. A proposed rule simply instructs these districts to "exercise reasonable, physical, administrative, and technological controls to ensure that materials accessible to students have access to age-appropriate materials

---

[3] Tom Barton and Caleb McCullough, *Iowa Board of Education advances rules on school library restrictions*, The Gazette (Nov. 15, 2023), https://bit.ly/4eNRjTN ("The rules allow for books to have 'neutral' mentions of LGBTQ characters, [Thomas] Mayes [General Counsel for the Iowa Department of Education] said. This includes an 'observation regarding a book character's sexual orientation or gender identity that stops short of being a promotion.'").

based on their age and grade." Proposed Rules, Item 4 (amending Iowa Admin. Code r. 281-12.3(12)(d)(4)).

89.     The proposed rules also purport to explain school officials' obligation under SF 496's Gender Identity Notification Provision: "Concerning a student's request to use a name that is different from the name on the student's registration forms or records, that request is governed by this subrule only if the request is an accommodation intended to affirm a student's gender identity." Proposed Rules, Item 5 (amending Iowa Admin. Code r. 281-12.3(16)(b)).

90.     This proposed subrule would require licensed practitioners to interrogate every student as to the purpose of their preferred name or nickname, imposing unique burdens on gender-nonconforming and transgender students forced to justify their own names. For example, under this proposed subrule, school officials may acquiesce to a student's request to use "Bob" instead of "Robert," without triggering the reporting requirement, but they may have to report Samantha for seeking to be referred to as "Sam" and would be required to report Susan for seeking to be referred to as "Simon."

91.     Alternatively, a school district might reason that "gender identity," as defined by the Iowa Civil Rights Act and incorporated into SF 496, includes cisgender identities, and any nickname might be understood to confirm a student's gender identity, whether that is transgender, nonbinary, gender non-conforming, or cisgender. Accordingly, Thomas's request to go by Tom[4] would affirm his identity as a cisgender male.

92.     Unless an anti-LGBTQ+ intent is read into the law, the proposed subrule does nothing to clarify the scope of the Gender Identity Notification Provision. Further, the proposed

---

[4] *See* Barton and McCullough, *supra* note 5 ("For example, 'Thomas to Tom' is fine, Mayes said.").

subrule does not address the failure of the statute to identify other contexts and content that might trigger reporting. The proposed subrule thus continues to encourage *ad hoc* implementation of the forced outing provision to any circumstance involving the expression of gender identity, including in GSA meetings and events.

93.     The President of the Iowa State Education Association summarized the proposed rules as follows:

> The proposed rules do nothing to address the chilling effect the law created. So far, hundreds of book titles have been pulled from shelves across the state, and we've created ridiculous amounts of paperwork over topics like student nicknames. Public education professionals will still continue to spend valuable instructional time trying to meet vague state mandates.[5]

94.     During a preliminary injunction of the Library Restriction and GISO Prohibition provisions of SF 496, State Defendants completed approval of the proposed rules on the Gender Identity Notification Provision as described.  *See* Iowa Admin. Bulletin, *Education Department [281] Adopted and Filed Rulemaking related to general accreditation standards*, ARC 8133C, ARC 8147C, at 384–87 (July 24, 2024), https://tinyurl.com/bdwatev4.

95.     Since the preliminary injunction on the Library Restriction and GISO Prohibition have been vacated, State Defendants have expressed an intent to resume the rulemaking process with respect to Library Restriction and GISO Prohibition.

96.     State Defendants have given no indication that the Proposed Rules will change. Instead, State Defendants appear to be proceeding with the Proposed Rules on the Library Restriction and GISO Prohibition as previously drafted. Indeed, the Iowa Administrative Bulletin of October 16, 2024, includes a regulatory analysis of the same Proposed Rules, with the same

---

[5]  Barton and McCullough, *supra* note 5 (quoting Mike Beranek).

language, as previously published relating to the Library Restriction and GISO Prohibition. *See* Iowa Admin. Bulletin, *Education Department [281] Regulatory Analysis*, ARC 8245C, at 3190 (Oct. 16, 2024), https://tinyurl.com/h5pns6ac. A public hearing is scheduled for November 5, 2024—the day of the 2024 General Election—from 8:00 to 9:30 a.m. *Id.*

97.    In an effort to implement and maintain compliance with SF 496, School Board Member Defendants have separately adopted various new and revised policies intended to address the Library Restriction, GISO Prohibition, and Gender Identity Notification Provision.

98.    Iowa City Community School District Defendants have, since SF 496 was enacted, reviewed and updated, or are presently reviewing, policies entitled LGBTQ+ Guideline (102.G1), Anti-Bullying/Anti-Harassment (104), Title IX-Discrimination and Harassment Based on Sex Prohibited (106), Student Appearance (502.1), Student Expression and Student Publication (502.3), Student Expression and Student Publication Code (502.3R1), Student Disclosure of Identity (503.7), Report of Student Disclosure of Identity (503.7E1), Request to Update Student Identity (503.7E2), Student Organizations (504.2), Student Library Circulation Records (506.4), Multicultural/Gender Fair Education (603.4), and Objection to Instructional and Library Materials (605.3), as well as others impacted by or applying the provisions of SF 496.

99.    Sioux City Community School District Defendants have, since SF 496 was enacted, reviewed and updated policies entitled Student Library Circulation Records (506.4) and Reconsideration of Library Materials (604.72), as well as others impacted by or applying the provisions of SF 496.

100.    Urbandale Community School District Defendants have, since SF 496 was enacted, reviewed and updated policies entitled Student Appearance (0541), Student Expressions (0543), Student Expressions – Regulations and Procedures for Distribution of Nonschool Publications by

Students (0543-R(1)), Transgender and Students Nonconforming to Gender Role Stereotypes (0548), Student Disclosure of Identity (0579), and Objection to Instructional or Library Materials (0631C), as well as others impacted by or applying the provisions of SF 496.

101.    Waterloo Community School District Defendants have, since SF 496 was enacted, reviewed and updated policies entitled Student Disclosure of Identification (503.7), Report of Student Disclosure of Identity (503.7E1), Request to Update Student Identity (503.7E2), Equal Access to School Facilities Student Meetings (505.1), Freedom of Expression (505.12), and Objection to Instructional and Library Materials (605.35), as well as others impacted by or applying the provisions of SF 496.

102.    West Des Moines Community Schools Defendants have, since SF 496 was enacted, reviewed and updated policies entitled Discrimination and Harassment based on Sex Prohibited (106), Multicultural/Gender Fair Education (603.07), and Challenged Materials – Instructional Materials and Classroom Libraries (605.06), as well as others impacted by or applying the provisions of SF 496.

103.    School District Defendants' policies have, as with State Defendants' rulemaking, failed to resolve the inherent vagueness of the Library Restriction and GISO Prohibition, failed to protect the First Amendment rights of School District Defendants' students infringed upon by the Library Restriction, GISO Prohibition, and Gender Identity Notification Provision, and, in many cases, rolled back preexisting protections for LGBTQ+ students in an effort to apply and comply with these provisions of SF 496.

## Legislative History of SF 496

104.    The landscape of Iowa law before the passage of SF 496, along with the law's legislative history, underscore that SF 496 was not enacted for any legitimate purpose and

demonstrate that SF 496 is an attempt to target LGBTQ+ students and prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion in Iowa schools.

105.    Prior to SF 496, Iowa law contained numerous protections for students that protected them from exposure to harmful materials in school.

106.    Iowa law prohibited the dissemination of obscene material to minors and the admission of minors to premises where obscene material is exhibited. *See* Iowa Code § 728.2, 728.3.

107.    Iowa law also provided for the creation and oversight of appropriate, supportive school library programs. *See* 281 Iowa Admin. Code r. 12.3(12)(*a*)–(*c*).

108.    And Iowa law required each school district to adopt policies to address the selection and reconsideration of school libraries. *See* 281 Iowa Admin. Code r. 12.3(12)(*c*).

109.    Despite these pre-existing protections for Iowa students, the 2022 legislative session opened with comments from Iowa State Senator Jake Chapman accusing "some" teachers of a "sinister agenda" to "normalize sexually deviant behavior" and describing an "attack on our children [that] is no longer hidden."[6]

110.    Shortly thereafter, Iowa Governor Kim Reynolds appeared for an interview and was asked about Senator Chapman's comments. Governor Reynolds responded, "If you're talking about, do I think inappropriate things are being displayed in libraries, and in classrooms, across the state? From what I've heard from parents, I absolutely agree with that."[7]

---

[6] *Iowa senator criticized for comments about Iowa teachers,* KCCI 8 Des Moines (updated Jan. 11, 2022, 6:22 PM CST), https://tinyurl.com/4mszm4za.

[7] James Stratton, *Iowa Gov: "I don't think that's appropriate': Context and controversy behind book challenged in Iowa*, KCCI 8 Des Moines (updated Jan. 24, 2022, 10:21 AM CST https://tinyurl.com/2zah6wn2.

111.    During the interview, Governor Reynolds proceeded to read a passage from *All Boys Aren't Blue*, a young adult memoir by writer and LGBTQ+ activist George M. Johnson, calling it "rated R" and suggesting it was inappropriate to teach as part of the curriculum for K-12 education and include in school libraries. At the time, the book was subject to challenge in certain school districts.

112.    Legislative action directed at LGBTQ+ expression in Iowa public schools became a priority of Iowa Governor Kim Reynolds for the 2023 legislative session.

113.    On February 2, 2023, Governor Reynolds promoted legislation targeting LGBTQ+ students and their identities at a town hall meeting hosted by Moms for Liberty[8] and the Leadership Institute.[9] The meeting began with an invocation praying for strength in "the battle taking place for our children's minds."[10]

114.    At the meeting, Governor Reynolds described her goal "to restore sanity" through the legislation, explaining there exists an "extreme and extremely loud minority," trying to "indoctrinate our children," that thinks "pornographic library books are education."[11]

115.    A week later, on February 9, 2023, Governor Reynolds's legislation was introduced in the Iowa Senate as Senate Study Bill 1145. An identical House Study Bill was introduced on

---

[8]  The Southern Poverty Law Center (SPLC) describes Moms for Liberty as "a far-right organization that engages in anti-student inclusion activities and self-identifies as part of the modern parental rights movement." SPLC, *Moms for Liberty*, https://tinyurl.com/3v2eczw3 (accessed Oct. 17, 2024). According SPLC, it is an extremist group that "opposes LGBTQ+ and racially inclusive school curriculum, and has advocated [for] book[] bans." *Id.*

[9]  The Leadership Institute describes its mission as "to increase the number and effectiveness of conservative activists and leaders in the public policy process." Leadership Institute, *Leadership Institute Mission*, https://leadershipinstitute.org/about/ (accessed Oct. 17, 2024).

[10]  Moms for Liberty, *Giving Parents a Voice Townhall – Iowa,* at 7:54, YouTube (Feb. 2, 2023), https://tinyurl.com/4nwxyxxf.

[11]  *Id.* at 19:47, 19:54, 21:14.

February 28, 2023.

116.    During the session, the bill emerged from House and Senate committees as Senate File 496, and underwent substantial amendments and refinements, which reinforced its anti-LGBTQ+ priorities and goals.

117.    The initial bill proposed a notification and right to opt out of "any activity or instruction that involves obscene material or sexually explicit material." S.S.B. 1145, § 16; H.S.B. 222, § 16. To that end, the initial version also proposed the creation of a "comprehensive list" of any book removed by a school board of directors. S.S.B. 1145, §§ 1, 14; H.S.B. 222, §§ 1, 14. The bill defined those restricted materials by (a) the definition of obscenity in existing Iowa Code,[12] and (b) a new, narrow definition of "sexually explicit" materials.[13] In order for material to be sexually explicit, it had to not only be "offensive" and "prurient," but also "lack[] serious literary, artistic, political, or scientific value as to minors."[14] The final bill jettisoned any reference to obscenity or that term's familiar factors—such as taking the work as a whole, judging it by contemporary community standards, or assessing its intended appeal—and abandoned the term "sexually explicit," opting instead for the blanket prohibition of materials that include *any*

---

[12]  *See* Iowa Code § 728.1(5) ("any material depicting or describing the genitals, sex acts, masturbation, excretory functions or sadomasochistic abuse which the average person, taking the material as a whole and applying contemporary community standards with respect to what is suitable material for minors, would find appeals to the prurient interest and is patently offensive; and the material, taken as a whole, lacks serious literary, scientific, political or artistic value").

[13]  "Sexually explicit" materials were defined as material that"(1) [t]aken as a whole with respect to minor children, the material appeals to the prurient interest in nudity, sex, or excretion," "(2) [t]he material depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minor children, a sex act or lewd exhibition of the genitals,"  and "(3) [t]aken as a whole, the material lacks serious literary, artistic, political, or scientific value as to minors," which would be deemed met "if the material contains material described in subparagraphs (1) and (2) when substantially similar material is readily available to minor children" without such material "but that conveys a substantially similar message or viewpoint." S.S.B. 1145, § 16.

[14]  *Id.*

"description or visual depiction of a sex act." Any attempt to limit the scope of the Library Restriction would be rejected, including the Iowa House's suggestion to prohibit only "graphic descriptions" of a sex act. Amendment H-1173 to S.F. 496, 90th Leg. Sess. Div. V § 10.19a(1) (as adopted by IA House, Apr. 4, 2023).

118.    Moreover, the final bill's Library Restriction was expressly amended to carve-out the Bible from the bill's effect. An Iowa Senator asked on the Senate floor whether a book containing "gang rape," "serial incest," and an "act of masturbation" would meet the bill's definition of "age appropriate." The Senate sponsor correctly identified the referenced book as the Bible,[15] and suggested that a school board that "decides to remove the Bible . . . might have to put up with the wrath of a few parents." After the inquiring senator noted that existing Iowa law actually prohibits the exclusion of the Bible from public schools, the bill was amended again to exclude religious texts from its scope.[16]

119.    In the initial bill, although the term "sexual activity" was present and had the same definition "sex act" does in the final bill (by reference to Iowa's criminal law), the term applied only to prohibit content in K-3 instruction.[17]

120.    The final bill's Library Restriction expanded the prohibition from grades K-3 (about ages 5-9) to all grades K-12 (ages 5-18), and redirected the use of the term "sex act" to ban

---

[15]*Senate Video (2023-03-22),* 90th IA S. Sess. 73rd Day at 6:35:39 PM, (Mar. 22, 2023), https://tinyurl.com/4dpsfzhh (quoting exchange between Sen. Quirmbach and Sen. Rozenboom); *see generally* Genesis 19:32-26, 38:8-9; Judges 19:24-29.

[16] S*ee* Iowa Code § 280.6 ("Religious books such as the Bible, the Torah, and the Koran shall not be excluded from any public school or institution in the state . . . .").

[17] S.S.B. 1145, § 13 (prohibiting any "program, curriculum, material, test, survey, questionnaire, activity, announcement, promotion, or instruction of any kind relating to gender identity or sexual activity to students in kindergarten through grade three" and defining "sexual activity" as "the same as defined in section 702.17").

library books and other materials.

121.    Similarly, although both the initial bill and final bill prohibit materials and instruction related to gender identity, that prohibition applied only to grades K-3 in the initial bill. And despite targeting gender identity from its inception, SF 496 did not expressly target sexual orientation. Instead, the initial bill only targeted only sexual "activity" related to K-3 instruction.

122.    The final bill's GISO Prohibition expanded the restriction on content related to gender identity to include grades 4-6 as well. The final bill also substituted in the term "sexual orientation" for "sexual activity," and like with gender identity, expanded the restriction from applying only to grades K-3 to applying to grades K-6.

123.    This legislative history shows a conflation of content concerning sexual activity and content related to LGBTQ+ identities and people. By conflating the two, the final bill sexualizes LGBTQ+ identities and people, portraying them as predatory, inappropriate for discussion in school, and unworthy of dignity, recognition, and respect. SF 496 communicates that LGBTQ+ children and adults are unspeakable and shameful, simply by virtue of who they are.

124.    Finally, in the initial version of the bill, the triggering event for the Gender Identity Notification Provision was an employee's "reasonabl[e] belie[f] that the minor child has expressed a gender identity that is different than the biological sex listed on the minor child's official birth certificate." S.S.B. 1145, § 16. After the bill's opponents criticized the potential reach and ambiguity in the language, the Senate sponsor countered, "We all know what we're talking about here."[18] The language was changed to trigger reporting on a student's "request" for "an accommodation."

---

[18] *Senate video (2023-03-22)*, supra note 17, at 6:46:42 PM (quoting IA Sen. Rozenboom).

125.    The final bill's Gender Identity Notification Provision also was amended to remove a safety measure. If the school determined that the notification "was likely to lead to a case of child abuse," the school was required to report its "safety concerns to the department of health and human services so that the department may determine whether the minor child is a child in need of assistance" under Iowa law, i.e., proceedings to determine whether the child should be removed from the home. S.S.B. 1145, § 16; *see generally* Iowa Code §§ 232.96A(1)–(17), .102(1)–(10). This apparent acknowledgment of the risks the legislation posed to children with parents or guardians that are not accepting or affirming of their identity ultimately was removed to ensure the severe consequences of reporting fall only upon the targeted students.

126.    Throughout the legislative process, legislators opposing the bill spoke out on what they saw as a "hateful"[19] bill "promoting ignorance and intolerance . . . about people who are different than themselves."[20] Others identified the bill as setting up "two tiers of kids in school: kids with a government approved identity or a government approved family, and kids who are forced to live in silent shadow," and predicted it would lead to "disruption, bullying, and prejudice."[21] On books, opponents saw the bill sending the "message that certain topics are taboo or shameful," even though "books that discuss sex can play a critical role in promoting empathy and understanding for those with different experiences and identities," effectively "den[ying] kids the opportunity to learn and grow."[22] Others noted the new definition of "age appropriate" would capture award-winning books that "have already been vetted from the Department of Ed. on

---

[19] *Senate video (2023-04-19), supra* note 2, at 6:34:12 PM (quoting IA Sen. Donahue).

[20] *Senate video (2023-03-22), supra* note 17, at 7:02:25 PM (quoting IA Sen. Donahue).

[21] *Id* at 6:16:40 PM, 6:18:28 PM (quoting IA Sen. Bennett).

[22] *Id* at 6:20:23 PM, 6:24:34 PM (quoting IA Sen. Celsi).

down."[23] The bill was criticized as "censoring what kids can and cannot do in school, and what they can and cannot learn."[24]

127.    Nevertheless, proponents maintained the bill was necessary, citing an unspecified "mountain of evidence that many Iowa libraries contain books that do provide sexually explicit and obscene pictures and narratives that many Iowa parents find objectionable."[25] Proponents also claimed that students have "come home with books that are literally pornography."[26] By way of example, one Iowa Senator identified *Gender Queer: A Memoir* by Maia Kobabe, an autobiographical graphic novel about the author's journey of self-identity as a nonbinary, asexual person, which the Senator described as "disgusting."[27]

128.    But SF 496 does not ban only *Gender Queer*, whose intended audience is teenagers, it also—on its face—bans books like *Melissa* by Alex Gino, which does not contain a "sex act" and has been removed and restricted pursuant the GISO Prohibition solely for telling the story of a transgender girl.

129.    Ultimately, however, proponents decided the bill was necessary "due to schools pushing wokism"[28] and because it is "wrong to push political agendas in the classroom."[29]

130.    On information and belief, when Governor Reynolds signed SF 496 into law, the

---

[23] *Id* at 6:55:18 PM, 6:56:59 PM (quoting IA Sen. Donahue).

[24] *Id* at 6:59:27 PM.

[25] *Id* at 7:16:12 PM (quoting IA Senator Rozenboom).

[26] *House video (2023-04-04)*, 90th IA H. Sess. 86th Day at 2:41:32 PM (quoting IA Rep. Wheeler), https://tinyurl.com/mt37v5vs.

[27] *Senate video (2023-04-19)*, *supra* note 1, at 6:55:15 PM, 6:57:03 PM (quoting IA Sen. Zaun).

[28] *House video (2023-04-04)*, *supra* note 28, at 1:57:34 PM (quoting IA Rep. Wheeler).

[29] *House video (2023-04-20)*, 90th IA H. Sess. 102nd Day at 2:37:17 PM (quoting IA Rep. Wheeler), https://tinyurl.com/39etthrn.

Governor reengaged the rhetoric she had expressed while promoting the bill, suggesting the law was necessary to prevent the "indoctrination" of students with "extreme ideas," despite Iowa's existing laws and regulations prohibiting the distribution of obscene materials to minors and ensuring age-appropriate instruction at school.

### SF 496 has Caused Direct Harm to Plaintiff Iowa Safe Schools
### and its Student and GSA Members

131.    IOWA SAFE SCHOOLS serves a network of chapter member GSAs, which are student-led organizations and noncurricular clubs within schools that focus on providing a safe space for LGBTQ+ youth, address anti-LGBTQ+ harassment and discrimination, promote inclusion, offer support to students, and educate people about sexual orientation and gender identity.

132.    IOWA SAFE SCHOOLS serves its member GSAs in multiple ways, providing guidance to members forming new GSAs and supporting their goals throughout the school year, including individualized support in on-site visits, workshops, connections to other network GSAs and access to several annual events, and written resources on issues relevant to operating a GSA and supporting and advocating for LGBTQ+ youth.

133.    IOWA SAFE SCHOOLS also serves individual student members and groups of students who are not yet members of a GSA, including by providing resources and consultation on forming GSAs, materials and victim service information regarding bullying, and all other benefits of the GSA Network, such as access to events and scholarship opportunities. These students are part of the IOWA SAFE SCHOOLS GSA network regardless of whether they are members of an active GSA. In other words, numerous GSAs and individual LGBTQ+ students throughout Iowa are members of IOWA SAFE SCHOOLS.

134.    SF 496 chills students from associating for the purpose of expressing themselves, advocating for equality for LGBTQ+ students, and providing mutual support and community.

135.    IOWA SAFE SCHOOLS serves at least 4,000 students, representing more than 100 member GSAs in school districts across the state.

136.    The law has caused school districts across the state to restrict the activities of member GSAs within IOWA SAFE SCHOOLS's GSA network and has forced some member GSAs to close altogether.

137.    School districts have prohibited IOWA SAFE SCHOOLS's member GSAs from displaying signs or promoting the club in classrooms or hallways where students younger than seventh graders may be present, even in schools that include eighth or ninth graders, and even though other noncurricular clubs are not subject to the same restrictions. The GISO Prohibition of SF 496 is cited as the source for this restriction. For example, the administration at Mount Vernon Middle School would not allow the school's GSA—an IOWA SAFE SCHOOLS member—to advertise in the public areas of hallways, such as on students' lockers, in areas where 5th and 6th grade students are able to see. On information and belief, no other noncurricular student organization at Mount Vernon Middle School, or any other school with mixed populations of students above and below 6th grade, was subject to this restriction.

138.    At other schools with students at or below 6th grade, the GISO Prohibition has forced them to close. For example, one advisor for a member GSA in the College Community School District informed an IOWA SAFE SCHOOLS staff person, "With us being a 5th/6th building, we will not be able to run our GSA this year due to the new legislation."

139.    Other advisors for IOWA SAFE SCHOOLS member GSAs have pointed to the law's Gender Identity Notification Provision as the cause of restrictions and/or closure of GSAs.

Students and faculty members alike are confused about what speech during a GSA meeting could trigger a report home, whether merely attending a meeting is sufficient, and how to handle other situations that may arise in an open group discussion. Faculty members who previously sponsored student-led GSA chapters now are reluctant to do so for fear of being required to out student members as a result of the law, forcing these chapter members of IOWA SAFE SCHOOLS to radically alter the way they conduct meetings, or even to close. For many member GSAs under SF 496, particularly those with student members who have not yet come out to their parents or guardians about their gender identity, the GSA cannot be a safe and open space if a teacher advisor is present, as that advisor's presence could put the students at risk of being outed before they are ready. As a result, these advisors must either withdraw from the GSA meetings and activities or decline to serve, in either event to the significant detriment of their GSA's members.

140.    For example, as a result of the Gender Identity Notification Provision, the administration at Mount Vernon Middle School has not allowed its GSA, a member of IOWA SAFE SCHOOLS's GSA network, to have a faculty sponsor present in the room during meetings. That prohibition caused the GSA's president, F.J., considerable difficulty in running the meetings. The presence of an adult authority figure in the room is important to the orderly conduct of a meeting full of teens and pre-teens, and F.J., then an eighth grader, struggled to keep the group focused on its mission of providing a supportive and inclusive space for students to share their experiences. On information and belief, no other student organization at Mount Vernon Middle School is subject to this restriction.

141.    At schools where an IOWA SAFE SCHOOLS member GSA has continued to meet with a faculty member present, SF 496's Gender Identity Notification Provision has prevented students who are not out to their parents or guardians from joining, reducing the membership of

41

the GSAs and thus interfering with the remaining GSA members' ability to meet their group goals. Although many individual student members of IOWA SAFE SCHOOLS are openly LGBTQ+ and out to their parents or guardians, others have not yet come out to their parents or guardians. Some student members of IOWA SAFE SCHOOLS who are not yet out to their parents or guardians participate in active member GSAs. But since SF 496 took effect, they do so only in a limited way, such as without disclosing their names and openly engaging in discussion when a faculty sponsor is in earshot for fear of being outed. These limitations impede the ability of student members of IOWA SAFE SCHOOLS to participate meaningfully in the GSA, frustrating the GSA's goals and lessening their fellow members' experience in the GSA. Other student members of IOWA SAFE SCHOOLS who are not out to their parents or guardians and who previously participated in a GSA no longer participate because they fear being outed. Due to SF 496, member GSAs of IOWA SAFE SCHOOLS have been forced to close or have otherwise been restricted in their ability to meet and conduct GSA activities on the same terms as other student-led, noncurricular groups.

142.    Before the passage of SF 496, Plaintiff A.C. attended meetings of the GSA at her school—a member GSA of IOWA SAFE SCHOOLS—as a third grader. The purpose of these meetings was to build community among the LGBTQ+ students as a result of SF 496's GISO Prohibition, Defendant IOWA CITY COMMUNITY SCHOOL DISTRICT ceased GSAs for kindergarten through sixth grades. On information and belief, Defendant IOWA CITY COMMUNITY SCHOOL DISTRICT did not similarly prohibit any other student group in K-6 schools. A.C. and other LGBTQ+ students at her school are not able to attend GSA meetings.

