**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| IOWA SAFE SCHOOLS f/k/a GLBT YOUTH IN IOWA SCHOOLS TASK FORCE, et al., | Case No.        4:23-cv-474 |
| Plaintiffs, | **PLAINTIFFS' BRIEF IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| KIM REYNOLDS, in her official capacity as Governor of the State of Iowa, et al., | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7(d), Plaintiffs Iowa Safe Schools ("ISS"), on its own behalf and in its representative capacity on behalf of its members; P.B.-P., by his parent and next friend Belinda Scarrott; A.C., by her parents and next friends Richard and Ulrike Carlson; T.S., by her parent and next friend Eric Saylor; B.F.S., by their parents and next friends Brigit and Joseph Stevens; B.F., by their parent and next friend Lara Newsom; and James Doe, by his parent and next friend John Doe; Daniel Gutmann; and Alyson Telford submit the following brief supporting Plaintiffs' Renewed Motion for Preliminary Injunction.

# I. **TABLE OF CONTENTS**

Page(s)

I.     TABLE OF CONTENTS ................................................................................................ i

II.    TABLE OF AUTHORITIES ...................................................................................... ii

III.   INTRODUCTION ..................................................................................................... 1

IV.   FACTUAL BACKGROUND ..................................................................................... 3

V.    ARGUMENT ............................................................................................................. 6

   a.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ........................ 6

     1.   The law is unconstitutionally overbroad. ....................................................... 9

     2.   The law is unconstitutionally vague. ............................................................ 13

     3.   The law violates students' right to receive information and ideas. ............... 15

     4.   The law violates students' rights of expressive association. ........................ 18

     5.   The law violates students' rights to equal protection. ................................... 19

   b.   Irreparable Harm ............................................................................................... 22

     1.   Plaintiff Students Have Suffered Irreparable Harm. ..................................... 22

     2.   Plaintiff Educators Have Suffered Irreparable Harm. ................................... 23

     3.   Iowa Safe Schools Has Suffered Direct Irreparable Harm. .......................... 23

     4.   ISS' Individual Student and GSA Chapter Members Also Have Suffered Irreparable Harm. ......................................................................................... 24

   c.   The Court Previously Determined that the Balance of Equities Weighs in Favor of the Plaintiffs and is in the Public Interest. ............................................................ 25

VI.   CONCLUSION ....................................................................................................... 26

VII.  CERTIFICATE OF SERVICE .............................................................................. 27

## II. TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
 75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom.*
 *Metro. Sch. Dist. Of Martinsville v. A.C.,* 144 S. Ct. 683 (2024) ............................................ 19

*Baskin v. Bogan,*
 766 F.3d 648 (7th Cir. 2014) ..................................................... 21

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
 457 U.S. 853 (1982)....................................................................... 10, 15, 17

*Bostock v. Clayton Cnty.,*
 590 U.S. 644 (2020)....................................................................... 21

*Brakke v. Iowa Dep't of Nat. Res.,*
 897 N.W.2d 522 (Iowa 2017) ...................................................... 20

*Brandt by & through Brandt v. Rutledge,*
 47 F.4th 661 (8th Cir. 2022) ....................................................... 21

*Broadrick v. Oklahoma,*
 413 U.S. 601 (1973)....................................................................... 12

*Brown v. Entertainment Merchants Ass'n,*
 564 U.S. 786 (2011)....................................................................... 17

*Campbell v. St. Tammany Par. Sch. Bd.,*
 64 F.3d 184  (5th Cir. 1995) ........................................................ 15

*Case v. Olson,*
 14 N.W.2d 717 (Iowa 1944) ........................................................ 20

*City of Cleburne v. Cleburne Living Ctr.,*
 473 U.S. 432 (1985)....................................................................... 21

*Crozier for A.C. v. Westside Cmty. Sch. Dist.,*
 973 F.3d 882 (8th Cir. 2020) ....................................................... 10, 16

*D.M. by Bao Xiong v. Minnesota State High Sch. League,*
917 F.3d 994 (8th Cir. 2019) ................................................................ 23, 25

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
640 F.2d 109, 114 (8th Cir. 1981) (en banc) ........................................... 6

*Elrod v. Burns,*
427 U.S. 347 (1976) ............................................................................ 22

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ....................................................................... 13, 18

*Fayetteville Pub. Libr. v. Crawford Cnty.,*
No. 23-5086, 2023 WL 4849849 (W.D. Ark. Jul. 29, 2023) .................. 15

*Gay & Lesbian Students Ass'n v. Gohn,*
850 F.2d 361 (8th Cir. 1988) ............................................................... 18

*Gay Lib v. Univ. of Missouri,*
558 F.2d 848 (8th Cir. 1977) ............................................................... 18

*Gay Students Org. of Univ. of New Hampshire v. Bonner,*
509 F.2d 652 (1st Cir. 1974) ................................................................ 18

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024) ........................................................ passim

*Glenn v. Brumby,*
663 F.3d 1312 (11th Cir. 2011) ........................................................... 21

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ............................................................................ 16

*Heckler v. Mathews,*
465 U.S. 728 (1984) ............................................................................ 19

*Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.,*
813 F.3d 1124 (8th Cir. 2016) ............................................................. 25

*Hill v. Colorado,*
530 U.S. 703 (2000) ............................................................................ 13

*Horton v. Midwest Geriatric Mgmt., LLC*,
   963 F.3d 844 (8th Cir. 2020) ............................................................. 21

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977)........................................................................... 25

*Matter of Estate of Janssen*,
   7 N.W.3d 516 (Iowa 2024) ............................................................... 20

*Miller v. California*,
   413 U.S. 15 (1973)...................................................................... 13, 18

*Minarcini v. Strongsville City Sch. Dist.*,
   541 F.2d 577 (6th Cir. 1976) ........................................................... 16

*Moody v. NetChoice, LLC*,
   144 S.Ct. 2383 (2024)..................................................................... 1, 9

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
   970 F.3d 1010 (8th Cir. 2020) ......................................................... 25

*Myers v. City of Cedar Falls*,
   8 N.W.3d 171 (Iowa 2024) ............................................................... 20

*NAACP v. Button*,
   371 U.S. 415 (1963)........................................................................... 13

*NAACP v. State of Alabama ex rel. Patterson*,
   357 U.S. 449 (1958).......................................................................... 18

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
   No. 23-10385, 2024 WL 133213 (N.D. Fla. Jan. 12, 2024) .................... 17

*Phelps-Roper v. Nixon*,
   545 F.3d 685 (8th Cir. 2008), *overruled on other grounds by*
   *Phelps-Roper v. City of Manchester*, Mo., 697 F.3d 678 (8th Cir. 2012) ............................... 25

*Powell v. Noble*,
   798 F.3d 690 (8th Cir. 2015) ........................................................... 22

*Pratt v. Indep. Sch. Dis. No. 831*,
   670 F.2d 771 (8th Cir. 1982) ............................................. 10, 15, 16, 17

iv

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)...............................................................22

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,*
    826 F.3d 1030 (8th Cir. 2016) ...............................................6

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)...............................................................18

*Rodgers v. Bryant,*
    942 F.3d 451 (8th Cir. 2019) .............................................6, 26

*Sessions v. Morales-Santana,*
    582 U.S. 47 (2017).................................................................21

