IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

IOWA SAFE SCHOOLS f/k/a GLBT YOUTH IN
IOWA SCHOOLS TASK FORCE; BELINDA
SCARROTT as Next Friend for P. B.-P.; RICHARD
CARLSON, as Next Friend for A.C.; ULRIKE
CARLSON, as Next Friend for A.C.; ERIC SAYLOR,
as Next Friend for T.S.; BRIGIT STEVENS, as Next
Friend for B.F.S.; JOSEPH STEVENS, as Next Friend
for B.F.S.; LARA NEWSOM, as Next Friend for B.F.;
JOHN DOE, as Next Friend for JAMES DOE;
DANIEL GUTMANN; and ALYSON TELFORD,

       Plaintiffs,

 vs.

KIM REYNOLDS, in her official capacity as Governor
of the State of Iowa, MCKENZIE SNOW, in her official
capacity as Director of the Iowa Department of
Education; JOHN ROBBINS, in his official capacity as
President of the Iowa State Board of Education; MATT
DEGNER, in his official capacity as Iowa City
Community School District Superintendent; MOLLY
ABRAHAM, SHAWN EYESTONE, CHARLIE
EASTHAM, JAYNE FINCH, RUTHINA MALONE,
MITCH LINGO, and LISA WILLIAMS, in their official
capacities as board members of the Iowa City
Community School District; ROD EARLEYWINE, in
his official capacity as Sioux City Community School
District Superintendent; DAN GREENWELL, LANCE
EHMCKE, JAN GEORGE, TREYLA LEE, JOHN
MEYERS, BOB MICHAELSON, and EARL MILLER,
in their official capacities as board members of the Sioux
City Community School District; ROSALIE DACA, in
her official capacity as Urbandale Community School
District Superintendent; KATHERINE HOWSARE,
RACHEL KENT, JENNY MEADE, JASON MENKE,
JOSH VAN RSWYK, CARISSA WILLIAMS, and
MARGARET YOUNG, in their official capacities as
board members of the Urbandale Community School
District; JARED SMITH, in his official capacity as
Waterloo Community School District Superintendent;
JONATHAN COX, JESSE KNIGHT, ASTOR
WILLIAMS, LYLE SCHMITT, STACIE MILLS,

Case No. 4:23-cv-00474

**ORDER GRANTING IN PART
AND DENYING IN PART
MOTION FOR PRELIMINARY
INJUNCTION**

JANELLE EWING, and KRYSTAL MADLOCK, in their official capacities as board members of the Waterloo Community School District; MATT ADAMS, in his official capacity as West Des Moines Community Schools Superintendent; JEFF HICKS, MICHAEL ANDRESKI, ELIZABETH LARSON, LILA P. MONTOYA STARR, FANNETTE ELLIOTT, JILL CATON JOHNSON, and ANADELIA MORGAN, in their official capacities as board members of the West Des Moines Community School District,

Defendants.

## I.    INTRODUCTION.

Iowa Code § 279.80(2) prohibits school districts and educators from "provid[ing] any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." The Court previously enjoined the law because the terms "gender identity" and "sexual orientation" were defined so broadly as to make it impossible for a reasonable school district, teacher, or student to understand what was prohibited. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 709 F. Supp. 3d 664 (S.D. Iowa 2023) ("*GLBT Youth I*"). The United States Court of Appeals for the Eighth Circuit vacated the injunction and remanded the case with instructions to the Court to do a better job of exploring narrower interpretations of the law that might save it from constitutional infirmity. *See GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) ("*GLBT Youth II*").

Having now done so, the Court concludes there are parts of the law that indeed pass constitutional muster under a narrow, atextual interpretation. Specifically, the Court concludes that the restrictions on any "curriculum," "test," "survey," "questionnaire," or "instruction" may be interpreted narrowly as applying only to (a) mandatory classroom instruction that (b) provides detailed explanations or normative views on gender identity or sexual orientation (as opposed to neutral references to those topics). As so interpreted, the restrictions are not facially unconstitutional given the broad discretion traditionally afforded to state and local officials to choose topics for mandatory classroom instruction. (These restrictions might be unconstitutional as applied in some circumstances, but Plaintiffs have not raised an as-applied challenge.)

By contrast, the restrictions on "program[s]" and "promotion" relating to gender identity and sexual orientation cannot reasonably be interpreted in a manner consistent with the First Amendment. The words "program" and "promotion" are simply too broad to refer only to mandatory classroom curriculum and instead prohibit school districts and educators from, among other things, making extracurricular activities relating to gender identity and sexual orientation available to students in grade six or below. These restrictions therefore violate students' First Amendment rights and are facially unconstitutional. Accordingly, the Court will enjoin Defendants (state officials and school districts) from taking any steps to enforce the restrictions on any "program" or "promotion" relating to gender identity and sexual orientation.

In the interest of clarity, the Court provides the following guidance as to what this ruling means:

(1) School districts and educators may not provide mandatory lessons or instruction to students in grade six or below that include detailed explanations or normative views on "gender identity" or "sexual orientation." It does not matter whether the lessons or instruction revolve around cisgender or transgender identities or straight or gay sexual orientations. All are forbidden.

(2) School districts and teachers nonetheless may provide mandatory lessons or instruction to students in grade six or below that contain neutral references to gender identity (whether cisgender or transgender) or sexual orientation (whether gay or straight). The lessons and instruction simply cannot focus on those topics. Thus, for example, school districts and teachers may assign books or provide lessons to students in grades six and below that contain characters with gender identities (cisgender or transgender) and sexual orientations (gay or straight) so long as gender identity and sexual orientation are not the focus of the book or lesson. School districts and teachers likewise may make other neutral references to any gender identity and any sexual orientation during classroom instruction; for example, a teacher may refer to his or her partner even if the partner is same-sex.

(3) Students in grades six and below must be allowed to join Gender Sexuality Alliances ("GSAs") and other student groups relating to gender identity and/or sexual orientation.

(4) School districts and educators must be permitted to advertise GSAs and other student groups that relate to gender identity and/or sexual orientation to all students, including those in grade six and below. This means, among other things, that school districts and educators may: (a) advertise such groups in posters or over the loudspeaker to the same degree as any other student group; (b) serve as advisors for those groups; (c) encourage students to join those groups; and (d) otherwise discuss such groups with students outside mandatory classroom curriculum.

The grounds for the Court's ruling are set forth in detail below.

Plaintiffs also challenge the constitutionality of a statute that requires school officials to notify parents if a student requests an "accommodation that is intended to affirm the student's gender identity." Iowa Code § 279.78(3). In a relatively recent case, the Eighth Circuit struck down as unconstitutional a school policy requiring students and staff to "respect" a student's gender identity because the policy was too vague to provide fair notice to a student or teacher about what was permitted. *See Parents Defending Educ. v. Linn Mar Comty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023). Similar logic applies here. Section 279.78(3) is, in part, unconstitutionally vague because it does not define the word "accommodation" and therefore

does not provide fair notice about when the parental notification requirement applies. There is, however, one exception: the statute unambiguously requires notice when a student requests an "accommodation" in the form of asking to be addressed using a "pronoun that is different than the … pronoun assigned to the student in the school district's registration forms or records." As to that exception, the statute is enforceable; otherwise, it is not. Accordingly, state officials and school districts may enforce the parental notice requirement if a student asks for an accommodation in the form of a different pronoun but not as to any other requests for an accommodation.

Finally, Plaintiffs challenge the constitutionality of a statute requiring the removal of all books from school libraries that contain a "description" or "visual depiction" of a "sex act." In a recent ruling in a different case, the Court concluded that the book restrictions were likely facially unconstitutional under the First Amendment. *See Penguin Random House LLC v. Robbins*, No. 4:23-cv-00478-SHL-SBJ, 2025 WL 1156545 (S.D. Iowa Mar. 25, 2025). For reasons set forth in that ruling (which will not be repeated here), the Court will continue to enjoin state officials and school districts from enforcing the book restrictions.

In sum, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction.

## II.    FACTUAL AND PROCEDURAL BACKGROUND.

### A.  Senate File 496.

In late April 2023, the Iowa Legislature passed Senate File 496, which, among other things, enacted new Iowa Code § 279.80, entitled "Sexual orientation and gender identity–prohibited instruction." It states that "[a] school district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." Iowa Code § 279.80(2). "Gender identity" is defined in section 216.2(12) as "a gender-related identity of a person, regardless of the person's assigned sex at birth." "Sexual orientation" is defined in section 216.2(17) as "actual or perceived heterosexuality, homosexuality, or bisexuality." This Order will refer to the restrictions in Iowa Code § 279.80(2) as the "Gender Identity/Sexual Orientation Restriction" or, sometimes, simply the "Restriction."

Senate File 496 also added provisions to the Iowa Code related to parental rights in education. Newly enacted Iowa Code § 601.1(2) states that "a parent or guardian bears the

ultimate responsibility, and has the fundamental, constitutionally protected right, to make decisions affecting the parent's or guardian's minor child, including decisions related to the minor child's medical care, moral upbringing, religious upbringing, residence, education, and extracurricular activities. Any and all restrictions of this right shall be subject to strict scrutiny." There are exceptions for emergency medical care and suspected child abuse. Iowa Code § 601.1(3), (4).