143.    SF 496 has interfered with Plaintiff P.B.-P.'s ability to enjoy his GSA. The Gender Identity Notification Provision has caused the number of members of the Waterloo West High School GSA—another member GSA of IOWA SAFE SCHOOLS—to dwindle, as students now

fear being outed to unsupportive family members and increased bullying and harassment from peers. Even among members, engagement has declined due to these fears from the law, making it difficult to fill leadership roles and organize GSA activities. Waterloo West High School's GSA is a happy space that should be accessible to all interested LGBTQ+ students, but SF 496 interferes with students' ability to create a supportive community for each other. On information and belief, students and members of other student-led groups in Defendant WATERLOO COMMUNITY SCHOOL DISTRICT have not experienced such challenges and harms.

144.    Plaintiff JAMES DOE is active in his school's GSA—a member GSA of IOWA SAFE SCHOOLS—and knows fellow students who would like to join the GSA but will not because they are afraid of facing hostility at home if they are outed by SF 496's requirements. LGBTQ+ students' reluctance to join the GSA diminishes DOE's own experience of community in the GSA. DOE also knows students who are afraid to use the name and pronoun that match their gender identities, because SF 496 will cause school officials to out these students to unsupportive parents or guardians, and they will face negative consequences at home. Students remain worried that even the GSA sponsor might be required to out them to their parents. Additionally, DOE states that the school also supports some student groups in holding events for the public or attending events or competitions relevant to the group around the state, but his GSA has never received special funding to host or attend events like those put on by Iowa Safe Schools.

145.    JAMES DOE feels that SF 496 has created a climate of fear that prevents students from coming together to support each other and express a common message of pride in who they are. For example, this has manifested in an incident of anti-LGBTQ harassment, when posters featuring pride flags posted by the GSA were torn down. Due to SF 496, even among the few members of the JAMES DOE's GSA, engagement with group activities has substantially

decreased, placing a larger burden on a few members to accomplish the GSA's goals. The conditions for the GSA under SF 496 are such that the GSA's leadership, including JAMES DOE, are considering "rebranding" to a general activism club, allowing the group to support LGBTQ+ without being as visibly an LGBTQ+ group. On information and belief, students and members of other student-led groups in Defendant SIOUX CITY COMMUNITY SCHOOL DISTRICT have not experienced such challenges and harms.

146. These examples highlight myriad local rules, customs, and practices schools have developed surrounding the Gender Identity Notification Provision and GISO Prohibition. They have adopted rules or practices that prohibit GSAs in the K-6 environment and limit advertisements of the GSAs in public places that other student groups may access. Students have seen pride flags and safe space stickers removed. Schools have had to develop ad hoc understandings of what constitutes a "request" for an "accommodation" "related to" "gender identity," as well as when and how the rules are to be implemented. For example, at one middle school, students in the GSA were instructed to only use their last names when referring to themselves and others in front of their faculty advisor, to avoid potentially triggering the Gender Identity Notification Provision. On information and belief, no other student groups require such limitations on speech or expression. At another middle school GSA, students in 7th and 8th grade are forced to obtain parental permission to join the GSA, and 5th and 6th graders are barred from joining at all. On information and belief, no other student groups require parental permission for mere participation, nor do they bar students in 5th and 6th grade from attending. Such practices have effectively forced teachers to avoid or limit their participation as GSA faculty sponsors, and some GSAs have shrunk or disappeared entirely as a result. SF 496 has interfered with individual

students' rights to assemble and student GSAs abilities to function in ways that cannot be overstated.

147.    As a result of SF 496, IOWA SAFE SCHOOLS has expended significant resources educating its member students and GSAs on the law's impact and helping its member GSAs simply to avoid closure. Those are resources that IOWA SAFE SCHOOLS would otherwise spend on its ordinary course of helping GSAs to flourish and providing resources to students.

148.    Rather than taking advantage of IOWA SAFE SCHOOLS' core programming on leadership and organizational skills, student members and member GSAs of IOWA SAFE SCHOOLS since SF 496 have been far more in need of guidance navigating Iowa law. While previous visits to member GSAs by IOWA SAFE SCHOOLS' GSA coordinator would focus on group goal setting, visits after SF 496 were almost exclusively dedicated to reviewing SF 496 and assessing whether the student members' schools were overextending its provisions. Instead of improving program leadership resources over the summer as its employees would typically have done, employees were devoted to developing guidance regarding SF 496, preparing for teacher advisor Q&A sessions concerning the law, and responding to direct inquiries about the law's impact on member GSAs.

149.    GSAs are critical resources for LGBTQ+ students' mental and physical well-being, and academic success. GSAs assist LGBTQ+ students in seeking or forming friendships, networks, finding community, exploring their identity, and engaging with school resources or activism. Such supportive relationships promote self-esteem, sense of purpose, and adjustment for LGBTQ+ students, which can be particularly important for LGBTQ+ students who experience rejection or discomfort from their families. GSA participation is associated with higher GPAs, greater likelihood of graduating, and greater community involvement. Conversely, when LGBTQ+

students do not have access to supportive resources or meaningful peer networks, they are less likely to succeed academically.

150. GSA activities can promote tolerance, respect, and inclusion for LGBTQ youth, provide a space for advocacy and education, and help teachers better advocate for their students. LGBTQ+ students at schools with active GSAs hear fewer anti-LGBTQ remarks, are less likely to feel unsafe due to their identities, experience lass severe victimization, and are less likely to miss school for reasons of feeling unsafe or uncomfortable. Students in educational environments that do not have these structures in place, by contrast, report greater isolation, withdrawal, and open hostility from classmates and school employees. By causing the closure of certain GSAs, restrictions on the activities of others, and chilling student participation, SF 496 has harmed Plaintiffs A.C., P.B.-P., DOE, IOWA SAFE SCHOOLS, and its student members and GSA chapter members.

151. IOWA SAFE SCHOOLS also provides professional development, licensure renewal, and graduate credits to educators individually and district-wide, in the past reaching over 4,000 educators annually. These services are offered through in-person presentations and direct consultation with client school districts, an online Iowa Safe Schools Academy hosting coursework and seminars for educators, and large conferences and symposiums for educators to attend with their colleagues.

152. IOWA SAFE SCHOOLS' professional development services are designed to support its core mission of providing a safe, supportive, and nurturing learning environment and community for LGBTQ+ youth and their allies.

153. With respect to direct consultation programs, school districts contract with IOWA SAFE SCHOOLS to have an IOWA SAFE SCHOOLS employee meet with educators one-on-one

and present to them in group settings, such as during teacher in-service days, on issues related to better understanding and meeting the needs of LGBTQ+ kids. Common topics include "LGBTQ 101," how to build support systems for LGBTQ+ youth and their allies, how to build empathy among students on issues face by LGBTQ+ youth, and understanding and respecting students' pronouns.

154.    With respect to licensure renewal and graduate credit offerings, IOWA SAFE SCHOOLS maintains an online service, the Iowa Safe Schools Academy, which offers a variety of classes focusing on how best to support different student groups in classrooms, including LGBTQ+ students, and set them up for acceptance and success. Educators pay a fee to take these courses.

155.    With respect to conferences and symposiums, IOWA SAFE SCHOOLS has historically held three per year: the Engage and Empower Summit in the fall, the Trans Education Summit in the winter, and the Anti-Violence Symposium in the spring. As indicated by their titles, these conferences and symposiums are an opportunity for educators to expand their knowledge and skills in the area of LGBTQ+ inclusion and safety, and thus better support their students. Attendees pay an attendance fee and various sponsors pay fees to support the event.

156.    Since SF 496, there has been a sharp decline in participation across IOWA SAFE SCHOOLS' professional development services, frustrating its mission. Educators and administrators have cancelled existing engagements and rejected additional services because they believe the GISO Prohibition prohibits their engagement with LGBTQ+-affirming content or the Gender Identity Notification Provision prohibits their implementation of its lessons without putting themselves and their students at risk. Since SF 496, only two school districts have taken advantage of IOWA SAFE SCHOOLS' direct consultation programs, the number of registrants

for Iowa Safe Schools Academy courses has been cut in half, and IOWA SAFE SCHOOLS has been forced to cancel both the Engage and Empower Summit and the Anti-Violence Symposium due to lack of attendance. This decline represents a direct harm to IOWA SAFE SCHOOLS' funding.

157.    Further due to SF 496, IOWA SAFE SCHOOLS has been forced to modify the content of its professional development services substantially. SF 496 has diverted the time of IOWA SAFE SCHOOLS employees to revising the content of its professional development offerings and responding to educators' questions on the law and its applicability. SF 496 has shifted the focus of IOWA SAFE SCHOOLS' direct consultation programs, online coursework, and conferences from its core mission of building out systems and policies to support LGBTQ+ students and their allies to identifying what permissible supports remain under the law and navigating school policy implementing the law.

158.    SF 496 has further frustrated IOWA SAFE SCHOOLS' mission of supporting LGBTQ+ students and their allies in the K-12 setting, as it has been forced to redirect professional development services to colleges and employers, in an effort to support LGBTQ+ youth and their allies after high school graduation and to make up for the loss of K-12 educators and school engagement.

159.    Outside of professional development services, IOWA SAFE SCHOOLS partners with local nonprofits to provide programming and events that reach additional students, families, and educators. As with professional development services, SF 496 has created a need for IOWA SAFE SCHOOLS to modify its programming and events to respond to concerns of students, families, and educators on the impacts of the law.

160.    In summary, SF 496 has imposed unique harms and burdens on IOWA SAFE SCHOOLS's member GSAs, prevented some IOWA SAFE SCHOOLS student members from joining a GSA or participating openly in a GSA, correspondingly interfered with the enjoyment of IOWA SAFE SCHOOLS's student members remaining in GSA, caused IOWA SAFE SCHOOLS to expend significant resources on supporting GSAs in navigating the law and avoiding closure, substantially decreased school and educator engagement with IOWA SAFE SCHOOLS' paid professional development services, required IOWA SAFE SCHOOLS to modify its professional development services and community programming to respond to concerns relating to the law, and required IOWA SAFE SCHOOLS staff to shift from its core focus of enhancing the experience of LGBTQ+ youth and their allies to responding to concerns and questions surrounding the law.

**SF 496 Caused Chaos and Confusion and Deprived Plaintiff Students
of Access to Books Based on Content and Viewpoint**

161.    Although the Governor signed SF 496 into law in May, Iowa schools had virtually no guidance on how to comply with the law when the 2023-2024 school year started. And the proposed guidance they recently have received is of no utility, because it provides no greater specificity or clarity than the statute itself. Administrators, teachers, parents, and students are confused about how to comply with SF 496. Teachers and administrators across the state have expressed panic and anxiety about how to implement the law. School districts across the state have circulated and banned widely diverging lists of books and other materials from school classrooms and libraries.

162.    Many of the books that Iowa school districts have banned are books by LGBTQ+ authors, such as *All Boys Aren't Blue* by George M. Johnson, which chronicles the author's journey growing up as a queer Black man in New Jersey and Virginia.

163.    Many banned books also contain content of particular relevance to LGBTQ+ students, including LGBTQ+ characters, historical figures, or themes. These books include *Melissa* (winner of the Stonewall Award for Children's and Young Adult Literature, California Book Award for Juvenile (Gold), and Lambda Literary Award for Children's/Young Adult)[30] by Alex Gino; *Gender Queer: A Memoir* by Maia Kobabe; *Brave Face* by Shaun David Hutchinson; *The Song of Achilles* by Madeline Miller; and *This Book is Gay* by Juno Dawson.

164.    Similarly, many banned books are by authors of color, or contain content centering the narratives of Black, Brown, or Indigenous people. *See, e.g.*, *The Bluest Eye* by Toni Morrison; *The Color Purple* by Alice Walker; *Black Girl Unlimited* by Echo Brown; *Native Son* by Richard Wright; *When I Was Puerto Rican* by Esmeralda Santiago; *Milk and Honey* by Rupi Kaur; and *The Absolutely True Diary of a Part-Time Indian* by Sherman Alexie (winner of the National Book Award for Young People's Literature, Odyssey Award, Boston Globe-Horn Book Award for Fiction, and California Young Readers Medal for Young Adult)[31].

165.    On information and belief, in response to SF 496, Defendant URBANDALE COMMUNITY SCHOOL DISTRICT initially marked hundreds of books to be banned from Urbandale school libraries.[32] The list included *1984* (winner of the Prometheus Hall of Fame

---

[30] *Melissa*, Goodreads, https://bit.ly/4dODOll (last visited Oct. 17, 2024)

[31] *The Absolutely True Diary of a Part-Time Indian*, Goodreads, https://bit.ly/3U94SoA (last visited Oct. 17, 2024).

[32] *Nearly 400 titles on reported banned book list at Urbandale Schools*, KCCI 8 Des Moines (July 31, 2023); Chris Higgins, *Iowa school district flags 374 books as potentially banned, from 'Ulysses' to "Heartstopper,"* Des Moines Register (updated 6:15 PM CT, July 31, 2023), https://bit.ly/4f2Utm4. *See also* Caleb McCullough, *Iowa schools navigate library book law without state guidance*, The Gazette (Aug. 7, 2023), https://bit.ly/3YuQqK9.

Award)[33] by George Orwell; *The Catcher in the Rye* by J.D. Salinger; *Ulysses* by James Joyce; *The Color Purple* (winner of the Pulitzer Prize for Fiction, National Book Award for Fiction, and the Townsend Prize for Fiction)[34] by Alice Walker; and children's picture books. *See* Appendix A (the list of books Defendant URBANDALE COMMUNITY SCHOOL DISTRICT initially identified for removal).

166.     In a statement, Defendant URBANDALE COMMUNITY SCHOOL DISTRICT initially defended the list, explaining, "We had to take a fairly broad interpretation of the law knowing that if our interpretation was too finite, our teachers and administrators could be faced with disciplinary actions according to the new law."[35]

167.     After publication of the list and public outcry, Defendant URBANDALE COMMUNITY SCHOOL DISTRICT reduced the number of books banned from libraries and classrooms to 51, largely by assuming for the time being that the GISO Prohibition does not require banning books related to gender identity or sexual orientation from school libraries.[36] The shortened list, however, still includes titles such as *Gender Queer: A Memoir* (winner of the ALA Alex Award)[37] by Maia Kobabe; *Beloved* (winner of the Pulitzer Prize for Fiction, American Book Award, Anisfield-Wolf Book Award, and Frederic G. Melcher Book Award)[38] by Toni Morrison;

---

[33] Michael Grossberg, *Big Brother, doublethink, thoughtcrime, Newspeak & memory holes: George Orwell's Nineteen Eighty-Four, a 1984 Prometheus Hall of fame winner for Best Fiction*, Prometheus Blog (July 30, 2020), https://bit.ly/405FS59.

[34] *The Color Purple*, Goodreads, https://bit.ly/4dS5dTm, (last visited Oct. 17, 2024).

[35] Phillip Sitter, *Urbandale schools pause removing books referencing gender identity, sexual orientation*, Des Moines Register (updated 11:44 AM CT, Aug. 4, 2023), https://bit.ly/4eLpsnf.

[36] *Id.*

[37] American Library Association, *2020 Alex Award Winners*, https://bit.ly/3YqlGd7 (last visited Oct. 17, 2024).

[38] *Beloved*, Goodreads, https://bit.ly/3YrejSy (last visited Oct. 17, 2024).

*Like a Love Story* by Abdi Nazemian; and *Call Me By Your Name* (Lambda Literary Award for Gay Fiction)[39] by Andre Aciman. See Appendix B (the list of books Defendant URBANDALE COMMUNITY SCHOOL DISTRICT subsequently identified for removal).

168.    On information and belief, Mason City Community School District used ChatGPT to identify a list of books that purportedly depict sex acts and pulled 19 books from school shelves.[40] See Appendix C (the list of books Mason City Community School District identified for removal). Also, on information and belief, Ankeny Community School District has eliminated access to books for students in kindergarten through sixth grade, including *All Are Welcome* by Alexandra Penfold, and *Pink Is for Boys* by Robb Pearlman.

169.    Defendant IOWA CITY COMMUNITY SCHOOL DISTRICT circulated a list of 67 books for removal, including *Brave Face* by Shaun David Hutchinson; *All Boys Aren't Blue* by George M. Johnson; and *Beyond Magenta: Transgender Teens Speak Out* (winner of the 2015 Flora Stieglitz Straus award)[41] by Susan Kuklin. See Appendix D (the list of books Defendant IOWA CITY COMMUNITY SCHOOL DISTRICT identified for removal).

170.    Defendant WEST DES MOINES COMMUNITY SCHOOLS circulated a list of 47 books for removal, including *Gender Queer: A Memoir* by Maia Kobabe; *Lawn Boy* (winner of the ALA Alex Award)[42] by Jonathan Evison; and *Slaughterhouse Five*, by Kurt Vonnegut. See

---

[39] Lambda Literary, *Lambda Literary Awards Finalists & Winners*, https://bit.ly/4dSrQHB (last visited Oct. 17, 2024).

[40] Andrew Paul, *School district uses ChatGPT to help remove library books,* Popular Science (Aug. 14, 2023), https://www.popsci.com/technology/iowa-chatgpt-book-ban/.

[41] Bank Street College of Education, Children's Book Committee, *Past Winners*, https://bit.ly/3YriP3v (last visited Oct. 17, 2024).

[42] American Library Association: Young Adult Library Services Association, *2019 Alex Awards,* https://www.ala.org/yalsa/2019-alex-awards (last visited Oct. 17, 2024).

Appendix E (the list of books Defendant WEST DES MOINES COMMUNITY SCHOOLS identified for removal).

171.    Overall, at least 3,400 books have been removed from Iowa schools.[43]

172.    By targeting these books for removal from Iowa schools and depriving students of access to these materials based on their content and viewpoint, Defendants have prevented marginalized students such as LGBTQ+ young people from seeing themselves reflected in the stories collected in their classrooms and libraries. Plaintiff Students are denied the comfort of narratives that include LGBTQ+ characters and the solace that they are not alone.

173.    Plaintiff T.S. found meaning in the book *Rick* by Alex Gino, which chronicles the struggles of a gender nonconforming boy who finds support at a GSA meeting. T.S. has long hoped to read the book *Gender Queer: A Memoir* by Maia Kobabe, but never got around to doing so before passage of SF 496. Because Defendant URBANDALE COMMUNITY SCHOOL DISTRICT has banned the book from school libraries and classrooms as a result of SF 496, T.S. can no longer check it out from her school library. If *Gender Queer: A Memoir* were available, T.S. would check it out. As a queer person, T.S. feels that SF 496 erases her identity from public view.

174.    Plaintiff B.F. long has enjoyed graphic novels and other fiction containing LGBTQ+ representation that were available in their school library, such as *Heartstopper* by Alice Oseman; *Lumberjanes* by Shannon Watters, Grace Ellis, Gus Allen, and ND Stevenson; *Drama* by Raina Telgemeier; and *Laura Dean Keeps Breaking Up With Me* by Mariko Tamaki. B.F. was insulted by the list of books that Defendant URBANDALE COMMUNITY SCHOOL DISTRICT

---

[43]  Tim Webber, *These 5 graphics show the significant impact of 3,400 books banned from Iowa schools*, Des Moines Register (June 10, 2024), https://tinyurl.com/h5pns6ac.

banned. Several of the titles on the original list were books that were important to B.F. growing up because they included LGBTQ+ themes or characters. B.F. felt degraded at having their identity labeled too inappropriate to even be in the school. The law and Defendant URBANDALE COMMUNITY SCHOOL DISTRICT's implementation of it caused B.F. to feel as though they should be ashamed of who they are. B.F. would like to read books on the list for removal, such as *Call Me By Your Name* by Andre Aciman, and *The Color Purple* by Alice Walker. If they were not banned, B.F. would check out the books from the school library. Some of the books on the list are even recommended reading before college. Defendant URBANDALE COMMUNITY SCHOOL DISTRICT's implementation of SF 496 has deprived B.F. of the opportunity to obtain these books in school and to work through them with other students.

175.    Plaintiff B.F.S. reviewed the long list of books that Defendant WEST DES MOINES COMMUNITY SCHOOLS created in implementing SF 496. B.F.S. recognized that many of the books on the list include LGBTQ+ characters and authors, which bothered B.F.S. because they wish to read books at school that reflect their identity and experience.

176.    A.C. previously had access to books that helped answer questions relating to her gender identity. Prior to the preliminary injunction, A.C.'s school had started removing books that acknowledge the existence of LGBTQ+ people as well as books that educate preteens and young teenagers about topics related to sexuality. With the law back in effect, this has continued and been seriously harmful to A.C. and students in her age group, who can longer access books that represent them.

177.    District teachers have reported that K-6 schools were instructed to remove all books containing what is deemed sexual content or LGBTQ+ content. This lack of clarity leads to over-

censorship. Recently, a series of planned readings by an Iowan author of a novel addressing LGBTQ+ themes written for preteens and young teens (Erin Becker's *Crushing It*) was canceled.

178.    Queer literature is an important part of Plaintiff P.B.-P.'s life. He ceased feeling out of place in his own skin after reading *Gracefully Grayson* by Ami Polonsky, a story about a transgender young person. *Orlando* by Virginia Woolf helped him realize that queer people existed in past generations and that being queer does not need to be labeled the way it is today. *Heartstopper* by Alice Oseman; *Good Omens* (no. 68 on BBC's top 200 best-loved novels)[44] by Terry Pratchet and Neil Gaiman; and *Red, White, and Royal Blue* (winner of the ALA Alex Award)[45] by Casey McQuiston gave him hope that one day his life could be filled with as much laughter and queer joy as those characters had. The librarians have told him that that they were directed by the district attorney to remove several books, including *All Boys Aren't Blue* by George M. Johnson, *Gender Queer* by Maia Kobabe, *Let's Talk About It* by Erika Moen and Matthew Nolan, *Lawn Boy* by Jonathan Evison, and *Lucky* by Alice Sebold. He was able to check *Lawn Boy* before librarians were told to remove the book from the shelves, but he is worried if he doesn't finish it in time to return it by the due date, he won't be able to finish it all. These books made P.B.-P. feel safe and welcomed, and he fears that Defendant WATERLOO COMMUNITY SCHOOL DISTRICT's implementation of SF 496 will deny him access to these books he adores, in addition to queer literature he has yet to read.

**SF 496 Has Been Impossible for Educators to Understand and Has Been Implemented Inconsistently Throughout the State**

179.    The lack of guidance and clarity around the implementation of SF 496 has caused

[44] *The Big Read*, BBC, https://www.bbc.co.uk/arts/bigread/top100_2.shtml (last visited Oct. 17, 2024).

[45] *2020 Alex Award Winners*, *supra* note 37.

serious confusion and concern among educators. The vagueness of these provisions means many educators don't know what is forbidden and what is allowed.

180.    The potential for arbitrary enforcement of the GISO Prohibition means teachers are not sure what conduct could lead to discipline, and administrators have felt compelled to adopt broad interpretations—and impose broad restrictions—in an effort to steer clear of a sudden enforcement action.

181.    Plaintiff Aly Telford, a middle school English teacher, has found that the lack of clarity in the GISO Prohibition has made it more difficult for her to advocate for the safety and acceptance of her LGBTQ+ students. While she teaches primarily seventh graders, she also interacts with the sixth graders in her school regularly.

182.    For example, Telford was a co-sponsor for the GSA prior to SF 496.  After SF 496 she inquired about restarting the group, but administration advised her that doing so may violate the GISO Prohibition as a "program" or "promotion" relating to gender identity.  She was also told that putting posters to advertise the club in the hall—where they would be visible to sixth graders—may also constitute promotion in violation of the GISO Prohibition.

183.    Neither the text of the GISO Prohibition nor State Defendants' rulemaking efforts have provided any clarity on whether Plaintiff Telford would be putting her license at risk should she choose to sponsor a student-led GSA, allow sixth graders to join, or allow that GSA to advertise on school grounds.

184.    This uncertainty is particularly tragic, as Plaintiff Telford knows from past experience that she would be able to use her position as GSA co-sponsor to advocate for LGBTQ+ students and act as a safe adult for them to approach when they needed help. The GISO Prohibition's potential to be used as a tool of discrimination against LGBTQ+ students and clubs

has thus both discouraged teachers from supporting their students, and shut those same students off from a resource proven to have positive effects.

185.    Teacher sponsors of GSAs, including GSAs in school environments with sixth graders present, are able to develop trusting relationships with the student-club members. These teachers can leverage that relationship to encourage students to report being teased for having two dads, to refrain from unsafe behavior, and to communicate openly with their parents about their gender identity—all real examples of interactions Plaintiff Telford had while she co-sponsored the school GSA.

186.    However now, the lack of clarity in the GISO Prohibition means that even if Telford is able to form a trusting relationship with a student in need, if that student is a sixth grader coming to Plaintiff Telford to disclose anti-LGBTQ+ harassment or to seek advice on speaking with their parents about their gender identity, she would have to make the untenable choice between risking her license and supporting her student.

187.    Worse, because the Gender Identity Notification Provision is not clear on whether a student's mere disclosure that they are questioning their gender identity, or a student's mere request the teacher provide them with guidance in coming out to their parents, is a reportable event, Plaintiff Telford would have to choose between her license and both (a) whether to help the student, and (b) whether to report them for seeking that help. Prior to SF 496, Plaintiff Telford would be able to, and indeed had been able to, guide the student and provide them with the information and the confidence they need to approach their parents on the topic of gender identity in a prepared way. Now, Plaintiff Telford must question whether such an interaction is the end of her career.

57

188.     Plaintiff Daniel Gutmann, an educator with DMPS, has similarly expressed how SF 496 has substantially disrupted his advocacy for LGBTQ+ rights in the school.

189.     As a gay educator, Plaintiff Gutmann was told by his administration that he could not mention his husband in the presence of his students, and if he did, he would face disciplinary action. Thankfully the school later reversed course, but this only highlights the vagueness in possible interpretations of the provision. His school district simply could not—and still cannot—know whether allowing LGBTQ+ educators to exist and work as out LGBTQ+ educators is a violation of the GISO Prohibition. He still remains unclear on how to respond if students ask him why he is married to man or other such questions. The issue is not what policy his school district has adopted on this issue, but what interpretation State Defendants' enforcement personnel may choose to apply on that day.