*Sherwin-Williams Co. v. Iowa Dep't of Revenue,*
    789 N.W.2d 417 (Iowa 2010) ...............................................20

*Snider v. City of Cape Girardeau,*
    752 F.3d 1149 (8th Cir. 2014) ...........................................9, 12

*Stanley v. Georgia,*
    394 U.S. 557 (1969)...............................................................16

*State v. McGuire,*
    200 N.W.2d 832 (Iowa 1972) ...............................................21

*State v. Ross,*
    941 N.W.2d 341 (Iowa 2020) ...............................................14

*State v. Zacarias,*
    958 N.W.2d 573 (Iowa 2021) ...............................................20

*Stephenson v. Davenport Cmty. Sch. Dist.,*
    110 F.3d 1303 (8th Cir. 1997) ...............................................13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
    600 U.S. 181 (2023).................................................................25

*Teamsters Local Union No. 421 v. City of Dubuque,*
    706 N.W.2d 709 (Iowa 2015) ...............................................14

*Teig v. Chavez,*
  8 N.W.3d 484 (Iowa 2024) ........................................................... 14

*United States v. Hansen,*
  599 U.S. 762 (2023) ..................................................................... 9

*United States v. Stevens,*
  559 U.S. 460 (2010) ..................................................................... 9

*United States v. Virginia,*
  518 U.S. 515 (1996) ..................................................................... 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ..................................................................... 22

*W. Virginia State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ................................................................. 6, 15

*Wachovia Sec., L.L.C. v. Stanton,*
  571 F. Supp. 2d 1014 (N.D. Iowa 2008) ...................................... 25

*Warth v. Seldin,*
  422 U.S. 490 (1975) ..................................................................... 25

**Statutes**

Iowa Code § 4.4(4) ........................................................................ 20

Iowa Code § 256.11 ...................................................................... 17

Iowa Code § 256.11(9)(a)(2) ........................................................ 13

Iowa Code § 256.11(9)(*a*)(2)(a)-(b) ............................................... 2

Iowa Code § 256.18(1)(*b*) ............................................................ 17

Iowa Code § 261I.2(1)(*a*)–(*b*) ....................................................... 20

Iowa Code §272.2(4) .................................................................... 13

Iowa Code §279.27(1) .................................................................. 13

Iowa Code § 279.78(1), (3)-(4) .................................................................. 8

Iowa Code § 279.78(4)(a)-(b) .................................................................. 2

Iowa Code § 280.33(1)–(2) .................................................................. 20

Iowa Code § 728.1(5) .................................................................. 10

Senate File 496, 2023 Iowa Acts ch. 91 .................................................... 1, 6, 8, 24

## Regulations

Iowa Admin. Bulletin, *Education Department [281] Adopted and Filed Rulemaking related to general accreditation standards*, ARC 8133C, ARC 8147C, at 384–87 (July 24, 2024), https://tinyurl.com/bdwatev4 ............................................ 12

Iowa Admin. Bulletin, *Education Department [281] Regulatory Analysis*, ARC 8245C (Oct. 16, 2024), https://tinyurl.com/h5pns6ac   12

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) ............................................................................... 14

*Gay-Straight/Genders & Sexualities Alliances*, CDC.gov, https://www.cdc.gov/healthyyouth/safe-supportive-environments/sexuality-alliances.htm (last updated Oct. 26, 2021) .................................................... 18

Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018), p. 9, https://tinyurl.com/mvzmmr7k ............................................................. 5

Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 74 (GLSEN 2022), https://tinyurl.com/ymnsuzda .............................................................. 5

Kristopher M. Goodrich & Melissa Luke, *LGBTQ Responsive School Counseling*, 3 J. of LGBT Issues in Counseling 113, 116 (2009). .......................................... 5

Samantha Hernandez et al., *Iowa book ban's toll: 3,400 pulled books, including '1984' and 'To Kill a Mockingbird'*, Des Moines Register (updated June 7, 2024), https://tinyurl.com/42uxhndn. ...................................................... 4

The Trevor Project, 2022 *Nat'l Survey on LGBTQ Youth Mental Health By State* 87, 89 (Dec. 2022), https://tinyurl.com/yeyvz3zy ............................................................ 5

The Trevor Project, *Research Brief: Acceptance from Adults Is Associated With Lower Rates of Suicide Attempts Among LGBTQ Young People* 2 (Sept. 2023), https://tinyurl.com/3y6f4f27 ............................................................ 6

### III. <u>INTRODUCTION</u>

Following the Eighth Circuit's reversal of this Court's order granting partial preliminary injunctive relief, Plaintiffs moved to amend and supplement their Complaint and now renew their motion for an Order enjoining Defendants from enforcing or taking action to enforce Senate File 496, 2023 Iowa Acts ch. 91 ("SF 496" or "the law"), solely as to Claim I (all counts); Claim II (all counts); Claim III (counts 2, 3, 5, 6, and 10); Claim IV (all counts); Claim V (count 2).

This Court previously enjoined all Defendants from enforcing or acting in furtherance of the Library Restriction and the Gender Identity/Sexual Orientation Prohibition ("GISO Prohibition"). Order Granting Mot. For Prelim. Inj. ECF No. 65 at 3-4. State Defendants appealed, challenging all Plaintiffs' standing, and urging the Eighth Circuit to hold that library collections constitute a form of government speech.

The appellate court rejected State Defendants' government speech theory, affirmed that Plaintiffs have standing to challenge the Library Restriction, and upheld this Court's determination that at least one Plaintiff (A.C.) had standing to challenge the GISO Prohibition. *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667-69 (8th Cir. 2024). The court therefore did not need to reach challenges to the other plaintiffs' standing. *Id*. at 669. However, the appellate court reversed and vacated the preliminary injunction to give this Court an opportunity to apply the standard described in *Moody v. NetChoice, LLC*, 144 S.Ct. 2383 (2024), with respect to Plaintiffs' facial challenges, and to address Plaintiffs' as-applied challenges. *Id*. at 669-71. Finally, the appellate court addressed this Court's interpretation of SF 496, suggesting that the application of various canons of statutory interpretation might rescue the law from unconstitutionality. *Id*. at 670-71.

Plaintiffs' Amended and Supplemental Complaint and Renewed Motion for Preliminary

1

Injunction now provide sufficient evidentiary and legal support for this Court to again enjoin SF 496.

SF 496 can only be interpreted as targeting LGBTQ+ students and topics for erasure. The law advances three principal—and unconstitutional—means of doing so: (1) erasing acknowledgement of LGBTQ+ people and the concepts of sexual orientation and gender identity from schools in grades K-6 ("Gender Identity/Sexual Orientation Prohibition"); (2) banning books that contain "any material with descriptions or visual depictions of a sex act" from all school library programs, regardless of grade ("Library Restriction");  and (3) requiring schools to report students for expressing transgender, non-binary, or gender non-conforming identities ("Gender Identity Notification Provision"). To enforce these restrictions, the state threatens to investigate and discipline staff and administration found in violation, potentially resulting in loss of accreditation of the entire school. SF 496, Div. I, §§ 1–4, 9.