Newly enacted Iowa Code § 279.78 is entitled "Parental rights in education." Iowa Code § 279.78(2) prohibits a school district from "knowingly giv[ing] false or misleading information to the parent or guardian of a student regarding the student's gender identity or intention to transition to a gender that is different than the sex listed on a student's official birth certificate ...." Iowa Code § 279.78(3) requires a "licensed practitioner" to inform a school district administrator if a student "requests an accommodation that is intended to affirm the student's gender identity ... including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." In turn, the school district administrator "shall report the student's request to the student's parent or guardian." *Id.* This Order will refer to this provision as the "Gender Identity Notification Provision."

The phrase "licensed practitioner" is defined, in two parts, in Iowa Code § 256.145. "License[d]" means, in relevant part, "the authority that is given to allow a person to legally serve as a practitioner," while "practitioner" means "an administrator, teacher, or other licensed professional, including an individual who holds a statement of professional recognition, who provides educational assistance to students." Iowa Code § 256.145(4), (7). Thus, the "licensed practitioners" who must report requests for gender identity accommodations under Iowa Code § 279.78(3) include, among others, teachers, librarians, and administrators. Senate File 496 establishes graduated penalties for "licensed practitioners" who violate the disclosure requirements, starting with a "written warning" from the Iowa Department of Education for a first offense, followed by a disciplinary hearing, "which may result in disciplinary action," for a second or subsequent offense. Iowa Code § 279.78(4).

Finally, Senate File 496 amended Iowa Code § 256.11(9)(a)(2) to require each school district to establish a "kindergarten through grade twelve library program that is consistent with section 280.6 and with the educational standards established in this section, contains only age-

appropriate materials, and supports the student achievement goals of the total school curriculum." The phrase "age-appropriate" is newly defined in section 256.11(19)(a)(1) to mean "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group. '*Age-appropriate*' does not include any material with descriptions or visual depictions of a sex act as defined in section 702.17." In turn, Iowa Code § 702.17 defines "sex act" to mean:

> any sexual contact between two or more persons by any of the following:
>
> 1. Penetration of the penis into the vagina or anus.
>
> 2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.
>
> 3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a [licensed professional].
>
> 4. Ejaculation onto the person of another.
>
> 5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
>
> 6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

Senate File 496, on its face, does not permit school officials to take context into account when determining whether a book is "age-appropriate" or contains a "sex act." This Order will refer to this provision as the "Library Provision."

School districts and school employees are subject to graduated penalties for failing to remove non-age-appropriate materials from school library programs. *See* Iowa Code § 256.11(9)(a). For the first offense, the Iowa Department of Education "shall issue a written warning to the board of directors of the school district or the employee, as applicable." *Id.* § 256.11(9)(a)(3)(a). For a second or subsequent violation, the school district superintendent and/or employee "shall be subject to a hearing conducted by the board of educational examiners pursuant to [Iowa Code §] 256.146, subsection 13, which may result in disciplinary action." *Id.* § 256.11(9)(a)(3)(b)(ii).

B. *Implementation of the Gender Identity/Sexual Orientation Restriction.*

Plaintiffs have offered considerable evidence on how school districts have implemented the Gender Identity/Sexual Orientation Restriction. Many school districts have prohibited students in grade six and below from joining GSAs. (ECF[1] 115-13, ¶ 28 (Nevada); ECF 115-13, ¶ 30 (Mount Vernon); ECF 115-14, ¶ 18 (Mount Vernon); ECF 115-15, ¶ 8 (Iowa City).) In some schools or school districts, GSAs have been shut down altogether. (ECF 115-7, ¶¶ 25–26 (College Community School District); ECF 115-11, ¶ 32 (Des Moines—elementary); ECF 115-12, ¶ 11 (Norwalk); ECF 115-13, ¶ 24 (Waterloo); ECF 115-13, ¶ 26 (Winterset); ECF 115-15, ¶ 8 (Iowa City—elementary).) In many school districts, GSAs have been prohibited or discouraged from hanging signs or otherwise engaging in promotion in places where students in grade six and below might be present. (ECF 115-7, ¶ 24; ECF 115-11, ¶ 30 (Urbandale); ECF 115-12, ¶ 11 (Norwalk); ECF 115-13, ¶ 30 (Mount Vernon); ECF 115-14, ¶ 17 (Mount Vernon); ECF 115-15, ¶ 12 (Iowa City).) For example, the superintendent of the Urbandale School District sent an email "ordering the removal of all LGBTQ+ visual representations (pride flags, safe space stickers, etc.) from all schools, including high schools, given the potential for a student in grades kindergarten through six to see these symbols during a community event." (ECF 115-11, ¶ 30.) Similarly, the GSA at Mount Vernon High School was not allowed to hang posters on lockers or make school wide announcements over the loudspeaker because 5th and 6th graders might see or hear them. (ECF 115-14, ¶¶ 17, 38.) Other clubs are not subject to the same restrictions. (ECF 115-7, ¶ 24; ECF 115-14, ¶ 17.)

Issues have arisen inside the classroom, too. Plaintiff Daniel Gutmann, now a fourth-grade teacher, was instructed not to mention his husband in the presence of students. (ECF 115-11, ¶ 12.) In Iowa City, fifth-grade student A.C. worries that writing a report on Chappell Roan, a queer musician, will lead to discipline. (ECF 115-15, ¶ 14.) A nonbinary student in Eastern Iowa, A.G., was placed in a difficult position when a teacher instructed students to line up by girls and boys. (ECF 115-6, ¶ 15.) A.G. did not want to join either line, prompting a "barrage of questions about gender identity" from classmates. (Id., ¶¶ 15–16.) Due to the statutory restrictions on "instruction" and promotion" relating to gender identity, the teacher "felt unable to intervene." (Id., ¶ 16.)

---

[1] All references are to the docket number on the Electronic Case Filing system. All references to page numbers are to the numbers on the upper-right corner of each page, as populated by the ECF system. These page numbers may not correspond to the numbers placed by the parties on the bottom of their filings.

### C. Procedural History.

Plaintiffs filed their Complaint and original Motion for Preliminary Injunction on November 28, 2023. (ECF 1; ECF 2.) The State Defendants[2] resisted. (ECF 53.) The School District Defendants[3] took no position. (ECF 48.) In a ruling dated December 29, 2023, the Court granted in part and denied in part Plaintiffs' Motion for Preliminary Injunction. *See GLBT Youth I*, 709 F. Supp. 3d 664. The Court's ruling was consolidated and also addressed a partially overlapping motion for preliminary injunction in Case No. 4:23-cv-00478. On August 12, 2024, the United States Court of Appeals for the Eighth Circuit vacated the injunction in both cases and remanded for further consideration. *See GLBT Youth II*, 114 F.4th 660.

Following remand, Plaintiffs renew their Motion for Preliminary Injunction. (ECF 115.) The School District Defendants again take no position. (ECF 125.) The State Defendants resist. (ECF 128.) On March 25, 2025, the Court entered a ruling in Case No. 4:24-cv-00478 preliminarily enjoining enforcement of the Library Provision. *See Penguin Random House*, No. 4:23-cv-00478-SHL-SBJ, 2025 WL 1156545. That ruling did not address the enforceability of the Gender Identity/Sexual Orientation Restriction or Gender Identity Notification Provision because they were not at issue in that case.

## III.    PRELIMINARY INJUNCTION STANDARDS.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

---

[2] The Court will use "State Defendants" to refer, collectively, to Governor Kim Reynolds, McKenzie Snow, and John Robbins.

[3] The Court will use "School District Defendants" to refer, collectively, to the Superintendents and Board Members of the Iowa City, Sioux City, Urbandale, Waterloo, and West Des Moines Community School Districts.

"While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). For actions that seek to enjoin the enforcement of a duly enacted state statute, the moving parties must show they are likely to prevail on their claims. *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). This is a higher standard than applies in other preliminary injunction cases. *See id.* "We apply a heightened standard in such instances because the duly enacted state statute constitutes government action based on presumptively reasoned democratic processes, and such action is entitled to a higher degree of deference and should not be enjoined lightly." *Id.* (internal punctuation and citation omitted).

With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that irreparable injury is likely in the absence of an injunction." *Sleep No. Corp.*, 33 F.4th at 1018 (citations omitted). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, we weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Computer Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase Sys*., 640 F.2d at 113). This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id*. at 1048.

When a party seeks preliminary injunctive relief based on a facial constitutional challenge under the First Amendment, district courts must "determine a law's full set of applications, evaluate which are constitutional and which are not, and compare the one to the other." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 723 (quoting *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021)). "So in this singular context, even a law with 'a plainly

legitimate sweep' may be struck down in its entirety. But that is so only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723–24. Facial challenges are "hard to win." *Id.* at 723.