190.     The potential application of the GISO Prohibition to books is similarly confusing for educators who maintain diverse books in their classroom.

191.     Over the course of this litigation, State Defendants have sometimes taken the position that the GISO Prohibition does not require schools to remove books solely because they feature an LGBTQ+ character or characters. Other times, State Defendants have taken an inconsistent position.[46] This shifting litigation position, leading to the conclusion that a book with LGBTQ+ characters may be in class, but not *read* in class, is uncoupled from any text in the GISO Prohibition or the Proposed Rules implementing it, and does not guarantee State Defendants will not enforce the GISO Prohibition in this way in the future.

192.     Regardless, this interpretation does not resolve the lack of clarity in what is permitted to be done with those books; in other words, whether Plaintiffs Telford and Gutmann

---

[46] *See* paragraph 64, supra.

can recommend, read and discuss these books with their students without risk of disciplinary action.

193.    Plaintiff Telford maintains a diverse library in her classroom, which is open to all students.  She has had students come to her classroom specifically because she had books with LGBTQ+ characters. Because of the inconsistency in implementation of SF 496 she is now unsure what she can continue doing without receiving discipline. Books she had previously used in an extracurricular book club featuring LGBTQ+ characters were originally designated for removal. Even if not removed, Plaintiff Telford has no certainty on whether resuming such a book club, or merely continuing to recommend certain books with LGBTQ+ characters or addressing issues of interest to LGBTQ+ readers, would constitute a program or promotion relating to gender identity in violation of the GISO Prohibition.

194.    Plaintiff Gutmann also has a diverse library, including books that discuss LGBTQ+ themes. While he has not been told to remove these books from his classroom, the lack of clarity in the GISO Prohibition means he is similarly not sure if can read these books to students in class, or even recommend them, without being disciplined for engaging in prohibited curriculum, instruction, or promotion.

195.    The GISO Prohibition's and Gender Identity Notification Provision's confusing and vague language is demonstrated by their varying application across school districts.

196.    Cindy Harper is an educator at Waverly-Shell Rock Middle School, and has been since 2014.  During this time, she has been an advocate for LGBTQ+ students, including her role as a faculty supervisor for the GSA.  The GSA rebranded during the 2022-2023 school year to "Equality for All" in order to better reflect to the community that it is a group seeking to end oppression and bias against people not just on the basis of their LGBTQ+ identities, but also

because of their race, disability, economic status, or religion. The group is still a GSA member of the Iowa Safe Schools GSA Network.

197.    After her principal told her that SF 496 would apply not only to class but also the GSA, Harper has been forced to rethink how she acts as the GSA faculty supervisor, so she does not risk triggering the law. She has students only use their last name and only names that would appear in their Infinite Campus portal, to avoid triggering a report home. She also asks students if their parents support using "they/them" pronouns, and if they do not, she tells students not to let her know that they use these pronouns.

198.    The lack of knowing what the rules are has caused her a lot of frustration and resulted in situations where teachers have to decide between advocating for the safety of their students—or even just answering their questions in class—and potentially jeopardizing their licensure. The lack of clarity has also led to inaction. With school districts fearful of crossing a line they cannot see, past efforts to support LGBTQ+ students have often been put on hold.

## CLAIMS FOR RELIEF

## I.    VIOLATION OF THE FIRST AMENDMENT FOR OVERBREADTH

199.    The Library Restriction and Gender Identity/Sexual Orientation Prohibition, on their face, violate the First Amendment as overbroad.

200.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech . . . of the right of the people peaceably to assemble."

201.    Under the First Amendment, a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate

sweep. This less demanding standard for facial challenges in First Amendment cases exists to provide breathing room for free expression.

202.    The first step in a facial analysis is to assess the scope of the challenged laws; expressed differently, to ask: what activities, by what actors, do the laws prohibit or otherwise regulate?  As described in greater detail in the counts below, these challenged provisions of SF 496 are of a staggering, unprecedentedly broad scope.

203.    The second step in a facial analysis is to determine which of the laws' applications violate the First Amendment.  As described in greater detail in the counts below, and as further articulated in other claims asserted on First Amendment grounds in this Complaint, a substantial number of the provisions' applications violate the First Amendment.

204.    The third step in a facial analysis is to measure the unconstitutional applications against the remaining provisions. As described in greater detail in the counts below, the applications of the provisions that remain are insignificant when compared to the unconstitutional applications.

## Count 1

### The Library Restriction is Facially Unconstitutional for Overbreadth

205.    The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

    a.  Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

    b.  Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

c.   Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

d.   Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

e.   Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

f.   Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

206.   Plaintiffs incorporate paragraphs 199 through 204 as if fully set forth herein.

207.   The Library Restriction includes within its scope the operation of all kindergarten through grade twelve library programs in the State of Iowa's public school system.

208.   The term "library program" is undefined but generally understood to mean the space each Iowa elementary school, middle school, junior high, or high school sets aside in the building or by arrangement with a local public library for the collection of books and other materials and resources made available to the students attending such schools.

209.   The term "library program" may also include within its scope the collections of books commonly maintained in individual teachers' classrooms.

210.   The Library Restriction imposes a new restriction on the "material," principally books, though often including other media such as audiobooks, movies, music, or games, which may be made available to the students who access such library spaces.

211.   Thus, the Library Restriction regulates actors including the schools, school employees, and, in the case of local libraries made available to the school by agreement, third parties maintaining these libraries, as well as the students who are accessing them.

212.    The activities from which these actors are restricted is the inclusion of or, in the case of students, access to, any material that includes a "description[] or visual depiction[] of a sex act." The term "sex act" is separately defined in Iowa Code to mean sexual contact, in its various forms, between two or more persons.

213.    This definitional term does not include any qualification or adjustment for the frequency, type, or character of the descriptions or depictions contained within the material, the material's target audience or its restricted availability within the school system to students of certain grades, the material's intention as to the inclusion of such a description or depiction, the material's merit or value in other respects when taken as a whole, or any other characteristic of the material or its audience, with the exception of "the Bible, the Torah, . . . the Koran," and undefined other "religious books," which are excluded from the Library Restriction notwithstanding any descriptions or depictions of a sex act contained therein.

214.    Accordingly, the Library Restriction includes within its scope a massive amount of books and materials that had previously been made available in Iowa school libraries by and, in the case of students, accessed by, these actors because of the books' and materials' quality and identified support for the schools' and students' educational goals.

215.    An application of the Library Restriction violates the First Amendment if it results in a removal of books or materials that unjustifiably infringes upon a student's right to receive information.

216.    Students' First Amendment right to receive information includes the right to access books and materials otherwise made available in school libraries. This right is infringed upon when such a book or material is removed from the student's access without adequate justification.

217.    When an infringement upon the right to receive information occurs, it is unconstitutional unless justified by a substantial and reasonable governmental interest or, at a minimum, a legitimate pedagogical concern.

218.    State Defendants have conceded that every book removed thus far has included a description or depiction of a sex act which would qualify it for exclusion under the Library Restriction. This number is in the thousands of books.

219.    This statewide culling of library books does not serve either a substantial and reasonable governmental interest or a legitimate pedagogical purpose.

220.    The books that have been or will be removed had already been assessed to support and comport with the schools' central mission of educating Iowa's children. Local school districts, and particularly their professional teacher-librarians, are well-qualified and dedicated to ensuring the materials selected for inclusion in the school library are suitable for the developmental and social maturity of the grade or grades for which the materials are made available; in other words, they are age appropriate. Such inclusion decisions have additionally been subject to the oversight of the local school boards authorized to hear and resolve any objections made by the parents or guardians of the students within the district. The State cannot justify the Library Restriction's hardline overriding of this traditionally local discretion.

221.    These unconstitutional applications of the Library Restriction are substantial when compared to any applications that remain.

222.    The Library Restriction is not readily susceptible to a limiting construction that would render it constitutional. State Defendants' attempts at rulemaking have failed, and will fail again should they be allowed to continue, at limiting the Library Restriction's unconstitutional overbreadth.

223.    Plaintiff Students are all students at Iowa public schools subject to the Library Restriction. All Plaintiff Students' right to receive information has been infringed upon or is imminent danger of being infringed upon by both State Defendants and their respective School district Defendants due to the Library Restriction.

224.    Iowa Safe Schools' members include individual students in Iowa public schools subject to the Library Restriction. Iowa Safe Schools asserts in its representational capacity the right of these members to receive information, infringed upon by both State Defendants and their respective School District Defendants due to the Library Restriction.

225.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to books and other materials reflecting their identity.

226.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

227.    State Defendants and School district Defendants are responsible for enforcement of the Library Restriction. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its representational capacity would redress the harm caused by State Defendants' enforcement of the Library Restriction, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would make the removed books and materials available to them again, given all such books and materials previously included in these school libraries had already been deemed to be age appropriate and supportive of the schools' and students' educational goals.

228.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and

Iowa Safe Schools in its representational capacity on the one hand, and State Defendants (and their members' respective School District Defendants) on the other, concerning the constitutionality, and specifically the overbreadth, of the Library Restriction. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the Library Restriction is unconstitutionally overbroad.

229.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Library Restriction. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants and their members' respective School District Defendants from enforcing the Library Restriction.

### Count 2
### The Gender Identity/Sexual Orientation Prohibition is
### Facially Unconstitutional for Overbreadth

230.    The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

a.  Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

b.  Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

    c.   Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

    d.   Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

    e.   Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

    f.   Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

231.    Plaintiffs incorporate paragraphs 199 through 204 as if fully set forth herein.

232.    The Gender Identity/Sexual Orientation Prohibition includes within its scope any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation available to any student in grades kindergarten through sixth in an Iowa public school.

233.    "Program," "test," "survey," "questionnaire," "promotion" and "instruction" are not separately defined in Iowa statute. However, Iowa Administrative Regulations define "educational program" as "the entire offering of the school, including out-of-class activities and the sequences of curriculum areas and activities," and "curriculum" as "all the courses offered."

234.    These terms, together with the ordinary meaning of "test," "survey," "questionnaire," and, particularly, "promotion" and "instruction," encompass the provision of essentially all information to students in grades kindergarten through sixth. Consequently, the GISO Prohibition regulates the activities of students in grades kindergarten through sixth, who are prohibited from receiving such information or engaging with any such "program," "curriculum,"

"test," "survey," "questionnaire," "promotion," or "instruction," to the extent such activities are "related to gender identity or sexual orientation."

235.    The activities from which these actors are restricted depends upon the meaning of the statutory language, "relating to gender identity or sexual orientation."

236.    The phrase "related to" is an expansive phrase that is ordinarily understood to mean to stand in some relation; to have bearing or concern; to pertain; refer; or to bring into association with or connection with.

237.    The terms "gender identity" and "sexual orientation" are separately defined in Iowa Code as "a gender-related identity of a person, regardless of the person's assigned sex at birth," and "actual or perceived heterosexuality, homosexuality, or bisexuality," respectively.

238.    State Defendants have asserted that, notwithstanding these neutral definitions, the GISO Prohibition is intended to apply only to non-cisgender identities and non-heterosexual orientations; in other words, those identities and orientations captured by the acronym "LGBTQ+".

239.    In summary, the GISO Prohibition prohibits the availability of and engagement in any activity within the school that bears upon or concerns LGBTQ+ identities and orientations.

240.    Students' First Amendment rights in school-connected settings include the right to receive information, the right to engage in speech and expressive conduct, and the right to expressive association.

241.    Students' First Amendment right to receive information is unconstitutionally infringed upon when information otherwise made available in the school is removed from students' access without adequate governmental justification.

242.    Applications of the GISO Prohibition that have infringed upon students' First Amendment right to receive information include the prohibition on classroom activities that bear

upon LGBTQ+ identities and orientations, such as an in-class reading of a book featuring an LGBTQ+ character; the prohibition of instruction on LGBTQ+ identities and orientations, such as explanation or guidance on gender identity in response to an incident of harassment or bullying; the prohibition on promotion of books and materials with LGBTQ+ characters and themes, such as by recommendation or display; and, to the extent such has occurred and continues to occur notwithstanding State Defendants' assertion that the GISO Prohibition does not apply to the availability of books in school libraries, the removal of books with LGBTQ+ characters or themes.

243.    This restriction on information does not serve either a substantial and reasonable governmental interest or a legitimate pedagogical concern.

244.    Students' First Amendment right to engage in speech and expressive conduct is unconstitutionally infringed upon if the speech or expressive conduct is, in the case of school-sponsored speech, restricted without reasonable relation to a legitimate pedagogical concern, or, in the case of private, noncurricular speech, restricted despite not presenting a material and substantial interference with the requirements of appropriate discipline in the operation of school or impinging upon the rights of other students.

245.    Applications of the GISO Prohibition that have infringed upon students' First Amendment right to engage in speech and expressive conduct include the prohibition of classroom discussion of LGBTQ+ issues, such as a student project on the history of LGBTQ+ rights or an LGBTQ+ figure; the prohibition of the display of LGBTQ+ symbols, such as student placement of a flyer for an LGBTQ+ pride group; and other chilling or forced self-censorship caused by the GISO Prohibition, such as students refraining from engaging in speech or expressive conduct that would identify them as LGBTQ+, during and outside of classroom instructional time.

246.    These restrictions on student speech and expressive conduct are, in the case of speech deemed school-sponsored, not justified by a reasonable relation to a legitimate pedagogical concern, or, in the case of private, noncurricular speech, not justified by the presentation of a material and substantial interference with the requirements of appropriate discipline in the operation of school or impingement upon the rights of other students.

247.    Students' First Amendment right to expressive association is unconstitutionally infringed upon if it is restricted based upon the viewpoint expressed.

248.    Applications of the GISO Prohibition that have infringed upon students' First Amendment right to expressive association include the prohibition on student-led, extracurricular GSAs.

249.    The prohibition on GSAs is based upon the views expressed by such groups; namely, the promotion of LGBTQ+ students' rights.

250.    The above-described unconstitutional applications of the GISO Prohibition are substantial when compared to any applications that remain.

251.    The GISO Prohibition is not readily susceptible to a limiting construction that would render it constitutional. State Defendants' attempts at rulemaking have failed, and will fail again should they be allowed to continue, to limit the GISO Prohibition's unconstitutional overbreadth.

252.    Student Plaintiff A.C. is a fifth-grade student in an Iowa public school subject to the Gender Identity and Sexual Orientation Prohibition. Student Plaintiff A.C.'s First Amendment right to receive information has been infringed upon by the prohibition of instruction on LGBTQ+ issues in response to an incident of harassment or bullying; and the removal or prohibition on the promotion of books describing and explaining LGBTQ+ identities and orientation or otherwise

featuring LGBTQ+ themes or characters, as well as the removal and prohibition on the promotion of symbols of LGBTQ+ inclusion. Student Plaintiff A.C.'s First Amendment right to engage in speech and expressive conduct has been infringed upon in that she has been chilled or forced to engage in self-censorship including refraining from classroom discussion of LGBTQ+ issues, and refrained from speech or expressive conduct that would identify her as transgender. Student Plaintiff A.C.'s First Amendment right to engage in expressive association has been infringed upon by the prohibition on the maintenance of a student-led, extracurricular GSA.

253.    Plaintiff Students are all students in Iowa public school districts subject to the GISO Prohibition. All Plaintiff Students' First Amendment right to speech and expressive conduct has been infringed upon as they have engaged in or assert the rights of students who have been chilled or forced to engage in self-censorship due to the GISO Prohibition.

254.    Iowa Safe Schools in its organizational capacity has been injured by the loss of revenue associated with educator participation in online and in-person programming on LGBTQ+ inclusivity in the school setting made impermissible by the GISO Prohibition and the consequent harm to its mission-critical outreach and impact programs; the additional costs incurred to answer educators' questions relating to the scope and effect of the GISO Prohibition on preexisting LGBTQ+ inclusivity training and policies; the further costs incurred to prepare, modify, offer, and implement LGBTQ+ inclusivity programming in-school and out-of-school that addresses the limitations on educators', students', and GSAs' activities created by the GISO Prohibition; the forced redirection of professional development resources outside of the traditional K-12 focus due to the inability to implement its resources and guidance in the K-12 setting under the GISO Prohibition; and the frustration of its organizational purpose of maintaining a GSA network by the restrictions and prohibitions imposed upon its member GSAs.

255.    Iowa Safe Schools' members include both individual students in Iowa public schools, including students in the kindergarten through sixth-grade setting. Iowa Safe Schools' members also include GSAs, including GSAs in kindergarten through sixth-grade schools. Iowa Safe Schools asserts in its representational capacity the rights of those student members whose rights to receive information, engage in speech and expressive conduct, and engage in expressive association have been infringed upon by the GISO Prohibition. Iowa Safe Schools further asserts in its representational capacity the rights of GSAs in its membership that have had their right to engage in expressive association infringed upon by the GISO Prohibition. The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to information about their identity, engage in speech and expressive conduct that expresses their identity, and engage in expressive association by forming and participating in GSAs to promote and preserve their rights as LGBTQ+ students. Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

256.    State Defendants are responsible for enforcement of the GISO Prohibition. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its organizational and associational capacities would redress the harm caused by State Defendants' enforcement of the GISO Prohibition, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would revert to practices and policies in place prior to enforcement of the GISO Prohibition.

257.    Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its organizational and associational capacities on the

one hand, and State Defendants on the other, concerning the constitutionality, and specifically the overbreadth, of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the GISO Prohibition is unconstitutionally overbroad.

258.    Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the GISO Prohibition.

## II. VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS FOR VAGUENESS

259.    The Library Restriction, Gender Identity/Sexual Orientation Prohibition, and Gender Identity Notification Provision are, on their face, unconstitutionally vague in violation the First and Fourteenth Amendments.

260.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."

261.    A law is unconstitutionally vague in violation of the Fourteenth Amendment if it fails to provide adequate notice of the proscribed conduct and authorizes or encourages arbitrary enforcement.

262.    A severe enforcement mechanism lessens the degree of tolerable vagueness.

263.    To the extent a law intrudes upon an area protected by the First Amendment, standards of permissible vagueness are strict, and the government may regulate only the matter only with narrow specificity.

## Count 1

## The Library Restriction is Facially Unconstitutional for Vagueness

264.    The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

   a.  Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

   b.  Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

   c.  Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

   d.  Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

   e.  Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

   f.  Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

265.    Plaintiffs incorporate paragraphs 259 through 263 as if fully set forth in this Count.

266.    The Library Restriction fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and authorizes or encourages arbitrary and discriminatory enforcement.

267.    The Library Restriction is vague in its use of the phrase "description or visual depiction."

268.    The ordinary understanding of a description is "an act of describing," "discourse intended to give a mental image of something experienced," or "a statement or account giving the characteristics of someone or something: a descriptive statement or account."

269.    The ordinary understanding of a depiction is "a representation in words or images of someone or something."

270.    The Library Restriction contains no qualifying or quantifying language that would address the level of specificity, frequency, or explicitness that would rise to the level of a prohibited description or visual depiction.

271.    The Library Restriction is additionally vague in that it regulates a medium of creative expression—books and other materials—without accounting for their unique characteristics, such as a material's intended effect, its merit as a whole, or its target audience.

272.    By failing to provide clear boundaries on the books and materials prohibited by its terms, the Library Restriction has invited and resulted in arbitrary and discriminatory enforcement. Most notably, the creation and implementation of conflicting lists of books and materials subject to removal.

273.    Students' First Amendment right to receive information includes the right to access books and materials otherwise made available in school libraries. This right is infringed upon when such a book or material is removed from the student's access without adequate justification.

274.    Plaintiff Students are all students at Iowa public schools subject to the Library Restriction. All Plaintiff Students' right to receive information, and, consequently, their Fourteenth Amendment right to due process, has been infringed upon or is imminent danger of being infringed

upon due to the vagueness of the Library Restriction, in that they have lost or are imminent danger of arbitrarily or discriminatorily losing access to books or materials otherwise made available in their school libraries, have experienced stigmatization or wish to access, read, and discuss such books or materials without experiencing stigmatization due to the arbitrary and discriminatory labeling of such removed books, in particular books by LGBTQ+ authors, featuring LGBTQ+ characters, or addressing LGBTQ+ issues, as inappropriate, "pornography," "sexually explicit," or otherwise unacceptable in the school environment; and have otherwise experienced or are imminent danger of experiencing an infringement upon their First Amendment right.

275.    Iowa Safe Schools' members include individual students in Iowa public schools subject to the Library Restriction. Iowa Safe Schools asserts in its representational capacity the right of these members to receive information and not be subject to vague laws, infringed upon by the Library Restriction. The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to books and other materials reflecting their identity. Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

276.    State Defendants are responsible for enforcement of the Library Restriction. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its representational capacity would redress the harm caused by State Defendants' enforcement of the Library Restriction, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would make the removed books and materials available to them again, given all such books and materials previously included in these school libraries had already been deemed to be age appropriate and supportive of the schools' and students' educational goals.

277.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality, and specifically the vagueness, of the Library Restriction. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the Library Restriction is unconstitutionally vague.

## Count 2
### The Gender Identity/Sexual Orientation Prohibition is Facially Unconstitutional for Vagueness

278.    This count is brought by Plaintiff Educators against State Defendants.

279.    This count is also brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

a.    Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

b.    Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

c.    Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

d.    Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

e.    Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

      f.    Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

280.    Plaintiffs incorporate paragraphs 259 through 263 as if fully set forth in this Count.

281.    The Gender Identity/Sexual Orientation Prohibition fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and authorizes or encourages arbitrary and discriminatory enforcement.

282.    The GISO Prohibition is vague as to the activities to which it applies: "any program, curriculum, test, survey, questionnaire, promotion, or instruction." By use of the term "any," the GISO Prohibition indicates that the listed terms are intended to be interpreted as broadly as possible.

283.    The ordinary understanding of a program is "a public notice," a "performance" or "outline of the order to be followed, of the features to be presented, and the persons participating" in a performance; "a plan or system under which action may be taken toward a goal," "curriculum," or "prospectus, syllabus." Separately, an "Educational Program" is defined under Iowa law as "the entire offering of the school, including out-of-class activities and the sequences of curriculum areas and activities," and the phrase "library program" is used elsewhere in SF 496, namely, in the Library Restriction.

284.    The GISO Prohibition fails to identify to which of these uses of the term program, as ordinarily understood or separately defined in Iowa law, it refers, such that a person of ordinary intelligence is not given a reasonable opportunity to understand if its regulations apply to the entirety of in-class and out-of-class activities, coursework, school libraries, extracurricular groups, school performances, sport teams, bathrooms, after-school events, field trips, or any other offering or activity that may conceivably occur on or off school grounds if associated with the school.

285.    The term curriculum is defined in Iowa regulations as "all the courses offered" and has an ordinary understanding of "the courses offered by an educational institution." The GISO Prohibition fails to identify whether the use of this term refers to which courses may be offered, the assignments or projects given in a course, students' self-directed work or the presentation of their work in class, an educator's statements or guidance in class, or how the prohibition on curriculum interacts with the school districts' obligation to use a nondiscriminatory, multicultural, and gender-fair approach to education, such that a person of ordinary intelligence is not given a reasonable opportunity to understand to which, or all, of these activities the rule applies.

286.    The ordinary understanding of survey is, as to appraisals, "to examine as to condition, situation, or value," "to query (someone) in order to collect data for the analysis of some aspect of a group or area"; as to land, to take measurements; and otherwise, "to view or consider comprehensively," "inspect," or "scrutinize." The term survey appears elsewhere in SF 496 as listed with "analysis, activity, or evaluation," and elsewhere, a "formal examination[] or survey[]." Further, the term survey is used by State Defendants to refer to the Iowa Youth Survey, and is also used by the Youth Risk Behavior Survey provided by the CDC. The GISO Prohibition fails to provide a person of ordinary intelligence a reasonable opportunity to understand whether its use of this term is intended to refer to such "formal" surveys, or more generally to any question posed to or assessment taken of a student or group of students.

287.    The term "questionnaire" does not appear elsewhere in SF 496. It is generally understood to mean "a set of questions for obtaining statistically useful or personal information from individuals," "a written or printed questionnaire often with spaces for answers," or "a survey made by the use of a questionnaire." The GISO Prohibition does not provide clarification as to what the term "questionnaire" refers to in this context, if given a separate meaning from "survey."

288.    The term "promotion" is ordinarily understood to refer to "the act of furthering the growth or development of something." The GISO Prohibition's failure to define or limit the understanding of the term means there is no clarification on what acts or activities might reasonably be construed to be in furtherance of the prohibited topics. A person of ordinary intelligence is not given a reasonable opportunity to understand whether the GISO Prohibition's use of the term "promotion" may include displays in school hallways or classrooms, a display of books or other materials, in-class reading or discussion, educators' self-identification, acknowledgement or affirmance or students, extracurricular groups or events, or any other act or symbol that may be construed as promoting a prohibited concept.

289.    The term "instruction" is used in SF 496 to refer to an "instructional program" and "instructional materials." The term is ordinarily understood to refer broadly to "the action, practice, or profession of teaching." The GISO Prohibition does not provide a person of ordinary intelligence a reasonable opportunity to understand whether it includes on mandatory or compulsory instruction, such as giving a lecture to a seated class, or if it refers to every aspect of the practice of teaching, such as discussions with students, whether those are part of an identified lesson plan, on a student's ideas or wellbeing, or casually in an effort to form a positive relationship, or if it includes facilitating students' own preparation and presentation of coursework or allowing students' own speech or expressive conduct in or out of class.

290.    The vagueness of these terms is not cured by giving them their ordinary meaning, referencing their use in other parts of the statute or Iowa law, noting their common features, identifying what words may have been used or excluded, considering the consequences of a particular meaning, or engaging in any other inquiry of statutory construction or interpretation.

291.    The GISO Prohibition is further vague in its use of the phrase "relating to."

292.    Under Iowa rules of statutory interpretation, relating to, as with phrases such as linked to, in connection with, or associated with, are construed to require only a relation or nexus to the identified subject.

293.    The GISO Prohibition fails to provide a person of ordinary intelligence a reasonable opportunity to understand when or if an activity relates to the prohibited topics.