These provisions, together with their draconian enforcement measures,[1] communicate to LGBTQ+ students that they are too shameful to be acknowledged. This law deprives Plaintiffs of their freedoms of speech and expression; Plaintiff Students and others now self-censor their own identities, refraining from engaging in protected speech and expression for fear of being bullied, harassed, or disciplined by teachers simply for acknowledging who they are. The law infringes upon their right to receive information and ideas; indeed, it explicitly requires the removal of books and uniquely targets books with LGBTQ+ content. The law deprives Plaintiffs of their right of expressive association; it imposes limitations on—or outright prohibits—students associating into gender sexuality alliances ("GSAs"). The law is of such overbreadth that any conceivable purpose

---

[1] SF 496, Div. I, § 2 (Iowa Code § 256.11(9)(*a*)(2)(a)-(b)) (enforcement of prohibition of content in library programs); *Id.*, Div. II, § 14 (Iowa Code § 279.78(4)(a)-(b) (enforcement of forced outing));

is entirely divorced from the protected speech prohibited, as more than 3,400 books have been removed, welcoming and affirming messages have been taken down, and students incur penalties for being who they are. It is unconstitutionally vague by, among other things, failing to identify which books must be removed, what content might be LGBTQ+-related and therefore prohibited, and what expression might trigger a report. As a whole, in its purpose and effect, SF 496 discriminates against—indeed, intentionally targets—LGBTQ+ people and identities.

## IV.   <u>FACTUAL BACKGROUND</u>

The impact of SF 496 has been severe. Amidst widespread confusion and panic over the law, Plaintiff Students have closed off forms of expression in which they used to engage. They have become more reluctant to be "out" about their identities at school, choosing not to use their preferred names and pronouns, and avoiding engaging in classroom discussions or political advocacy on topics that might reveal their LGBTQ+ identities. Ex. 1 ("B.F. Supp. Dec.") ¶¶ 8, 11; Ex. 2 ("P.B.-P. Supp. Dec.") ¶¶ 7-8, 12-13; Ex. 3 ("Doe Supp. Dec.") ¶ 10; Ex. 4 ("T.S. Supp. Dec.") ¶ 6; Ex. 5 ("Gayman Shahinllari Dec.") ¶¶ 15-18. Other students feel they have no other choice but to stay in the closet. Doe Supp. Dec. ¶¶ 10; Ex. 6 ("Tayler Supp. Dec.") ¶ 28; Ex. 7 ("Stevens Supp. Dec.") ¶ 10; Ex. 8 ("Harper Dec.") ¶¶ 28-29. Its restrictions have even driven some students away from public school entirely, and others to even plan to leave the country. Gayman Shahinllari Dec. ¶¶ 25-27; Stevens Supp. Dec. ¶¶ 18; Ex. 9 ("B.F.S. Supp. Dec.") ¶¶ 15-16.

SF 496's Library Restriction also has forced Iowa school districts to remove inconsistent

lists of books from school classrooms and libraries, with more than 3,400 books removed thus far.[2]

SF 496 disadvantages Iowa students in both their personal growth and educational goals by stifling their opportunity to read and inquire and sending the message that literature previously vetted and approved for each age group and maturity level carried hidden dangers. Moreover, while State Defendants have since argued the GISO Prohibition does not require the removal of books with LGBTQ+ characters, students' access to those books has still been limited, as educators fear consequences from reading them aloud in class, recommending them to students, or using them in a book club. Ex. 10 ("Gutmann Dec.") ¶¶ 18-22; Ex. 11 ("Telford Dec.") ¶¶ 21, 26-29.

The GISO Prohibition and Gender Identity Notification Provision have caused schools to restrict GSA activities, interfering with the ability of these student clubs to meet and promote on terms comparable to other clubs. Tayler Supp. Dec. ¶¶ 23-30; Ex. 12 ("Mitchell Supp. Dec.") ¶¶ 24, 26-28; Ex. 13 ("F.J. Dec.") ¶¶ 17-18, 20-24, 28, 31-32; Harper Dec. ¶¶ 22-24. Certain GSAs have stopped meeting altogether, either because school districts have prohibited them to comply with the GISO Prohibition, or because teachers have declined to serve as sponsors for fear of being the one to out a student under the Gender Identity Notification Provision. Ex. 14 ("R. Carlson Supp. Dec.") ¶¶ 8-9; Tayler Dec. ¶¶ 23-30; Mitchell Supp. Dec. ¶¶ 24, 26, 28. In some schools, faculty sponsors are permitted to serve but have been required to stay out of earshot of club meetings, or avoid providing guidance to student members, unlike any other student group. Mitchell Suppl. Dec. ¶ 30; Tayler Suppl. Dec. ¶ 23; F.J. Dec. ¶¶ 18, 23-24, 32. In yet other GSAs, SF 496 has led to a steep decline in engagement as students from non-affirming homes have

---

[2] The Des Moines Register maintains an expanding list based on school districts' responses to open records requests, one of the few methods of tracking this information as SF 496 does not require schools to report their removal of materials. Samantha Hernandez et al., *Iowa book ban's toll: 3,400 pulled books, including '1984' and 'To Kill a Mockingbird'*, Des Moines Register (updated June 7, 2024), https://tinyurl.com/42uxhndn.

become terrified of joining for fear of being a victim of the Gender Identity Notification Provision, a concern at least one faculty sponsor attempted to resolve by having student members only use their last names. Doe Supp. Decl. ¶ 9; P.B.-P. Supp. Dec. ¶ 14-15; Tayler Supp. Dec. ¶¶ 28-29; Harper Dec. ¶ 23. Under the Gender Identity Notification Provision, some middle schools require permission slips to participate in GSAs—a requirement imposed on no other student group— while, under the GISO Prohibition, others have prohibited GSAs from advertising their club or events where a K-6 grader may see it, and still others have simply prohibited students in grades 5-6 from joining at all. F.J. Dec. ¶ 38; Mitchell Supp. Dec. ¶¶ 28, 34; Telford Dec. ¶ 11; Tayler Supp. Dec. ¶ 24.

The Gender Identity Notification Provision also has deprived LGBTQ+ students of resources that would otherwise be available to them, such as access to school counselors, social workers, and psychologists who otherwise could assist in addressing bullying, sexual harassment or assault, or mental health crises. Mitchell Dec. ¶ 27. Having a confidential relationship with such a trusted school staff member is of utmost importance for LGBTQ+ students and directly impacts whether they seek potentially vital assistance and support from their schools.[3] But many students already are reluctant to seek support at school for fear that school employees will "out" them to family members.[4] The Gender Identity Notification Provision causes students who fear rejection

---

[3] *See* Kristopher M. Goodrich & Melissa Luke, *LGBTQ Responsive School Counseling*, 3 J. of LGBT Issues in Counseling 113, 116 (2009). Nearly three-quarters of LGBTQ+ youth in Iowa have reported being discriminated against because of their sexual orientation or gender identity. The Trevor Project, 2022 *Nat'l Survey on LGBTQ Youth Mental Health By State* 87, 89 (Dec. 2022), https://tinyurl.com/yeyvz3zy ("Trevor Project Survey").

[4] *See* Joseph G. Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* 74 (GLSEN 2022), https://tinyurl.com/ymnsuzda. A 2018 survey of LGBT youth listed (1) non-accepting families, (2) school/bullying problems, and (3) fear of being out or open about their identity as the top three problems they face. Human Rights Campaign, *Growing Up LGBT in America: Key Findings* (2018), p. 9, https://tinyurl.com/mvzmmr7k.

or abuse at home to be even less likely to seek essential, and even lifesaving support at school.