## IV. LEGAL ANALYSIS: STANDING.

### A. Legal Standards.

As in any constitutional challenge, a threshold question is whether Plaintiffs have standing. To establish standing, "a plaintiff must present a 'case' or 'controversy' within the meaning of Article III of the Constitution." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). "This 'irreducible constitutional minimum of standing' requires a showing of 'injury in fact' to the plaintiff that is 'fairly traceable to the challenged action of the defendant,' and 'likely [to] be redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Whether a plaintiff has shown such an injury 'often turns on the nature and source of the claim asserted.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500, (1975)). "[T]he question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." *Id*.

### B. Plaintiffs Have Standing to Challenge the Library Provision.

In its December 2023 ruling, the Court concluded that at least two categories of Plaintiffs had standing to challenge the Library Provision: (i) "Educator Plaintiffs" like teachers and school librarians who face potential discipline for violating Senate File 496; and (ii) "Student Plaintiffs" whose access to books was impacted by the law. *See generally GLBT Youth I*, 709 F. Supp. 3d at 682–85. The Eighth Circuit agreed. *See GLBT Youth II*, 114 F.4th at 668 ("Plaintiffs have standing to pursue their First Amendment claim as to the Library Program."). On remand, there has been modest turnover among Plaintiffs, but not in a way that materially affects the standing analysis as to the Library Provision. Daniel Gutmann, a fourth-grade teacher (ECF 121, ¶ 15), has been added as a Plaintiff to this case after previously serving as a plaintiff in Case No. 4:23-cv-00478. He has standing either way because he is plausibly subject to discipline if he violates the Library Provision. The same is true for Plaintiff Alyson Telford, a seventh-grader teacher whose name was Alyson Browder at the time of the December 2023 ruling. (ECF 121, ¶ 16.) The six Student Plaintiffs also continue to have standing to challenge the Library Provision, which directly limits the books and materials they can obtain from the school library. These Student Plaintiffs range from fifth grade (A.C.) to high school students. (ECF 121, ¶¶ 8–13.)

C. *At Least Three Plaintiffs Have Standing to Challenge the Gender Identity/Sexual Orientation Restriction.*

In its December 2023 ruling, the Court concluded that three Plaintiffs had standing to challenge the Gender Identity/Sexual Orientation Restriction, which applies only to students and teachers in grades six and below. *See GLBT Youth I*, 709 F. Supp. 3d at 682. Specifically, Gutmann had standing because at the time he taught sixth grade; Telford (then Browder) had standing because she made books available to sixth graders; and one Student-Plaintiff, A.C., had standing because the Gender Identity/Sexual Orientation Restriction plausibly restricted what A.C. (then in fourth grade) could do and say within and outside the classroom. *See id.* at 682, 687–88. The Court concluded the remaining Plaintiffs did not have standing because they were high school students and therefore were not directly impacted by the Gender Identity/Sexual Orientation Restriction. As the Court explained:

> [N]othing in the law restricts the ability of school districts, teachers, or other professionals to provide programs, promotion, and/or instruction of gender identity and sexual orientation to students in grade seven and above. School districts instead have full freedom to offer gay-straight alliances ("GSAs") or similar clubs that provide resources and support for LGBTQ+ students in grades seven and above. Teachers and other licensed professionals are not restricted in any way from serving as advisors for such GSAs, displaying rainbow flags, providing instruction on gay and transgender rights, and otherwise performing their responsibilities in a manner that emphasizes inclusiveness and respect for LGBTQ+ students in grades seven and above. Likewise, students in grade seven and above are free to engage in whatever forms of expression they wish, subject only to generally applicable restrictions that apply equally to all students. To the extent school districts, teachers, or students have been interpreting the law otherwise, they are simply wrong.

*Id.* at 674; *see also Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 792–93 (8th Cir. 2004) (affirming dismissal of First Amendment claim for lack of standing where the only alleged "chilling effect" was on speech that was not forbidden by the statute).

In *GLBT Youth II*, the Eighth Circuit agreed that A.C. and the Educator Plaintiffs had standing to challenge the Gender Identity/Sexual Orientation Restriction. 114 F.4th at 669 & n.1. As to A.C., the Eighth Circuit rejected the State Defendants' argument that A.C. was not injured by the statute itself, but rather by the school district's overly-aggressive reading of it. *Id.* at 669. The Eighth Circuit explained that it would create a "standing paradox" if a school district interpreted the statute more broadly than it should have but the student could not challenge that

interpretation. *Id.* As to the Educator Plaintiffs, the State Defendants conceded standing, and the Eighth Circuit agreed. *Id.* at 669 n.1. The Eighth Circuit did not consider the standing of the other Student Plaintiffs. *Id.*

On remand, there have been no material changes relative to standing. Although Gutmann now teaches fourth grade, not sixth, he continues to have standing because he remains subject to a credible threat of discipline if he violates the Gender Identity/Sexual Orientation Restriction. *See Parents Defending Educ*, 83 F.4th at 667 (holding that plaintiffs had standing to challenge school district policy when credible threat of enforcement existed). Telford likewise continues to have standing because she makes books available to sixth-grade students in a way that might be considered "promotion" or "program" related to gender identity or sexual orientation. *See id.* Finally, A.C. continues to have standing because, as a fifth-grade student, the Gender Identity/Sexual Orientation Restriction arguably restricts what A.C. can do and say within and outside the classroom. *See GLBT Youth II*, 114 F.4th at 669; *GLBT Youth I*, 709 F. Supp. 3d at 687–88.

*GLBT Youth II* arguably gives the other Student Plaintiffs a stronger basis for arguing standing given the Eighth Circuit's recognition that even an arguable misreading of a statute can give rise to standing in some circumstances. *See* 114 F.4th at 669. To that end, and by way of example, if Student Plaintiffs in grades seven and above are being prevented from joining GSAs due to the Gender Identity/Sexual Orientation Restriction, it would create the same "standing paradox" the Eighth Circuit recognized with respect to A.C. "Even if it is due to a misreading of the statute [the Student Plaintiffs'] injury is traceable to the Instruction Section, and an injunction would redress that injury." *Id.* The Court need not decide the issue, however, because it can already reach the merits based solely on A.C., Telford, and Gutmann having standing.

*D. At Least Two Plaintiffs Have Standing to Challenge the Gender Identity Notification Provision.*

The final issue as it relates to standing is whether any Plaintiffs have standing to challenge the Gender Identity Notification Provision. In its December 2023 ruling, the Court concluded that Plaintiffs lacked standing because the Provision allegedly discouraged transgender students from coming out to their teachers or classmates (lest their gender identity be disclosed to their parents), but all Student Plaintiffs were already "out" to their families. In other words, no Plaintiff could establish a concrete injury. On remand, there are two new Plaintiff-Educators, Gutmann and Telford, who argue standing from a different angle: they are subject to

discipline if they do not inform school administrators when a student "requests an accommodation that is intended to affirm the student's gender identity." Iowa Code § 279.78(3). In addition, Plaintiff Iowa Safe Schools ("ISS") alleges that it has organizational and associational standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (recognizing that organizations "can assert the standing of their members"); *Mo. Coal. for Env't v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (recognizing that organizations have standing in some circumstances when "the interests at stake [are] germane to the organization's purpose").

The Court agrees that Gutmann and Telford have standing by virtue of their status as educators who face a credible risk of discipline if they fail to comply with the Gender Identity Notification Provision. *See Parents Defending Educ.* 83 F.4th at 666. The Court concludes that ISS does not have associational standing because it still has not identified a member who has a credible risk of injury if the Gender Identity Notification Provision is enforced. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601 (8th Cir. 2022) (holding that an organization must identify particular members and their injuries in order to establish associational standing). ISS's arguments for organizational standing are likewise insufficient; at most, ISS has alleged that the Gender Identity Notification Provision (i) is inconsistent with ISS's core mission of providing support for LGBTQ+ students and has required the entity to divert time and resources away from other projects, and (ii) has discouraged student participation in GSAs or caused schools to drop GSAs altogether. The first is not enough in and of itself to satisfy Article III. *See Food & Drug Admin. v. All. for Hippcratic Med.*, 602 U.S. 367, 394 (2024). The second is based on a misreading of the Gender Identity Notification Provision, which does not even arguably prevent schools from having GSAs or students from joining them. *See Klobuchar*, 381 F.3d at 792–93.

## V.    LEGAL ANALYSIS: CONSTITUTIONALITY OF THE LIBRARY PROVISION.

In a recent ruling in Case No. 4:23-cv-00478, the Court enjoined enforcement of the Library Provision, concluding it was likely facially unconstitutional under the First Amendment. *See Penguin Random House*, No. 4:23-cv-00478-SHL-SBJ, 2025 WL 1156545. For the reasons set forth in that ruling (which will not be repeated here), the Court will grant Plaintiffs' Motion for Preliminary Injunction as it relates to the Library Provision. The Court recognizes that the State Defendants have appealed the ruling, and the Court of course will abide by the Eighth Circuit's disposition of that appeal.