294.    The GISO Prohibition is further vague in its use of the terms "gender identity" and "sexual orientation."

295.    SF 496 defines these terms using the definition given them elsewhere in Iowa law; specifically, as "a gender-related identity of a person, regardless of the person's assigned sex at birth," and "actual or perceived heterosexuality, homosexuality, or bisexuality," respectively.

296.    Under Iowa rules of statutory interpretation, when the legislature has specifically defined a term, the definition given must normally be used, even if the term as defined by the legislature does not coincide with dictionary or common law definitions. In this case, the encompassing use of the terms gender identity and sexual orientation that refers to all gender identities and sexual orientations. Following this obligation, the GISO Prohibition would mean that any acknowledgment or reference of any kind that identifies a real or fictional person's gender identity or sexual orientation would be prohibited.

297.    Notwithstanding, State Defendants have asserted the legislatively prescribed meanings of gender identity and sexual orientation should not be used, as State Defendants assert this would lead to an "absurd" result inconsistent with other provisions of Iowa law governing, for example, school sports teams and bathrooms. State Defendants have instead asserted the terms must be understood to mean only non-cisgender identities and non-heterosexual orientations.

298.    The GISO Prohibition's failure to define its terms in a way State Defendants find feasible of implementation, as well as State Defendants' own rewriting of the GISO Prohibition, injects substantial uncertainty into the meaning of the terms, such that a person of ordinary intelligence is not given a reasonable opportunity to understand what topics or concepts are prohibited from the regulated activities.

299.    By failing to provide clear boundaries on the activities regulated, the concepts prohibited, and the requisite nexus between the two that would give rise to a violation, the GISO Prohibition has invited and resulted in arbitrary and discriminatory enforcement. Most notably, vastly different policies governing the conduct of educators and the expression of students and student groups.

300.    Plaintiff Educators have a right under the Fourteenth Amendment to be free from laws that are so vague that a person of ordinary intelligence does not have fair notice of what is prohibited.

301.    Plaintiff Educators are teachers at Iowa public schools subject to the GISO Prohibition. Plaintiff Educators are subject to disciplinary action, up to and including a loss of teaching licensure, for any violation of the GISO Prohibition. Plaintiff Educators' Fourteenth Amendment right to be free from vague laws has been infringed upon due to the GISO Prohibition, in that they do not have fair notice of what is proscribed behavior such that they may govern their conduct accordingly.

302.    Plaintiff Students have First Amendment rights to receive information, engage in speech and expressive conduct, and the right to expressive association.

303.    Plaintiff Students' First Amendment rights, and, consequently, their Fourteenth Amendment rights, have been infringed upon due to the vagueness of the Gender Identity/Sexual

Orientation Prohibition, in that the potential for arbitrary and discriminatory enforcement of the GISO Prohibition has chilled them or forced them to engage in self-censorship, deprived them of access to information, interfered with their ability to engage in expressive association, and has otherwise infringed upon their First Amendment rights.

304.    Iowa Safe Schools in its organizational capacity has been injured by the loss of revenue associated with educator participation in online and in-person programming on LGBTQ+ inclusivity in the school setting made impermissible by or declined due to fear of arbitrary or discriminatory enforcement of the vague GISO Prohibition and the consequent harm to its mission-critical outreach and impact programs; the additional costs incurred to answer educators' questions relating to the scope and effect of the vague GISO Prohibition on preexisting LGBTQ+ inclusivity training and policies; the further costs incurred to prepare, modify, offer, and implement LGBTQ+ inclusivity programming in-school and out-of-school that addresses the limitations on educators', students', and GSAs' activities created by the GISO Prohibition and the risks of arbitrary and discriminatory enforcement of its vague prohibitions; the forced redirection of professional development resources outside of the traditional K-12 focus due to the fear of implementing its resources and guidance in the K-12 setting under the vague and arbitrarily and discriminatorily enforced GISO Prohibition; and the frustration of its organizational purpose of maintaining a GSA network by the restrictions and prohibitions imposed upon its member GSAs due to the fear of arbitrary and discriminatory enforcement of the GISO Prohibition.

305.    Iowa Safe Schools' members include both individual students in Iowa public schools, including students in the kindergarten through sixth-grade setting. Iowa Safe Schools' members also include GSAs, including GSAs in kindergarten through sixth-grade schools. Iowa Safe Schools asserts in its representational capacity the rights of those student members whose

rights to receive information, engage in speech and expressive conduct, and engage in expressive association have been infringed upon due to the vagueness of the GISO Prohibition. Iowa Safe Schools further asserts in its representational capacity the rights of GSAs in its membership that have had their right to engage in expressive association infringed upon by due to the fear of arbitrary and discriminatory enforcement of the GISO Prohibition.

306.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to information about their identity, engage in speech and expressive conduct that expresses their identity, and engage in expressive association by forming and participating in GSAs to promote and preserve their rights as LGBTQ+ students.

307.    Iowa Safe Schools' direct injury claim and the relief it requests do not require the participation of its individual members.

308.    State Defendants are responsible for enforcement of the GISO Prohibition. The declaratory and injunctive relief sought by Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools in its organizational and associational capacities would redress the harm caused by State Defendants' enforcement of the Gender Identity/Sexual Orientation Prohibition, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would revert to practices and policies in place prior to enforcement, including the fear of arbitrary and discriminatory enforcement, of the GISO Prohibition.

309.    Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools in its organizational and representational capacity are entitled to injunctive relief. Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools' student and gender sexuality alliance members have suffered

and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of arbitrary and discriminatory enforcement of the vague GISO Prohibition. Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools' student and gender sexuality alliance members have no plain, adequate, or speedy remedy at law.

310.    Plaintiff Educators respectfully request injunctive relief that enjoins State Defendants from enforcing the GISO Prohibition.

311.    Plaintiff Students, and Iowa Safe Schools in both its own organizational capacity and its representational capacity, respectfully request injunctive relief that enjoins All Defendants from enforcing the GISO Prohibition.

## Count 3
### The Gender Identity Notification Provision is Facially Unconstitutional for Vagueness

312.    This Count is brought by Plaintiff Educators Against State Defendants.

313.    This count is also brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

a.    Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

b.    Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

c.    Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

d.    Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

e.   Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

f.   Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

314.   Plaintiffs incorporate paragraphs 259 through 263 as if fully set forth in this Count.

315.   The Gender Identity Notification Provision fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits and authorizes or encourages arbitrary and discriminatory enforcement.

316.   The Gender Identity Notification Provision is vague as to what constitutes a reportable "request" for an "accommodation" "intended to affirm the student's gender identity."

317.   The Gender Identity Notification Provision provides a single example of a request for an accommodation that is intended to affirm the student's gender identity, as "including a request that the licensed practitioner address the student using a name or pronoun assigned to the student in the school district's registration forms or records." The use of the term "including" indicates a request for a name or pronoun different than that assigned to the student in school records is only one of multiple reportable requests for accommodation.

318.   The Gender Identity Notification Provision does not state the level of specificity with which a request must be made before the reporting obligation is triggered, such that a person of ordinary intelligence is not given a reasonable opportunity to understand whether a reporting obligation is triggered by a request that could be construed as gender-affirming alone, or if the obligation is not triggered until the student clearly states the request is intended to affirm a gender identity.

319.    The Gender Identity Notification Provision does not state whether the reporting obligation is limited to requests made during school hours or school activities, such that a person of ordinary intelligence is not given a reasonable opportunity to understand whether a request made or received after school hours or outside of school events would trigger the obligation.

320.    The Gender Identity Notification Provision does not separately define the term "accommodation." The term "accommodation" is not used elsewhere in SF 496. In the school setting, Iowa law elsewhere refers to an "accommodation" as a request to school officials for alternative restroom or changing facilities. State and federal law also use the term "accommodation" in the school setting to refer to the provision of aid or the modification of the educational program offered a student as may be necessary to ensure the student's access to a free and appropriate public education. Accommodation is otherwise ordinarily understood as the act of accommodating someone, as providing what is needed or desired for convenience. The Gender Identity Notification Provision's use of the term accommodation renders it vague, such that a person of ordinary intelligence is not given a reasonable opportunity to understand what activities constitute a reportable accommodation, such as a request to be referred to by a nickname, a request for counseling or therapy services, a request for permission to use the restroom or join a sports team, or a request to join and participate openly in a GSA, or a request for intervention in response to an incident of anti-transgender bullying.

321.    The Gender Identity Notification Provision is further vague in its incorporation of the definition of "gender identity" elsewhere used in Iowa law as "a gender-related identity of a person, regardless of the person's assigned sex at birth." As a term defined by the legislature, this definition, which includes all gender identities, must normally be used. The Gender Identity Notification Provision thus fails to limit the scope of reportable requests that may be construed as

affirming a gender identity, such that every request for a name or nickname, even if aligning with the student's gender assigned at birth, could be deemed to trigger the obligation.

322.    Plaintiff Educators have a right under the Fourteenth Amendment to be free from laws that are so vague that a person of ordinary intelligence does not have fair notice of what is prohibited.

323.    Plaintiff Educators are teachers at Iowa public schools subject to the Gender Identity Notification Provision. Plaintiff Educators are subject to disciplinary action, up to and including a loss of teaching licensure, for any violation of the Gender Identity Notification Provision. Plaintiff Educators' Fourteenth Amendment right to be free from vague laws has been infringed upon due to the Gender Identity Notification Provision, in that they do not have fair notice of what is proscribed behavior such that they may govern their conduct accordingly.

324.    Plaintiff Students have First Amendment rights engage in speech, expressive conduct, and expressive association.

325.    Plaintiff Students' First Amendment rights, and, consequently, their Fourteenth Amendment rights, have been infringed upon due to the vagueness of the Gender Identity Notification Provision, in that the potential for arbitrary and discriminatory enforcement of the Gender Identity Notification Provision has chilled them or forced them to engage in self-censorship and has otherwise infringed upon their First Amendment rights.

326.    Iowa Safe Schools in its organizational capacity has been injured by the loss of revenue associated with educator participation in online and in-person programming on LGBTQ+ inclusivity in the school setting made impermissible by or declined due to fear of arbitrary or discriminatory enforcement of the vague Gender Identity Notification Provision and the consequent harm to its mission-critical outreach and impact programs; the additional costs incurred

to answer educators' questions relating to the scope and effect of the vague Gender Identity Notification Provision on preexisting LGBTQ+ inclusivity training and policies; the further costs incurred to prepare, offer, and implement LGBTQ+ inclusivity programming that addresses the limitations on educators', students', and GSAs' activities created by the Gender Identity Notification Provision and the risks of arbitrary and discriminatory enforcement of its vague prohibitions; and the frustration of its organizational purpose of maintaining a GSA network by the restrictions and prohibitions imposed upon its member GSAs due to the fear of arbitrary and discriminatory enforcement of the Gender Identity Notification Provision.

327.    Iowa Safe Schools' members include both individual students in Iowa public schools. Iowa Safe Schools' members also include GSAs. Iowa Safe Schools asserts in its representational capacity the rights of those student members whose rights to engage in speech, expressive conduct, and in expressive association have been infringed upon due to the vagueness of the Gender Identity Notification Provision, in that they have refrained from speech that would potentially trigger a report, including identifying themselves as transgender or gender nonconforming, seeking relief from anti-transgender bullying, and utilizing school counseling or support services, and have further refrained from open participation in GSAs due to the risk of being reported.

328.    Iowa Safe Schools further asserts in its representational capacity the rights of GSAs in its membership that have had their right to engage in expressive association infringed upon by due to the fear of arbitrary and discriminatory enforcement of the Gender Identity Notification Provision, in that membership and open participation in GSAs has declined due to students' fear of a report, and in that GSAs have been denied support provided other student groups for educators' fear of having to make a report.

329.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to engage in speech and expressive conduct that expresses their identity, and engage in expressive association by forming and participating in GSAs to promote and preserve their rights as LGBTQ+ students.

330.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

331.    State Defendants are responsible for enforcement of the Gender Identity Notification Provision. The declaratory and injunctive relief sought by Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools in its organizational and associational capacities would redress the harm caused by State Defendants' enforcement of the Gender Identity Notification Provision, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would revert to practices and policies in place prior to enforcement, including the fear of arbitrary and discriminatory enforcement, of the Gender Identity Notification Provision.

332.    Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools in its organizational and representational capacity are entitled to injunctive relief. Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools' student and gender sexuality alliance members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of arbitrary and discriminatory enforcement of the vague Gender Identity Notification Provision. Plaintiff Educators, Plaintiff Students, and Iowa Safe Schools' student and gender sexuality alliance members have no plain, adequate, or speedy remedy at law.

333.    Plaintiff Educators respectfully request injunctive relief that enjoins State Defendants from enforcing the Gender Identity Notification Provision.

334.    Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins All Defendants from enforcing the Gender Identity Notification Provision.

### III. VIOLATION OF THE FIRST AMENDMENT RIGHTS TO FREEDOM OF SPEECH AND EXPRESSION

335.    The Library Restriction, Gender Identity/Sexual Orientation Prohibition, and Gender Identity Notification Provision, on their face, violate the First Amendment rights to receive information and engage in speech, expressive conduct, and expressive association.

336.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech . . . of the right of the people peaceably to assemble."

337.    In the case of private, noncurricular speech or expressive conduct in the school setting, the right to engage in such speech and expressive conduct is unconstitutionally infringed upon when restricted despite not presenting a material and substantial interference with the requirements of appropriate discipline in the operation of school or impinging upon the rights of other students.

338.    Government regulation of private speech based on viewpoint discrimination is subject to strict scrutiny, requiring the government to demonstrate the restriction is narrowly tailored and necessary to further a compelling governmental interest.

339.    Government laws and actions violate the First Amendment when, taken as a whole, they create a chilling effect that deters free speech and association rights because they target such expression.

340. In the case of speech or expressive conduct considered school-sponsored, the right to engage in such speech and expressive conduct is unconstitutionally infringed upon if the speech or expressive conduct is restricted without reasonable relation to a legitimate pedagogical concern.

341. In the school setting, the right to receive information is unconstitutionally infringed upon when information otherwise made available in the school is removed from students' access without adequate governmental justification.

### Count 1

### SF 496 Is Facially Unconstitutional Because It Chills Student Speech

342. The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

    a. Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

    b. Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

    c. Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

    d. Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

    e. Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

    f. Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

343.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

344.    Defendants are state actors operating under color of state law.

345.    The First Amendment, applicable to the State of Iowa by the Fourteenth Amendment, provides in part that the government "shall make no law . . . abridging the freedom of speech."

346.    Discrimination against speech based on its content and viewpoint is a violation of the First Amendment. Efforts to suppress speech based on the government's opposition to the speaker's views or beliefs are unconstitutional absent narrow tailoring in service of a compelling justification.

347.    On its face, as legislative history shows, and based on State Defendants' own interpretation in this litigation, SF 496 is a façade for content and viewpoint discrimination. By design, the Library Restriction, GISO Prohibition, and Gender Identity Notification Provisions of SF 496 are meant to suppress speech on the basis of viewpoint and content. SF 496 is facially unconstitutional under the First Amendment.

348.    On its face and in its intent, purpose, and effect, SF 496 attempts to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, most notably, the inclusion, affirmation, and support of LGBTQ+ students and persons. By design, the Library Restriction, GISO Prohibition, and Gender Identity Notification Provisions of SF 496 collapse the spectrum of available knowledge, forbid the discussion of disfavored topics, and penalize the expression of LGBTQ+ identity.

349.    SF 496 impermissibly chills the exercise of all Plaintiff Students' and Iowa Safe Schools' student members' constitutionally protected speech based on the content and viewpoint of their speech and is unconstitutional as applied to Plaintiffs under the First Amendment.

350.    School District Defendants have implemented and unless enjoined will continue to implement SF 496 in a way that explicitly censors messages of inclusion, affirmation, and support with respect to students' LGBTQ+ orientation or gender identity. SF 496 therefore is unconstitutional as applied to Plaintiffs and ISS Member Students under the First Amendment.

351.    The First Amendment guarantees Iowa students the right to speak, express themselves, and associate with other like-minded students, including in schools. These rights include the right to speak about and express their own gender identity or sexual orientation, to affirm their friends' or loved ones' gender identity or sexual orientation, to ask questions of their teachers and trusted school staff members about gender identity and sexual orientation, to organize into or join GSAs, to wear clothing consistent with their gender or that otherwise indicates that they are members of the LGBTQ+ community, and to otherwise engage in conduct expressing messages of inclusion, affirmation, and support for LGBTQ+ students and persons.

352.    Speech and expression "relating to gender identity or sexual orientation" or "intended to affirm . . . gender identity," such as coming-out speech, is protected First Amendment activity. So too is reading and discussing books and materials that express messages of support and inclusion for members of the LGBTQ+ community.

353.    The Library Restriction, GISO Prohibition, and Gender Identity Notification Provisions of SF 496 taken together chill student speech and expression related to sexual orientation and gender identity at all grade levels. By prohibiting speech related to gender identity or sexual orientation in kindergarten through sixth grade; requiring that educational programming for all grades, including all activities in and outside of the classroom, exclude descriptions of sex acts; banning books from classrooms and libraries; mandating the outing of students to parents or guardians regardless of whether doing so would put the student at risk; inviting anonymous

complaints by parents; and enforcing the law via draconian penalties including the potential loss of licensure for school employees and loss of accreditation for schools, the law communicates to all LGBTQ+ students that they should remain silent.

354.    Accordingly, SF 496 on its face and the manner in which the Defendants are implementing it impermissibly chills Plaintiffs' and Iowa Safe Schools' student members' speech and expression and causes them to self-censor. The Library Restriction, GISO Prohibition, and Gender Identity Notification Provision, taken together, in their intent and purpose, as applied, and in effect, impermissibly infringe upon students' expressive rights based upon the content of the expression, the message they mean to convey, and the ideas and subject matter expressed individually or as groups associated for that purpose, and on its face, infringes upon said rights based upon the viewpoint of the speaker.

355.    SF 496 is not narrowly tailored to a compelling government interest.

356.    As a content- and viewpoint-based regulation that is neither justified by a compelling government interest nor narrowly tailored to achieve any arguable interest, SF 496 violates students' First Amendment rights.

357.    As a regulation of private, non-curricular student speech, SF 496 infringes upon students' expressive rights without any justification of a material and substantial interference with the requirements of appropriate discipline in the operation of school or an impingement upon the rights of other students.

358.    As a regulation of student speech that may be considered school-sponsored, SF 496 infringes upon students' expressive rights without any reasonable relation to legitimate pedagogical concerns and is thus unconstitutional.

359.    The overbreadth of the GISO Prohibition and Gender Identity Notification Provision, together with the vagueness of those provisions and the Library Restriction, has created, and was intended to create, an environment in which the expression of LGBTQ+ identity or support for LGBTQ+ inclusion is discouraged. In an effort to comply with the broad prohibitions of SF 496 to avoid the potential for arbitrary and discriminatory enforcement by State Defendants, school districts across the state, including School District Defendants, have identified conflicting lists of books for removal disproportionately focused on books with LGBTQ+ characters or addressing LGBTQ+ issues, disparate rules for GSA participation falling uniquely upon these and no other student-led groups, differing understandings of where, when, or how the concepts of gender identity or sexual orientation can be discussed, and vastly different policies on the speech or expression that would necessitate a report to a student's parent or guardian, all underscoring the overbreadth and the vagueness of the law. This uncertainty among those charged with applying SF 496, which is intended by those charged with enforcing it through disciplinary measures, naturally deters and chills constitutionally protected speech as Plaintiff Students, Iowa Safe Schools' student members, and other LGBTQ+ students not before the Court choose simply to abstain from protected speech rather than undertake the risk of discipline for themselves or teachers.

360.    Moreover, the overbreadth and vagueness of SF 496 and the unpredictable and inconsistent efforts to comply with it have conveyed a message that LGBTQ+ people and their families are not as worthy as others and that LGBTQ+ students are inherently vulgar, promiscuous, obscene, shameful, or inappropriate for school, further chilling Plaintiff Students, Iowa Safe Schools' student members, and other LGBTQ+ students not before the Court from engaging in constitutionally protected speech due to the stigma attached.  Abstaining from protected speech harms Plaintiffs and society as a whole, which is deprived of an uninhibited marketplace of ideas.

361.    In the past, Plaintiff Students and Iowa Safe Schools' student members have engaged in protected speech and expression concerning their own or others' sexual orientation and gender identity in school contexts and with other students. They wish to continue to do so. However, because of SF 496, these Plaintiffs have been chilled and/or forced to self-censor by taking care not to mention their own sexual orientation and/or gender identity, or otherwise engaging in related speech and expression in school contexts when they otherwise would do so.

362.    SF 496 stigmatizes and silences P.B.-P., chilling him from engaging in protected speech acknowledging who he is and advocating for the LGBTQ+ community. Despite the bullying and harassment P.B.-P. experienced, he used to feel more comfortable wearing clothing or buttons in school with the Pride rainbow flag or other indicators that he is a member of the LGBTQ+ community. After passage of SF 496, however, his worries about being a target have reached a new high, and he now self-censors such expression.

363.    P.B.-P. used to refer to his identity as transgender in class or related schoolwork when it was relevant, such as in essays on self-reflection, overcoming personal challenges, what he would say to his younger self, and what it means to be American. Now that SF 496 has been enacted, he self-censors such references out of concerns for his own safety and fear that mentioning his identity as transgender will get his teachers in trouble. Rather than correct peers and teachers who use incorrect pronouns to refer to him, P.B.-P. now self-censors because he fears discipline and does not want to get a teacher in trouble during class for correcting his own pronouns.

364.    SF 496 also chills P.B.-P. from engaging in speech protesting anti-LGBTQ+ legislation affecting Iowa students. As a member of his school's GSA during his freshman year, he led a protest against such measures, gathering outside of the school. After SF 496 was passed, P.B.-P. feels terrified of staging another protest. The law has caused anti-LGBTQ sentiment to

increase at his school, and students fear punishment from school officials for participating in such a protest.

365.    Plaintiff A.C. used to love school and could not wait to go every morning. But because of SF 496, she has become reluctant and fearful to go to school. A.C. now feels unsafe and as if she is being watched. A.C. is aware, even at her young age, that teachers whom she once trusted are now not permitted to be sources of support to her, because of the law. A.C. is hurt, stressed, and upset as a result. The law sends A.C. the message that there is something wrong with her, and that she should be silenced and erased from school.

366.    Plaintiff T.S. self-censors references to her identity in class, trying never to mention that she is a lesbian because she fears that teachers will react poorly and crack down on students as a result of SF 496. T.S. has experienced bullying in the past targeting her identity as a lesbian. She was called names, slurs, mocked, pushed to the ground, shoved into a locker, and bullied so harshly in science class that she repeatedly felt forced to go to a counselor's room instead of to class. She filled out at least 50 incident report sheets over the course of one year. She fears increased bullying as a result of SF 496.

367.    SF 496 causes Plaintiff B.F. to feel unwanted, shameful, and unwelcome in school. It interferes with B.F.'s relationship with teachers because B.F. self-censors mention of their gender identity and pronouns even to supportive teachers for fear of getting a teacher fired, and for fear of harassment by other students who now feel encouraged to bully LGBTQ+ students as a result of the law. In the past, fellow students have harassed B.F., calling them slurs, a slut, and telling them to kill themself. Since SF 496 was passed, the harassment has become worse, making B.F. feel uncomfortable and less safe at school.

368.    The law has caused Plaintiff B.F.S. to feel as though they have a target on their back at school. B.F.S. already has experienced bullying in school for expressing their LGBTQ+ identity, including on "Culture Day," when students were invited to wear flags celebrating diverse cultures. Because B.F.S. wore rainbow socks and a Pride flag, another student yelled, "Jesus hates you! You're going to hell!" SF 496 sends the message to B.F.S. that students can expect this kind of targeted harassment if they express themselves as LGBTQ+. B.F.S. now thinks twice before wearing a Pride shirt, button, or anything else that expresses their identity and feels less safe at school.

369.    Plaintiff JAMES DOE is aware of other students who have been bullied based on their LGBTQ+ identities but fear telling teachers about the bullying because they do not wish to be outed to their parents. DOE and other students are hesitant to bring up queer themes and topics in classes and outside of class in school for fear of getting teachers in trouble.

370.    Iowa Safe Schools' members include individual students in Iowa public schools subject to these provisions of SF 496. Iowa Safe Schools asserts in its representational capacity the right of these members whose speech has been chilled by SF 496.

371.    Plaintiff Students', Iowa Safe Schools' student members', and other LGBTQ+ students not before the Court's speech is presently being chilled and will continue to be chilled as Defendants and their agents seek to enforce the law. Plaintiff Students and Iowa Safe Schools in its representational capacity on behalf of its student members are entitled to declaratory and injunctive relief from the Defendants to remedy the deprivations suffered as a result of the violations of their First Amendment rights.

372.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to engage in speech and expressive conduct.

373.    Iowa Safe Schools's claim and the relief it requests do not require the participation of its individual members.

374.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality of the Library Restriction, GISO Prohibition, and Gender Identity Notification Provision, and whether they violate the right to engage in speech or expressive conduct. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that these provisions of SF 496 are unconstitutional.

375.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Library Restriction, GISO Prohibition, and Gender Identity Notification Provision. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing these provisions of SF 496 and directs School District Defendants to restore any materials and revert any changes to school policy already made to comply with these provisions of SF 496.

**Count 2**

**The Library Restriction Unconstitutionally Infringes the
Right to Receive Information under the First Amendment**

376.     The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

  a.  Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

  b.  Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

  c.  Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

  d.  Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

  e.  Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

  f.  Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

377.     Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

378.     The Library Restriction infringes upon students' First Amendment right to receive information.

379.     The Library Restriction has resulted in the removal of thousands of books and other materials from Iowa school libraries. The Library Restriction continues to require the removal of books and other materials.

380.    The removal of these books and other materials from Iowa school libraries was done, and will continue to be done, without a substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

381.    The books and other materials that have been, or are at imminent risk of being, removed supported and were consistent with Iowa schools' central mission of educating Iowa's children. The books and other materials in Iowa school libraries have been selected for inclusion after being determined to be suitable for the developmental and social maturity of the grade or grades for which the books and other materials are made available.