Forcing young people to come out to their families before they are ready can have serious consequences, including alienation from their family, increased suicidality from family rejection, or being kicked out of their home. LGBTQ+ youth represent 40% of all unhoused youth in America and face double the risk of early death on the streets.[5] These dire consequences underscore why SF 496's Gender Identity Notification Provision substantially and reasonably influences students' decision-making, precludes their participation in GSAs for fear of triggering a report home, and chills their speech and expression. If the provision remains in effect, ISS student and GSA members will continue to experience these harms.

## V.    ARGUMENT

Plaintiffs are entitled to preliminary injunctive relief: (1) Plaintiffs are likely to succeed on the merits; (2) they face irreparable harm absent the injunction; (3) Defendants incur no harm by injunction; and (4) the public interest supports enjoining these provisions of SF 496. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (likelihood of success on First Amendment claim generally satisfies other injunction requirements); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (likelihood of success need only be shown on any one of multiple claims).

## a.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

SF 496 has been enforced to prescribe an orthodoxy within Iowa schools. *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). By design, it limits the spectrum of

---

[5] The Trevor Project, *Research Brief: Acceptance from Adults Is Associated With Lower Rates of Suicide Attempts Among LGBTQ Young People* 2 (Sept. 2023), https://tinyurl.com/3y6f4f27.

available knowledge, forbids the discussion of disfavored topics, and penalizes the expression of LGBTQ+ identity. Through the Library Restriction, the GISO Prohibition, and the Gender Identity Notification Provision, SF 496 sweeps broadly to treat LGBTQ+ people in plainly discriminatory ways and threaten dissenters with the loss of livelihood. Because the law so plainly violates the First and Fourteenth Amendments, Plaintiffs easily demonstrate a likelihood of success on the merits of their claims.

<u>Library Restriction</u>

The Library Restriction requires the removal of "any material with descriptions or visual depictions of a sex act." As this Court noted, "The law is incredibly broad and has resulted in the removal of hundreds of books from school libraries, including, among others, nonfiction history books, classic works of fiction, Pulitzer Prize winning contemporary novels, books that regularly appear on Advanced Placement exams, and even books designed to help students avoid being victimized by sexual assault." ECF No. 65 at 3. The Eighth Circuit reaffirmed the government is not entitled to blanket, "government speech" authority in removing books from schools. *GLBT Youth*, 114 F.4th at 667-68. Plaintiffs are likely to succeed on their claims that the Library Restriction is overbroad (Claim I, count 1), vague (Claim II, count 1), and infringes upon their First Amendment right to receive information (Claim III, counts 2, 5, and 6).

<u>GISO Prohibition</u>

The GISO Prohibition forbids any "program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation." This Court previously held that this provision should not be interpreted to require the removal of rainbow flags, limit the expression of LGBTQ+ students, prevent the formation of GSAs, or otherwise impact students above grade 6, and to the extent that school officials, teachers and students have been interpreting

it otherwise, "they are simply wrong." ECF No. 65 at 4. With respect to students in grade 6 or below, this Court held that the law is neutral, bans mention of any gender identity or sexual orientation, "making no distinction between cisgender or transgender identity or gay or straight relationships," and forbids recognition of whether anyone is male or female or in a relationship of any sort. *Id.* The Court therefore concluded that the law is "so wildly overbroad that every school district and elementary school teacher in the State has likely been violating it since the day the school year started." *Id.* The Eighth Circuit panel expressed skepticism at this plain text interpretation, however, and urged the parties and Court to consider Iowa's interpretative canons to determine if the text's scope can be justifiably narrowed by proper application of any of them. *GLBT Youth*, 114 F.4th at 670-71.

Ultimately, the interpretive canons not only fail to save the law from its constitutional infirmity, but also reinforce the legislators' intent to target and harm a category of disfavored students. Thus, Plaintiffs are likely to succeed on their claims the GISO Prohibition is overbroad (Claim I, count 2), is vague (Claim II, count 2), infringes upon Plaintiffs' First Amendment rights (Claim III, counts 3 and 10; Claim IV, counts 1 and 3), and, as this Court has previously suggested, when interpreted as urged by State Defendants, violates Plaintiffs' Fourteenth Amendment right to equal protection (Claim V, count 2).

<u>Gender Identity Notification Provision</u>

The Gender Identity Notification Provision mandates that school officials notify a student's parent or guardian when a student asks for "an accommodation" intended to affirm their gender identity, even if officials are aware that such a disclosure will render a student unsafe at home. SF 496, Div. II, § 14 (Iowa Code § 279.78(1), (3)-(4)). The Court previously found Plaintiff Students were unlikely to succeed in establishing their standing to challenge the Gender Identity Notification

Provision. ECF No. 65 at 19. Plaintiffs have expanded upon their factual allegations and set forth facts that establish Iowa Safe Schools' standing in both its direct organizational and representational capacities. Plaintiffs also now include two Iowa educators challenging this provision's vagueness in violation of their Fourteenth Amendment rights. Accordingly, Plaintiffs are likely to succeed on their claims the Gender Identity Notification Provision is vague (Claim II, count 3) and infringes upon the right to engage in expressive association (Claim IV, counts 1–5).

    1.   <u>The law is unconstitutionally overbroad.</u>

Even if SF 496 had a legitimate purpose (which it does not), it sweeps far too broadly. SF 496 is a "prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). It covers a "a substantial amount of expressive activity;" indeed, "[i]t is hard to imagine any scenario in which the elements of the statute would be met and yet the actions would constitute non-expressive conduct." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1158 (8th Cir. 2014).

Under the First Amendment, a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep. *Stevens*, 559 U.S. at 473. This less demanding standard for facial challenges exists in First Amendment cases to provide breathing room for free expression. *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2397 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 769 (2023)). The Supreme Court articulated the steps to follow in assessing such a facial claim: (1) assess the scope of the challenged laws; expressed differently, ask: what activities, by what actors, do the laws prohibit or otherwise regulate? (2) determine which of the laws' applications violate the First Amendment; and (3) measure the unconstitutional applications against the remaining provisions. *Moody*, 144 S.Ct. at 2398.

First, the scope of the Library Restriction is vast. It is not limited to targeting

"pornography" in school libraries. The materials prohibited under SF 496 are those that include "descriptions or visual depictions of a sex act." Intentionally, there is no regard for the work as a whole, contemporary community standards as to what is suitable for minors, its intended appeal or offensiveness, or its value. *Cf.* Iowa Code § 728.1(5). It thus is not surprising that classic works, such as *I Know Why the Caged Bird Sings*, *As I Lay Dying*, *Their Eyes Were Watching God*, *Slaughterhouse Five*, and *1984* have been removed from various Iowa schools. Hernandez, *supra* note 2. If the State had meant to remove pornography from school libraries, it could have enforced existing law; instead, it intentionally sweeps up far more. In doing so, it regulates both the actions of the schools and school employees applying its restrictions, and the actions of the students' whose access to books and materials is revoked.