## VI.    LEGAL ANALYSIS: CONSTITUTIONALITY OF THE GENDER IDENTITY/ SEXUAL ORIENTATION RESTRICTION.

### A.  Introduction.

In its December 2023 ruling, the Court enjoined the Gender Identity/Sexual Orientation Restriction because it concluded the law was "staggeringly broad" on its face and therefore almost certainly would be enforced in an arbitrary way. The Court explained:

> On its face, the law prohibits school districts and teachers from providing any "program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to any students in kindergarten through grade six." Based on the neutral definitions of "gender identity" and "sexual orientation," Senate File 496 unambiguously prohibits instruction relating to *any* gender identity (cisgender or transgender) and *any* sexual orientation (gay or straight). *See* Iowa Code § 216.2(10) (defining "gender identity" as "a gender-related identity of a person, regardless of the person's assigned sex at birth"); Iowa Code § 216.2(16) ("defining "sexual orientation" as "actual or perceived heterosexuality, homosexuality, or bisexuality"). It follows that any teacher in grade six or below who incorporates gender identity or sexual orientation into the curriculum in any way has violated section 279.80. This would include, for example, teachers or other licensed professionals like the Educator Plaintiffs who make books available to students that refer to any character's gender or sexual orientation; which is to say, virtually every book ever written. Similarly, a math teacher will have violated the law by requiring students to take an exam stating that Sally bought eight apples and ate three and asking how many "she" has left. This is a forbidden "test . . . relating to gender identity." Any number of other examples also could be given.

*GLBT Youth I*, 709 F. Supp. 3d at 703. The Eighth Circuit reversed, concluding the Court "imparted its interpretation without referencing several canons of construction that may have revealed a narrower, reasonable interpretation, such as the canons of constitutional-avoidance, *noscitur a sociis*, and Iowa's admonition to interpret its laws reasonably and in a manner feasible of execution, Iowa Code § 4.4(3)-(4)." *GLBT Youth II*, 114 F.4th at 670–71.

The Eighth Circuit's criticism is well-taken, and the Court will try to do a better job this time around of exploring alternative interpretations of the Gender Identity/Sexual Orientation Restriction that may narrow its scope and/or protect it from constitutional infirmity. For reasons explained below, the Court concludes that there are indeed alternative interpretations that make certain aspects of the Restriction constitutional, including, in particular, the portion of the law that prohibits schools from providing any "**curriculum**, **test**, **survey**, **questionnaire** . . . or

**instruction** relating to gender identity or sexual orientation" to students in grade six and below. The State Defendants have convinced the Court that these portions of the law should be interpreted as applying only to compulsory classroom instruction and not to extracurricular activities like GSAs or informal counseling or guidance provided by teachers to students.

Conversely—and, again, for reasons explained in full below—the Gender Identity/Sexual Orientation Restriction is facially unconstitutional under the First Amendment insofar as it prohibits schools from providing any "**program** . . . [or] **promotion** . . . relating to gender identity or sexual orientation" to students in grade six or below. The words "program" and "promotion" are too broad to be interpreted as applying solely to compulsory classroom instruction even after relevant canons of construction are explored and exhausted. It follows that the restrictions on "programs" and "promotion" related to gender identity and sexual orientation prohibit things like GSAs, informal guidance/support, and other activities outside the mandatory curriculum. Because the First Amendment does not permit such restrictions, the unconstitutional applications of these parts of the Gender Identity/Sexual Orientation Restriction substantially outweigh the constitutional applications. The restrictions on "programs" and "promotion" relating to gender identity and sexual orientation therefore will be enjoined.

*B. Interpreting the Instruction Provision.*

The first step is to determine the proper interpretation of the Gender Identity/Sexual Orientation Restriction, which states: "A school district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." Iowa Code § 279.80(2). There are two parts to the interpretive analysis: (1) what the words "program, curriculum, test, survey, questionnaire, promotion, or instruction" mean; and (2) what the words "relating to gender identity or sexual orientation" mean. The first part ignores the substance of the restriction and simply asks when it applies (as in, *which activities are restricted*), while the second focuses entirely on substance (as in, *what topics or subjects are off-limits*).

1. The Gender Identity/Sexual Orientation Restriction Imposes Restrictions on Compulsory and Non-Compulsory Parts of the School Curriculum.

As to the first part of the analysis, the State Defendants argue that the Gender Identity/Sexual Orientation Restriction applies "only to a school's compulsory instructional program, not to every activity a school may offer students." (ECF 128, p. 9.) Plaintiffs, by contrast, argue the statute is too broad to be limited to "compulsory instruction" and instead

16

applies to in-class and extracurricular activities alike, including GSAs. Both sides support their positions with reference to canons of construction.

The starting point is, of course, the statutory language, which uses seven words to describe which activities are restricted: "program, curriculum, test, survey, questionnaire, promotion, or instruction." Two of those words, "test" and "instruction," unmistakably refer to in-class activities that one typically would regard as a compulsory part of an educational system. The word "curriculum" is slightly broader in the sense that it can sometimes refer to out-of-class activities. *See, e.g., Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1133 (8th Cir. 1999) (characterizing student-body election as "part of the school's curriculum"). Even so, "curriculum" is typically understood as referring to mandatory parts of education, too, in contrast to *extra*-curricular activities like clubs or sports teams, which are voluntary.

Of the remaining four words, "survey" and "questionnaire" do not inherently refer to mandatory or compulsory parts of the education system. Indeed, those words do not carry any plain or obvious meaning as it relates to education, period. Devoid of context, one might wonder why they ended up in the statute at all. In context, however, the answer is clear. The State Defendants have shown that the Gender Identity/Sexual Orientation Restriction ended up in Senate File 496 in response to parent complaints about schools administering surveys or questionnaires to students that included questions about gender identity and sexual orientation. (E.g., ECF 53-1, p. 2.) With this context in mind, although the words "survey" and "questionnaire" do not mean "compulsory" in ordinary usage, they reasonably can be interpreted in the Gender Identity/Sexual Orientation Restriction as referring to compulsory parts of the curriculum. The word "survey," in particular, appears more than a dozen times in Iowa Code Chapter 279, virtually always as part of laws restricting when school districts can require students to provide information. *See* Iowa Code § 279.76(1) (imposing limits on surveys relating to a student's mental, emotional, or physical health without parental consent); Iowa Code § 279.79(1) (imposing limits on surveys that may yield information about, inter alia, a student's or parent's political affiliation, mental health, sexual orientation, or religion). It is not unreasonable to interpret it the same way in the Gender Identity/Sexual Orientation Restriction.

The word "program" is different. A "program" is not inherently compulsory. *See, e.g., Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211 (1998) (recognizing that programs may be either voluntary or mandatory); *Loras Coll. v. Iowa C.R. Comm'n*, 285 N.W.2d 143, 144 (Iowa

1979) (similar). Nor do the education-related chapters of the Iowa Code use the word "program" exclusively or primarily to describe compulsory activities; to the contrary, it is frequently used to describe things that are non-mandatory. *See, e.g.*, Iowa Code § 279.46 (authorizing, but not requiring, early retirement programs); Iowa Code § 279.49(1) (authorizing, but not requiring, childcare programs); Iowa Code § 279.68(2)(a) (authorizing, but not requiring, summer reading programs); Iowa Code § 280.28(4) (encouraging, but not requiring, anti-bullying programs). Indeed, the State Defendants themselves recognize that "program" can describe voluntary and mandatory activities alike, including, as to the former, extracurricular activities like intramural sports. (ECF 128, p. 12 (explaining that Iowa law distinguishes between a school's "educational program," "library program," "activity program," and "instructional program").) When the Iowa Legislature *does* intend for the word "program" to refer to compulsory activities, it says so expressly. *See* Iowa Code § 280.3(1) ("The board of directors of each public school district and the authorities in charge of each nonpublic school **shall** prescribe the minimum educational program….") (emphasis added); Iowa Code § 280.3(5) ("Public school kindergarten programs **shall** and public and nonpublic school prekindergarten programs may be provided.") (emphasis added); Iowa Code § 280.19A(1) ("Each school district **shall** adopt a plan to provide alternative options education programs to students who either at risk of dropping out or have dropped out.") (emphasis added). This makes it difficult to interpret the word "program" in the Gender Identity/Sexual Orientation Restriction as referring only to compulsory curriculum.

The same is true for the word "promotion." It has two common meanings, neither of which inherently has anything to do with an activity being "compulsory" or "voluntary." *See Promotion*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020) ("1: the act or fact of being raised in position or rank; 2: the act of furthering the growth or development of something."). The Iowa Code sheds no further light. The words "promote" and "promotion" appear in Iowa Code Chapter 279 a handful of times, most of which refer to elevating someone to a higher position. *See* Iowa Code §§ 279.14B, 279.21(2)(b) (discussing employee promotions). This is obviously not what the word means in the Gender Identity/Sexual Orientation Restriction. In the other instances where they appear in Iowa Code Chapter 279, "promote" and "promotion" are used as synonyms for "encourage." *See* Iowa Code § 279.66(1) (requiring the adoption of policies "that are designed to promote responsible behavior on school property and at school functions"); Iowa Code § 279.68(1)(b)(3) (directing school districts to

18

develop reading proficiency initiatives "including but not limited to the promotion of parent-guided home reading"). This tracks one of the common meanings of "promotion" and is surely what the Iowa Legislature had in mind in the Gender Identity/Sexual Orientation Restriction; i.e., the Legislature wanted to forbid school districts from encouraging students to explore concepts of gender identity or sexual orientation.