382.    Plaintiff Students are all students at Iowa public schools subject to the Library Restriction. All Plaintiff Students' right to receive information has been infringed upon or is imminent danger of being infringed upon due to the Library Restriction.

383.    Iowa Safe Schools' members include individual students in Iowa public schools subject to the Library Restriction. Iowa Safe Schools asserts in its representational capacity the right of these members to receive information, infringed upon by the Library Restriction.

384.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to books and other materials reflecting their identity.

385.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

386.    State Defendants are responsible for enforcement of the Library Restriction. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its representational capacity would redress the harm caused by State Defendants' enforcement of the

Library Restriction, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would make the removed books and materials available to them again, given all such books and materials previously included in these school libraries had already been deemed to be age appropriate and supportive of the schools' and students' educational goals.

387.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality of the Library Restriction and whether it violates the right to receive information. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the Library Restriction is unconstitutional.

388.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Library Restriction. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the Library Restriction.

## Count 3

### The Gender Identity/Sexual Orientation Prohibition Unconstitutionally Infringes on the Right to Receive Information, and Engage in Speech and Expressive Conduct

389.    This count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its GSAs and Individual Student Members, against State Defendants.

390.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

391.    The Gender Identity/Sexual Orientation Prohibition has infringed upon students' rights to receive information and engage in speech and expressive conduct.

392.    The GISO Prohibition has infringed upon students' First Amendment right to receive information by its the prohibition on classroom activities that bear upon LGBTQ+ identities and orientations, such as an in-class reading of a book featuring an LGBTQ+ character; the prohibition of instruction on LGBTQ+ identities and orientations, such as explanation or guidance on gender identity in response to an incident of harassment or bullying; its prohibition on promotion of books and materials with LGBTQ+ characters and themes, such as by recommendation or display; and, to the extent such has occurred and continues to occur notwithstanding State Defendants' assertion that the GISO Prohibition does not apply to the availability of books in school libraries, its requiring the removal of books with LGBTQ+ characters or themes.

393.    This infringement on students' right to receive information does not serve a substantial and reasonable governmental interest or a legitimate pedagogical purpose.

394.    The GISO Prohibition has infringed upon students' First Amendment right to engage in speech and expressive conduct by prohibiting classroom discussion of LGBTQ+ issues, such as a student project on the history of LGBTQ+ rights or an LGBTQ+ figure; prohibiting the display of LGBTQ+ symbols, such as student placement of a flyer for an LGBTQ+ pride group; and chilling students from engaging in other speech or expressive conduct that would identify them as LGBTQ+, during and outside of classroom instructional time.

395.    To the extent this student speech or expressive conduct is school-sponsored, its restriction is not justified by reasonable relation to a legitimate pedagogical concern.

396.    To the extent this student speech or expressive conduct is private, noncurricular speech, its restriction is not justified by the presentation of a material and substantial interference with the requirements of appropriate discipline in the operation of school or impinging upon the rights of other students.

397.    Student Plaintiff A.C. is a fifth-grade student in an Iowa public school subject to the GISO Prohibition. Student Plaintiff A.C.'s First Amendment right to receive information has been infringed upon by the prohibition of instruction on LGBTQ+ issues in response to an incident of harassment or bullying; and the removal or prohibition on the promotion of books describing and explaining LGBTQ+ identities and orientation or otherwise featuring LGBTQ+ themes or characters, as well as the removal and prohibition on the promotion of symbols of LGBTQ+ inclusion. Student Plaintiff A.C.'s First Amendment right to engage in speech and expressive conduct has been infringed upon in that she has been chilled or forced to engage in self-censorship including refraining from classroom discussion of LGBTQ+ issues and refraining from speech or expressive conduct that would identify her as transgender. Student Plaintiff A.C.'s First Amendment right to engage in expressive association has been infringed upon by the prohibition on the maintenance of a student-led, extracurricular GSA.

398.    Plaintiff Students are all students in Iowa public school districts subject to the GISO Prohibition. All Plaintiff Students' First Amendment right to speech and expressive conduct has been infringed upon as they have been chilled or forced to engage in self-censorship due to the GISO Prohibition.

399.    Iowa Safe Schools' members include both individual students in Iowa public schools, including students in the kindergarten through sixth-grade setting. Iowa Safe Schools' members also include GSAs, including GSAs in kindergarten through sixth-grade schools. Iowa

Safe Schools asserts in its representational capacity the rights of those student members whose rights to receive information and engage in speech and expressive conduct have been infringed upon by the GISO Prohibition.

400.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to have access to information about their identity and engage in speech and expressive conduct that expresses their identity.

401.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

402.    State Defendants are responsible for enforcement of the GISO Prohibition. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its associational capacities would redress the harm caused by State Defendants' enforcement of the GISO Prohibition, as Plaintiff Students' and Iowa Safe Schools' student members' local school districts would revert to practices and policies in place prior to enforcement of the GISO Prohibition.

403.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality of the GISO Prohibition and whether it violates the right to receive information or engage in speech or expressive conduct. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the GISO Prohibition is unconstitutional.

404.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the GISO Prohibition.

### Count 4
### The Gender Identity Notification Provision Unconstitutionally Infringes on the Right to Freedom of Speech and Expression

405.    The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

a.    Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

b.    Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

c.    Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

d.    Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

e.    Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

      f.   Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

406.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

407.    The Gender Identity Notification Provision has infringed upon students' right to engage in speech and expressive conduct by chilling them or forcing them to engage to engage in self-censorship, in that speech or expressive conduct that would reveal their gender identity, particularly a gender identity different that that assigned to them at birth ("coming out" speech), would result in a report to their parent or guardian without regard for their wishes and safety, or alternatively that they would put a trusted educator who refused to report them at risk for disciplinary action, and therefore they have refrained from engaging in such speech or expressive conduct. Such speech or expressive conduct from which students have refrained and will continue to refrain while the Gender Identity Notification Provision is enforceable includes requesting or signaling a request they be referred to by their proper name or pronoun, such as a verbal request or by displaying a pin, sticker, or other sign that indicates their chosen pronoun; participating openly in a GSA or GSA event, such as by sharing their experience with their gender identity, asking other students for guidance and advice on seeking gender-affirmation socially, or promoting gender-affirming inclusive school policies; seeking and receiving school resources, such as making requesting support from teachers and administrators following an incident of anti-trans bullying—whether experienced as the victim or having witnessed another student victim, or making disclosures to a school-provided mental health counselor or social worker regarding theirs or another's theirs or another student's struggles with a non-affirming home environment; or otherwise expressing their own or supporting another student's expression of their gender identity.

408.    To the extent this student speech or expressive conduct is school-sponsored, its restriction is not justified by a legitimate pedagogical concern.

409.    To the extent this student speech or expressive conduct is private, noncurricular speech, its restriction is not justified by the presentation of a material and substantial interference with the requirements of appropriate discipline in the operation of school or impinging upon the rights of other students.

410.    Plaintiff Students are all students in Iowa public school districts subject to the Gender Identity Notification Provision. All Plaintiff Students' First Amendment right to speech and expressive conduct has been infringed upon as they have been chilled or forced to engage in self-censorship due to the Gender Identity Notification Provision.

411.    Iowa Safe Schools' members include both individual students in Iowa public schools. Iowa Safe Schools' members also include GSAs. Iowa Safe Schools asserts in its representational capacity the rights of those student members whose rights to engage in speech and expressive conduct have been infringed upon by the Gender Identity Notification Provision.

412.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to engage in speech and expressive conduct that expresses their gender identity.

413.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

414.    State Defendants are responsible for enforcement of the Gender Identity Notification Provision. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its representational capacity would redress the harm caused by State Defendants'

enforcement of the Gender Identity Notification Provision, as Plaintiff Students' and Iowa Safe Schools' members' local school districts would revert to practices and policies in place prior to enforcement of the Gender Identity Notification Provision.

415.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality of the Gender Identity Notification Provision and whether it violates the right to receive information or engage in speech or expressive conduct. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the Gender Identity Notification Provision is unconstitutional.

416.    Plaintiff Students' and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Gender Identity Notification Provision. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the Gender Identity Notification Provision.

### Count 5
### As Applied by Waterloo Community School District, The Library Restriction Unconstitutionally Infringes on the Right to Receive Information

417.    This count is brought by P.B.-P., through His Parent and Next Friend, Belinda Scarrott,  against Waterloo Community School District  Defendants.

418.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

419.    Waterloo Community School District Defendants' application of the Library Restriction infringes upon Plaintiff P.B.-P.'s First Amendment right to receive information.

420.    Plaintiff P.B.-P.  attends Waterloo West High School, in the Waterloo Community School District.

421.    Books by LGBTQ+ authors, or featuring LGBTQ+ characters or issues, are of great importance to P.B.-P., as their presence on the school library shelves help him feel safe and welcome. P.B.-P. enjoys reading such books, citing their importance to him in understanding his own gender identity and feeling a part of a community. Books P.B.-P. has found impactful include *Gracefully Grayson* by Ami Polonsky, *Hell Followed With Us* by Andrew Joseph White, *Orlando* by Virginia Woolf, *Heartstopper* by Alice Oceman, *Good Omens* by Terry Pratchett and Neil Gaiman, and *Red, White, and Royal Blue* by Casey McQuiston.

422.    Plaintiff P.B.-P. has and wishes to continue recommending books by LGBTQ+ authors, or featuring LGBTQ+ characters or issues, to other students who he believes will benefit from reading them. For example, P.B.-P. has recommended and shared a copy of *Gracefully Grayson*.

423.    The Waterloo Community School District has not publicly identified the complete list of books it has removed or will remove from school libraries pursuant to the Library Restriction. However, the Waterloo Community School District has removed or will remove the following from the Waterloo West High School building: *All Boys Aren't Blue* by George M. Johnson, *Gender Queer* by Maia Kobabe, *Let's Talk About It* by Erika Moen and Matthew Nolan, *Lawn Boy* by Jonathan Evison, and *Lucky* by Alice Sebold.

424.    Of these, Plaintiff P.B.-P. has read *All Boys Aren't Blue*, and is reading—and wishes to continue to read—*Lawn Boy*. However, because of the Waterloo Community School

111

District Defendants' application of the Library Restriction, P.B.-P.'s access to *Lawn Boy* will be revoked if he returns it to the school library, he could be subject to discipline if he continues to retain it past its due date, and he is unable to recommend others check out *Lawn Boy* from the school library.

425.    Plaintiff P.B.-P. wishes to see these books and others that have been identified as subject to removal under the law on the school library shelves for the affirming message their inclusion in the collection conveys; to have such books available on the shelves so that he can discover books relevant to him that he would like to read; to check these books out from the school library and read them to learn the stories and information contained within them; to recommend, share, and discuss these books to other students; and to do all of this without experiencing the stigmatization associated with enjoying books that the Library Restriction, its proponents, and those school districts charged with applying it, have, expressly or implicitly, labeled inappropriate, pornography, sexually explicit, or otherwise unacceptable in the school environment, and consequently, the further stigmatization experienced as these terms are attached to those who wish to read or who share characteristics with the characters or themes highlighted by the books removed.

426.    The removal of these books and other materials from the Waterloo West High School violates Plaintiff P.B.-P.'s right to receive information. The Waterloo Community School District applying the Library Restriction to remove these books has done so without any substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

427.    The books and other materials that have been removed from the Waterloo West High School had supported and were consistent with the Waterloo Community School District's central mission of education of the students within its bounds. Such books and other materials

were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending Waterloo West High School.

428.     Waterloo Community School District Defendants are responsible for applying the Library Restriction. The declaratory and injunctive relief sought by Plaintiff P.B.-P. would redress the harm caused by Waterloo Community School District Defendants' application of the Library Restriction, as the removed books and materials would be made available to P.B.-P. again.

429.     Plaintiff P.B.-P. is entitled to declaratory relief. There is an actual and substantial controversy between P.B.-P. and Waterloo Community School District Defendants concerning the constitutionality and application of the Library Restriction, including whether it has violated P.B.-P.'s right to receive information. Plaintiff P.B.-P. respectfully requests a declaration from this Court that Waterloo Community School District Defendants' application of the Library Restriction is unconstitutional.

430.     Plaintiff P.B.-P. is entitled to injunctive relief. P.B.-P. has suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Library Restriction. Plaintiff P.B.-P. has no plain, adequate, or speedy remedy at law. Plaintiff P.B.-P. respectfully requests injunctive relief that enjoins Waterloo Community School District Defendants from applying the Library Restriction in this manner and directs Waterloo Community School District Defendants to return the books and materials removed under their unconstitutional application of the Library Restriction.

## Count 6
### As Applied by Iowa City Community School District, the Library Restriction Unconstitutionally Infringes on the Right to Receive Information

431.     This count is brought by A.C, through her Parents and Next Friends, Richard Carlson and Ulrike Carlson against Iowa City Community School District Defendants.

432.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

433.    Iowa City Community School District Defendants' application of the Library Restriction infringes upon Plaintiff A.C.'s right to receive information.

434.    Plaintiff A.C. attends an elementary school in the Iowa City Community School District.

435.    Books by LGBTQ+ authors, or featuring LGBTQ+ characters or issues, of great importance to A.C. Plaintiff A.C. wishes to access and read such books, as well as non-fiction books about adolescence, including those discussing changes to the body during puberty, a topic of great interest and concern to A.C. Plaintiff A.C.'s parents, Richard Carlson and Ulrike Carlson, want A.C. to be able to access and read books that acknowledge and support her gender identity, and to discover new books that provide an important avenue for her self-discovery.

436.    The Iowa City Community School District has removed at least 67 titles from school libraries in its district pursuant to the Library Restriction. The Iowa City Community School District has removed books pursuant to the Library Restriction from the elementary school attended by Plaintiff A.C.

437.    Among the books removed which Plaintiff A.C. wishes to read is the referenced non-fiction book about puberty and adolescence and others like it. However, because of the Iowa City Community School District Defendants' application of the Library Restriction, Plaintiff A.C. is unable to find and access this book and other such books in her school library.

438.    Plaintiff A.C. wishes to see these books and others that have been identified as subject to removal under the law on the school library shelves for the affirming message their inclusion in the collection conveys; to have such books available on the shelves so that she can discover books relevant to her that she would like to read; to check these books out from the school

library and read them to learn the stories and information contained within them; to recommend, share, and discuss these books with other students; and to do all of this without experiencing the stigmatization associated with enjoying books that the Library Restriction, its proponents, and those school districts charged with applying it, have, expressly or implicitly, labeled inappropriate, pornography, sexually explicit, or otherwise unacceptable in the school environment, and consequently, the further stigmatization experienced as these terms are attached to those who wish to read or who share characteristics with the characters or themes highlighted by the books removed.

439.    The removal of these books and other materials from A.C.'s elementary school violates Plaintiff A.C.'s right to receive information. The Iowa City Community School District applying the Library Restriction to remove these books has done so without any substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

440.    The books and other materials that have been removed from A.C.'s elementary school had supported and were consistent with the Iowa City Community School District's central mission of education of the students within its bounds. Such books and other materials were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending A.C.'s elementary school.

441.    Iowa City Community School District Defendants are responsible for applying the Library Restriction. The declaratory and injunctive relief sought by Plaintiff A.C. would redress the harm caused by Iowa City Community School District Defendants' application of the Library Restriction, as the removed books and materials would be made available to A.C. again.

442.    Plaintiff A.C. is entitled to declaratory relief. There is an actual and substantial controversy between A.C. and Iowa City Community School District Defendants concerning Iowa

City Community School District Defendants' application of the Library Restriction, including whether it has violated A.C.'s right to receive information. Plaintiff A.C. respectfully requests a declaration from this Court that Iowa City Community School District Defendants' application of the Library Restriction is unconstitutional.

443.    Plaintiff A.C. is entitled to injunctive relief. A.C. has suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Library Restriction. Plaintiff A.C. has no plain, adequate, or speedy remedy at law. Plaintiff A.C. respectfully requests injunctive relief that enjoins Iowa City Community School District Defendants from applying the Library Restriction in this manner and directs Iowa City Community School District Defendants to return the books and materials removed under their unconstitutional application of the Library Restriction.

## Count 7
### As Applied by Urbandale Community School District, The Library Restriction Unconstitutionally Infringes on the Right to Receive Information

444.    This count is brought by T.S., through her Parent and Next Friend Eric Saylor, and by B.F., through their Parent and Next Friend, Lara Newsome, against Urbandale Community School District Defendants.

445.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

446.    Urbandale Community School District Defendants' application of the Library Restriction infringes upon Plaintiff T.S.'s and Plaintiff B.F.'s First Amendment right to receive information.

447.    Plaintiff T.S. and B.F. attend Urbandale High School in the Urbandale Community School District.

448.    Books by LGBTQ+ authors or featuring LGBTQ+ characters or issues are of great importance to Plaintiffs T.S. and B.F. Plaintiff B.F. especially enjoys graphic novels with LGBTQ+ representation, such as *Heartstopper* by Alice Oseman, *Lumberjanes* by Shannon Watters, Grace Ellis, Gus Allen, and ND Stevenson, *Drama* by Raina Telgemeier, and *Laura Dean Keeps Breaking Up With Me* by Mariko Tamaki. Plaintiff T.S. found to book *Rick* by Alex Gino particularly impactful in understanding her identity.

449.    Plaintiff T.S. further notes the importance of books with LGBTQ+ being displayed in school libraries, as it allowed her to discover new books of interest to read and expressed a message of LGBTQ+ inclusion. Plaintiff B.F. similarly expresses the importance of representation on school library shelves.

450.    The Urbandale Community School District has currently identified at least 51 titles for removal from schools within its district. This list was revised after public outcry on a far longer list of titles subject to removal, including titles listed solely for their inclusion of LGBTQ+ characters and themes. Books identified on this list have been removed from the Urbandale High School.

451.    Plaintiff B.F. was insulted, degraded, and shamed by seeing books they have enjoyed, would like to read, or which include representation of their experience, on the list of books removed, and takes offense to the message sent that Plaintiff B.F. and their friends whose identities are represented in the books removed were inappropriate to be in school. Plaintiff T.S. experienced a feeling of being erased from school.

452.    Among the books that have been removed is *Gender Queer: A Memoir* by Maia Kobabe. Plaintiff T.S. wishes to check out *Gender Queer* from her school library and read it but

is unable to due to the Urbandale Community School District Defendants' application of the Library Restriction.

453.    Also among the books that have been removed are *Call Me By Your Name* by Andre Aciman, and *The Color Purple* by Alice Walker. Plaintiff B.F. wishes to check out these books from their school library and read them but is unable to due to the Urbandale Community School District Defendants' application of the Library Restriction.

454.    Plaintiff B.F. and T.S. wish to see these books and others that have been identified as subject to removal under the law on the school library shelves for the affirming message their inclusion in the collection conveys; to have such books available on the shelves so that they can discover books relevant to them that they would like to read; to check these books out from the school library and read them to learn the stories and information contained within them; to recommend, share, and discuss these books with other students; and to do all of this without experiencing the stigmatization associated with enjoying books that the Library Restriction, its proponents, and those school districts charged with applying it, have, expressly or implicitly, labeled inappropriate, pornography, sexually explicit, or otherwise unacceptable in the school environment, and consequently, the further stigmatization experienced as these terms are attached to those who wish to read or who share characteristics with the characters or themes highlighted by the books removed.

455.    The removal of these books and other materials from the Urbandale High School violates Plaintiff B.F.'s and Plaintiff T.S.'s right to receive information. The Urbandale Community School District applying the Library Restriction to remove these books has done so without any substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

456.    The books and other materials that have been removed from the Urbandale High School had supported and were consistent with the Urbandale Community School District's central mission of education of the students within its bounds. Such books and other materials were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending Urbandale High School.

457.    Urbandale Community School District Defendants are responsible for applying the Library Restriction. The declaratory and injunctive relief sought by Plaintiffs B.F. and T.S. would redress the harm caused by Urbandale Community School District Defendants' application of the Library Restriction, as the removed books and materials would be made available to B.F. and T.S. again.

458.    Plaintiffs B.F. and T.S. are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiffs B.F. and T.S. and Urbandale Community School District Defendants concerning Urbandale Community School District Defendants' application of the Library Restriction, including whether it has violated B.F.'s and T.S.'s right to receive information. Plaintiffs B.F. and T.S. respectfully request a declaration from this Court that Urbandale Community School District Defendants' application of the Library Restriction is unconstitutional.

459.    Plaintiffs B.F. and T.S. are entitled to injunctive relief. B.F. and T.S. have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Library Restriction. Plaintiffs B.F. and T.S. have no plain, adequate, or speedy remedy at law. Plaintiffs B.F. and T.S. respectfully request injunctive relief that enjoins Urbandale Community School District Defendants from applying the Library Restriction in this manner and

directs Urbandale Community School District Defendants to return the books and materials removed under their unconstitutional application of the Library Restriction.

**Count 8**

**As Applied by West Des Moines Community Schools, the Library Restriction Unconstitutionally Infringes on the Right to Receive Information**

460.    This count is brought by B.F.S., through their Parents and Next Friends, Brigit and Joseph Stevens,  against West Des Moines Community Schools Defendants.

461.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

462.    West Des Moines Community Schools Defendants' application of the Library Restriction infringes upon Plaintiff B.F.S.'s right to receive information.

463.    Plaintiff B.F.S. attends Valley Southwoods Freshman High School in the West Des Moines Community Schools district.

464.    Books by LGBTQ+ authors or featuring LGBTQ+ characters or issues are of great importance to Plaintiff B.F.S. Plaintiff B.F.S. notes the importance of books with LGBTQ+ representation being included in school libraries alongside books with representation of other groups, in that their presence alongside such other books sends the message that nothing is wrong with LGBTQ+ people.

465.    The Library Restriction has resulted in the removal of at least 47 titles from the West Des Moines Community Schools district. Books on this list have been removed from Valley Southwoods Freshman High School.

466.    Among the books removed are books by LGBTQ+ authors and featuring LGBTQ+ characters, which Plaintiff B.F.S. would otherwise wish to check out and read. Due to the Library Restriction, Plaintiff B.F.S. is unable to do so.

467.    Plaintiff B.F.S. wishes to see these books and others that have been identified as subject to removal under the law on the school library shelves for the affirming message their inclusion in the collection conveys; to have such books available on the shelves so that they can discover books relevant to her that they would like to read; to check these books out from the school library and read them to learn the stories and information contained within them; to recommend, share, and discuss these books with other students; and to do all of this without experiencing the stigmatization associated with enjoying books that the Library Restriction, its proponents, and those school districts charged with applying it, have, expressly or implicitly, labeled inappropriate, pornography, sexually explicit, or otherwise unacceptable in the school environment, and consequently, the further stigmatization experienced as these terms are attached to those who wish to read or who share characteristics with the characters or themes highlighted by the books removed.

468.    The removal of these books and other materials from Valley Southwoods Freshman High School violates Plaintiff B.F.S.'s right to receive information. The West Des Moines Community Schools district applying the Library Restriction to remove these books has done so without any substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

469.    The books and other materials that have been removed from Valley Southwoods Freshman High School had supported and were consistent with the West Des Moines Community Schools' central mission of education of the students within its bounds. Such books and other materials were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending Valley Southwoods Freshman High School.

470.    West Des Moines Community Schools Defendants are responsible for applying the Library Restriction. The declaratory and injunctive relief sought by Plaintiff B.F.S. would redress the harm caused by West Des Moines Community Schools Defendants' application of the Library Restriction, as the removed books and materials would be made available to B.F.S. again.

471.    Plaintiff B.F.S. is entitled to declaratory relief. There is an actual and substantial controversy between B.F.S. and West Des Moines Community Schools Defendants concerning West Des Moines Community Schools Defendants' application of the Library Restriction, including whether it has violated B.F.S.'s right to receive information. Plaintiff B.F.S. respectfully requests a declaration from this Court that West Des Moines Community Schools Defendants' application of the Library Restriction is unconstitutional.

472.    Plaintiff B.F.S. is entitled to injunctive relief. B.F.S. has suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Library Restriction. Plaintiff B.F.S. has no plain, adequate, or speedy remedy at law. Plaintiff B.F.S. respectfully requests injunctive relief that enjoins West Des Moines Community Schools Defendants from applying the Library Restriction in this manner and directs West Des Moines Community Schools Defendants to return the books and materials removed under their unconstitutional application of the Library Restriction.

### Count 9
### As Applied by Sioux City Community Schools, the Library Restriction Unconstitutionally Infringes on the Right to Receive Information

473.    This count is brought by James Doe, through his Parent and Next Friend, John Doe, against Sioux City Community Schools Defendants.

474.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

475.    Sioux City Community School District Defendants' application of the Library Restriction infringes upon Plaintiff James Doe's right to receive information.

476.    Plaintiff Doe attends a high school in the Sioux City Community School District.

477.    Books by LGBTQ+ authors or featuring LGBTQ+ characters or issues, as well as books with advanced subject matter, are of great importance to Plaintiff Doe. Plaintiff Doe takes advanced reading courses and wishes to access books that will help him excel in this coursework and prepare him for college. Plaintiff Doe further wishes to see his identity reflected on school library shelves for the destigmatizing effect this has.

478.    The Sioux City Community School District has not publicly identified the titles it has removed or will remove pursuant to the Library Restriction. However, books have been removed or imminently will be removed from Plaintiff Doe's high school pursuant to the Library Restriction.

479.    Plaintiff Doe wishes to access books reflecting his identity, as well as books that will aid him in his coursework and prepare him for college. However, because of the Sioux City Community School District Defendants' application of the Library Restriction, Plaintiff Doe's ability to discover and access such books has been restricted.

480.    Plaintiff Doe wishes to see these books and others that have been identified as subject to removal under the law on the school library shelves for the affirming message their inclusion in the collection conveys; to have such books available on the shelves so that he can discover books relevant to him that he would like to read; to check these books out from the school library and read them to learn the stories and information contained within them; to recommend, share, and discuss these books with other students; and to do all of this without experiencing the stigmatization associated with enjoying books that the Library Restriction, its proponents, and

those school districts charged with applying it, have, expressly or implicitly, labeled inappropriate, pornography, sexually explicit, or otherwise unacceptable in the school environment, and consequently, the further stigmatization experienced as these terms are attached to those who wish to read or who share characteristics with the characters or themes highlighted by the books removed.