Second, in removing books and materials from school libraries based upon their content without adequate justification, the Library Restriction infringes upon students' right to receive information. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (holding government officials may not remove books from school libraries "simply because they dislike the ideas contained in those books"). Eighth Circuit caselaw indicates that removals from school libraries are constitutional only if the government proves they are justified by a substantial and reasonable governmental interest. *Pratt v. Indep. Sch. Dis. No. 831*, 670 F.2d 771, 777 (8th Cir. 1982). Or, per the minimum standard of protection in the school-setting, are "reasonably related to legitimate pedagogical concerns." *Crozier for A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020). In this case, the Eighth Circuit further advised that library materials should support the educational mission of the schools. *GLBT Youth*, 114 F.4th at 670. Here, all books removed did so. As this Court found, the books removed can be sorted into categories, all of which serve a valuable role in the school. ECF No. 65 at 28 (including "historical

classics," "modern award-winners," "non-fiction books designed to help minors avoid being victimized by sexual assault," "non-fiction history books" about tragic events, "non-fiction books about how to make safe and informed decisions about sex," and "other works of fiction geared toward the emotional and intellectual challenges associated with being a junior high school or high school student"). The Library Restriction cannot withstand "any standard of scrutiny" under the First Amendment. ECF No. 65 at 3.

Third, if there is any application of the Library Restriction that has not infringed upon students' right to receive information, it is substantially outweighed by the unjustifiable statewide culling of more than 3,400 books. Consequently, under *Moody*, the Library Provision is *facially* invalid as overbroad.

The GISO Prohibition similarly prohibits vast amounts of constitutionally protected speech in a manner that substantially outweighs any purported legitimate sweep. The GISO Prohibition regulates seven separate activities ("program, curriculum, test, survey, questionnaire, promotion, and instruction"), and prohibits anything that might "relate to" gender identity or sexual orientation. As this Court has noted, "related to" is an expansive phrase that requires little nexus between the activity and the subject. ECF No. 65 at 16. The prohibited concepts of gender identity and sexual orientation are defined inclusively under Iowa law; but, even if, as State Defendants have argued, the GISO Prohibition applies only to the concept of LGBTQ+ identities and orientations, the Prohibition still sweeps wide. Reading LGBTQ+ themed books, responding to anti-LGBTQ+ bullying, displaying pride or safe space signs, permitting GSAs and allowing them to promote themselves, allowing student self-expression of their or a family member's LGBTQ+ identity: all is subject to even this "narrowed" scope of the GISO Prohibition. Such application infringes, variously, on students' First Amendment rights to receive information, engage in speech

or expressive conduct, and engage in expressive association, without satisfying the barest constitutional scrutiny. If there were a legitimate purpose to this provision, it cannot extend so far as to remove the concept of LGBTQ+ people from the school entirely—to erase their very existence. Unconstitutional, viewpoint-based restriction is the purpose and the scope of the GISO Prohibition; there are few, if any, constitutional applications that remain.

Finally, "a limiting construction or partial invalidation" cannot rescue either the Library Restriction or the GISO Prohibition. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). State Defendants have asserted the GISO Prohibition does not, for example, require the removal of books from K-6 school libraries merely because they contain an LGBTQ+ character. Putting aside this interpretation's inconsistency with the text of the GISO Prohibition, and that it has not been articulated in the Department's rulemaking, *cf.* Iowa Admin. Bulletin, *Education Department [281] Adopted and Filed Rulemaking related to general accreditation standards*, ARC 8133C, ARC 8147C, at 384–87 (July 24, 2024), https://tinyurl.com/bdwatev4; Iowa Admin. Bulletin, *Education Department [281] Regulatory Analysis*, ARC 8245C, at 3190 (Oct. 16, 2024), https://tinyurl.com/h5pns6ac, it still fails to limit the GISO Prohibition's impact on what happens with such books. Under the GISO Prohibition, perhaps they may exist, but they cannot be acknowledged. As for the Library Restriction, State Defendants have advanced no limiting construction at all, choosing instead to double down and claim all books removed had, in fact, violated the statute. Brief of State Defendants-Appellants, Case No. 24-1075, at 59 (March 11, 2024) ("Every book removed from library shelves because of the Library Program included at least some material that was not 'age-appropriate' under the law."). "No limiting construction would be consistent with any plausible understanding of the legislature's intent," *see Snider*, 752 F.3d at 1159, and none has been offered.

2. <u>The law is unconstitutionally vague.</u>

The Library Restriction, GISO Prohibition, and Gender Identity Notification Provision are unconstitutionally vague. A law is vague and unconstitutional under the Fourteenth Amendment if it fails to provide "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997). With respect to the threat of enforcement against Educator Plaintiffs, the severity of the mechanism—loss of professional licensure—demands greater scrutiny of the statute's language. Iowa Code §§ 256.11(9)(a)(2) (SF 496, Div. I, § 2), 272.2(4), 279.27(1). With respect to the impact of these provisions on Plaintiff Students' rights of speech, expression, and association, the level of specificity expected from the statute rises further. *NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society," which is why the "government may regulate in the area only with narrow specificity"); *see also id.* at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

The Library Restriction is vague in its use of the phrase "description or visual depiction." These terms fail to define a comprehensible scope given the creative medium regulated. There is no qualification as to the level of specificity, frequency, or explicitness of a description that rises to the level of prohibition. This problem is especially pronounced by the Library Restriction's refusal to allow those applying and enforcing it to consider the material's intended effect, its merit as a whole, its target audience, or any other of the factors pronounced by the Supreme Court for use in regulating content that may be constitutionally prohibited from minors. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975); *Miller v. California*, 413 U.S. 15, 24 (1973).

13

Unsurprisingly, the Library Restriction has encouraged extraordinary and inconsistent censorship by Iowa schools, given their reasonable fear of arbitrary and discriminatory enforcement.

The GISO Prohibition has three facets that are each vague, and collectively render the Prohibition unintelligible. First is its use of seven undefined terms to designate the contexts in which it applies ("program, curriculum, test, survey, questionnaire, promotion, and instruction"). None is clear, leaving educators and students to guess at what acts or activities might potentially be prohibited, and no canon of statutory interpretation alters this conclusion. The canon of *noscitur a sociis*, by which words are read in context, *see State v. Ross*, 941 N.W.2d 341, 348 (Iowa 2020), applies when groups of words "ordinarily have a similar meaning." *Teig v. Chavez*, 8 N.W.3d 484, 494 (Iowa 2024). The similarities between the activities to which the GISO Prohibition applies start and end with the fact they may conceivably all occur at school. The related tool of statutory interpretation, *ejusdem generis*, "when general words follow specific words in a statute, the general words are read to embrace only objects similar to those objects of the specific words," *Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 715 (Iowa 2015), similarly counsels against an interpretation that would require the Court to expand the specific word—curriculum— to consume the general words, such as promotion or instruction. While State Defendants have argued the GISO Prohibition should be read to apply only to "mandatory curriculum," such an interpretation is like taking the classic example of this canon, "dogs, cats, horses, cattle, and other animals," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012), and concluding that "other animals" refers only to tabby cats. Second, the GISO Prohibition's connecting phrase, "relating to," expands its scope, granting unfettered discretion to its enforcers deciding what speech or conduct crosses the line. Third, as has been a constant source of disagreement in this very case (let alone amongst those expected to abide by the Prohibition),

the terms "gender identity" and "sexual orientation" are neutrally defined. State Defendants' attempt to rewrite this language over the course of litigation only emphasizes the uncertainty. On the ground, this has created a system where a student's constitutional rights depend entirely on the school they happen to attend.