Interpreting "promotion" to mean "encourage" makes it difficult, however, to conclude the Restriction only prohibits "promotion" as part of the mandatory school curriculum. Schools "encourage" or "promote" things all the time that have nothing to do with mandatory school curriculum, including, for example, community service, at-home reading, and extracurricular clubs and sports teams. It follows that the only reasonable interpretation of the word "promotion" in the Gender Identity/Sexual Orientation Restriction is that it prohibits anything a school district or teacher might do in any context to encourage students in grade six and below to explore issues regarding gender identity and sexual orientation. Take, for example, a teacher who learns during classroom discussion that a student is gay. If the teacher approaches the student after class ends—i.e., after the "mandatory curriculum" is over—and encourages the student to join a GSA, this would constitute "promotion . . . relating to . . . sexual orientation" under the ordinary meaning of those terms. In fact, the district itself has engaged in "promotion . . . relating to . . . sexual orientation" merely by offering the GSA to students in grade six and below in the first place. It is no wonder that schools have interpreted the law as prohibiting students in those grades from joining GSAs or even being exposed to promotional materials for such groups.

This interpretation of "promotion" and "program" is reinforced by the fact that the Gender Identity/Sexual Orientation Restriction uses the words "shall not provide" to explain what school districts cannot do; as in, they "shall not **provide** any program … [or] promotion … relating to gender identity or sexual orientation to students in kindergarten through grade six." Merriam-Webster defines "provide" to mean "to supply or make available" or "to make something available to." *See Provide*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020). Under plain meaning, a school district is "provid[ing]" a "program … [or] promotion relating to gender identity or sexual orientation" when it makes GSAs and other resources relating to gender identity and sexual orientation available for students in grade six or below.

This plain meaning interpretation creates major problems under the First Amendment, which limits when schools can prohibit students from joining student organizations or otherwise

expressing themselves. *See, e.g.*, *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 367–68 (8th Cir. 1988). These problems presumably explain why the State Defendants want the Court to interpret the Gender Identity/Sexual Orientation Restriction as applying only to compulsory curriculum. Under the canon of constitutional avoidance, the Court agrees that it must search for a reasonable alternative interpretation that would avoid constitutional problems. *See GLBT Youth II*, 114 F.4th at 671 (directing the court to "discuss[] and exhaust[]" other interpretive methods); *State v. Iowa Dist. Ct. ex rel. Story Cnty.*, 843 N.W.2d 76, 85 (Iowa 2014) ("The doctrine of constitutional avoidance suggests the proper course in the construction of a statute may be to steer clear of 'constitutionals shoals' when possible.")

This leads to another important canon, *noscitur a sociis*, which directs courts to "read words in context rather than in isolation ... This canon 'summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words.'" *State v. Ross*, 941 N.W.2d 341, 348 (Iowa 2020) (quoting *Peak v. Adams*, 799 N.W.2d 535, 547 (Iowa 2011) (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:6 at 432 (4th ed. 1999)). The State Defendants argue that this canon supports their interpretation of "promotion" and "program" as being forbidden only when part of the mandatory curriculum because other words in the Gender Identity/Sexual Orientation Restriction describe mandatory parts of the curriculum.

The Court cannot agree. Of the seven relevant words in the Gender Identity/Sexual Orientation Restriction, only three—curriculum, test, and instruction—inherently relate to mandatory parts of the educational curriculum. Two others—survey and questionnaire—do not inherently relate to compulsory curriculum and instead, at most, take on that meaning only when supplemented with contextual clues from elsewhere in the education-related provisions of the Iowa Code. The final two words—program and promotion—carry no inherent connotation of being compulsory or mandatory whatsoever, nor are they primarily used elsewhere in the Iowa Code in such a manner. Thus, in total, only three of the seven relevant words in the Restriction— i.e., less than half—carry the meaning the State Defendants wish to ascribe to all seven. It follows that this is not a situation where "words of a feather flock together," *Ross*, 941 N.W.2d at 348, but rather one in which the Iowa Legislature chose to use disparate terms with distinct meanings. The Court must give effect to this choice. *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (refusing to apply *noscitus a sociis* because "[t]he substantive connection, or fit, between the terms [in the statute] is not so

20

tight or so self-evident as to demand that we 'rob' any of them 'of its independent and ordinary significance'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39 (1979))). Meaning: *noscitur a sociis* does not support the State Defendants' position that the words "promotion" and "program" refer to compulsory curriculum. *See id.*

The State Defendants also urge the Court to apply the title-and-headings canon, noting that the title of the Gender Identity/Sexual Orientation Restriction is "Sexual orientation and gender identity—prohibited instruction." (ECF 128, p. 6.) Because the word "instruction" is generally associated with compulsory curriculum, the State Defendants argue the inclusion of that word in the title makes it appropriate to interpret the entire statute as referring to compulsory curriculum. *See Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 220–21 (Iowa 2016). The problem remains, however, the Legislature's decision to use disparate words like "survey," "questionnaire," "program," and "promotion" in the statutory text. The first two of those words can be interpreted as referring to mandatory portions of the curriculum only with some level of extra-textual effort; the last two cannot be interpreted that way at all. Accordingly, the Court cannot accept the State Defendants' argument, but rather must follow the Iowa Supreme Court's admonition that "the title 'cannot limit the plain meaning of the text.'" *State v. Shorter*, 945 N.W.2d 1, 8 (Iowa 2020) (quoting *Des Moines Flying Serv.*, 880 N.W.2d at 221).

To that end, the title-and-headings canon must be used "along with our other statutory interpretation rules," *Des Moines Flying Serv.*, 880 N.W.2d. at 221, such as the rule that "legislative intent is expressed through selective placement of statutory terms," *State v. Macke*, 933 N.W.2d 226, 235 (Iowa 2019). Here, the Iowa Legislature clearly understands that "programs" can be either compulsory or non-compulsory and specifies when it wants the use the word in one way or the other. *Compare, e.g.* Iowa Code § 279.68(2)(a) (using permissive language for summer reading programs), *with* Iowa Code § 280.19A(1) (using mandatory language for alternative education programs). The Legislature's failure to so specify in the Gender Identity/Sexual Orientation Restriction means it must have intended the word "program" to include mandatory and voluntary programs alike. The same is true for "promotion."

The Eighth Circuit addressed a similar issue in *Parents Defending Education v. Linn Mar Community School District*, 83 F.4th at 668–69. There, a school district enacted a policy requiring students to "respect a student's gender identity" as part of a section entitled "Names and Pronouns." *Id.* at 668. Based on the section title, the district court interpreted the policy

21

narrowly as simply requiring students to use other students' preferred names and pronouns. *Id.*
The Eighth Circuit disagreed, concluding the section title could not take precedence over the
"plain meaning" of the policy language itself. *Id.* at 669. The same logic applies here.

In sum, the Court agrees with the State Defendants that five words in the Gender
Identity/Sexual Orientation Restriction—curriculum, test, instruction, survey, and questionnaire
—reasonably can be interpreted as referring to mandatory portions of the educational curriculum.
The remaining two words in the Restriction—program and promotion—cannot reasonably be
interpreted in that manner even after exhausting all relevant canons of construction.

### 2.   The Gender Identity/Sexual Orientation Restriction Limits Activities that Revolve Around or Focus on Gender Identity and Sexual Orientation.

The next question is what the words "relating to gender identity or sexual orientation"
mean. In other words, the Court must figure out what topics the Gender Identity/Sexual
Orientation Restriction prohibits from being part of any "program, curriculum, test, survey,
questionnaire, promotion, or instruction…."

The analysis starts, again, with the statutory text, which defines "gender identity" to mean
"a gender-related identity of a person, regardless of the person's assigned sex at birth" and
"sexual orientation" to mean "actual or perceived heterosexuality, homosexuality, or
bisexuality." The Court continues to believe the breadth of these definitions, when combined
with their facial neutrality and the words "relating to," means the most natural reading of the
Gender Identity/Sexual Orientation Restriction is that it prohibits programs, promotion, and
instruction relating in any way to any gender identity (cisgender or transgender) or any sexual
orientation (gay or straight). *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)
(Scalia, J.) ("The ordinary meaning of ['relating to'] is a broad one."). In its December 2023
ruling, however, the Court erred by not considering reasonable alternative interpretations that
might narrow the law's scope. *See GLBT Youth II*, 114 F.4th at 670–71.