481.    The removal of these books and other materials from Doe's high school violates Plaintiff Doe's right to receive information. The Sioux City Community School District Defendants applying the Library Restriction to remove these books has done so without any substantial or reasonable governmental interest, or even a legitimate pedagogical concern.

482.    The books and other materials that have been removed from Doe's high school had supported and were consistent with Sioux City Community School District's central mission of education of the students within its bounds. Such books and other materials were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending Doe's high school.

483.    Sioux City Community School District Defendants are responsible for applying the Library Restriction. The declaratory and injunctive relief sought by Plaintiff Doe would redress the harm caused by Sioux City Community School District Defendants' application of the Library Restriction, as the removed books and materials would be made available to Doe again.

484.    Plaintiff Doe is entitled to declaratory relief. There is an actual and substantial controversy between Doe and Sioux City Community School District Defendants concerning Sioux City Community School District Defendants' application of the Library Restriction, including whether it has violated Doe's right to receive information. Plaintiff Doe respectfully

requests a declaration from this Court that Sioux City Community School District Defendants' application of the Library Restriction is unconstitutional.

485.    Plaintiff Doe is entitled to injunctive relief. Doe has suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Library Restriction. Plaintiff Doe has no plain, adequate, or speedy remedy at law. Plaintiff Doe respectfully requests injunctive relief that enjoins Sioux City Community School District Defendants from applying the Library Restriction in this manner and directs Sioux City Community School District Defendants to return the books and materials removed under their unconstitutional application of the Library Restriction.

### Count 10

### As Applied by Iowa City Community School District, the
### Gender Identity/Sexual Orientation Prohibition Unconstitutionally
### Infringes on the Right to Freedom of Speech and Expression

486.    This count is brought by A.C, through her Parents and Next Friends, Richard Carlson and Ulrike Carlson, and Iowa Safe Schools Behalf of its Members in the Iowa City Community School District against Iowa City Community School District Defendants

487.    Plaintiffs incorporate paragraphs 335 through 341 as if fully set forth in this count.

488.    Iowa City Community School District Defendants' application of the Gender Identity/Sexual Orientation Prohibition has infringed upon Plaintiff A.C.'s First Amendment rights to receive information and engage in speech and expressive conduct.

489.    Iowa City Community School District Defendants' application of the GISO Prohibition has further infringed upon the same rights of Iowa Safe Schools' student members in the Iowa City Community School District.

490.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to protecting the rights of LGBTQ+ students,

125

including the rights of LGBTQ+ students to receive information relating to gender identity or sexual orientation and to engage in speech and expressive conduct that relates to gender identity or sexual orientation.

491.    Iowa Safe Schools' claim on behalf of student members in the Iowa City Community School District does not require the participation of its individual members.

492.    Plaintiff A.C.'s parents, Richard Carlson and Ulrike Carlson, consider the availability of information related to LGBTQ+ issues in the school environment extremely important to A.C.'s safety and overall success at her elementary school. The Carlsons note Iowa City Community School District Defendants' removal of all messages of support for LGBTQ+ identities, such as pride flags and "safe space" stickers, made A.C. feel singled out and unwelcomed for her differences. Ulrike Carlson notes the inability of A.C.'s educators to confront anti-trans bullying without providing information on gender identity, and the consequent negative effect this has had upon A.C.'s school experience. Richard Carlson notes A.C.'s fears that prompting in-class discussion of LGBTQ+ issues would be prohibited or lead to discipline. The Carlsons further note the removal, or potential removal, of books by LGBTQ+ authors or featuring LGBTQ+ characters from school libraries, as well as the prohibition on in-class or extracurricular readings of such books, and that these applications of the GISO Prohibition have made A.C. feel alienated and like an outcast.

493.    Iowa Safe Schools' members include LGBTQ+ students in the Iowa City Community School District, including students in the kindergarten through sixth-grade setting. Such members have experienced the same or substantially similar infringements upon their right to receive information as those articulated by A.C. through her parents, due to the Iowa City Community School District Defendants' application of the GISO Prohibition.

494.    Iowa City Community School District Defendants' application of the GISO Prohibition has infringed upon Plaintiff A.C.'s and Iowa Safe Schools' student members in the Iowa City Community School District's First Amendment right to receive information by its the prohibition on classroom activities that bear upon LGBTQ+ identities and orientations, such as an in-class reading of a book featuring an LGBTQ+ character; the prohibition of instruction on LGBTQ+ identities and orientations, such as explanation or guidance on gender identity in response to an incident of harassment or bullying; its prohibition on promotion of books and materials with LGBTQ+ characters and themes, such as by recommendation or display; and, to the extent such has occurred and continues to occur notwithstanding State Defendants' assertion that the GISO Prohibition does not apply to the availability of books in school libraries, its requiring the removal of books with LGBTQ+ characters or themes.

495.    Iowa City Community School District Defendants' infringement upon Plaintiff A.C.'s and Iowa Safe Schools' student members in the Iowa City Community School District's right to receive information does not serve a substantial and reasonable governmental interest or a legitimate pedagogical purpose.

496.    The information, books, materials, or other message relating to gender identity or sexual orientation previously contained within Plaintiff A.C.'s elementary school and the schools of Iowa Safe Schools' student members in the Iowa City Community School District had supported and were consistent with the Iowa City Community School District's central mission of education of the students within its bounds. Such information, books, materials, and other messages were, in fact, selected for inclusion after being determined to be suitable for the developmental and social maturity of the students attending Plaintiff A.C.'s elementary school and the schools of Iowa Safe Schools' student members in the Iowa City Community School District.

497.    Iowa City Community School District Defendants' application of the GISO Prohibition has further infringed upon Plaintiff A.C.'s and Iowa Safe Schools' student members in the Iowa City Community School District's First Amendment right to engage in speech and expressive conduct.

498.    Plaintiff A.C. has, due to the Iowa City Community School District Defendants' application of the GISO Prohibition, been chilled from protected expression and has otherwise been forced to engage in self-censorship. Richard Carlson notes A.C.'s fear of expressing herself as a transgender girl in the classroom, giving a presentation on transgender rights, or asking questions about the gender identity or sexual orientation of a books characters. Ulrike Carlson notes A.C. has avoided wearing clothing to school that might reveal her biological sex and has refrained from sharing her identity as a transgender girl.

499.    Iowa Safe Schools' members include LGBTQ+ students in the Iowa City Community School District, including students in the kindergarten through sixth-grade setting. Such members have experienced the same or substantially similar infringements upon their right to engage in speech and expressive conduct as those articulated by A.C. through her parents, due to the Iowa City Community School District Defendants' application of the GISO Prohibition.

500.    To the extent such speech or expressive conduct is school-sponsored, Iowa City Community School District Defendants' restriction of it is not justified by reasonable relation to a legitimate pedagogical concern.

501.    To the extent such speech or expressive conduct is private, noncurricular speech, Iowa City Community School District Defendants' restriction of it is not justified by the presentation of a material and substantial interference with the requirements of appropriate discipline in the operation of school or an impingement upon the rights of other students.

502.    Iowa City Community School District Defendants are responsible for applying the GISO Prohibition. The declaratory and injunctive relief sought by Plaintiff A.C. and Iowa Safe Schools on behalf of its student members in the Iowa City Community School District would redress the harm caused by Iowa City Community School District Defendants' application of the GISO Prohibition, in that the information, books, materials, and other messages relating to gender identity or sexual orientation would be returned or permitted, and the restrictions on expressive conduct would be lifted.

503.    Plaintiff A.C. and Iowa Safe Schools on behalf of its student members in the Iowa City Community School District are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff A.C. and Iowa Safe Schools on behalf of its student members in the Iowa City Community School District on the one hand, and Iowa City Community School District Defendants on the other, concerning the constitutionality of Iowa City Community School District Defendants' application of the GISO Prohibition and whether it violates the right to receive information or engage in speech or expressive conduct. Plaintiff A.C. and Iowa Safe Schools respectfully request a declaration from this Court that Iowa City Community School District Defendants' application of the GISO Prohibition is unconstitutional.

504.    Plaintiff A.C. and Iowa Safe Schools on behalf of its student members in the Iowa City Community School District are entitled to injunctive relief. Plaintiff A.C. and Iowa Safe Schools' student members in the Iowa City Community School District have suffered and will continue to suffer irreparable injury as a direct and proximate result of Iowa City Community School District Defendants' application of the GISO Prohibition. Plaintiff A.C. and Iowa Safe Schools' student members in the Iowa City Community School District have no plain, adequate, or speedy remedy at law. Plaintiff A.C. and Iowa Safe Schools respectfully request injunctive relief

that enjoins Iowa City Community School District Defendants from applying the GISO Prohibition

in this manner and directs Iowa City Community School District Defendants to restore and permit

the dissemination of all information, books, materials, and other messages removed pursuant to

their application of the GISO Prohibition and to revert to the policies and practices in place with

respect to student expression prior to their unconstitutional application of the GISO Prohibition.

## IV. VIOLATION OF THE FIRST AMENDMENT RIGHT OF EXPRESSIVE ASSOCIATION

505.    SF 496, on its face and as applied, violates the First Amendment's right of

expressive association.

506.    The First Amendment, applicable to the State of Iowa by the Fourteenth

Amendment, provides in part that the government "shall make no law . . . abridging . . . the right

of the people peaceably to assemble."

507.    On its face and as applied, the GISO Prohibition and the Gender Identity

Notification Requirement of SF 496 violate the rights of the Named-Plaintiff Student GSA

Members, Plaintiff IOWA SAFE SCHOOLS's student and GSA members, and other students, to

freedom of expressive association under the First Amendment to the Constitution.

508.    Defendants have created and maintain a limited public forum for student expression

and association from which they have excluded the Named-Plaintiff Student GSA Members,

Plaintiff IOWA SAFE SCHOOLS's student and GSA members, and other students not before the

Court from access on terms equal to others in a manner that constitutes viewpoint discrimination

and that was and is unreasonable in light of the purposes the forum serves.

509.    Defendants have discriminated and are continuing to discriminate against the

Named-Plaintiff Student GSA Members, Plaintiff IOWA SAFE SCHOOLS's student and GSA

members, and other students based upon the viewpoint and content of their expression and expressive association.

510. By restricting the ability of the Named-Plaintiff Student GSA Members, Plaintiff IOWA SAFE SCHOOLS's student and GSA members, and other students to express themselves and associate with others in student groups on equal terms to other student groups, Defendants have prohibited and unless enjoined will continue to prohibit the Named-Plaintiff Student GSA Members, Plaintiff IOWA SAFE SCHOOLS's student and GSA members, and other students not before the Court from enjoying the support, inclusion, and affirmation such groups provide, causing irreparable harm.

511. Plaintiffs are entitled to injunctive relief and request this Court enjoin Defendants from enforcing SF 496 to prohibit students from becoming members of GSAs or attending GSA meetings and events or to prohibit GSAs from advertising or promoting their group, or to otherwise interfere with the lawful conduct of the GSAs. The Named-Plaintiff Student GSA Members and Plaintiff IOWA SAFE SCHOOLS' student and GSA members all will suffer irreparable injury and will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of SF 496. Plaintiffs have no plain, adequate, or speedy remedy at law.

512. Additionally, Defendants' enforcement of SF 496 has directly injured IOWA SAFE SCHOOLS, causing it to divert its own resources to address the illegality of SF 496 and frustrating its mission of securing safe and affirming school environments for Iowa students. Unless Defendants are enjoined, Plaintiff IOWA SAFE SCHOOLS will continue to suffer real and immediate threat of irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of SF 496.

**Count 1**

**The Gender Identity/Sexual Orientation Prohibition is Facially Unconstitutional Because It Violates the First Amendment Right to Freedom of Expressive Association**

513.    The count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its Individual Student Members, against All Defendants.

    a.   Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

    b.   Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

    c.   Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

    d.   Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

    e.   Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

    f.   Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

514.    Plaintiffs incorporate paragraphs 505 through 512 as if fully set in this count.

515.    The GISO Prohibition has resulted in restrictions on GSAs that inhibit their ability to advertise, convene, and pursue their mission of providing a safe and inclusive environment for LGBTQ+ and LGBTQ+ allied students to meet and build community and awareness of LGBTQ+ topics.

516.    The GISO Prohibition violates the expressive association rights of ISS member students, including the GSA-member Plaintiff Students, by preventing them from full and equal enjoyment of their student-led noncurricular group on equal terms as other student-led noncurricular groups that are not formed to discuss viewpoints and content related to LGBTQ+ people.

517.    The GISO Prohibition prevents students in Kindergarten through 6th grade from joining GSAs. Accordingly, the GISO Prohibition directly deprives those K-6 students of the benefit of joining the expressive association of their choice. The GISO Prohibition also deprives other students of the benefit of the membership of those K-6 students.

518.    ISS member GSAs in schools that include K-6 students must now comply with onerous restrictions on their ability to advertise the club, such as being prevented from making schoolwide announcements or posting posters and flyers in common areas, because such advertising would conflict with the GISO Prohibition. On information and belief, no other student groups are similarly restricted in this way.

519.    ISS member GSAs in schools that include K-6 students require 5th and 6th grade students to obtain parental permission prior to joining the GSA. On information and belief, no other student groups require parental permission for attendance at regular meetings.

520.    At least one ISS member GSA has voluntarily ceased to operate, because the school prohibited 5th and 6th grade students from joining the GSA at all and required parental permission for 7th and 8th grader students prior to joining the GSA.

521.    On its face and as applied, the GISO Prohibition violates the rights of the Plaintiff Student GSA Members, Plaintiff IOWA SAFE SCHOOLS's student and GSA members, and other students to freedom of expressive association under the First Amendment to the Constitution.

522.    The State Defendants have abridged and are continuing to abridge the right to freedom of expressive association of the Plaintiff Student GSA Members, Plaintiff IOWA SAFE SCHOOLS' student and GSA members, and other students by adopting and enforcing the GISO Prohibition.

523.    State Defendants are responsible for adoption and enforcement of the GISO Prohibition. The declaratory and injunctive relief sought by GSA-member Plaintiff Students and ISS in its representational capacity would redress the harm caused by State Defendants' adoption and enforcement of the GISO Prohibition, as GSA-member Plaintiff Students' and ISS members' local school districts would remove all restrictions that inhibit the ability of GSAs to operate on the same terms as other extracurricular groups, and on the same terms upon which GSAs had already been operating without incident prior to the adoption of the GISO Prohibition.

524.    GSA-member Plaintiff Students and ISS in its representational capacity are entitled to injunctive relief. GSA-member Plaintiff Students and Iowa Safe Schools's student and GSA members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools's student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins All Defendants from enforcing the terms of the GISO Prohibition against GSAs in any form.

## Count 2

### As Applied by the State Defendants, the Gender Identity Notification Provision Unconstitutionally Infringes on the Right to Freedom of Expressive Association

525.    This count is brought by Plaintiff Students and Iowa Safe Schools, in its Representational Capacity on behalf of its GSAs and Individual Student Members, Against State

Defendants.

526.    Plaintiffs incorporate paragraphs 505 through 512 as if fully set in this count.

527.    The Gender Identity Notification Provision has resulted in restrictions on GSAs that inhibit their ability to advertise, convene, and pursue their mission of providing a safe and inclusive environment for LGBTQ+ and LGBTQ+ allied students to meet and build community and awareness of LGBTQ+ topics.

528.    Plaintiff P.B.-P. is an officer of his high school's GSA, which is a member of Iowa Safe Schools.

529.    Plaintiff P.B.-P. knows students who are afraid to join the GSA because of fear that they will be outed to their parents or guardians in accordance with SF 496's Gender Identity Notification Provision.

530.    Plaintiff James Doe is an officer of his high school's GSA, which is a member of Iowa Safe Schools.

531.    Plaintiff James Doe knows fellow students who would like to join the GSA but who will not because they are afraid of the consequences at home if they are outed to their parents or guardians in accordance with SF 496's Gender Identity Notification Provision.

532.    Some ISS member GSAs have voluntarily ceased to operate entirely for fear of triggering the Gender Identity Notification Provision. Other ISS member GSAs have been forced to cease operation because teachers or school administrators feared triggering the Gender Identity Notification Provision.

533.    State Defendants are responsible for adoption and enforcement of the Gender Identity Notification Provision. The declaratory and injunctive relief sought by GSA-member Plaintiff Students and ISS in its representational capacity would redress the harm caused by State

Defendants' adoption and enforcement of the Gender Identity Notification Provision, as GSA-member Plaintiff Students and ISS members' local school districts would remove all enforcement of the Gender Identity Notification Provision against GSAs or against speech which occurs within the purview of a GSA pursuing its mission, which would return GSAs to the same position that they occupied without incident prior to the adoption of the Gender Identity Notification Provision.

534.    GSA-member Plaintiff Students and ISS in its representational capacity are entitled to injunctive relief. GSA-member Plaintiff Students and Iowa Safe Schools' student and GSA members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Gender Identity Notification Provision. Plaintiff Students and Iowa Safe Schools' student members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the terms of the Gender Identity Notification Provision against GSAs or any other student or extracurricular student group in any form.

### Count 3

### As Applied by Iowa City Community School District, the
### Gender Identity/Sexual Orientation Prohibition Unconstitutionally Infringes on the
### Right to Freedom of Expressive Association

535.    Plaintiff A.C. states this claim against Defendants MATT DEGNER, in his official capacity as Iowa City Community School District Superintendent; and MOLLY ABRAHAM, SHAWN EYESTONE, CHARLIE EASTHAM, JAYNE FINCH, RUTHINA MALONE, MITCH LINGO, and LISA WILLIAMS, in their official capacities as board members of the Iowa City Community School District (together "Iowa City Community School District").

536.    Plaintiffs incorporate paragraphs 505 through 512 as if fully set in this count.

537.    Student Plaintiff A.C. further challenges the Gender Identity and Sexual Orientation Prohibition as unconstitutional as it is applied to her due to its infringement upon her First Amendment right to expressive association. A.C. brings this claim against Iowa Community School District Defendants.

538.    Student Plaintiff A.C. further challenges the Gender Identity and Sexual Orientation Prohibition as unconstitutional as it is applied to her due to its infringement upon her First Amendment right to expressive association. A.C. brings this claim against Iowa Community School District Defendants.

539.    Iowa Safe Schools, on behalf of its members in the Iowa City Community School District, joins A.C. in this challenge.

540.    By restricting the ability of A.C., Iowa Safe Schools members, and other students to express themselves and associate with others in student groups on equal terms to other student groups, Defendants have prohibited and, unless enjoined, will continue to prohibit the rights of A.C., Iowa Safe Schools members, and other students not before the Court from enjoying the support, inclusion, and affirmation such groups provide, causing irreparable harm.

## Count 4

### As Applied by Waterloo Community School District, the Gender Identity Notification Provision Unconstitutionally Infringes on the Freedom of Expressive Association

541.    Student Plaintiff P.B.-P. states this claim against State Defendants and Defendants JARED SMITH, in his official capacity as Waterloo Community School District Superintendent; and JONATHAN COX, JESSE KNIGHT, ASTOR WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, and KRYSTAL MADLOCK, in their official capacities as board members of the Waterloo Community School District (together "Waterloo Community School District").

542.    Plaintiffs incorporate paragraphs 505 through 512 as if fully set in this count.

543.    Waterloo Community School District Defendants' application of the Library Restriction infringes upon Plaintiff P.B.-P.'s First Amendment right to receive information.

544.    Plaintiff P.B.-P. attends Waterloo West High School, in the Waterloo Community School District.

545.    Plaintiff P.B.-P. is an officer of his high school's GSA, which is a member of Iowa Safe Schools.

546.    Plaintiff P.B.-P. knows students who are afraid to join the GSA because of fear that they will be outed to their parents or guardians in accordance with SF 496's Gender Identity Notification Provision.

547.    The reluctance of other LGBTQ+ students to join the GSA because of SF 496 diminishes Plaintiff P.B.-P.'s own experience of community in and through the GSA.

548.    The reluctance of other students to join the GSA because of SF 496 has also resulted in a smaller pool of students available to take on leadership positions within the GSA, threatening its ability to remain an ongoing concern.

### Count 5

**As Applied by Sioux City Community School District, the Gender Identity Notification Provision Unconstitutionally Infringes on the Freedom of Expressive Association**

549.    The count is brought by James Doe, through his Parent and Next Friend John Doe, and Iowa Safe Schools, on Behalf of Its Members in the Sioux City Community School District, against Sioux City Community School District Defendants

550.    Plaintiffs incorporate paragraphs 505 through 512 as if fully set in this count.

551.    Student Plaintiff James Doe further challenges the Gender Identity Notification Provision Orientation Restriction as unconstitutional as it is applied to him due to its infringement

upon his First Amendment right to expressive association. JAMES DOE states this claim against Defendants ROD EARLEYWINE, in his official capacity as Sioux City Community School District Superintendent; and DAN GREENWELL, LANCE EHMCKE, JAN GEORGE, TREYLA LEE, JOHN MEYERS, BOB MICHAELSON, and EARL MILLER, in their official capacities as board members of the Sioux City Community School District (together, "Sioux City Community School District").

552.    Plaintiff James Doe attends a high school in the Sioux City Community School District.

553.    Plaintiff James Doe is an officer of his high school's GSA, which is a member of Iowa Safe Schools.

554.    Plaintiff James Doe knows fellow students who would like to join the GSA but who will not because they are afraid of the consequences at home if they are outed to their parents or guardians in accordance with SF 496's Gender Identity Notification Provision.

555.    The reluctance of other LGBTQ+ students to join the GSA because of SF 496 diminishes James Doe's own experience of community in and through the GSA.

556.    No other student groups at James Doe's high school have experienced similar challenges or harms.

557.    The restrictions on the ability of James Doe to interact and participate with his GSA, and on the ability of the GSA to meet on the same terms as any other student group, violates James Doe's right to expressive association.

558.    Plaintiff Iowa Safe Schools' members include individual students in Sioux City Community School District schools subject to the Gender Identity Notification Provision. Iowa

Safe Schools asserts in its representational capacity the right of these members to receive information, infringed upon by the Gender Identity Notification Provision.

559.     The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to form community with one another safely on the same terms as other student groups and with all of the same benefits provided to those groups by their schools.

560.     Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

561.     The Sioux City Community School District is responsible for the application, implementation, and enforcement of the Gender Identity Notification Provision. The declaratory and injunctive relief sought by Plaintiff James Doe and Plaintiff Iowa Safe Schools in its representational capacity on behalf of ISS member students in the Sioux City Community School District would redress the harm caused by Sioux City Community School District application of the Gender Identity Notification Provision, and would allow James Doe and ISS members to enjoy their full rights to expressive association.

562.     Plaintiffs James Doe and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between these plaintiffs and the Sioux City Community School District Defendants concerning the constitutionality and application of the Gender Identity Notification Provision, including whether it has violated these Plaintiffs' right to expressive association. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request a declaration from this Court that Sioux City

Community School District Defendants' application of the Gender Identity Notification Provision is unconstitutional.

563.    Plaintiff James Doe and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. These plaintiffs have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Gender Identity Notification Provision. These plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins Sioux City Community School District Defendants from applying the Gender Identity Notification Provision in a manner which violates their rights to expressive association.

## V. VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

564.    SF 496, on its face and as applied, as a whole and with respect to the Gender Identity/Sexual Orientation Prohibition and Gender Identity Notification Provision, violates the Equal Protection Clause of the Fourteenth Amendment.

565.    The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

566.    When determining whether a classification based on sex, sexual orientation, gender identity, or transgender status violates the Equal Protection Clause, courts must view that classification with heightened scrutiny, as these traits "generally provide no sensible ground for differential treatment."

567.    As a result, the state must provide an "exceedingly persuasive justification" for laws that differentiate on the basis of sex, sexual orientation, gender identity, or transgender status. If the state cannot provide such a justification, the law is unconstitutional.

**Count 1**
**SF496 Is Motivated by Animus and, Thus, Facially Unconstitutional**
**as a Violation of Equal Protection Under the Fourteenth Amendment**

568.  This count is brought by Plaintiff Students and Iowa Safe Schools, in its representational capacity on behalf of its GSAs and individual student members, against State Defendants.

      a.  Plaintiff IOWA SAFE SCHOOLS, in its representational capacity on behalf of its student members, states this claim against State Defendants, and against School District Defendants.

      b.  Plaintiff P.B.-P. states this claim against State Defendants and Waterloo Community School District Defendants.

      c.  Plaintiff A.C. states this claim against State Defendants and Iowa City Community School District Defendants.

      d.  Plaintiffs T.S. and B.F. state this claim against State Defendants and Urbandale Community School District Defendants.

      e.  Plaintiff B.F.S. states this claim against State Defendants and West Des Moines Community Schools Defendants.

      f.  Plaintiff JAMES DOE states this claim against State Defendants and Sioux City Community School District Defendants.

569.  Plaintiffs incorporate paragraphs 564 through 567 as if fully set forth in this count.

570.  SF 496 was enacted with the purpose of and has the effect of discriminating against LGBTQ+ students, subjecting them to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, and transgender status.

142

571.    State Defendants, who are responsible for the adoption and implementation of SF 496, do not, and cannot, offer any legitimate governmental purpose for SF 496's differential treatment of LGBTQ+ students on the basis of their sex, sexual orientation, gender identity, and transgender status.

572.    SF 496 serves no legitimate governmental purpose, let alone an exceedingly persuasive or compelling one.

573.    The legislative history, context, and process surrounding SF 496 make abundantly clear that this discrimination against LGBTQ+ students was a motivating factor behind the law's passage.

574.    The text of the law further affirms that SF 496 discriminates against LGBTQ+ students. For example, the Gender Identity Notification Provision explicitly targets LGBTQ+ students on the basis of their gender identity or transgender status, by requiring school officials to notify a student's parent or guardian whenever a student asks school officials to "affirm the student's gender identity" by using a name or pronoun that is different from those in their school records. The Gender Identity Notification Provision makes no such requirement for non-LGBTQ+ students whose gender identities, names, and pronouns align with those in their school records.