The Gender Identity Notification Provision is vague as to what constitutes a reportable "request" for an "accommodation" "intended to affirm the student's gender identity." The legislature provided only one example—names and pronouns—and left the rest to discretion. There is no qualification on how specific a request must be, what a request for a gender-affirming accommodation is, or even whether the provision applies only to transgender or gender nonconforming identities; problems handwaved by the senate sponsor of the bill as, "We all know what we're talking about here." When it comes to a threat against the license of an educator, or the safety and free speech rights of a student, the Constitution requires more.

### 3. The law violates students' right to receive information and ideas.

Students have a First Amendment right to be free from official conduct intended to suppress ideas based on disapproval of their content. *See Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 776–79 (8th Cir. 1982); *see also generally Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 188–89 (5th Cir. 1995) (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (plurality)); *Fayetteville Pub. Libr. v. Crawford Cnty.*, No. 23-5086, 2023 WL 4849849, at *3 (W.D. Ark. Jul. 29, 2023). Schools may not remove books containing LGBTQ+ content from school libraries to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 854 (quoting *Barnette*, 319 U.S. at 642). "[T]he Constitution protects the right to receive information and ideas," a right that extends to students with respect to school library materials. *Id.* (quoting *Stanley v. Georgia*, 394

U.S. 557, 564 (1969)). Restrictions on this right constitute a First Amendment injury. *Id*. The library, a noncurricular space, is outside the scope of otherwise permissible content-based restrictions on speech in the school setting. *Id*. at 869; *Pratt*, 670 F.2d at 776; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 581–82 (6th Cir. 1976). Under Eighth Circuit precedent, the removal of school library materials is unconstitutional unless the government can establish a substantial and reasonable justification for the removal. *Pratt*, 670 F.2d at 777. At a minimum, such an infringement on the right to receive information must be in service of a legitimate pedagogical concern. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 268 (1988); *Crozier*, 973 F.3d at 891; *see also GLBT Youth*, 114 F. 4th at 670.

For example, Student Plaintiff P.B.-P. is a 17-year-old senior at Waterloo West High School in the Waterloo School District. P.B.-P. Supp. Dec. ¶¶ 1-2. P.B.-P. wants to have continued access in school to books like *Gracefully Grayson* by Ami Polonsky, *Hell Followed With Us* by Andrew Joseph White, *Orlando* by Virginia Woolf, *Heartstopper* by Alice Oceman, *Good Omens* by Terry Pratchett and Neil Gaiman, and *Red, White, and Royal Blue* by Case McQuiston—all books telling stories he found beautiful and important to his own journey. *Id.* ¶ 4. He recently read *All Boys Aren't Blue* by George M. Johnson, and he is currently reading, and wants to finish, *Lawn Boy* by Jonathan Evison. *Id.* ¶¶ 6–7. However, these books have been or will be removed, along with *Gender Queer* by Maia Kobabe, *Let's Talk About It* by Erika Moen and Matthew Nolan, and *Lucky* by Alice Sebold. *Id.* ¶ 5. Far from interfering with his education, books like these made P.B.-P. feel safe, secure, and reaffirmed. *Id.* ¶ 8.

Student Plaintiff B.F. is a 17-year-old senior at Urbandale High School in the Urbandale Community School District. B.F. Supp. Dec. ¶¶ 1-4. Student Plaintiff T.S. is a 16-year-old junior at the same school. T.S. Supp. Dec. ¶¶ 1-4. Student Plaintiff T.S. wanted to read *Gender Queer*

by Maia Kobabe, but the book was pulled from school shelves. T.S. Supp. Dec. ¶ 8. Student Plaintiff B.F. wants to read *Call Me By Your Name* by Andre Aciman and *The Color Purple* by Alice Walker, but those books were pulled from school shelves, as well. B.F. Supp. Dec. ¶ 14. In addition, the school library has pulled books with LGBTQ+ narratives from display. T.S. Supp. Dec. ¶ 9. Removing these books has not only interfered with Plaintiff B.F.'s and T.S.'s desire to read these materials, it has made B.F. and T.S. feel insulted, degraded, shamed, and erased, as the stigma is attached to those who wish to read such books—or who, like B.F. and T.S., share characteristics with the characters in them. T.S. Supp. Dec. ¶¶ 8-9; B.F. Supp. Dec. ¶ 13.

The infringement upon these Plaintiffs' right to receive information is unjustifiable. The removal of these materials does not facilitate any "pedagogical mission." *See GLBT Youth*, 114 F.4th at 670. It does not "advance the school curriculum," or constitute "tailoring to provide for 'the teaching of basic skills and ideas.'" *Id.* (quoting *Pico*, 457 U.S. at 915 (Rehnquist, C.J., dissenting)). There is no evidence from any Defendant that these material "undermine[]" or are "inconsistent with" Iowa schools' "central mission of educating Iowa children." *Id.* And their removal certainly serves no "substantial and reasonable governmental interest." *Pratt*, 670 F.2d at 777. The State of Iowa requires that its approach to education be "age-appropriate, multicultural, and gender-fair," Iowa Code § 256.11 (introductory section), and that schools instill in students qualities of "caring," "justice and fairness," "respect," "courage," "kindness," and "compassion," *id.* § 256.18(1)(*b*). The Library Restriction utterly fails to support these goals.

While case law has included "sexual content" among legitimate concerns, *see PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 23-10385, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024) (collecting exemplifying cases), the concern is only legitimate where the content is not in line with pedagogical values. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795 (2011)

17

("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.") (quoting *Erznoznik*, 422 U.S. at 213-14). There must be a reasonable justification for why the material, taken as a whole and considering its serious literary, artistic, political, or scientific value, *Miller*, 413 U.S. at 24, is nevertheless contrary to Iowa schools' pedagogical mission because of a description or depiction of a sex act. The Library Restriction eschews these considerations and overrules the decisions of the schools and communities expected to make them.

    4. <u>The law violates students' rights of expressive association.</u>

    The First Amendment protects the freedom of expressive association. *Roberts v. U.S. Jaycees,* 468 U.S. 609, 617–18 (1984). The freedom to "engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). These protections apply to students who wish to join together in noncurricular clubs such as GSAs in school settings for purposes of social networking, political advocacy, mutual support, and public education.[6] *See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 367–68 (8th Cir. 1988); *Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 856 (8th Cir. 1977); *Gay Students Org. of Univ. of New Hampshire v. Bonner*, 509 F.2d 652, 660 (1st Cir. 1974). Based on viewpoint, the GISO Prohibition and Gender Identity Notification Provision

---

[6] GSAs lead to "feelings of school connectedness among [LGBTQ+] students," as well as "increasing young people's sense of purpose, self-esteem, and agency." *Gay-Straight/Genders & Sexualities Alliances*, CDC.gov, https://www.cdc.gov/healthyyouth/safe-supportive-environments/sexuality-alliances.htm (last updated Oct. 26, 2021). GSAs offer myriad positive influences, for both LGBTQ+ youth and others, leading to "reduced risk across health outcomes related to HIV and other STDs, including experiencing violence, illicit drug use and prescription drug misuse, and suicidal ideation." *Id*.

have obstructed and interfered with the ability of students to associate for these purposes in violation of the First Amendment. Some school districts have shuttered GSAs altogether in younger grades. R. Carlson Supp. Dec. ¶ 8; Tayler Supp. Dec. ¶ 26. In others, the law has made it impossible to find a teacher willing to serve as a sponsor, resulting in the GSA's closure. Tayler Supp. Dec. ¶¶ 26, 29. Many more have imposed restrictions not imposed on other clubs or witnessed the number of GSA members dwindle as a result of students' fears they will be reported and outed to their parents if they attend. P.B.-P. Supp. Dec. ¶ 14; Doe Supp. Dec. ¶ 9. The First Amendment forbids such limitations on students' rights of expressive association.