Plaintiffs offer a narrower interpretation of the law, arguing that it focuses exclusively—
and unconstitutionally—on LGBTQ+ students. Specifically, according to Plaintiffs, the law
prohibits teachers and students from reading LGBTQ+ themed books, responding to anti-
LGBTQ+ bullying, displaying pride or safe space signs, permitting GSAs, and self-expressing
their LGBTQ+ identities. In short, Plaintiffs argue that the Gender Identity/Sexual Orientation
Restriction "remove[s] the concept of LGBTQ+ people from the school entirely—to erase their
very existence." (ECF 115-1, p. 21.) Plaintiffs do not, however, attempt to square their position

with the neutral definitions of "gender identity" and "sexual orientation" in the Restriction itself, instead relying largely on stray post-enactment comments by legislators and evidence of how individual school districts have responded to the law. This is problematic. *See United States v. Monsanto*, 491 U.S. 600, 610 (1989) (explaining that post-enactment statements by legislators "'form a hazardous basis for inferring the intent' behind a statute" (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)).

For their part, the State Defendants' brief devotes little attention to the words "relating to gender identity or sexual orientation mean," instead focusing almost entirely on their argument that those words, however interpreted, apply only to compulsory curriculum. To the extent the State Defendants analyze the words "relating to gender identity or sexual orientation" at all, it is to argue anecdotally that they do not: prevent students from referring to teachers with gender-specific titles like "Mr." or "Ms." (ECF 128, p. 14); prohibit the use of pronouns (id.); apply to extracurricular activities like GSAs or basketball teams (id., p. 16); apply to school libraries (id., pp 16–17); or prohibit books with gay or transgender characters (id.). At oral argument, the State Defendants' counsel was more helpful, asserting that a school district or teacher is permitted to assign books or other materials to students in grade six and below that contain a "neutral reference" to gender identity (cisgender or transgender) or sexual orientation (gay or straight) but not if the "purpose of assigning the book is to explain to students, hey, this is what a same-sex couple is, this is what sexuality is" or to offer "some type of normative view on marriage." (ECF 139, pp. 78–79.) In other words, according to the State Defendants, school districts and teachers cannot explain or offer normative views on concepts like marriage, sexual orientation, or gender identity to students in grade six and below but are not precluded from providing content to students that includes incidental or neutral references to those topics.

The State Defendants' interpretation is attractive because it solves the "absurdity" problem that arises when the words of the Gender Identity/Sexual Orientation Restriction are given their plain meaning. It is, however, an atextual interpretation in at least two ways. First, it interprets the words "relating to" narrowly to mean, in essence, "focusing on" or "revolving around." *Contra, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023) (describing "relating to" as a "broad phrase"). Second, it superimposes a distinction between "neutral" references to gender identity and sexual orientation (which are permitted) and normative or explanatory references to

23

those concepts (which are not) despite the absence of any such distinction in the plain text of the statute.

As to the first argument, the Supreme Court and Eighth Circuit have recognized that although the words "relating to" are "broad" and "indeterminate," they may be given a narrower reading when context so requires. *See Mellouli v. Lynch*, 575 U.S. 798, 811–12 (2015); *Barcomb v. Gen. Motors LLC*, 978 F.3d 545, 550 (8th Cir. 2020). The Supreme Court has done so in the context of preemption under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its court, for '[r]eally, universally, relations stop nowhere.'" *Id.* at 655 (quoting H. James, Roderick Hudson xli (New York ed., World's Classics 1980)). There, the Supreme Court decided to "go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide" to understanding what Congress intended. *Id.* at 656. Applied here, this logic arguably gives the Court the freedom to interpret the words "relating to" to mean "focusing on" or "revolving around" even though this is not the common interpretation of those words.

This logic appears to be used fleetingly, and the Court is reluctant to employ it. *See, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) ("[W]hen asked to interpret statutory language including the phrase 'relating to,' … this Court has typically read the relevant text expansively."). Nonetheless, the Court must endeavor to read the statute "reasonably and in a manner feasible of execution, Iowa Code § 4.4(3)-(4)." *GLBT Youth II*, 114 F.4th at 670–71. Accordingly, the Court will interpret "relating to" narrowly and atextually to mean "focusing on" or "revolving around."

Similarly, under the constitutional-avoidance canon and similar principles, the Court will accept the State Defendants' argument that the Gender Identity/Sexual Orientation Restriction permits "neutral" references to gender identity and sexual orientation. Although atextual, this interpretation avoids the absurdity that arises if the Restriction is literally interpreted to forbid *any* reference to gender identity or sexual orientation. *See Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 427 n.8 (Iowa 2010) ("[W]hen a literal interpretation of a statute results in absurd consequences that undermine the clear purpose of the statute, an ambiguity arises."). The Court therefore will interpret the Gender Identity/Sexual Orientation Restriction as

making a distinction between normative or explanatory references to gender identity and sexual orientation (not permitted) and neutral references to those concepts (permitted). In other words, school districts and teachers cannot provide detailed explanations or normative views on concepts like marriage, sexual orientation, or gender identity to students in grade six and below but are permitted to provide content to those students that includes incidental or neutral references to those topics.

A few examples will help illustrate the difference. Suppose a book contains straight or gay characters but does not attempt to explain or offer normative views on same- or opposite-sex marriage. Such a book would not "focus on" or "revolve around" sexual orientation and thus would be permitted under the State Defendants' interpretation of the Gender Identity/Sexual Orientation Restriction. The same is true for a math problem that has a cisgender or transgender person as the subject or teachers who refer to their spouses during classroom discussion, regardless of whether the spouse is the same or opposite sex. All these things are permitted. The teachers simply cannot go further in explaining concepts of sexual orientation or gender identity.

There are, to be sure, practical problems with this interpretation. As any parent or teacher knows, *kids ask questions*. So, for example, if a book includes a reference to a same-sex couple, a third grader with opposite-sex parents might ask why. The next section will address how this impacts the constitutionality of the Gender Identity/Sexual Orientation Restriction.

> C. Some Parts of the Gender Identity/Sexual Orientation Restriction Are Facially Unconstitutional But Others Are Not.

Having now interpreted both parts of the Gender Identity/Sexual Orientation Restriction, the question turns to whether the Restriction is constitutional in all, some, or none of its applications. The answer varies depending on which part of the Restriction is being considered.

> 1. The Gender Identity/Sexual Orientation Restriction Is Not Facially Unconstitutional in Prohibiting School Districts from Providing Any Curriculum, Test, Instruction, Survey, or Questionnaire on Gender Identity and Sexual Orientation as Part of Compulsory Curriculum.

The Court first concludes that the Gender Identity/Sexual Orientation Restriction is not facially unconstitutional insofar as it prohibits school districts from providing compulsory instruction that explains or provides normative views on gender identity and sexual orientation to students in grade six or below. State and local officials have "traditional latitude to determine appropriate subjects of instruction." *Bd. of Educ. of Westside Comty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 241 (1990). More specifically, school officials "are entitled to

exercise greater control [over curriculum content] to assure that participants learn whatever the activity is designed to teach [and] that readers or listeners are not exposed to material that may be inappropriate for their level of maturity…." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Here, reasonable minds may disagree about whether elementary school students are too young to study sexual orientation and gender identity as part of mandatory curriculum, but it is the job of state and local officials, not federal courts, to resolve that disagreement. *See id.* at 273 ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.").

Granted, Plaintiffs have raised credible arguments about whether the enactment of the Gender Identity/Sexual Orientation Restriction was motivated by discriminatory animus. The reality, however, is that the law neutrally forbids instruction on *any* sexual orientation (gay, straight, or otherwise) or gender identity (cisgender or transgender). As long as this facially neutral law applies only to any mandatory "curriculum, test, instruction, survey, or questionnaire" and does not forbid "neutral" references to gender identity or sexual orientation, it is not unconstitutional on its face.

There are, to be sure, scenarios where the law might be unconstitutional *as applied*. For example, if, notwithstanding the neutral language of the Gender Identity/Sexual Orientation Restriction, the State allows one teacher to explain heterosexual marriage as part of the classroom curriculum but punishes another for explaining gay marriage, it would create First Amendment problems. *See, e.g.*, *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (recognizing that the First Amendment generally prohibits viewpoint discrimination). The law must be applied just as neutrally as it is written.

The State also will need to be careful in how—if at all—it tries to enforce the law when a teacher responds to a student question. Suppose, for example, a teacher assigns a book that contains a neutral reference to a transgender character or same-sex couple (either of which the State Defendants admit is permissible). If a student asks what it means to be transgender or why two men (or women) can be married to each other, state officials must give latitude to teachers in how they respond even if the response drifts into "explaining" transgenderism or gay marriage. Otherwise, it would start to appear that the law does not permit "neutral" references to sexual orientation and gender identity after all, in which case the overbreadth and void-for-vagueness problems the Court identified in its December 2023 ruling would emerge again. *See Parents*

*Defending Educ.*, 83 F.4th at 669 (striking down school policy on First Amendment grounds when it allowed school officials to "determine on an 'ad hoc and subjective basis' what speech is…subject to discipline, and what speech is acceptable" (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

Stated differently, common sense dictates that students will ask questions about what they read or hear. Accordingly, any reference to sexual orientation or gender identity in books and other classroom materials, even if "neutral," nonetheless may engender further discussion. The Gender Identity/Sexual Orientation Restriction—as interpreted under the canon of constitutional avoidance—is constitutional insofar as it expects the teacher to avoid responding to student questions with an extensive or normative dissertation on sexual orientation and gender identity. The law cannot, however, be applied in such a manner as to forbid even the lightest explanation of those concepts as part of the teacher's effort to steer classroom discussion back to something "neutral." A teacher must be able to say things along the lines of "gay marriage is when two people of the same sex get married to each other, but we won't be able to talk any more about that today." *See id.*

In any event, these are problems for a different day. For present purposes, the canon of constitutional avoidance compels the Court to interpret the Gender Identity/Sexual Orientation Restriction as a facially-neutral prohibition on instruction relating to gender identity (cisgender or transgender) or sexual orientation (heterosexual or gay) as part of any compulsory curriculum, test, instruction, survey, or questionnaire. As so limited, the unconstitutional applications of the law do not substantially outweigh the constitutional applications. Accordingly, the Court will deny Plaintiffs' Motion for Preliminary Injunction on the portions of the law that prohibit a school district from providing any curriculum, test, instruction, survey, or questionnaire relating to gender identity or sexual orientation.