575.    Plaintiff Students are all students at Iowa public schools subject to SF 496. All Plaintiff Students have been directly and irreparably harmed by SF 496, which discriminates against them and subjects them to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, and transgender status.

576.    Iowa Safe Schools asserts in its representational capacity the rights of its members, which include both individual students and GSAs in Iowa public schools. Iowa Safe Schools' student members and member GSAs have been directly and irreparably harmed by SF 496, which

discriminates against them and subjects them to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, and transgender status, or, in the case of Iowa Safe Schools' member GSAs, the sex, sexual orientation, gender identity, and transgender status of their members.

577.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to be free from discrimination and adverse treatment on the basis of their sex, sexual orientation, gender identity, or transgender status.

578.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

579.    The declaratory and injunctive relief sought would redress the harm caused by SF 496 State Defendants' unconstitutional adoption, implementation, and enforcement of SF 496.

580.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its representational capacity on the one hand, and State Defendants on the other, concerning the constitutionality, and specifically the unjustifiable discriminatory motivation, of SF 496. Plaintiff Students and Iowa Safe Schools respectfully request a declaration that SF 496 is unconstitutional due to its discriminatory motivation.

581.    Plaintiff Students and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student members and member GSAs have suffered and will continue to suffer irreparable injury as a direct and proximate result of the adoption, implementation, and enforcement of SF 496. Plaintiff Students and Iowa Safe Schools' student members and member GSAs have no plain, adequate, or speedy remedy at law. Plaintiff

Students and Iowa Safe Schools' student members and member GSAs respectfully request injunctive relief that enjoins State Defendants from enforcing SF 496.

### Count 2

### As Applied to Transgender, as well as Gender Nonconforming or Questioning Students, the Gender Identity/Sexual Orientation Prohibition Violates Equal Protection Under the Fourteenth Amendment

582.    This count is brought by Plaintiff Students and Iowa Safe Schools, both for direct injury to itself as an organization and in its representational capacity, on behalf of its GSAs and individual student members, against State Defendants.

583.    Plaintiffs incorporate paragraphs 564 through 567 as if fully set forth in this count.

584.    SF 496's GISO Prohibition has resulted in the differential and adverse treatment of Plaintiff Students and Iowa Safe Schools, both as an organization and in its representational Capacity on behalf of its GSAs and Individual Student Members, on the basis of their sex, sexual orientation, gender identity, and transgender status, thus violating their Equal Protection rights under the Fourteenth Amendment.

585.    SF 496's GISO Prohibition forbids any mention of sexual orientation or gender identity from kindergarten through the sixth grade, encompassing all activities within a school, in or outside of the classroom.

586.    Although SF 496 uses broad definitions of "gender identity" and "sexual orientation," even a facially neutral law can violate the Equal Protection Clause if it has a discriminatory purpose and effect. SF 496 has both a discriminatory purpose and effect, for the reasons explained above.

587.    When read as written and taken literally, the language of the GISO Prohibition appears facially neutral, and would therefore prohibit any reference whatsoever to any gender

identity or sexual orientation in grades K-6, including any reference to heterosexuality or cisgender identities.

588.    Notwithstanding the seemingly facially neutral language within the GISO Prohibition, this portion of the law has been widely interpreted as restricting only discussion of non-heterosexual orientations and non-cisgender identities. As such, the GISO Prohibition, as applied, targets only LGBTQ+ students in schools on the basis of their gender identity or sexual orientation, and therefore violates the Equal Protection Clause.

589.    Moreover, by failing to provide clear boundaries on the speech prohibited under the GISO Prohibition, SF 496 invites and has resulted in arbitrary and discriminatory enforcement.

590.    For example, some schools have disallowed GSAs from meeting or declined to provide GSAs resources in schools with students in kindergarten through sixth grade, who are expressly subject to the GISO Prohibition. Others have prohibited GSAs with older students from hanging posters or otherwise promoting their meetings in areas of schools where K-6 students may be present.  In addition, some GSA leaders have been told they cannot invite 5th or 6th grade students to their meetings.

591.    The GISO Prohibition therefore subjects these students to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, or transgender status.

592.    State Defendants, who are responsible for the adoption and implementation of the GISO Prohibition, do not, and cannot, offer any legitimate governmental purpose for the provision's differential and adverse treatment of these students on the basis of their sex, sexual orientation, gender identity, or transgender status.

593.    SF 496's GISO Prohibition serves no legitimate governmental purpose, let alone an exceedingly persuasive or compelling one.

594.    Plaintiff Students are all students in Iowa public school districts subject to the GISO Prohibition. Plaintiff Students have been discriminated against and subjected to differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, or transgender status by the GISO Prohibition.

595.    Iowa Safe Schools in its organizational capacity has been injured by the loss of revenue associated with educator participation in online and in-person programming on LGBTQ+ inclusivity in the school setting made impermissible by the GISO Prohibition and the consequent harm to its mission-critical outreach and impact programs; the additional costs incurred to answer educators' questions relating to the scope and effect of the GISO Prohibition on preexisting LGBTQ+ inclusivity training and policies; the further costs incurred to prepare, modify, offer, and implement LGBTQ+ inclusivity programming in-school and out-of-school that addresses the limitations on educators', students', and GSAs' activities created by the GISO Prohibition; the forced redirection of professional development resources outside of traditional K-12 focus due to inability to implement its resources and guidance in the K-12 setting under the GISO Prohibition; and the frustration of its organizational purpose of maintaining a GSA network by the restrictions and prohibitions imposed upon its member GSAs.

596.    Iowa Safe Schools' members include both individual students in Iowa public schools, including students in the kindergarten through sixth-grade setting. Iowa Safe Schools' members also include GSAs, including GSAs in kindergarten through sixth-grade schools. Iowa Safe Schools asserts in its representational capacity the rights of those student members who have experienced and are experiencing discrimination and differential and adverse treatment due to their sex, sexual orientation, gender identity, or transgender status due to the GISO Prohibition. Iowa Safe Schools further asserts in its representational capacity the rights of GSAs in its membership

whose members have experienced and are experiencing discrimination and differential and adverse treatment due to their sex, sexual orientation, gender identity, or transgender status due to the GISO Prohibition.

597.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to be free from discrimination and differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, or transgender status.

598.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

599.    The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity would redress the harm caused by State Defendants unconstitutional enforcement of the GISO Prohibition.

600.    Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its organizational and associational capacities on the one hand, and State Defendants on the other, concerning the constitutionality, and specifically the discrimination, of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the GISO Prohibition is unconstitutionally discriminatory in violation of the Fourteenth Amendment.

601.    Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have suffered and will continue to suffer irreparable injury as

a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the GISO Prohibition. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the GISO Prohibition.

### Count 3
### As Applied to Transgender, as well as Gender Nonconforming or Questioning Students, the Gender Identity Notification Provision Violates Equal Protection Under the Fourteenth Amendment

602.     This count is brought by Plaintiff Students and Iowa Safe Schools, both for direct injury to itself as an organization and in its representational capacity, on behalf of its GSAs and individual student members, against State Defendants.

603.     Plaintiffs incorporate paragraphs 564 through 567 as if fully set forth in this count.

604.     SF 496's Gender Identity Notification Provision has resulted in the differential and adverse treatment of Plaintiff Students and Iowa Safe Schools, as an organization and in its representational capacity on behalf of its GSAs and Individual Student Members on the basis of their sex, gender identity, and transgender status, thus violating their Equal Protection rights under the Fourteenth Amendment.

605.     SF 496's Gender Identity Notification Provision expressly targets students who wish to use gender-affirming names or pronouns that differ from those in school records, by requiring school officials to report any such request to the student's parent or guardian.  The provision makes no such requirement for non-LGBTQ+ students whose names and pronouns align with those in their school records.

606.     The Gender Identity Notification Provision thus subjects these students to differential and adverse treatment on the basis of their sex, gender identity, and transgender status.

607.    Alternatively, if SF 496's Gender Identity Notification Provision is read neutrally, even a facially neutral law can violate the Equal Protection Clause where, as here, the law has a discriminatory purpose and effect. The legislative history and context of SF 496 makes this clear.

608.    State Defendants, who are responsible for the adoption and implementation of SF 496's Gender Identity Notification Provision, do not, and cannot, offer any legitimate government rationale for the provision's differential and adverse treatment of students on the basis of their sex, gender identity, and transgender status.

609.    State Defendants cannot, for example, justify the law as promoting parental rights in education, as the government cannot enact a law forsaking Constitutional rights for private biases.  Protecting the interests of parents with personal, religious, or philosophical objections to LGBTQ+ people cannot be a valid rationale for governmental action which results in the denial of equal protection of the laws to students.

610.    SF 496's Gender Identity Notification Provision serves no legitimate governmental purpose, let alone an exceedingly persuasive or compelling one.

611.    Plaintiff Students are all students in Iowa public school districts subject to the Gender Identity Notification Provision. Plaintiff Students have been discriminated against and subjected to differential and adverse treatment on the basis of their sex, gender identity, or transgender status by the Gender Identity Notification Provision.

612.    Iowa Safe Schools in its organizational capacity has been injured by the loss of revenue associated with educator participation in online and in-person programming on LGBTQ+ inclusivity in the school setting made impermissible by the Gender Identity Notification Provision and the consequent harm to its mission-critical outreach and impact programs; the additional costs incurred to answer educators' questions relating to the scope and effect of the Gender Identity

Notification Provision on preexisting LGBTQ+ inclusivity training and policies; the further costs incurred to prepare, modify, offer, and implement LGBTQ+ inclusivity programming in-school and out-of-school that addresses the limitations on educators', students', and GSAs' activities created by Gender Identity Notification Provision; the forced redirection of professional development resources outside of traditional K-12 focus due to inability to implement its resources and guidance in the K-12 setting under the Gender Identity Notification Provision; and the frustration of its organizational purpose of maintaining a GSA network by the restrictions and prohibitions imposed upon its member GSAs.

613.    Iowa Safe Schools' members include both individual students in Iowa public schools and GSAs. Iowa Safe Schools asserts in its representational capacity the rights of those student members who have experienced and are experiencing discrimination and differential and adverse treatment due to their sex, gender identity, or transgender status due to the Gender Identity Notification Provision. Iowa Safe Schools further asserts in its representational capacity the rights of GSAs in its membership whose members have experienced and are experiencing discrimination and differential and adverse treatment due to their sex, gender identity, or transgender status due to the Gender Identity Notification Provision.

614.    The interests at stake are germane to Iowa Safe Schools' organization's purpose, in that Iowa Safe Schools is an organization dedicated to the protecting the rights of LGBTQ+ students, including the right of LGBTQ+ students to be free from discrimination and differential and adverse treatment on the basis of their sex, sexual orientation, gender identity, or transgender status.

615.    Iowa Safe Schools' claim and the relief it requests do not require the participation of its individual members.

616. The declaratory and injunctive relief sought by Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity would redress the harm caused by State Defendants unconstitutional enforcement of the Gender Identity Notification Provision.

617. Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between Plaintiff Students and Iowa Safe Schools in its organizational and associational capacities on the one hand, and State Defendants on the other, concerning the constitutionality, and specifically the discrimination, of the Gender Identity Notification Provision. Plaintiff Students and Iowa Safe Schools respectfully request a declaration from this Court that the Gender Identity Notification Provision is unconstitutionally discriminatory in violation of the Fourteenth Amendment.

618. Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity are entitled to injunctive relief. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence, operation, enforcement, and threat of enforcement of the Gender Identity Notification Provision. Plaintiff Students and Iowa Safe Schools' student and gender sexuality alliance members have no plain, adequate, or speedy remedy at law. Plaintiff Students and Iowa Safe Schools in its organizational and representational capacity respectfully request injunctive relief that enjoins State Defendants from enforcing the Gender Identity Notification Provision.

## VI.  VIOLATION OF THE EQUAL ACCESS ACT OF 1984

619. SF 496, as applied, violates the Equal Access Act of 1984, 20 U.S.C. § 4071.

620. The Equal Access Act ensures that noncurricular student groups are afforded the same access to public secondary school facilities as other, similarly situated student groups.

621.   The Act applies to any public secondary school that receives federal funds and creates a limited open forum by allowing one or more noncurricular student groups to meet on its premises during non-instructional time. Schools meeting these criteria are forbidden to prevent access or deny fair opportunity to students who wish to hold meetings on school grounds.

622.   Schools allowing at least one noncurricular related student group may not deny comparable access to any other student group because of the religious, political, philosophical, or other content of the speech at the group's meetings. The Act therefore prohibits schools from banning student-led noncurricular groups because of the content of the speech at the groups' meetings.

623.   "Access" and "fair opportunity" refer not only to physical meeting spaces on school premises, but also to recognition and privileges afforded to other groups at the school, including, for example, the right to announce club meetings in the school newspaper, on bulletin boards, or over the public-address system.

624.   The Act does not permit schools to ban a group based on school officials' general moral disapproval or on assumptions about the content of speech at group meetings. A school violates the Act by excluding, preventing access, or denying a fair opportunity to a group based on the fact that the group addresses issues of interest to LGBTQ+ students. The Act requires the school to treat each group like other groups and prohibits imposing additional requirements on some student-run groups that are not imposed on all others.

## Count 1

### As Applied by the Waterloo Community School District, the Gender Identity Notification Provision Violates the Equal Access Act of 1984

625.   Plaintiff P.B.-P. states this claim against State Defendants and Defendants JARED SMITH, in his official capacity as Waterloo Community School District Superintendent; and

JONATHAN COX, JESSE KNIGHT, ASTOR WILLIAMS, LYLE SCHMITT, STACIE MILLS, JANELLE EWING, in their official capacities as board members of the Waterloo Community School District (together "Waterloo Community School District").

626.    Plaintiffs incorporate paragraphs 619 through 624 as if fully set forth in this count.

627.    Waterloo West High School is a public secondary school within Defendant WATERLOO COMMUNITY SCHOOL DISTRICT. On information and belief, Waterloo West High School receives federal financial assistance. Plaintiff P.B.-P. attends Waterloo West High School.

628.    Prior to SF 496, Waterloo West High School had and continues to have a limited open public forum hosting at least one student-led, noncurricular club that meets outside of regular instructional hours. A GSA at Waterloo West High School is among those student groups.

629.    The Gender Identity Notification Provision has caused the number of members of the Waterloo West High School GSA to dwindle and has caused those who remain members to disengage from GSA activities and leadership and refrain from open group discussion. Students now fear being outed to unsupportive parents or guardians as a result of the Gender Identity Notification Provision and increased bullying and harassment from peers as a result of the law as a whole.

630.    The Waterloo Community School District is responsible for the application, implementation, and enforcement of the Gender Identity Notification Provision.

631.    The declaratory and injunctive relief sought by Plaintiff P.B.-P. and Plaintiff Iowa Safe Schools in its representational capacity on behalf of ISS member students in the Waterloo Community School District would redress the harm caused by Waterloo Community School

District application of the Gender Identity Notification Provision and would allow P.B.-P. and ISS members to enjoy their full rights under the Equal Access Act.

632.    Plaintiffs P.B.-P. and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between these plaintiffs and the Waterloo Community School District Defendants concerning the application of the Gender Identity Notification Provision, including whether it has violated these Plaintiffs' rights under the Equal Access Act. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request a declaration from this Court that Sioux City Community School District Defendants' application of the Gender Identity Notification Provision violates the Equal Access Act.

633.    Plaintiff P.B.-P. and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. These plaintiffs have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Gender Identity Notification Provision. These plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins Waterloo Community School District Defendants from applying the Gender Identity Notification Provision in a manner which violates their rights under the Equal Access Act.

### Count 2

### As Applied by Sioux City Community School District, the Gender Identity Notification Provision Violates the Equal Access Act of 1984

634.    This count is brought by James Doe, by his Parent and Next Friend John Doe, and Iowa Safe Schools, on behalf of its members in the Sioux City Community School District,  against Sioux City Community School District Defendants

635.    Plaintiffs incorporate paragraphs 619 through 624 as if fully set forth in this count

636.    JAMES DOE's high school is a public secondary school within Defendant SIOUX CITY COMMUNITY SCHOOL DISTRICT. On information and belief, JAMES DOE's high school receives federal financial assistance.

637.    Prior to SF 496, JAMES DOE's high school had and continues to have a limited open public forum hosting at least one student-led, noncurricular club that meets outside of regular instruction. JAMES DOE's high school's GSA was and is one of these student groups. JAMES DOE's high school's GSA provided a sense of community to LGBTQ+ students.  However, LGBTQ+ students are now reluctant to join the GSA because they fear being outed to unsupportive parents or guardians as a result of the Gender Identity Notification Provision and fear they will face negative consequences at home. Further, those who remain members in JAMES DOE's high school's GSA are reluctant to engage in public group activities for fear of harassment and bullying on the basis of their membership in an openly LGBTQ+ group.

638.    The Sioux City Community School District is responsible for the application, implementation, and enforcement of the Gender Identity Notification Provision.

639.    The declaratory and injunctive relief sought by Plaintiff James Doe and Plaintiff Iowa Safe Schools in its representational capacity on behalf of ISS member students in the Sioux City Community School District would redress the harm caused by Sioux City Community School District application of the Gender Identity Notification Provision and would allow James Doe and ISS members to enjoy their full rights under the Equal Access Act.

640.    Plaintiffs James Doe and Iowa Safe Schools in its representational capacity are entitled to declaratory relief. There is an actual and substantial controversy between these plaintiffs and the Sioux City Community School District Defendants concerning the application of the Gender Identity Notification Provision, including whether it has violated these Plaintiffs' rights

under the Equal Access Act. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request a declaration from this Court that Sioux City Community School District Defendants' application of the Gender Identity Notification Provision violates the Equal Access Act.

641.    Plaintiff James Doe and Iowa Safe Schools in its representational capacity are entitled to injunctive relief. These plaintiffs have suffered and will continue to suffer irreparable injury as a direct and proximate result of the existence and application of the Gender Identity Notification Provision. These plaintiffs have no plain, adequate, or speedy remedy at law. Plaintiff James Doe and Iowa Safe Schools in its representational capacity respectfully request injunctive relief that enjoins Sioux City Community School District Defendants from applying the Gender Identity Notification Provision in a manner which violates their rights under the Equal Access Act.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request an order and judgment:

A.    Declaring that the Library Restriction, Gender Identity/Sexual Orientation Prohibition, and Gender Identity Notification Provision are unconstitutional on their face and as applied to Plaintiffs due to their overbreadth, vagueness, and infringement upon Plaintiffs' First Amendment rights and are unenforceable.

B.    Declaring that SF 496 is unconstitutional on its face and as applied to Plaintiffs due to its discriminatory motivation in violation of Plaintiffs' Fourteenth Amendment rights.

C.    Declaring that the Gender Identity/Sexual Orientation Prohibition is unconstitutional as applied to Plaintiffs due to unjustifiable discrimination on the basis of their sex, sexual orientation, gender identity, or transgender status in violation of Plaintiffs' Fourteenth Amendment rights.

D.    Declaring that the Gender Identity Notification Provision is unconstitutional on its face and as applied to Plaintiffs due to its unjustifiable discrimination on the basis of their sex, gender identity, and transgender status in violation of Plaintiffs' Fourteenth Amendment rights. Declaring that the Gender Identity/Sexual Orientation Prohibition and Gender Identity Notification Provision violate the Equal Access Act.

E.    Permanently enjoining Defendants, their officers, agents, employees, attorneys, and all persons in active concert or participation with them from enforcing the Library Restriction, Gender Identity/Sexual Orientation Prohibition, and Gender Identity Notification Provision.

F.    Awarding the Plaintiffs reasonable attorneys' fees and costs; and

G.    Awarding any such other relief as the Court deems just.

Dated: October 18, 2024                                    Respectfully submitted,

/s/_____

Thomas D. Story, AT0013130 (Lead Counsel)
Rita Bettis Austen, AT0011558
Shefali Aurora, AT0012874
**American Civil Liberties Union**
  **of Iowa Foundation**
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988
thomas.story@aclu-ia.org
rita.bettis@aclu-ia.org
shefali.aurora@aclu-ia.org

Laura J. Edelstein*
Katherine E. Mather*
**Jenner & Block LLP**
525 Market Street, 29th Floor
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com
KMather@jenner.com

Camilla B. Taylor*
Nathan Maxwell* **
Kenneth D. Upton, Jr.* ***
**Lambda Legal Defense**
  **and Education Fund, Inc.**
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
(312) 663-4413
ctaylor@lambdalegal.org
nmaxwell@lambdalegal.org
kupton@lambdalegal.org

Karen L. Loewy*
Sasha J. Buchert*
**Lambda Legal Defense**
  **and Education Fund, Inc.**
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
kloewy@lambdalegal.org
sbuchert@lambdalegal.org

Anna K. Lyons*
Effiong Dampha*
**Jenner & Block LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
ALyons@jenner.com
EDampha@jenner.com

*Admitted pro hac vice.*

*\*\* Member of the Arizona bar. Practicing
    under the supervision of a member of the Illinois bar.*

*\*\*\*Member of the District of Columbia, Texas and
    Oklahoma bars; Not licensed to practice in Illinois.*

Daniel R. Echeverri*
Christopher J. Blythe*
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
DEcheverri@jenner.com
CBlythe@jenner.com

Joshua J. Armstrong*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
JArmstrong@jenner.com

*Counsel for Plaintiffs*

# APPENDIX A

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| Author | Title |
|---|---|
| Ace, Lauren | The Girls |
| Acosta, Alicia; Amavisca, Luis | I Love My Colorful Nails |
| Adler, Dahlia | Cool for the Summer |
| Albertalli, Becky | Kate in Waiting |
| Albertalli, Becky | Simon vs. the Homo Sapiens Agenda |
| Albertalli, Becky | The Upside of Unrequited |
| Albertalli. Becky | The Upside of Unrequited |
| Anderson. Airlie | Neither |
| Andrews, Jesse | Me and Earl and the Dying Girl |
| Andrews, Jesse | The Haters |
| Angelo, Maya | I Know Why the Caged Bird Sings |
| Anonymous | Go Ask Alice |
| Arnold, Elana | What Riley Wore |
| Arnold, Elana K. | Damsel |
| Asher, Jay | 13 |
| Atta, Dean | The Black Flamingo |
| Atwood, Margaret | The Handmaid's Tale novel and graphic novel |
| Austrian. J.J. | Worm Loves Worm |
| Bailar, Schuyler | Obie is Man Enough |
| Baldacchino, Christine | Morris Micklewhite and the Tangerine Dress |
| Baldwin, James | Go Tell It On the Mountain |
| Barakiva, Michael | One Man Guy |
| Baudelaire, Charles | The Flowers of Evil |
| Bean, Lexie | The Ship We Built |
| Beer, Sophie | Love Makes A Family |
| Bertie, Alex | Trans Mission: My Quest to a Beard |
| Biddulph, Rob | Odd Dog Out |
| Bigelow, Lisa Jenn | Hazel's Theory of Evolution |
| Bildner, Phil | A High Five for Glenn Burke |
| Blackstone, Stella | Baby's First Words |
| Blake, Ashley Herring | Hazel Bly and the Deep Blue Sea |
| Blake, Ashley Herring | Ivy Aberdeen's Letter to the World |
| Block, Francesca Lia | Psyche in a Dress |
| Blume, Judy | Are You There God? It's Me, Margaret. |
| Blume, Judy | Forever |
| Blume, Judy | Forever |
| Blume, Judy | Summer Sisters |
| Blumenthal, Lasor | The Hand Book |
|  | Starboy* (Register note: could refer to the novel |
| Bowie, David* | Starboy by Jami Gigot, inspired by David Bowie) |
| Braden. Ann | Flight of the Puffin |
| Bradley, Sandra | Henry Holton Takes the Ice |
| Brannen. Sarah | Uncle Bobby's Wedding |
| Branscum, Robbie | The Girl |
| Brennan-Nelson, Denise | Willow and the Wedding |
| Brichzin, Kerstin | Felix's New Skirt |
| Brockington, Ryan | Daddy & Dada |
| Brown, Karamo | I am Perfectly Designed |
| Brown, Peter | Fred Gets Dressed |
| Buck, Pearl S. | The Good Earth |
| Bunker, Lisa | Zenobia July |
| Burgess, Melvin | Junk |
| Cabot, Meg | Ready or Not |
| Callender, Kacen | Hurricane Child |
| Callender, Kacen | King and the Dragonflies |
| Camus, Albert | The Stranger |
| Capetta, A.R. | Stranger Things: Rebel Robin |
| Chbosky, Stephen | The Perks of Being a Wallflower |
| Clarke, Cat | The Pants Project |
| Cleland, John | Fanny Hill: Memoirs of a Woman of Pleasure |
| Cohen, Barbara | Unicorns in the Rain |
| Colbert, Brandy | The Only Black Girls in Town |