### 5. The law violates students' rights to equal protection.

The GISO Prohibition, given the interpretation offered by State Defendants as applying only to non-cisgender identities and non-heterosexual orientations, targets LGBTQ+ students' coming out speech and their ability to find community with one another through GSAs, while imposing no such burdens on non-LGBTQ+ students and student groups. *See Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (laws that discriminate by perpetuating archaic and stereotypic notions about a disfavored group, or that target members of the group as innately inferior, cause cognizable dignitary injury); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied sub nom. Metro. Sch. Dist. Of Martinsville v. A.C.,* 144 S. Ct. 683 (2024) (equal protection guarantee prohibits schools from enacting policies that discriminate against transgender students). Because SF 496 singles out LGBTQ+ people for differential treatment and lacks adequate tailoring in service of even a legitimate governmental purpose, let alone the exceedingly persuasive one required, it violates the Equal Protection Clause.

The GISO Prohibition appears neutral on its face when taken literally. However, it is abundantly clear from its legislative history, its purpose and intent, and the interpretation that has

been given it by State Defendants and the school districts charged with applying it, it is anything but neutral. Ordinarily, Iowa law on statutory interpretation requires a court interpreting an unambiguous statute to apply the plain language. *Matter of Estate of Janssen*, 7 N.W.3d 516, 523 (Iowa 2024) ("The first step in our statutory interpretation analysis is to determine whether the statute is ambiguous. Our inquiry ends with the plain language if the statute is unambiguous." (quoting *State v. Zacarias*, 958 N.W.2d 573, 581 (Iowa 2021) (cleaned up)). However, interpretive canons also counsel against "interpretations that create conflict" with other statutes, and to "adopt interpretations that are harmonious." *Myers v. City of Cedar Falls*, 8 N.W.3d 171, 180 (Iowa 2024). A plain text interpretation creates conflict with other laws on LGBTQ+ students passed by this same Iowa legislature. *See* Iowa Code § 261I.2(1)(*a*)–(*b*) (requiring sports teams be designated by gender and prohibiting participation in girls team based on a student's sex assigned at birth); *id.* § 280.33(1)–(2) (prohibiting access to restrooms, changing areas, overnight accommodations, and other spaces based upon a student's sex assigned at birth). For this reason, and for the reason that, as this Court found, a plain text interpretation would mean schools have been violating the GISO Prohibition every day, ECF No. 65 at 4, this statute presents the rare case for an application of the "absurdity doctrine." *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 538 (Iowa 2017) ("The court should give effect to the spirit of the law rather than the letter, especially so where adherence to the letter would result in absurdity, or injustice, or would lead to contradiction, or would defeat the plain purpose of the act . . . ." (quoting *Case v. Olson*, 14 N.W.2d 717, 719 (Iowa 1944))); *see also* Iowa Code § 4.4(4) ("In enacting a statute, it is presumed that . . . [a] result feasible of execution is intended."). As recognized by the Iowa Supreme Court, an absurd result from literal interpretation creates the ambiguity in a statute necessary to apply other interpretative canons. *See Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 427 n. 8 (Iowa 2010).

Ultimately, State Defendants cannot take advantage of the constitutional avoidance doctrine, *see State v. McGuire*, 200 N.W.2d 832, 833 (Iowa 1972) (noting an absurd interpretation that also leads to "serious constitutional questions" must be avoided), as the GISO Prohibition is unconstitutional whichever interpretation is adopted. Either it is neutral and unconstitutionally overbroad, or it is targeted and unconstitutionally discriminatory. Plaintiffs advance their equal protection claim under the latter circumstance.

Under this reading of the GISO Prohibition, it is unavoidable to conclude it makes classifications based on LGBTQ+ status. Classifications based on sex, sexual orientation, and gender identity/transgender status all warrant heightened scrutiny. *See, e.g.*, *Sessions v. Morales-Santana*, 582 U.S. 47, 56-9 (2017) (sex); *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669–70 (8th Cir. 2022) (sex); *Baskin v. Bogan*, 766 F.3d 648, 654–657 (7th Cir. 2014) (sexual orientation); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (transgender status). Because these traits "generally provide no sensible ground for differential treatment," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985), the Equal Protection Clause requires that government provide an "exceedingly persuasive justification" for legislation that differentiates on those bases, *United States v. Virginia*, 518 U.S. 515, 531 (1996). Classifications based on sexual orientation and transgender status warrant such scrutiny both in and of themselves and as forms of sex discrimination. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) (discrimination on the bases of sexual orientation and transgender status "necessarily entails discrimination based on sex"); *accord Horton v. Midwest Geriatric Mgmt., LLC*, 963 F.3d 844, 847 (8th Cir. 2020). Finally, as previously explained, any attempt to cast the GISO Prohibition as neutral on its face and, thus, avoid triggering suspect classification analysis cannot save it.

Recognizing the GISO Prohibition for its discriminatory classification, it fails to serve even

a legitimate governmental purpose, let alone the compelling one required. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (strict scrutiny applies both to content-based restrictions on speech, and to laws that, while facially content neutral, either cannot be justified without reference to the content of the regulated speech or were adopted by the government because of disagreement with its message). The purpose and effect of this provision is to target speech and expressive association by LGBTQ+ people and to prohibit discussion or acknowledgment of LGBTQ+ identities and orientations, while leaving untouched comparable speech and expressive associations by or about cisgender people and heterosexual people. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (even a facially neutral law may nonetheless violate Equal Protection Clause if it has a discriminatory purpose and effect); R. Carlson Supp. Dec. ¶¶ 13-17 (describing ways in which Plaintiff A.C. has engaged in self-censorship while at school); Ex. 15 ("U. Carlson Supp. Dec.") ¶ 13 ("A.C. does not share her status as a trans girl with any other peers and has taken care to ensure that she avoids wearing clothing that might reveal her biological sex."); *see also supra* Sec. V.a.(4) ("The law violates students' rights of expressive association"). There is no constitutionally valid justification for this blatant discrimination.

b.    **Irreparable Harm**

1.   Plaintiff Students Have Suffered Irreparable Harm.

Plaintiff Students have identified the numerous ways each of the challenged provisions interfered with their First Amendment rights. "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The GISO Prohibition's intended discriminatory application only inflicts further irreparable harm. *See D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994,

1004 (8th Cir. 2019) (students denied opportunities based on sex suffer irreparable harm sufficient to warrant preliminary injunction).