2. The Gender Identity/Sexual Orientation Restriction Is Facially Unconstitutional in Prohibiting School Districts from Providing Any Program or Promotion Relating to Gender Identity and Sexual Orientation.

The constitutional analysis is different for the parts of the Gender Identity/Sexual Orientation Restriction that prohibit school districts from providing any "program" or "promotion" relating to gender identity or sexual orientation. As explained above, the Court cannot conclude—even after applying the canon of constitutional avoidance and searching for reasonable alternative interpretations—that "program" and "promotion" refer only to compulsory

parts of the curriculum. Those words are simply too broad and disconnected from mandatory classroom instruction to allow for such an interpretation. Accordingly, they prohibit school districts and teachers from doing anything within or outside the mandatory curriculum to provide programs or promotion relating to gender identity or sexual orientation to students in grade six and below. This means, among other things, the law prohibits school districts and teachers from encouraging or allowing students in those grades to join GSAs or engage in any other extracurricular activities that revolve around gender identity and/or sexual orientation.

It is not just the Court interpreting the law in this way. The record shows that school districts are, too. Specifically, school districts have: prohibited or restricted GSAs altogether or prevented students in grades six and below from joining them (ECF 115-11, ¶ 32; ECF 115-12, ¶ 11; ECF 115-7, ¶¶ 25–26; ECF 115-13, ¶¶ 24, 26, 28, 30; ECF 115-14, ¶ 18; ECF 115-15, ¶ 8); discouraged or prohibited the hanging of posters promoting GSAs in hallways where students in grade six and below might see them (ECF 115-12, ¶ 11; ECF 115-7, ¶ 24; ECF 115-13, ¶ 30; ECF 115-14, ¶ 17); prohibited school wide announcements over the loudspeakers about GSAs (ECF 115-14, ¶ 38); ordered the removal of all LGBTQ+ visual representations (pride flags, "safe space" stickers, etc.) from places where they could be seen by students in grade six and below (ECF 115-11, ¶ 30; ECF 115-15, ¶ 12; ECF 115-16, ¶ 9); and chosen not to celebrate the achievements of GSAs in the same way as other school clubs (ECF 115-14, ¶ 21). It is easy to understand why schools are doing so, as these are all examples of "programs [and] promotion . . . relating to gender identity or sexual orientation" under even narrow readings of the words "program," "promotion," and "relating to."

Under this plain meaning interpretation, the restrictions on "programs" and "promotion" run into constitutional problems under the First Amendment. As a starting point, a school is generally understood as a "limited public forum" when it allows organizations or speech outside the mandatory curriculum. *See, e.g.*, *Cajune v. Indep. Sch. Dist. 194*, 105 F.4th 1070, 1083 (8th Cir. 2024); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001). This means that any restrictions on speech may not discriminate based on viewpoint and must be reasonable in light of the purpose served by the forum. *See id.*

Plaintiffs likely will succeed in establishing that the restrictions on "programs" and "promotion" in the Gender Identity/Sexual Orientation Restriction are viewpoint-based. "[A]t times, whether the government has engaged in content-based discrimination or viewpoint-based

discrimination may be a fine distinction." *Viewpoint Neutrality Now! v. Bd. of Regents of Univ. of Minn.*, 109 F.4th 1033, 1040 (8th Cir. 2024). Here, although the Restriction contains neutral language, Plaintiffs and the State Defendants alike agree it should not be interpreted as prohibiting schools from having extracurricular programs that revolve around gender identity, such as "girls" and "boys" sports teams. Accordingly, by this logic, the Restriction allows programs and promotion that revolve around cisgender identity but not programs or promotion that explore or revolve around transgenderism. Allowing the expression of some views on a subject but not others is the epitome of a viewpoint-based restriction. *See Cajune*, 105 F.4th at 1083 (holding that school district engaged in viewpoint discrimination by allowing "Black Lives Matter" posters on school walls but not "Blue Lives Matter" posters); *Gay & Lesbian Students Ass'n*, 850 F.2d at 367–68 (holding that university engaged in viewpoint discrimination by denying funds to gay and lesbian student group).

Stated differently, the State Defendants cannot have it both ways. If it is "absurd" to interpret the Gender Identity/Sexual Orientation Restriction as forbidding schools from dividing sports teams or other extracurricular programs into groups based on gender identity, it means the Iowa Legislature only intended for the law to restrict speech relating to *some* types of gender identity. This is viewpoint discrimination. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985) ("[T]he purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers."); *see also Gay & Lesbian Students Ass'n*, 850 F.2d at 367 (explaining that courts must determine the motives of government officials to determine if state action is viewpoint-based).

There are First Amendment problems with the restriction on programs and promotion relating to sexual orientation, too. One might argue that the neutral language of the Gender Identity/Sexual Orientation Restriction means there can be no clubs relating to sexual orientation, period; as in, a "Straight Student Alliance" is just as forbidden as a GSA. The Supreme Court, however, rejected a similar argument in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831–32 (1995), when it struck down a program forbidding the use of funds for "religious activity" irrespective of the religious view being expressed. As *Rosenberger* explained, the "exclusion of several views on [a] problem is just as offensive to the First Amendment as exclusion of only one . . . The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways." *Id.*

So it is here: absent a compelling governmental interest, the State cannot categorically prohibit clubs that express views on sexual orientation—particularly when it appears that the only such clubs promote the acceptance of same-sex relationships. *See Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1043 (D. Mont. 2023) (concluding based on legislative history and context that challenged law had "an overt and impermissible purpose to target the speech and expression of LGBTQ+ community members"); *cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.").

To the extent the restrictions on "programs" and "promotion" are not viewpoint-based, they are nonetheless likely to be unconstitutional under void-for-vagueness principles. A statute "is unconstitutionally vague if it fails to 'provide adequate notice of the proscribed conduct' and lends 'itself to arbitrary enforcement.'" *Parents Defending Educ.*, 83 F.4th at 668 (quoting *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)). School policies "need not be as detailed as a criminal code that imposes criminal sanctions." *Id.* "But when a school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'" *Id.* (quoting *Stephenson v. Davenport Comm. Sch. Dist.*, 110 F.3d 1303, 1308–09 (8th Cir. 1997)). "As such, 'while a lesser standard of scrutiny is appropriate because of the public school setting, a proportionately greater level of scrutiny is required because the regulation reaches the exercise of free speech.'" *Id.* (quoting *Stephenson*, 110 F.3d at 1308–09).

Here, the only plausible way to interpret the restriction on "programs" and "promotion" as non-viewpoint-based is to conclude that school districts are forbidden from providing programs or promotion relating to *any* gender identity or *any* sexual orientation. But this gets back to the absurdity problem because it would mean the law bans "girls" and "boys" sports teams and any other classroom or extracurricular activity that recognizes and endorses gender identity. By insisting this is not how the Gender Identity/Sexual Orientation Restriction should be interpreted, the State Defendants are basically guaranteeing that state officials will "determin[e] on an 'ad hoc and subjective basis'" which speech is permitted and which is not. Under *Parents Defending Education*, this violates the First Amendment. 83 F.4th at 669.

To that end, there is a notable political dynamic at play in recent school speech cases in Iowa. In cases like *Parents Defending Education*, the school district enacted a transgender-

friendly policy requiring "respect" for students' preferred pronouns. The Eighth Circuit struck it down because it went too far in restricting the First Amendment rights of students who may wish to express contrary views, such as a student who "expresses discomfort about sharing a bathroom with someone who is transgender, argues that biological sex is immutable during a debate in social studies class, or expresses an opinion about the participation of transgender students on single-sex athletic teams." 83 F.4th at 668. The proverbial shoe is on the other foot in the Gender Identity/Sexual Orientation Restriction, which shuts down clubs and activities that *support* transgenderism for students in grade six and below. But the same First Amendment principles apply: the Iowa Legislature cannot pass a "capacious" law that gives state officials subjective and virtually unfettered discretion to decide which speech it likes and which it does not on a particular topic. *Id.* at 669.