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| | |
|---|---|
| Cole, Barbara S. | Don't Tell A Soul |
| Cormier, Robert | Beyond the Chocolate War |
| Couch, Robbie | The Sky Blues |
| Cronn-Mills, Kirstin | Beautiful Music for Ugly Children |
| Cumming, Alan | The Adventure of Honey & Leon |
| Curate, Mike | Flamer |
| Danforth, Emily M. | The Miseducation of Cameron Post |
| Davids, Sharice | Sharice's Big Voice |
| Dawson, Juno | This Book is Gay |
| Deaver, Mason | The Ghosts We Keep |
| Dee, Barbara | Star-Crossed |
| DeMont, Belle | I Love My Purse |
| DePalma, Kate | The Bread Pet |
| Desmond is Amazing | Be Amazing |
| Desombre, Auriane | I Think I Love You |
| Donoghue, Emma | The Lotterys More or Less |
| Donoghue, Emma | The Lotterys Plus One |
| Dooley, Sarah | Ashes to Asheville |
| Dufresne, Emilie | Change |
| Dugan, Jennifer | Some Girls Do |
| Elliott, Rachel | The Real Riley Mayes |
| Ellison, Joy Michael | Sylvia and Marsha Start A Revolution! |
| Emezi, Akwaeke | Bitter |
| Emezi, Akwaeke | Pet |
| Errico, Daniel | The Bravest Knight Who Ever Lived |
| Evison, Jonathan | Lawn Boy |
| Faulkner, William | As I Lay Dying |
| Feder, Tyler | Bodies are Cool |
| Federle, Tim | Better Nate than Ever |
| Federle, Tim | Nate Expectations |
| Finch, Michelle | Phoenix Goes to School |
| Flaubert, Gustave | Madame Bovary |
| Forman, Gayle | Frankie & Bug |
| Furst, Joshua | The Little Red Stroller |
| Gaiman, Neil | American Gods, Vol. 1: Shadows |
| Gaiman, Neil | American Gods, Vol. 2: My Ainsel |
| Gale, Heather | Ho'onani: Hula Warrior |
| Garcia, Cristina | Dreaming in Cuban |
| Garden, Nancy | Molly's Family |
| Gardner, Whitney | Long Distance |
| Garza Villa, Jonny | Fifteen Hundred Miles from the Sun |
| Gay, Marie-Louse | Any Questions? |
| Gay, Roxane | Not that Bad: Dispatches from Rape Culture |
| Gee, Kimberly | Glad, Glad Bear! |
| Genhart, Michael | Love is Love |
| Genhart, Michael | Rainbow |
| Gennari, Jennifer | My Mixed Up Berry Blue Summer |
| Gephart, Donna | Lily and Dunkin |
| Gillman, Melanie | As the Crow Ries |
| Gino, Alex | Alice Austen Lived Here |
| Gino, Alex | Melissa (George) |
| Gino, Alex | Rick |
| Gino, Alex | You Don't Know Everything, Jilly P! |
| Ginsberg, Allen | Howl and Other Poems |
| Giovanna, Nikki | My House |
| Gonzales, Chuck | Carlos Gomez Freestyles |
| Gonzales, Sophie | Only Mostly Devastated |
| Gonzalez, Maya Christina | Call Me Tree |
| Gonzalez, Maya Christina | The Gender Wheel |
| Gonzalez, Maya Christina | They, She, He, Easy as ABC |
| Gonzalez, Maya Christina | They, She, He, Me: Free to Be |
| Green, John | Looking for Alaska |
| Green, John | Paper Towns |

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| | |
|---|---|
| Green, John | The Fault in Our Stars |
| Green. Simon James | Llama Glamarama |
| Greener, Rachel | Making a Baby |
| Gregory, Jarlath | What Love Looks Like: Sometimes Love Turns Up Where You Least Expect It |
| Grehan, Meg | The Deepest Breath |
| Gyasi, Yaa | Homegoing |
| Haack, Daniel | Maiden & Princess |
| Haack, Daniel | Prince & Knight |
| Haack, Daniel | Tale of the Shadow King |
| Hall, Radclyffe | The Well of Loneliness |
| Hall, Sandy | Been Here All Along |
| Harris, Neil Patrick | Magic Misfits: The Second Story |
| Harris, Robie | It's Perfectly Normal: Changing Bodies, Growing Up, Sex and Sexual Health |
| Hatori, Bisco | Ouran High School Host Club Series |
| Hayden, Torey | One Child |
| Hegarty, Patricia | We are Family |
| Heller, Joseph | Catch 22 |
| Hemingway, Ernest | A Farewell to Arms |
| Hennessey, M. G. | The Other Boy |
| Hernandez, Mili | Federico and All His Families |
| Herthel, Jessica | I am Jazz! |
| Higginbotham, Anastasia | What You Don't Know: A Story of Liberated Childhood |
| Hill, Katie | Rethinking Normal: A Memoir in Transition |
| Hill-Meyer, Tobi | A Princess of Great Daring! |
| Hirst, Jo | A House for Everyone |
| Hitchcock, Shannon | One True Way |
| Hoffman, Sarah | Jacob's New Dress |
| Hoffman, Sarah | Jacob's Room to Choose |
| Hong, Jess | Lovely |
| Hopkins, Ellen | Crank |
| Hopkins, Ellen | Tilt |
| Hopkins, Ellen | Tricks |
| Hosseini, Khaled | The Kite Runner |
| Howard, Greg | The Whispers |
| Howe, James | Big Bob, Little Bob |
| Howe, James | Totally Joe |
| Hurston, Zora Neale | Their Eyes Were Watching God |
| Hutchinson, Shaun David | Brave Face: A Memoir |
| Huxley, Aldous | Brave New World |
| James, E.L. | Fifty Shades of Grey |
| Jenkins, Steve | The True Adventures of Esther the Wonder Pig |
| Jennings, Jazz | Being Jazz: My Life as a (Transgender) Teen |
| Johnson, Cathy | The Breakaways |
| Johnson, R. Charles | Faith and the Good Thing |
| Johnson, Varian | The Parker Inheritance |
| Johnston, George M. | All Boys Aren't Blue |
| Jones, Toeckey | Skindeep |
| Jonsberg, Barry | A Song Only I Can Hear |
| Joosten, Michael | My Two Dads and Me |
| Joosten, Michael | My Two Moms and Me |
| Joyce, James | Ulysses |
| June, Jason | Jay's Gay Agenda |
| Kaur, Rupi | Milk and Honey |
| Kaur, Rupi | The Sun and Her Flowers |
| Keller, Tae | When You Trap a Tiger |
| Kemp, Kristen | Healthy Sexuality |
| Kerr, M.E. | Night Kites |
| Khor, Shing Yin | The Legend of Auntie Po |
| Kibblesmith, Daniel | Santa's Husband |
| Kilodavis, Cheryl | My Princess Boy |
| Kirst, Seamus | Papa, Daddy, and Riley |
| Klas, Benjamin | Second Dad Summer |
| Klein, Norma | Mom The Wolf Man & Me |

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| | |
|---|---|
| Klune, TJ | Flash Fire |
| Knowles, John | A Separate Peace |
| Kobabe, Maia | Gender Queer |
| Koertge, Ron | The Arizona Kid |
| Kreloff, Elliot | Tuesday is Daddy's Day |
| Kuklin, Susan | Beyond Magenta: Transgender Teens Speak Out |
| Kuklin, Susan | Beyond Magenta: Transgender Teens Speak Out |
| Kushner, Tony | Angels in America |
| Lambert, Megan Dowd | Real Sisters Pretend |
| Lang, Suzanne | Families, Families, Families! |
| Lawrence, D.H. | Lady Chatterley's Lover |
| Lee, C.B. | Not Your Sidekick |
| Levine, Arthur | Monday is One Day |
| Levithan, David | Two Boys Kissing |
| Levy, Dana Alison | The Family Fletcher Takes Rock Island |
| Levy, Dana Alison | The Misadventures of the Family Fletcher |
| Levy, Dana Alison | This Would Make a Good Story Someday |
| Lil Miss Hot Mess | The Hips on the Drag Queen Go Swish, Swish, Swish |
| Lo, Malinda | Last Night at the Telegraph Club |
| Lo, Malinda | The Last Night at the Telegraph Club |
| Locke, Katherine | This is Our Rainbow: 16 Stories of Her, Him, Them, and Us |
| Loney, Andrea | Bunnybear |
| Love, Jessica | Julián at the Wedding |
| Love: Jessica | Julián Is A Mermaid |
| Lucas, Chad | Thanks a Lot, Universe |
| Lukoff, Kyle | Call Me Max |
| Lukoff, Kyle | Too Bright to See |
| Lukoff, Kyle | When Aidan Became A Brother |
| Maas, Sarah J. | A Court of Mist and Fury |
| Machias, Jules | Both Can Be True |
| Mackler, Carolyn | Vegan Virgin Valentine |
| Madison, Megan | Being You: A First Conversation About Gender |
| Man, Chella | Continuum |
| Manushkin, Fran | Plenty of Hugs |
| Manzer, Jenny | My Life as a Diamond |
| Matsui, Yusei | Assassination Classroom |
| Mayeno, Laurin | One of A Kind, Like Me / Único como yo |
| McCormick, Patricia | Sold |
| McCurry, Kristen | Patrick's Polka-dot Tights |
| McGahern John | The Dark |
| McKenna, Miles | OUT!: How to Be Your Authentic Self |
| Mercurio, Peter | Our Subway Baby |
| Meyer, Stephenie | Breaking Dawn (Twilight Book 4) |
| Meyers, Susan | Everywhere Babies |
| Miller, Henry | Tropic of Cancer |
| Moen, Erika | Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human |
| Moen, Erika | Let's Talk About It: The Teen's Guide to Sex, Relationships, and Being a Human |
| Moradian, Afsaneh | Jamie is Jamie: A Book About Being Yourself and Playing Your Way |
| Morrison, Toni | Beloved |
| Morrison, Toni | Song of Solomon |
| Morrison, Toni | The Bluest Eye |
| Moskowitz, Hannah | Marco Impossible |
| Myracle, Lauren | l8r g8r |
| Nabokov, Vladimir | Lolita |
| Naylor, Phyllis Reynolds | Alice the Brave |
| Neal, Trinity | My Rainbow |
| Newman, Leslea | Daddy, Papa, and Me |
| Newman, Leslea | Donovan's Big Day |
| Newman, Leslea | Heather Has Two Mommies |
| Newman, Leslea | Mommy, Mama, and Me |
| Newman, Leslea | Sparkle Boy |
| Nguyen, Trung Le | The Magic Fish |
| Nielsen-Fernlund, Susin | Princess Puffybottom...and Darryl |

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| | |
|---|---|
| Nielsen-Fernlund, Susin | We Are All Made of Molecules |
| Niven, Jennifer | Breathless |
| Nuanez, J. M. M. | Birdie and Me |
| O'Brien, Erica | The Country Girls |
| Oelschlager, Vantia | A Tale of Two Daddies |
| O'Leary, Sara | A Family is A Family Is A Family |
| O'Neill, Kay | The Tea Dragon Society |
| Orwell, George | 1,984 |
| Oseman, Alice | Heartstopper series |
| Oshiro, Mark | Anger is A Gift |
| Pancholy, Maulik | The Best At It |
| Panetta, Kevin | Bloom |
| Parr, Todd | The Family Book |
| Patterson, Jodie | Born Ready: The True Story of a Boy Named Penelope |
| Pearlman, Robb | Pink is for Boys |
| Peck, Richard | The Best Man |
| Perez, Ashley | Out of Darkness |
| Pessin-Whedbee, Brook | Who Are You?: The Kid's Guide to Gender Identity |
| Picoult, Jodi | Mercy |
| Picoult, Jodi | My Sister's Keeper |
| Picoult, Jodi | Nineteen Minutes |
| Pierets, Fleur | Love Around the World |
| Pitman, Gayle | A Church for All |
| Pitman, Gayle | My Maddy |
| Pitman, Gayle | Sewing the Rainbow: A Story About Gilbert Baker |
| Pitman, Gayle | The Stonewall Riots: Coming Out in the Streets |
| Pitman, Gayle | This Day in June |
| Pitman, Gayle | When You Look Out the Window: How Phyllis Lyon and Del Martin Built a Community |
| Podos, Rebecca | Like Water |
| Polacco, Patricia | In Our Mothers' House |
| Polonsky, Ami | Gracefully Grayson |
| Prager, Sarah | Rainbow Revolutionaries: 50 LGBTQ+ People Who Made History |
| Presley, Elvis* | Love Me Tender* (Register note: could reference an illustrated book based on the song) |
| Ramadan, Danny | Salma the Syian Chef |
| Rapinoe, Megan | One Life |
| Reed, Amy | The Truth About Alice |
| Reynolds, Marilyn | Shut Up |
| Rhodes-Courter, Ashley | Sam is My Sister |
| Richardson, Justin | And Tango Makes Three |
| Rivas, Lourdes | They Call Me Mix/Me Llaman Maestre |
| Rorby, Ginny | Freeing Finch |
| Rosenthal, Amy Krouse | Dear Boy: A Celebration of Cool, Clever, Compassionate You! |
| Rosenthal, Amy Krouse | Dear Girl: A Celebration of Wonderful, Smart, Beautiful You! |
| Rotner, Shelley | Families |
| Rowell, Rainbow | Any Way the Wind Blows |
| Rowell, Rainbow | Carry On |
| Roy, Arundhati | The God of Small Things |
| Royce, Ellie | Auntie Uncle: Drag Queen Hero |
| Salazar, Aida | The Moon Within |
| Salinger, J.D. | The Catcher in the Rye |
| Sanchez, Alex | The Greatest Superpower |
| Sanchez, Erika | I Am Not Your Perfect Mexican Daughter |
| Sanders, Rob | Mayor Pete |
| Sanders, Rob | Pride |
| Sanders, Rob | Stonewall |
| Sanders, Rob | Two Grooms on a Cake |
| Sapphire | Push |
| Sass, A. J. | Ana on the Edge |
| Satrapi, Marjane | Persepolis |
| Schiffer, Miriam | Stella Brings the Family |
| Schrefer, Eliot | The Darkness Outside Us |
| Sebold, Alice | Lucky |
| Shannon, George | One Family |

**The List of Books Defendant Urbandale Community School District Initially Identified for Removal**

| | |
|---|---|
| Sicardi, Arabelle | Queer Heroes: Meet 53 LGBTQ Heroes From Past and Present! |
| Sie, James | All Kinds of Others |
| Silvera, Adam | ∞ |
| Silvera, Adam | ∞ |
| Silvera, Adam | The First to Die at the End |
| Silvera, Adam | They Both Die at the End |
| Silverberg, Cory | What Makes a Baby |
| Silverman, Erica | Jack (not Jackie) |
| Sima, Jessie | Harriet Gets Carried Away |
| Simon, Rachel | The Everybody Book: The LGBTQ+ Inclusive Guide for Kids about Sex, Gender, Bodies, and Families |
| Slater, Dashka | The 57 Bus: A True Story of Two Teenagers and the Crime That Changed Their Lives |
| Sloan, Holly Goldberg | Two Night Owl From Dogfish |
| Smith, Heather | A Plan for Pops |
| Smith, Heather | Angus All Aglow |
| Smith, Niki | The Golden Hour |
| Snape, Emily | Old MacDonald Had a Baby |
| Spalding, Amy | The Summer of Jordi Perez (And the Best Burger in Los Angeles) |
| Spiegelman, Art | Maus: A Survivor's Tale |
| Stamper, Phil | The Gravity of Us |
| Stapley, Marissa | Lucky |
| Stead, Rebecca | The List of Things That Will Not Change |
| Stevenson, Robin | Pride |
| Stevenson, Robin | Pride Colors |
| Stevenson, Robin | Pride Puppy! |
| Stoeve, Ray | Between Perfect and Real |
| Stone, Jeff | Crane |
| Stones, Tanya Lee | A Bad Boy Can Be Good for a Girl |
| Stott, Ann | Want to Play Trucks? |
| Stratton, Allan | Chanda's Secrets |
| Styron, William | Sophie's Choice |
| Sugiura, Misa | Love & Other Natural Disasters |
| Sutton, Jane | Defineitely Not Sexy |
| Telgemeier, Raina | Drama |
| The Nib | Be Gay, Do Comics |
| Thom, Kai Cheng | From the Stars in the Sky to the Fish in the Sea |
| Thomas, Angie | The Hate U Give |
| Thomas, E.L. | Choose Your Own Adventure: Eighth Grade Witch |
| Thompson, Craig | Habibi |
| Thompson, Julian F. | Discontinued |
| Thorn, Theresa | It Feels Good to be Yourself: A Book About Gender Identity |
| Torchia, Joseph | The Kryptonite Kid |
| Trimmer, Christian | Teddy's Favorite Toy |
| Turley, Beth | The Flyers |
| Turner, Ann | Learning to Swim |
| Twiss, Jill | A Day in the Life of Marlon Bundo |
| Underwood, Deborah | Ogilvy |
| Vaughan, Brian K. | Saga |
| Walden, Tillie | Spinning |
| Walker, Alice | The Color Purple |
| Waller, Jae | The Call of the Rift: Crest |
| Walton, Jessica | Introducing Teddy: A gentle story about gender and friendship |
| Watkins, Christine | Date Rape |
| Williams, Vera | Home at Last |
| Wood, Margot | Fresh |
| Woodgate, Harry | Grandad's Camper |
| Wright, Bill | Putting Makeup on the Fat Boy |
| Wright, Richard | Native Son |
| Wright, Richard | Native Son |

https://databases.desmoinesregister.com/books-flagged-for-removal-from-school-libraries/

# **APPENDIX B**

**The List of Books Defendant Urbandale Community School District**
**Subsequently Identified for Removal**

| Author | Title |
| --- | --- |
| Aciman, Andre | Call Me By Your Name |
| Andrews, Jesse | The Haters |
| Arnold, Elana K. | Damsel |
| Arnold, Elana K. | Red Hood |
| Arnold, Elana K. | What Girls Are Made Of |
| Asher, Jay | Thirteen Reasons Why |
| Atwood, Margaret | The Handmaid's Tale |
| Blume, Judy | Forever |
| Cabot, Meg | Ready or Not |
| Chbosky, Stephen | The Perks of Being a Wallflower |
| Dugard, Jaycee | A Stolen Life |
| Foley, Jessie Ann | The Carnival at Bray |
| Green, John | Looking for Alaska |
| Gruen, Sara | Water for Elephants |
| Hopkins, Ellen | Crank |
| Hopkins, Ellen | Identical |
| Hopkins, Ellen | Tilt |
| Hopkins, Ellen | Tricks |
| Johnson, George M. | All Boys Aren't Blue |
| Joyce, James | Ulysses |
| Kaur, Rupi | Milk and Honey |
| Kaur, Rupi | The Sun and Her Flowers |
| Keplinger, Kody | The Duff |
| Kobabe, Maia | Gender Queer |
| Levithan, David | Two Boys Kissing |
| Lo, Malinda | The Last Night at the Telegraph Club |
| Maas, Sarah J. | A Court of Frost and Starlight |
| Maas, Sarah J. | A Court of Mist and Fury |
| Maas, Sarah J. | A Court of Silver Flames |
| Maas, Sarah J. | A Court of Thorns and Roses |
| Maas, Sarah J. | A Court of Wings and Ruin |
| Maas, Sarah J. | Empire of Storms |
| Maas, Sarah J. | Kingdom of Ash |
| Maguire, Gregory | Wicked |
| McCormick, Patricia | Sold |

## The List of Books Defendant Urbandale Community School District Subsequently Identified for Removal

| | |
|---|---|
| Morrison, Toni | Beloved |
| Morrison, Toni | Song of Solomon |
| Morrison, Toni | The Bluest Eye |
| Myracle, Lauren | Shine |
| Myracle, Lauren | The Infinite Moment of Us |
| Nazemian, Abdi | Like a Love Story |
| Niven, Jennifer | Breathless |
| Perez, Ashley Hope | Out of Darkness |
| Picoult, Jodi | Nineteen Minutes |
| Reed, Amy | The Nowhere Girls |
| Sapphire | Push |
| Sndowsky, Daria | Anatomy of a Boyfriend |
| Sndowsky, Daria | Anatomy of a Single Girl |
| Vaughan, Brian K. | Saga |
| Walker, Alice | The Color Purple |
| Wright, Richard | Native Son |

https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/

# APPENDIX C

# APPENDIX D

# The List of Books Defendant Iowa City Community School District Identified for Removal

| Author | Title |
|---|---|
| Armas, Elena | American Roommate Experiment |
| Armas, Elena | Spanish Love Deception |
| Arnold, Elana | Damsel |
| Asher, Jay | Thirteen Reasons Why |
| Atwood, Margaret | The Handmaid's Tale |
| Blume, Judy | Forever |
| Brown, Echo | Black Girl Unlimited |
| Brynie, Faith | 101 |
| Burcaw, Shane | Laughing at My Nightmare |
| Chang, Iris | The Rape of Nanking |
| Chbosky, Steven | The Perks of Being a Wallflower |
| Cochrun, Alison | Charm Offensive |
| Dawson, Juno | This Book is Gay |
| Gaiman, Neil | Stardust |
| Gay, Roxane | Not That Bad |
| Gowen, L. Kris | Making Sexual Decisions |
| Grace, Hannah | Icebreaker |
| Green, John | Looking for Alaska |
| Grimes, Nikki | Ordinary Hazards: A Memoir |
| Gruen, Sarah | Water for Elephants |
| Gyasi, Yaa | Homegoing |
| Hall, Alexis | Boyfriend Material |
| Hancock, Justin | Can We Talk About Consent |
| Hazelwood, Ali | Love Hypothesis |
| Henry, Emily | Beach Read |
| Hoover, Coleen | Ugly Love |
| Hoover, Colleen | It Ends with Us |
| Hoover, Colleen | It Starts With Us |
| Hopkins, Ellen | Crank |
| Hopkins, Ellen | Identical |
| Hopkins, Ellen | Traffick |
| Hopkins, Ellen | Tricks |
| Hutchinson, Shaun David | Brave Face |
| Jackson, Tiffany | Grown |
| Johnson, George M. | All Boys Aren't Blue |

# The List of Books Defendant Iowa City Community School District Identified for Removal

| | |
|---|---|
| Joyce, James | Ulysses |
| Kaur, Rupi | Milk and Honey |
| King, Stephen | It |
| Kuklin, Susan | Beyond Magenta |
| Larsson, Stieg | Girl With the Dragon Tattoo |
| Lyga, Barry | Boy Toy |
| Maas, Sarah J. | A Court of Frost and Starlight |
| Maas, Sarah J. | A Court of Mist and Fury |
| Maas, Sarah J. | A Court of Silver Flames |
| Maas, Sarah J. | A Court of Thorns and Roses |
| Maas, Sarah J. | A Court of Wings and Ruin |
| Maas, Sarah J. | Empire of Storms |
| Maas, Sarah J. | Kingdom of Ash |
| Maas, Sarah J. | Tower of Dawn |
| McCormick, Patricia | Sold |
| McQuiston, Casey | Red, White, and Royal Blue |
| Miller, Madeline | Song of Achilles |
| Moen, Erika | Let's Talk About It |
| Moore, Darnell | No Ashes in the Fire |
| Morrison, Toni | The Bluest Eye |
| Myracle, Lauren | The Infinite Moment of Us |
| Niven, Jennifer | Breathless |
| Perez, Ashley Hope | Out of Darkness |
| Picoult, Jodi | Nineteen Minutes |
| Santiago, Esmeralda | When I was Puerto Rican |
| Sebold, Alice | Lucky |
| Smiley, Jane | Thousand Acres |
| Stok, Barbara | Vincent |
| Thompson, Craig | Blankets |
| Vaughan, Brian K. | Y: The Last Man |
| Walker, Alice | The Color Purple |
| Witton, Hannah | Doing It: Let's Talk about Sex |

https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/

# The List of Books Mason City Community School District Identified for Removal

| Author | Title |
| --- | --- |
| Maas, Sarah J. | A Court of Mist and Fury |
| Dreiser, Theodore | An American Tragedy |
| Morrison, Toni | Beloved |
| Hopkins, Ellen | Crank |
| Anderson, M. T. | Feed |
| Bissinger, Buzz | Friday Night Lights |
| von Ziegesar, Cecily | Gossip Girl |
| Angelou, Maya | I Know Why the Caged Bird Sings |
| Duncan, Lois | Killing Mr. Griffin |
| Green, John | Looking for Alaska |
| Jackson, Tiffany | Monday's Not Coming |
| Picoult, Jodi | Nineteen Minutes |
| McCormick, Patricia | Sold |
| Alexie, Sherman | The Absolutely True Diary of a Part-time Indian |
| Walker, Alice | The Color Purple |
| Atwood, Margaret | The Handmaid's Tale |
| Hosseini, Khaled | The Kite Runner |
| Asher, Jay | Thirteen Reasons Why |
| Hopkins, Ellen | Tricks |

https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/

# APPENDIX E

# The List of Books Defendant West Des Moines Community Schools Identified for Removal

| Author | Title |
| --- | --- |
| Adichie, Chimamanda Ngozi | Half of a Yellow Sun |
| Arnold, Elana K. | Damsel |
| Arnold, Elana K. | Red Hood |
| Arnold, Elana K. | What Girls Are Made Of |
| Atwood, Margaret | The Handmaid's Tale |
| Butler, Octavia | Speech Sounds |
| Evison, Jonathan | Lawn Boy |
| Gay, Roxane | Not That Bad |
| Hoover, Colleen | Two More Days: An Anthology |
| Hopkins, Ellen | A Sin Such As This |
| Hopkins, Ellen | Crank |
| Hopkins, Ellen | Tilt |
| Hopkins, Ellen | Triangles |
| Hopkins, Ellen | Tricks |
| Johnson, George M. | All Boys Aren't Blue |
| Kaur, Rupi | Milk and Honey |
| Kobabe, Maia | Gender Queer: A Memoir |
| Maas, Sarah J. | A Court of Frost and Starlight |
| Maas, Sarah J. | A Court of Mist and Fury |
| Maas, Sarah J. | A Court of Silver Flames |
| Maas, Sarah J. | A Court of Thorns and Roses |
| Maas, Sarah J. | A Court of Wings and Ruins |
| Maas, Sarah J. | Empire of Storms |
| Maas, Sarah J. | House of Earth and Blood |
| Maas, Sarah J. | Kingdom of Ash |
| McCormick, Patricia | Sold |
| Melnick, Lynn | The Luckiest MILF in Brooklyn |
| Miles, Sara and Rofes, Eric | Opposite Sex |
| Morrison, Toni | The Bluest Eye |
| Myracle, Lauren | l8r, g8r |
| Myracle, Lauren | Shine |
| Myracle, Lauren | The Infinite Moment of Us |
| Myracle, Lauren | YOLO |
| Niven, Jennifer | Breathless |
| Palahniuk, Chuck | Adjustment Day |

# The List of Books Defendant West Des Moines Community Schools Identified for Removal

| | |
|---|---|
| Palahniuk, Chuck | Choke |
| Palahniuk, Chuck | Doomed |
| Palahniuk, Chuck | Haunted |
| Palahniuk, Chuck | Inisile Monsters Remix |
| Palahniuk, Chuck | Lullaby |
| Palahniuk, Chuck | Rant |
| Palahniuk, Chuck | Snuff |
| Reed, Amy | The Nowhere Girls |
| Sapphire | Push |
| Sebold, Alice | Lucky |
| Sheeres, Julia | Jesus Land: A Memoir |
| Vonnegut, Kurt | Slaughterhouse Five |

https://databases.desmoinesregister.com/database-books-removed-from-libraries-in-iowa-school-districts/