### 2. Plaintiff Educators Have Suffered Irreparable Harm.

Due to the vagueness of the GISO Prohibition and Gender Identity Notification Provision, Plaintiff Educators face a present risk that their licenses will be taken from them on an arbitrary and discriminatory basis. The vagueness of the GISO Prohibition led to Plaintiff Gutmann being told he could not mention his husband. Gutmann Dec. ¶ 12. His school changed its interpretation of the law, but Gutmann still does not know whether State Defendants will decide differently. Gutmann Dec. ¶¶ 12-16. Plaintiff Telford wants to sponsor a GSA at her school, but does not know if doing so risks discipline for violating the law. Telford Dec. ¶¶ 10-11. Both Educators maintain diverse classroom libraries for their students; State Defendants have asserted they can keep them, but if they were to do anything with these books, they fear they will be at risk. Gutmann Dec. ¶¶ 18–23; Telford Dec. ¶¶ 21, 26. Both also fear the day, which they know will come, when they have to choose between risking violating the Gender Identity Notification Provision and supporting a student in need. Gutmann Dec. ¶¶ 24–26; Telford Dec. ¶¶ 30–37. They face uncertainty every day they go to work, and this violation of their Fourteenth Amendment rights cannot be remedied absent the certainty of a preliminary injunction.

### 3. Iowa Safe Schools Has Suffered Direct Irreparable Harm.

ISS's mission is to provide a safe, supportive, and nurturing learning environment and community for LGBTQ+ youth and their allies. Tayler Supp. Dec. ¶ 3; Ex. 16 ("Mix Supp. Dec.") ¶ 2. But ISS has had to completely recalibrate its focus from providing these services to responding to and providing education about this one law in particular. Tayler Supp. Dec. ¶¶ 21–22; Mitchell Supp. Dec. ¶¶ 20-25; Mix Supp. Dec. ¶¶ 10, 17–18. Some ISS employees have shifted virtually

their entire focus from ISS's primary mission because of the law. Mitchell Supp. Dec. ¶¶ 22–23; Mix Supp. Dec. ¶¶ 17–18. ISS has diverted resources into addressing issues arising from the GISO Provision and Gender Identity Notification Provision, which directly and indirectly inhibit GSAs from organizing in their normal course of business. Mitchell Supp. Dec. ¶¶ 26–30, 34–35; Tayler Supp. Dec. ¶¶ 28–29.

SF 496 has also caused a steep decline in ISS's paid professional development services, resulting in a loss of ISS's funding and a sharp curtailment of one of its primary methods of outreach to educators. Mix Supp. Dec. ¶¶ 7, 12, and 13. These paid services provide opportunities for educators to gain the skills to better understand and meet the needs of LGBTQ+ youth and their allies. Mix Supp. Dec. ¶¶ 5. Educators and administrators now fear that implementing ISS's advice to provide a safe and environment for LGBTQ+ youth will subject them to discipline under SF 496 and put their students at risk of being forcibly outed. Mix Supp. Dec. ¶¶ 8, 10, 16. Because of this, in-person and direct consultation has become infrequent, registration for ISS-offered licensure renewal and graduate credit coursework has sharply declined, and attendance at ISS's three annual conferences has dropped so significantly that ISS has canceled two of the conferences going forward. Mix Supp. Dec. ¶¶ 7, 12, 12-15. ISS has been forced to adjust its professional development content to meet educator needs of navigating SF 496 and related school policy, as well as students' needs after graduation, rather than further developing its core content of building the safest and most affirming environment possible for K-12 LGBTQ+ students. Mix Supp. Dec. ¶¶ 10, 13, 15–17.

### 4. ISS' Individual Student and GSA Chapter Members Also Have Suffered Irreparable Harm.

ISS also seeks relief on behalf of its individual student and GSA chapter members who

have been directly harmed by the law. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An association has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An entity can have representational standing even if only one member has standing, *id.* at 342, and even if the entity is not itself directly injured, *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1128 (8th Cir. 2016). ISS has members experiencing irreparable infringements upon their constitutional rights.

**c.** **The Court Previously Determined that the Balance of Equities Weighs in Favor of the Plaintiffs and is in the Public Interest.**

In balancing the equities, the court also weighs the threat of irreparable harm against any injury the injunction will inflict on other parties, *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020), including consideration of harm to the public, *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). This Court previously determined that these final two factors weigh in favor of enjoining SF 496. This remains true. "The balance of equities [] generally favors the constitutionally-protected freedom of expression . . . . [T]he public is served by the preservation of constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 694 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, Mo., 697 F.3d 678 (8th Cir. 2012). *See also D.M.*, 917 F.3d at 1004 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (quotation omitted).

There is no harm to Defendants in maintaining the status quo that existed prior to SF 496.

All Iowa schools benefit when students can read freely, express themselves, and form connections in student-led groups. Indeed, limiting the freedom to learn and grow is contrary to the goals of public education. No legitimate public interest is served by suppressing statutory and constitutional rights. The State suffers no injury when it is prevented from enforcing a plainly unconstitutional law. *Rodgers*, 942 F.3d at 458.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, enforcement of the Library Restriction, GISO Prohibition, and Gender Identity Notification Provision should be enjoined during the pendency of this action.

Dated: October 18, 2024                                 Respectfully submitted,

/s/ _____

Thomas D. Story, AT0013130 (Lead Counsel)              Camilla B. Taylor*
Rita Bettis Austen, AT0011558                          Nathan Maxwell* **
Shefali Aurora, AT0012874                              Kenneth D. Upton, Jr.* ***
**American Civil Liberties Union**                     **Lambda Legal Defense**
  **of Iowa Foundation**                                 **and Education Fund, Inc.**
505 Fifth Avenue, Suite 808                            65 E. Wacker Pl., Suite 2000
Des Moines, IA 50309                                   Chicago, IL 60601
(515) 243-3988                                         (312) 663-4413
thomas.story@aclu-ia.org                               ctaylor@lambdalegal.org
rita.bettis@aclu-ia.org                                nmaxwell@lambdalegal.org
shefali.aurora@aclu-ia.org                             kupton@lambdalegal.org

Laura J. Edelstein*                                    Karen L. Loewy*
Katherine E. Mather*                                   Sasha J. Buchert*
**Jenner & Block LLP**                                 **Lambda Legal Defense**
525 Market Street, 29th Floor                            **and Education Fund, Inc.**
San Francisco, CA 94105                                1776 K Street, N.W., 8th Floor
(628) 267-6800                                         Washington, DC 20006-2304
LEdelstein@jenner.com                                  (202) 804-6245
KMather@jenner.com                                     kloewy@lambdalegal.org
                                                       sbuchert@lambdalegal.org

Anna K. Lyons*
Effiong Dampha*                                        Daniel R. Echeverri*
**Jenner & Block LLP**                                 Christopher J. Blythe*
515 S. Flower Street, Suite 3300                       **Jenner & Block LLP**

26

Los Angeles, CA 90071-2246
(213) 239-5100
ALyons@jenner.com
EDampha@jenner.com

*Admitted pro hac vice.*

** *Member of the Arizona bar. Practicing
under the supervision of a member of the Illinois bar.*

***Member of the District of Columbia, Texas and
Oklahoma bars; Not licensed to practice in Illinois.*

353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
DEcheverri@jenner.com
CBlythe@jenner.com

Joshua J. Armstrong*
**Jenner & Block LLP**
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
JArmstrong@jenner.com

*Counsel for Plaintiffs*

## VII.  CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk

of Court by using the CM/ECF system.

Dated: October 18, 2024                    */s/ Thomas D. Story*
                                           Thomas D. Story

27