The last step in the analysis is to determine whether the unconstitutional applications of the law substantially outweigh the constitutional applications. *See NetChoice*, 603 U.S. at 724. On that issue, Plaintiffs have offered evidence that school districts across the state have, among other things, closed GSAs altogether, forbidden students in grade six and below from joining them, and restricted where and how GSAs can provide promotional materials. These applications of the Gender Identity/Sexual Orientation Restriction are all unconstitutional under the First Amendment. *See Cajune*, 105 F.4th at 1083; *Gay & Lesbian Students Ass'n*, 850 F.2d at 367–68. By contrast, the State Defendants have not established any constitutional applications of the law except, at most, when a "program" or "promotion" is provided as part of mandatory classroom curriculum. But other parts of the statute already prohibit instruction relating to gender identity and sexual orientation as part of the mandatory curriculum, and thus the words "program" and "promotion" have no independent significance in that context. Instead, "program" and "promotion" take on unique meaning only when school districts and teachers provide activities or opportunities relating to gender identity and sexual orientation outside the mandatory curriculum. As the prohibition on those activities is inconsistent with the First Amendment, the unconstitutional applications of the law substantially outweigh the constitutional ones as it relates to "program[s]" and "promotion" relating to gender identity and sexual orientation.

3. Summary.

The Gender Identity/Sexual Orientation Restriction does not violate the First Amendment insofar as it prohibits school districts and teachers from providing any curriculum, test,

instruction, survey, or questionnaire relating to gender identity and sexual orientation because this part of the Restriction is facially neutral, applies only to mandatory curriculum, and does not prevent neutral references to gender identity or sexual orientation.[4] The Restriction does, however, violate the First Amendment when it prohibits programs and promotion relating to gender identity and sexual orientation because these restrictions cannot be interpreted to apply only to mandatory curriculum. The restrictions therefore unconstitutionally interfere with students' First Amendment rights.

## VII.  LEGAL ANALYSIS: CONSTITUTIONALITY OF THE GENDER IDENTITY NOTIFICATION PROVISION.

Iowa Code § 279.78(3) requires a "licensed practitioner" to inform a school district administrator if a student "requests an accommodation that is intended to affirm the student's gender identity ... including a request that the licensed practitioner address the student using a name or pronoun that is different than the name or pronoun assigned to the student in the school district's registration forms or records." In turn, the school district administrator "shall report the student's request to the student's parent or guardian." *Id.* Plaintiffs argue that this statute is unconstitutionally vague because it fails to define "accommodation."

The governing precedent is the Eighth Circuit's recent decision in *Parents Defending Education*, 83 F.4th at 668–69. There, the school district enacted a policy subjecting students and staff to discipline if they did not "respect" the gender identity of other students. *Id.* at 668. The Eighth Circuit concluded that a parent group was "likely to succeed on its claim that this portion of the policy is void for vagueness." *Id.* The Eighth Circuit explained that the policy did not define the term "respect" and therefore did not provide sufficient guidance about which speech would be subject to discipline. *Id.*

A similar problem exists here. The Gender Identification Notification Provision requires schools to notify parents when a student requests an "accommodation," which is a broad term that is not defined in the statute. Other resources are similarly unhelpful. Merriam-Webster's Collegiate Dictionary, for example, defines "accommodation" to mean "the providing of what is needed or desired for convenience" or "adaptation, adjustment." *See Accommodation*, MERRIAM-

---

[4] Based on the same facially neutral interpretation, the Gender Identity/Sexual Orientation Restriction does not violate the equal protection clause as to any curriculum, test, instruction, survey, or questionnaire relating to gender identity and sexual orientation. *See, e.g., Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998) (recognizing that equal protection claims require differential treatment). The equal protection analysis might be different under the restrictions on programs and promotion, but the Court need not undertake it because it is already enjoining those restrictions on First Amendment grounds.

WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020). This is a "capacious concept." *Parents Defending Educ.*, 83 F.4th at 669. Moreover, the reporting requirement only applies when the request for an accommodation is "intended to affirm the student's gender identity." One can imagine any number of judgment calls, including: a student asking to be called by a nickname that may or may not have a gender connotation, such as "Harriett" asking to be called "Harry" or "Julia" asking to be called "J.R."; a (biological) male choosing a pink pencil from the teacher's supply; a female asking "to sit with the boys" at lunch; a female asking if it's ok to wear pants instead of a skirt at a school music concert; and a male consistently choosing to write reports about female historical figures. As the Eighth Circuit put it in *Parents Defending Education*, "[t]he undefined term ["accommodation"] leaves the policy open to unpredictable interpretations, and creates a substantial risk that school administrators [or state officials] may arbitrarily enforce the policy." *Id.*

There is one exception to the vagueness problem. The Gender Identity Notification Provision states that one example of an "accommodation" that triggers the notification requirement is when a student "request[s] that the licensed practitioner address the student using a … pronoun that is different than the … pronoun assigned to the student in the school district's registration forms or records." Iowa Code § 279.78(3). This example is clear enough to provide fair notice to educators and other school officials about what is expected. Accordingly, the Provision is not void-for-vagueness insofar as it requires notice to parents when a student asks to be addressed with a different pronoun than the one in school registration forms or records.

When some parts of a law are constitutionally valid but others are not, the Iowa Supreme Court has recognized that courts may in some circumstances "sever the offending portion from the enactment and leave the remainder intact." *Breeden v. Iowa Dep't of Corrs.*, 887 N.W.2d 602, 608 (Iowa 2016) (quoting *Am. Dog Owners Ass'n, Inc. v. City of Des Moines*, 469 N.W.2d 416, 418 (Iowa 1991) (per curiam)). *See also* Iowa Code § 4.12. Here, it is relatively simple to sever the constitutional and unconstitutional portions of the Gender Identity Notification Provision. The law is constitutional and therefore enforceable to the extent it requires schools and teachers to provide notice to parents when a student requests to be addressed with a different pronoun. It is unconstitutional and unenforceable to the extent it requires notice when a student

requests some other "accommodation" that might be related to gender identity. *See Parents Defending Education*, 83 F.4th at 668–69.[5]

## VIII.   PRELIMINARY INJUNCTION FACTORS.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012). Thus, injunctive relief is appropriate as to the restrictions on "program[s]" and "promotion" relating to gender identity and sexual orientation in the Gender Identity/Sexual Orientation Restriction simply because Plaintiffs are likely to prevail on the merits of their First Amendment challenge. *See id.*; *see also Carson*, 978 F.3d at 1059 ("While no single factor is determinative, the probability of success factor is the most significant." (internal punctuation and citation omitted)). The same is true for the portion of the Gender Identity Notification Provision that is unconstitutionally vague.

Nonetheless, in an abundance of caution, the Court will briefly analyze the other preliminary injunction factors. The irreparable harm factor weighs squarely in favor of imposing a preliminary injunction. "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). Here, the Student Plaintiffs face such a loss because they are being denied the opportunity to exercise their First Amendment rights to free expression and association. Moreover, the Educator Plaintiffs are at risk of termination, loss of licensure, or other consequences if they are deemed to have violated the unconstitutional portions of the Gender Identity/Sexual Orientation Restriction and Gender Identity Notification Provision. By contrast, while the temporary invalidation of portions of a duly enacted state law is a serious and significant remedy, school districts retain the discretion they have always had to control curriculum and otherwise set expectations for students and teachers. The balancing of equities therefore weighs in favor of injunctive relief, as does the public interest. *See Parents Defending Educ.*, 83 F.4th at 669 (awarding preliminary injunctive relief).

---

[5] Plaintiffs also challenge the Gender Identity Notification Provision under the equal protection clause and as viewpoint-discrimination under the First Amendment. The Educator Plaintiffs only have standing to raise the void-for-vagueness challenge, however, and no other Plaintiffs have standing at all. The Court therefore will not address the equal protection or viewpoint-discrimination arguments.

## IX.    CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction as it relates to the Gender Identity/Sexual Orientation Restriction. Defendants are ENJOINED from enforcing the restrictions in Iowa Code § 279.80(2) on any "program" or "promotion" relating to gender identity or sexual orientation because those restrictions unconstitutionally restrain speech outside the mandatory classroom curriculum. Conversely, Defendants are *not* enjoined from enforcing the restrictions in Iowa Code § 279.78(2) on any "curriculum," "test," "instruction," "survey," or "questionnaire" relating to gender identity or sexual orientation. Those restrictions apply narrowly to mandatory classroom curriculum revolving around or focusing on gender identity or sexual orientation and therefore are not facially unconstitutional.

Next, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Preliminary Injunction on the Gender Identity Notification Provision. Defendants are ENJOINED from enforcing alleged violations of Iowa Code § 279.78(3) in any circumstance other than when a student requests to be addressed by a different pronoun than the one assigned to the student in the school district's registration forms or records.

Finally, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction on the Library Provision. Defendants are ENJOINED from enforcing the restrictions set forth therein.

No bond has been requested or will be required.

**IT IS SO ORDERED.**

Dated: May 15, 2025

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE